## UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

**Thurgood Marshall U.S. Courthouse  40 Foley Square, New York, NY 10007 Telephone: 212-857-8500**

### MOTION INFORMATION STATEMENT

**Docket Number(s):** 25-333, 25-296

Caption [use short title]

**Motion for:** Release pending appeal

Set forth below precise, complete statement of relief sought:

Senator Robert Menendez moves for release pending appeal pursuant to 18 U.S.C. 3143(b) and Fed. R. App. 9(b). He poses neither a flight risk nor a danger to the public, and his appeal presents substantial questions that would lead to reversal of his conviction.

United States v. Menendez

**MOVING PARTY:** Robert Menendez  **OPPOSING PARTY:** United States

- [ ] Plaintiff
- [x] Defendant
- [x] Appellant/Petitioner
- [ ] Appellee/Respondent

**MOVING ATTORNEY:** Noel J. Francisco  **OPPOSING ATTORNEY:** Daniel C. Richenthal

[name of attorney, with firm, address, phone number and e-mail]

| | |
|---|---|
| Jones Day | United States Attorney's Office for the Southern District of New York |
| 51 Louisiana Avenue, NW, Washington, DC 20001 | One St. Andrew's Plaza, New York, NY 10007 |
| njfrancisco@jonesday.com, 202-879-3939 | Daniel.Richenthal@usdoj.gov, 212-637-2343 |

**Court- Judge/ Agency appealed from:** Hon. Sidney H. Stein, Southern District of New York

**Please check appropriate boxes:**

Has movant notified opposing counsel (required by Local Rule 27.1):
- [x] Yes
- [ ] No (explain):

Opposing counsel's position on motion:
- [ ] Unopposed [x] Opposed [ ] Don't Know

Does opposing counsel intend to file a response:
- [x] Yes [ ] No [ ] Don't Know

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUCTIONS PENDING APPEAL:**

Has this request for relief been made below? [x] Yes [ ] No
Has this relief been previously sought in this court? [ ] Yes [x] No

Requested return date and explanation of emergency:
Senator Menendez is scheduled to report to prison by June 17, 2025. He respectfully requests that his motion for release pending appeal be decided before that date.

Is the oral argument on motion requested? [x] Yes [ ] No (requests for oral argument will not necessarily be granted)

Has the appeal argument date been set? [ ] Yes [x] No  If yes, enter date:

**Signature of Moving Attorney:**

/s/ Noel J. Francisco  **Date:** 5/13/2025  Service: [x] Electronic [ ] Other [Attach proof of service]

Form T-1080 (rev. 10-23)

# 25-333, 25-296

## United States Court of Appeals
## for the Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

— v. —

ROBERT MENENDEZ, WAEL HANA, FRED DAIBES,

*Defendants-Appellants.*

On Appeal from the United States District Court for the
Southern District of New York
No. 1:23-cr-00490-SHS – Judge Sidney H. Stein

## DEFENDANT-APPELLANT ROBERT MENENDEZ'S
## MOTION FOR RELEASE PENDING APPEAL

Meir Feder
JONES DAY
250 Vesey Street
New York, NY 10281-1047
(212) 326.3939
mfeder@jonesday.com

David K. Suska
JONES DAY
150 West Jefferson, Suite 2100
Detroit, MI 48226-4438
dsuska@jonesday.com

Noel J. Francisco
*Counsel of Record*
John Henry Thompson
JONES DAY
51 Louisiana Ave, N.W.
Washington, DC 20001
(202) 879-3939
njfrancisco@jonesday.com
jhthompson@jonesday.com

*Counsel for Defendant-Appellant Robert Menendez*

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................. 3

    A.    The Egypt scheme ............................................................... 4

    B.    The New Jersey scheme ..................................................... 5

    C.    The Daibes scheme ............................................................ 6

    D.    Proceedings below .............................................................. 8

LEGAL STANDARD ......................................................................................... 9

ARGUMENT ..................................................................................................... 10

I.    Senator Menendez's Appeal Will Present "Substantial" and Material Questions. ........................................................................................ 10

    A.    The Speech or Debate Clause Questions Are Substantial. ................... 11

    B.    Prevailing on These Issues Would Lead to a New Trial. ....................... 16

    C.    Other Appellate Issues Are Likewise Substantial and Material. ............. 18

II.    Senator Menendez Presents No Flight Risk or Danger. .................................... 19

CONCLUSION .................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Att'y Gen. of U.S. v. Irish N. Aid Comm.*,
  668 F.2d 159 (2d Cir. 1982) ........................................................................ 19

*Doe v. McMillan*,
  412 U.S. 306 (1973) ...................................................................................... 11

*Eastland v. U.S. Servicemen's Fund*,
  421 U.S. 491 (1975) ................................................................................ 11, 13

*Gravel v. United States*,
  408 U.S. 606 (1972) ...................................................................................... 13

*Hein v. Freedom from Religion Found., Inc.*,
  551 U.S. 587 (2007) ...................................................................................... 19

*Hutchinson v. Proxmire*,
  443 U.S. 111 (1979) ...................................................................................... 15

*In re Search of the Rayburn House Off. Building Room No. 2113*,
  432 F. Supp. 2d 100 (D.D.C. 2006) ............................................................. 16

*Rangel v. Boehner*,
  20 F. Supp. 3d 148 (D.D.C. 2013) ............................................................... 16

*Tenney v. Brandhove*,
  341 U.S. 367 (1951) ...................................................................................... 11

*United States v. Aiello*,
  118 F.4th 291 (2d Cir. 2019) ........................................................................ 10

*United States v. Al-Moayad*,
  545 F.3d 139 (2d Cir. 2008) ......................................................................... 17

ii

*United States v. Arthur*,
  544 F.2d 730 (4th Cir. 1976) ............................................ 18

*United States v. Biaggi*,
  853 F.2d 89 (2d Cir. 1988) .....................................11, 13, 14

*United States v. Brewster*,
  408 U.S. 501 (1972) .............................................11, 14, 15

*United States v. Dowdy*,
  479 F.2d 213 (4th Cir. 1973) ............................................ 14

*United States v. Dukagjini*,
  326 F.3d 45 (2d Cir. 2003) .............................................. 18

*United States v. Fortenberry*,
  89 F.4th 702 (9th Cir. 2023) ............................................ 19

*United States v. Geibel*,
  369 F.3d 682 (2d Cir. 2004) ............................................. 19

*United States v. Hamilton*,
  46 F.4th 389 (5th Cir. 2022) ............................................ 10

*United States v. Helstoski*,
  442 U.S. 477 (1979) .................................................15, 16

*United States v. Jefferson*,
  289 F. Supp. 3d 717 (E.D. Va. 2017) .................................... 18

*United States v. Lindberg*,
  39 F.4th 151 (4th Cir. 2022) ............................................ 17

*United States v. McDermott*,
  245 F.3d 133 (2d Cir. 2001) ............................................. 18

*United States v. Myers*,
  635 F.2d 932 (2d Cir. 1980) ............................................. 11

*United States v. Pollard*,
    778 F.2d 1177 (6th Cir. 1985) ................................................. 9, 10

*United States v. Porat*,
    76 F.4th 213 (3d Cir. 2023) ........................................................ 10

*United States v. Randell*,
    761 F.2d 122 (2d Cir. 1985) ..................................................... 9, 13

*United States v. Renzi*,
    651 F.3d 1012 (9th Cir. 2011) ...................................................... 14

*United States v. Renzi*,
    769 F.3d 731 (9th Cir. 2014) ......................................................... 3

*United States v. Siegelman*,
    561 F.3d 1215 (11th Cir. 2009) .................................................... 10

*United States v. Silver*,
    948 F.3d 538 (2d Cir. 2019) ......................................................... 10

*United States v. Swindall*,
    971 F.2d 1531 (11th Cir. 1992) .................................................... 16

## STATUTES

18 U.S.C.
    § 201 ........................................................................................... 8
    § 219 ....................................................................... 8, 17, 18, 19
    § 3143 ........................................................... 1, 2, 9, 10, 16, 19

22 U.S.C.
    § 611 .......................................................................................... 18

## OTHER AUTHORITIES

L. Gorjanc, *The Solution to the Filibuster Problem: Putting the Advice Back in Advice and Consent*, 54 Case W. Res. L. Rev. 1435 (2004) ........................................... 13

L. White, *The Federalists: A Study In Administrative History* (1948) .................................... 13

iv

Sen. C. Mathias, Jr., *Advice and Consent: The Role of the United States Senate in the Judicial Selection Process*, 54 U. Chi. L. Rev. 200 (1987)............................................ 13

U.S. Const. art. I, § 6, cl. 1 ................................................................................. 11

## INTRODUCTION

Defendant-Appellant Robert Menendez respectfully moves for release pending appeal. As the government conceded below—and as the district court agreed—Senator Menendez is not likely to flee, he poses no danger to the community, and his appeal is not a device to delay. That leaves just one question: Does the appeal raise even a single "substantial" issue of law "likely" to result in reversal or a new trial? 18 U.S.C. § 3143(b).

It does. This was *exactly* the sort of boundary-testing public-corruption prosecution that has *frequently* resulted in appellate reversal in recent years, and the judgment below rests on many of the same problematic arguments—such as aggressively stretching the line between "official acts" and routine constituent services—that resulted in those overturned convictions. Even more fundamentally, the unusual circumstance of prosecuting a sitting U.S. Senator in the face of Article I's Speech or Debate Clause protections produced a host of serious, largely unprecedented constitutional issues that are self-evidently substantial. As just one example, the district court ruled that the Senator's recommendation to the President of a nominee for U.S. Attorney was not "Advice" under the Advice and Consent Clause and was therefore outside the scope of Speech or Debate protections. Senator Menendez will establish on appeal that this was wrong. But at a minimum, it raises a substantial question, as do multiple other issues.

These questions alone would be more than enough to entitle Senator Menendez to continued bail while this Court considers his appeal. But there is far more, because

1

the trial was marred by a *conceded* violation of the Speech or Debate Clause: The government provided the jury with evidence that *had been excluded* as constitutionally forbidden—evidence the government described as "very critical," "highly probative," and "compelling," Tr.1041-42; ECF 648 at 34. The government then wiped the laptop containing this inadmissible evidence, making it impossible to determine what the jury actually reviewed. The district court's treatment of this egregious constitutional violation as raising no substantial issue—based on theories of waiver and harmless error—is untenable. Not until this case had *any* court *ever* held that a Senator or Representative waived Speech or Debate protections. Yet the district court here did so on the theory *Senator Menendez* should have caught *the government's* error, which cannot satisfy the explicit and unequivocal renunciation required for such a Speech or Debate waiver. Besides, Speech or Debate violations are structural errors not subject to excusal as harmless error. The district court's speculation that it is unlikely the jury even reviewed the critical documents at issue—speculation made necessary only by the government's wiping of the laptop—hardly provides a basis for dismissal of the issue as insubstantial.

These questions, and others, make release mandatory under 18 U.S.C. § 3143(b). The Speech or Debate Clause is not often litigated, but it represents a critical protection for the Legislative Branch. This Court should have the opportunity to evaluate whether this prosecution involved rampant violations (as Senator Menendez maintains)—not to mention the other appellate issues beyond the scope of this motion—before sending a

2

former U.S. Senator to prison for his conduct in office. *See* Order at 1-2, *United States v. Renzi*, 769 F.3d 731 (9th Cir. 2014) (No. 13-10588), ECF 20 (granting release pending appeal in case involving Speech or Debate Clause).

## BACKGROUND

Former Senator Robert Menendez served on the Foreign Relations Committee, including as Chairman and Ranking Member. Tr.4462-63.[1] The Senator met his wife Nadine in 2017; they began dating in February 2018. Tr.5828-29; DX 1302, rows 1-9, 55-4. The other important figures are Wael "Will" Hana, a New Jersey businessman with ties to the Egyptian government and longtime friend of Nadine, Tr.415-16; Jose Uribe, another New Jersey businessman, Tr.3328-40; and Fred Daibes, a New Jersey real-estate developer and close friend of Senator Menendez, Tr.749, 1001.

The Government prosecuted Senator Menendez on the basis of gifts of cash and gold that Nadine received from those men. Its bribery case hinged on three purported "schemes"—none of which involved a coherent timeline, let alone an express *quid pro quo*. The Senator maintains his innocence and disputes much of the narrative below. But for present purposes, it is enough to sketch the "schemes."

---

[1] "Tr." citations refer to the trial transcript. "GX" and "DX" citations refer to government exhibits and defense exhibits from trial, respectively. Relevant portions of the trial transcript and exhibits are attached as an appendix to this motion. "ECF" citations refer to docket entries on SDNY docket no. 1:23-cr-00490.

3

A.    **The Egypt scheme**

According to the Government, Senator Menendez agreed to assist Egypt secure unspecified benefits from Hana for a woman he had taken on a few dates.  ECF 611 at 16-17.  The theory is that, in April 2018, the Senator agreed to undertake "official acts" in exchange for payments from Hana to Nadine that began in July 2019.  GX 1302, row 956.  The Government relied on the Senator's meetings with Egyptian officials, ECF 654 at 13-14, at which the Senator "learn[ed] what [the Egyptians] wanted" so he could "tak[e] actions to give them" just that.  Tr.6537.

Approving foreign aid:  Given his role on the Foreign Relations Committee, Senator Menendez could place "holds" on much of the $1.3 billion allocated annually to Egypt and had to "sign off" for the State Department to clear distribution.  Tr.857-63, 867-72, 877-901.  On July 26, 2018, he texted Nadine to "[t]ell Will I am going to sign off this sale to Egypt today."  GX 1302, row 320; GX A101-14.  This came a day after an official "white paper" meeting with Egyptian officials to discuss "[r]eleasing the suspended amounts of U.S. aid."  GX 1302, rows 310, 313-14.  Per the Government, the subsequent release of aid was "unusually swift."  ECF 611 at 21.

Calling a Department of Agriculture official:  In April 2019, Egypt granted a monopoly over halal exports to the new "IS EG Halal Certifiers Inc."—a New Jersey company owned and operated by Hana.  Tr.1774; GX 8B-3.  American officials urged Egypt to change course.  Tr.588-91.  In May, Hana sent an article detailing these efforts to Nadine, who forwarded it to the Senator.  GX 1302, rows 721-22, 724.  The Senator

called Undersecretary of Agriculture Ted McKinney, who was working on the issue. McKinney testified that the Senator told him to "[s]top interfering with my constituent" (Hana's company). Tr.1799, 1806. But he did not threaten McKinney, or promise to use his office in any way. Tr.1802, 1979-81. The Senator did not contact McKinney again. Tr.1992-94.

In exchange for these acts, Hana supposedly provided Nadine with funds to pay her mortgage and a "sham job" intended to funnel payments to Nadine and the Senator. GX1302, row 956; GX 5C-200; GX C104-4.

### B. The New Jersey scheme

The Government also alleged that the Senator agreed to intervene in New Jersey criminal matters in return for Nadine's $65,000 car. In 2018, New Jersey Attorney General Gurbir Grewal began investigating insurance fraud involving Jose Uribe's trucking companies. Tr.2948, 2961. Hana offered to help, and in January 2019 sent the case information to Nadine, who passed it to the Senator. *See* GX 1303, rows 343, 345, 349, 352-69, 370, 373. The Senator called Grewal, raised concerns that Hispanic defendants were being treated unfairly, then clarified that he was thinking of a case where Michael Critchley represented the defendant. Tr.2715-16. Grewal said Critchley should address any issues with the prosecutors. Tr.2717. The Senator did not threaten to use his office or ask Grewal to take action. Tr.2772-75.

A month later, Uribe offered to buy Nadine a car if she agreed to "help." Tr.3001. At a meeting with Nadine and the Senator, Uribe "beg[ged]" him to do "anything in his

5

power." Tr.3130-31. Senator Menendez called Grewal to set up a meeting, at which he raised his concerns again. Tr.2719-20, 2729-30. Grewal—who did not even know which case was being referenced—refused to discuss the matter and reiterated that defense counsel could work it out with the prosecutors. Tr.2729-30, 2741.

## C.    The Daibes scheme

The Government's last theory posited that Daibes—the Senator's friend of three decades—bribed him to assist with Daibes's federal criminal case and to facilitate his business dealings with a Qatari investment firm.

Senator Menendez supposedly achieved the first goal by recommending a pliable U.S. Attorney to President Biden. Tr.3873, 3907. In December 2020, he met with Philip Sellinger to discuss the nomination. GX 1304, row 32. He raised his "belie[f] that [Daibes] was being treated unfairly" and "hoped" that Sellinger "would look at [the case] carefully." Tr.3612. Sellinger testified that he did not feel the Senator was asking him to take any specific action; nor did he feel threatened or pressured. Tr.3795-97.

Two days later, Sellinger called Senator Menendez to tell him that he would look at "all cases carefully" but might need to recuse from Daibes's case for unrelated reasons. Tr.3623-24. Soon after, the Senator asked advisor Michael Soliman to research a different candidate, Esther Suarez. Tr.3888-91. In early 2021, the Senator put forward Suarez's name. Tr.3804. But her nomination stalled, and Sellinger reached out to the Senator to confirm his interest. Tr.3632. Meanwhile, Sellinger told Soliman that he likely would *not* need to recuse from the Daibes case. Tr.3935-36, 3939. Soliman

6

relayed this to the Senator. Tr.4038-39. Senator Menendez recommended Sellinger to the President, Tr.3942-43, and he was sworn in on December 16, 2021.

In the end, the Justice Department told Sellinger to recuse in Daibes's case. GX 1304, row 210. Senator Menendez asked Soliman to find out why, and later to tell Sellinger to "give Mr. Daibes all due process," since he felt the U.S. Attorney's office had been "unresponsive to Mr. Daibes' counsel." Tr.3946. Soliman, who never followed through on either request, testified that the Senator did not ask Soliman to seek any outcome or to pressure Sellinger. Tr.3945, 4049-50.

The Government's secondary theory was that Daibes bribed the Senator to take favorable actions toward Qatar, to help Daibes seal a deal with a Qatari firm. Tr.7003-04 (Closing: "I'm not going to talk too long about Qatar. … There are no counts that rest alone on Qatar."). In 2021, Senator Menendez introduced Daibes to a Qatari royal, who was a principal at an investment firm with whom Daibes subsequently pursued a $95 million deal. GX 1304, row 91, 114-15. During this time, Qatar sent humanitarian aid to Yemen, prompting U.S. officials to issue commendatory press releases. *E.g.*, DX 1304, rows 116-1 to 116-5. Senator Menendez sent advance versions of these releases to Daibes, who forwarded them to his Qatari contacts. GX 1304, row 118. To prove an agreement to take an "official act," the Government offered two text messages from Daibes to the Senator with links to Senate resolutions "express[ing] appreciation" for Qatar's aid efforts. GX 1304, rows 164, 189. During this time, Daibes provided Nadine and the Senator with gold bars. GX 1304, rows, 169, 176-78.

7

### D.     Proceedings below

On September 21, 2023, a grand jury indicted Senator Menendez, Nadine, Hana, Daibes, and Uribe.  On March 5, 2024, it returned the operative 18-count indictment. Counts 5-8 charged bribery offenses (18 U.S.C. § 201, honest services fraud, and Hobbs Act extortion) covering the Egypt scheme; Counts 9-10 were bribery offenses for the New Jersey scheme; and Counts 11-14 covered the Daibes scheme.  The indictment also charged overarching conspiracy counts (1-3) under each bribery statute, on the theory that the schemes were part of one interrelated enterprise.  ECF 654 at 30; Tr.6526-30.  Based on the Egypt scheme, the indictment also charged substantive and conspiracy counts (15-16) under 18 U.S.C. § 219, which bars Members of Congress from acting as "foreign agents" under the Foreign Agents Registration Act (FARA). Last, the grand jury charged obstruction:  Count 4 alleged interference in the Daibes prosecution, while Counts 17-18 charged that the Senator and Nadine had sought to conceal bribes as loans after learning about the grand-jury investigation.

Senator Menendez moved to dismiss the indictment, on the ground that it failed to properly allege any corrupt bargain for an "official act," as required by each charged statute.  The Senator argued that the only official acts identified by the Government were "legislative acts" that, under the Constitution's Speech or Debate Clause, could not be used to support any charge.  The district court denied the motion but agreed that a "Senator's decision whether to place a hold on foreign aid" was a "legislative act," and could not be introduced as evidence.  ECF 252 ("MTD Op.") at 6-7.

At trial, Speech or Debate Clause disputes arose over and over again. *E.g.*, Tr. 563-66, 3591-92, 4475-89; ECF 404, 405, 407, 420, 421, 448, 467. Senator Menendez was ultimately convicted. In post-trial motions, he renewed his Speech or Debate objections, challenged the sufficiency of the evidence and the jury instructions, and contested venue. He later sought a new trial when the Government revealed that it failed to redact evidence that the court had excluded under the Speech or Debate Clause. The district court denied relief, sentenced the Senator, and denied release pending appeal. ECF 654, 710, 733, 839. This motion followed.[2]

## LEGAL STANDARD

A court "shall" order release of a defendant pending appeal if (i) he is "not likely to flee or pose a danger to the safety of any other person" and (ii) his appeal is "not for the purpose of delay" but rather "raises a substantial question of law or fact" that, if resolved in his favor, will "likely" result in reversal or a new trial. 18 U.S.C. § 3143(b)(1).

A "substantial" question means one that is "novel" and "not … decided by controlling precedent," "a 'close' question or one that very well could be decided the other way," or one that is "fairly debatable." *United States v. Randell*, 761 F.2d 122, 125 (2d Cir. 1985). Thus, this Court need not determine that the district court "committed reversible error." *United States v. Pollard*, 778 F.2d 1177, 1181-82 (6th Cir. 1985). Release

---

[2] Following the district court's order denying release pending appeal, the Senator attempted to engage counsel for the government in a good-faith effort to avoid further contested motion practice. When that effort failed, the Senator promptly filed this motion given his report date of June 17. ECF 850.

is required if (i) the appeal will present a "close" issue on which reasonable minds could disagree, and (ii) assuming the question is "decided in the defendant's favor" on appeal, "it is more probable than not that … a new trial will occur." *Id.* at 1182.

As noted above, courts have granted release in bribery appeals that implicate the Speech or Debate Clause. More generally, this Court and others often approve release pending appeal in novel or high-profile fraud and corruption cases—even where those courts later affirm—in recognition of the complex legal questions involved.[3]

## ARGUMENT

**I.** **Senator Menendez's Appeal Will Present "Substantial" and Material Questions.**

Senator Menendez satisfies the merits prong of § 3143(b) if his appeal will raise at least one "substantial question" material to the counts of conviction. His Speech or Debate arguments—which have divided courts and scholars and attracted approving dicta from this Court—qualify as substantial in their own right. They are serious arguments that go to fundamental separation-of-powers principles. And given how the Government structured its case, even partial success on these arguments would require a new trial on all counts.

---

[3] *E.g.*, Order, *United States v. Hamilton*, 46 F.4th 389 (5th Cir. 2022) (No. 21-11157), ECF 107-1; Order, *United States v. Porat*, 76 F.4th 213 (3d Cir. 2023) (No. 22-1560), ECF 17; Order, *United States v. Aiello*, 118 F.4th 291 (2d Cir. 2019) (No. 18-2990), ECF 155; Order, *United States v. Silver*, 948 F.3d 538 (2d Cir. 2019) (No. 18-2380), ECF 106; Mar. 27, 2008, Order, *United States v. Siegelman*, 561 F.3d 1215 (11th Cir. 2009) (No. 07-13163).

## A.     The Speech or Debate Clause Questions Are Substantial.

Prosecuting a Member of Congress for acts relating to his office is not supposed to be easy.  The Constitution provides that "for any Speech or Debate in either House, [Senators and Representatives] shall not be questioned in any other Place."  U.S. Const. art. I, § 6, cl. 1.  The Clause shields "Congressmen and their aides" from criminal liability "for their actions within the legislative sphere."  *Doe v. McMillan*, 412 U.S. 306, 312-13 (1973).  It reaches beyond floor speeches and votes to the whole "sphere of legitimate legislative activity."  *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951).  That includes "legislative factfinding," "information gathering," *United States v. Biaggi*, 853 F.2d 89, 103 (2d Cir. 1988), and all "matters which the Constitution places within the Jurisdiction" of the House or Senate, *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 504 (1975).

This Court has recognized that "the Speech or Debate Clause imposes significant limits on the prosecution of congressional bribery."  *United States v. Myers*, 635 F.2d 932, 937 (2d Cir. 1980).  While a Member may be prosecuted for *agreeing* to take legislative action for a bribe, *United States v. Brewster*, 408 U.S. 501, 526 (1972), "[c]onduct that falls within the broad category of legislative action may not be charged as an offense under [any] statute, nor may evidence of a Member's legislative action be offered" to prove a *quid pro quo* exchange.  *Myers*, 635 F.3d at 937.  These acts are off-limits.

On appeal, the Senator will argue that the district court allowed the Government to violate that rule at least four times over. Each issue is at minimum "close," and a victory on any one would entitle the Senator to a new trial.

1.     **The Sellinger recommendation.** The key prosecution evidence in the Daibes scheme was the Senator's decision to "recommend a candidate to be nominated by the President to be the U.S. Attorney." ECF 654 at 25. The district court recognized that, if a pre-nomination recommendation is "Advice" under the Advice and Consent Clause, it is "squarely a legislative act" and could not be admitted. MTD Op. 4. But the court held that only *post*-nomination activity can qualify as "Advice." *Id.*

The court erred. Notably, it broke from this Court's observation in *United States v. Allocco* that, for the advice-and-consent process to work, the views of "Senators must be obtained and weighed … *before* a final decision" by the President. 305 F.2d 704, 711 (2d Cir. 1962) (emphasis added). And it self-consciously chose sides in a robust debate, rejecting the views of prominent scholars. MTD Op. 5 (citing D. Strauss & C. Sunstein, *The Senate, the Constitution, and the Confirmation Process*, 101 Yale L.J. 1491, 1495 (1992)). The court also broke from a consistent historical record. As the Framers understood, restricting "Advice" to *post-nomination* input gives the word "no Meaning," because the Senate's "Consent" (or lack thereof) would do all the work. *See* Letter from George Mason to James Monroe (Jan. 30, 1792). Since the founding, Congress and the

12

President have thus understood "Advice" to capture pre-nomination input.[4]  Indeed, earlier this year, the Senate convened hearings to provide their "Advice" on individuals who had not yet been formally nominated (since the President had not yet been sworn in).  It is therefore *at least* "fairly debatable," *Randell*, 761 F.2d at 125, that *Allocco*, the scholars, and the centuries-long historical practice got it right, and that the district court got it wrong.  That makes this question plainly "substantial."  *See id.*

Moreover, even if "Advice and Consent" were limited to voting, pre-nomination recommendations are "integral" to that duty—just as legislative subpoenas are integral to lawmaking.  *Gravel v. United States*, 408 U.S. 606, 625 (1972).  The court below held otherwise because recommendations are not "mandated."  MTD Op. 5.  But neither are subpoenas—the point is that *both* enable Senators to more effectively execute "the task[s] assigned" by the Constitution.  *Eastland*, 421 U.S. at 504-05.  That is enough.

2.    **Information gathering.**  "[L]egislative factfinding" and "information gathering" are heartland legislative acts.  *Biaggi*, 853 F.2d at 103.  But the Government relied on *precisely that* to substantiate its Egypt scheme.  ECF 654 at 13-14, 26-27.  It admitted that the Senator's meetings with Egyptian officials allowed him to gather information to inform legislative acts.  Tr.6537.  And the district court agreed that such

---

[4] *E.g.*, L. White, *The Federalists: A Study In Administrative History* 83-85 (1948); L. Gorjanc, *The Solution to the Filibuster Problem: Putting the Advice Back in Advice and Consent*, 54 Case W. Res. L. Rev. 1435, 1460-61 (2004); Sen. C. Mathias, Jr., *Advice and Consent: The Role of the United States Senate in the Judicial Selection Process*, 54 U. Chi. L. Rev. 200, 202-03 (1987).

activities *ordinarily* fit within the Clause. MTD Op. 2-3. But it said *these* meetings did not, because the Clause "does not privilege [a Member] to violate an otherwise valid criminal law in preparing for or implementing legislative acts." *Id.* at 8-9.

That is wrong. To be sure, criminal *non-legislative acts* are not immune, even if they *relate to* a legislative act—say, committing burglary to obtain papers. *United States v. Renzi*, 651 F.3d 1012, 1026 (9th Cir. 2011). But here, the activity is information-gathering *itself*. It does not matter *why* the information was gathered, for the Clause shields legislative acts regardless of motive. *Brewster*, 408 U.S. at 528. So even if the Senator took these meetings to "implement[] a corrupt bargain," ECF 654 at 69, that would not exempt them from the Clause, any more than a vote cast as part of a bribery deal.

The Fourth Circuit agrees: It is irrelevant that a legislator's "actual motives in communicating with various government officials and in obtaining certain government documents could have been … for improper non-legislative purposes"; so long as his conduct *could* bear on a legislative act, it remains "immune." *United States v. Dowdy*, 479 F.2d 213, 226 (4th Cir. 1973). Whether to split from a decision this Court has favorably cited (*Biaggi*, 853 F.2d at 103) is surely a "substantial question."

**3.** **The "sign off" message.** For the Egypt scheme, the Government also relied heavily on the Senator's text to Nadine regarding his decision on a release of aid: "Tell Will I am going to sign off this sale to Egypt today." *Supra* p. 4. While the district court held that the Senator's *approval* of the aid was protected by the Speech or Debate

14

Clause (MTD Op. 8), it thought that this *contemporaneous description* of the decision constituted only a promise of future legislative action. ECF 654 at 68.

This Court could conclude that the Speech or Debate Clause is not so easily circumvented. The district court's hyper-formalist line ignores that the Clause must be given "a practical rather than a strictly literal reading." *Hutchinson v. Proxmire*, 443 U.S. 111, 124 (1979). There is no dispute that promises to act are not immune. *Brewster*, 408 U.S. at 501. But the relevant distinction is between a promise to enter an illicit "compact," versus evidence of what a legislator actually "decided" to do. *United States v. Helstoski*, 442 U.S. 477, 489 (1979). At some point, a *description* of an impending legislative act is indistinguishable from *evidence of the act itself*. If a news article reported a Senator's comments about how he intends to vote on a pending matter, for example, that would simply be a roundabout way to prove up the legislative act itself.

So too here. The text used unconditional language bearing no hint of negotiation. It did not mention a *quid* or imply a *pro*, and the only referenced *quo* (aid approval) is indisputably a legislative act. It was used merely to support an inference that the Senator had signed off on aid—from which the jury was expected to infer, in turn, that he did so pursuant to an illicit agreement. This Court could easily treat that as a violation.

**4.** **The laptop violations.** On top of all this, the Government admitted after trial that it had placed unredacted evidence of the Senator's actual signoff on aid to Egypt—evidence that even the district court agreed was constitutionally forbidden— onto the jury laptop for review during deliberations. ECF 710 at 3-4. Despite that

15

striking and egregious error, the district court denied a new trial, reasoning that the Senator had waived his Speech or Debate objection and alternatively that the error was harmless. *Id.* at 7-12. Both rationales are wrong—or *at least* debatable.

Until now, "[n]o court ha[d] ever held that a Representative or Senator waived" Speech or Debate immunity. *Rangel v. Boehner*, 20 F. Supp. 3d 148, 182 (D.D.C. 2013). That is because "ordinary" waiver rules "do not apply"—there must be an "explicit and unequivocal renunciation of the [Clause's] protection." *Helstoski*, 442 U.S. at 491. The district court ignored that rule. But under any test, the Senator's *successful objection* to this *very evidence* is the antithesis of waiver. This Court could reasonably find that the failure to catch *the Government's errors* on an impossibly tight timeline does not change that.

The court's harmless-error ruling is also suspect. The Government itself called this evidence "very critical," "highly probative," and "compelling." Tr.1041-42; ECF 648 at 34. Plus, there is a serious argument—adopted by the Eleventh Circuit—that Speech or Debate violations are structural errors that "harmless-error analysis will not excuse." *United States v. Swindall*, 971 F.2d 1531, 1548 n.21 (11th Cir. 1992); *see also In re Search of the Rayburn House Off. Building Room No. 2113*, 432 F. Supp. 2d 100, 116 n.9 (D.D.C. 2006). That is sufficient to render the question "substantial."

## B. Prevailing on These Issues Would Lead to a New Trial.

If some or all of the Speech or Debate issues above are resolved in the Senator's favor, a new trial is "likely." 18 U.S.C. § 3143(b)(1)(B)(ii). If this Court agrees that pre-nomination "advice" is a legislative act, that will taint the verdicts on all counts related

16

to that evidence: Counts 11, 13, and 14 (Daibes bribery), Counts 1-3 (conspiracy), and Count 4 (Daibes obstruction). If this Court sides with the Senator on the information-gathering meetings, the "sign off" text, or the laptop errors, that would require a new trial on the counts to which *that* evidence was directed: Counts 5 and 7-8 (Egypt bribery), Counts 15-16 (Egypt-based § 219), and Counts 1-3 (conspiracy).

The taint of these violations does not end there. Where errors as to one set of counts "effortlessly ble[e]d into the jury's consideration" of related counts, the latter cannot stand. *United States v. Lindberg*, 39 F.4th 151, 164-65 (4th Cir. 2022). Here, the Government framed its case as a three-legged stool, with each scheme supporting (and relying upon) the others. *E.g.*, Tr.6422-23 (urging jury at closing to convict on Egypt based on how that scheme fit into "broader pattern"); Tr.6461-62 (on New Jersey: "Every new piece of the puzzle … reinforces the clear pattern of corruption that you see throughout the case. … But now look at it together with the Egypt conduct, because it is all part of the same pattern of corruption."); Tr.6521-22 (on Daibes: "That brings us to the last reason you know this was a *quid pro quo*. The big picture."). That is, the Government invoked each scheme as evidence to support the other schemes; the flip-side is that evidentiary error as to one scheme infects the rest too.

Thus, if this Court agrees with the Senator on *any* of the Speech or Debate errors, a new trial will be required on all counts identified above, plus those related to New Jersey (Counts 9-10). *See United States v. Al-Moayad*, 545 F.3d 139, 165 (2d Cir. 2008) (reversing where jury could have been "substantially influenced" by improper evidence);

17

*United States v. McDermott*, 245 F.3d 133, 138–39 (2d Cir. 2001) (similar). On the grand-jury obstruction counts (17 and 18), the government theorized that Senator Menendez obstructed justice by characterizing payments as loans *when they were bribes*. It is thus highly likely that the jury's "determination" that the Senator took bribes was "a crucial step in ascertaining whether he" obstructed justice. *United States v. Arthur*, 544 F.2d 730, 736 (4th Cir. 1976); *United States v. Dukagjini*, 326 F.3d 45, 61 (2d Cir. 2003).

## C.    Other Appellate Issues Are Likewise Substantial and Material.

Senator Menendez's appeal will raise at least three other substantial questions.

*First*, while the bribery statutes required the Government to prove a *quid pro quo* for "official action," prosecutors relied heavily on actions that were not "official" under *McDonnell*. Both the Grewal and McKinney calls involved informal requests from a prominent official—but not any threat to wield federal power. In effect, Menendez did nothing more than an influential citizen-lobbyist could do. By definition, because the Senator did not "us[e] his official position," these acts were not official. *McDonnell*, 579 U.S. at 572. Other courts recognize this creates a *McDonnell* problem. *See United States v. Jefferson*, 289 F. Supp. 3d 717, 737-43 (E.D. Va. 2017). And as explained, success on these arguments would topple the Government's three-legged stool. *Supra* p. 4.

*Second*, this Court will confront substantial questions about the constitutionality of 18 U.S.C. § 219—which has never before been used to prosecute a public official— as applied to a Member of Congress. Section 219 bans a wide range of actions if taken for particular motives, such as at the "request" of a foreigner. 22 U.S.C. § 611(c)(1),

(b)(1)-(3), (o). That raises weighty and novel separation-of-powers problems, and threatens to chill legislators' exercise of their duties. This Court could conclude that § 219—whose boundaries are "difficult to locate," *Att'y Gen. of U.S. v. Irish N. Aid Comm.*, 668 F.2d 159, 161 (2d Cir. 1982) (per curiam)—empowers courts and prosecutors to impermissibly "superintend" a coequal branch. *Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587, 611-12 (2007) (plurality op.).

*Third*, the appeal will present substantial venue questions. *See* July 8, 2003 Order, *United States v. Geibel*, 369 F.3d 682 (2d Cir. 2004) (No. 02-1645) (granting release pending appeal based on venue issue). The Government has suffered appellate losses after overreaching on venue in other high-profile prosecutions. *E.g.*, *United States v. Fortenberry*, 89 F.4th 702 (9th Cir. 2023). This case fits that mold: The Senator lived in (and represented) New Jersey, and virtually all of the conduct occurred there or in the District of Columbia. Yet the Government chose to charge him in the Southern District of New York. The district court found that a few fleeting contacts (like a car ride from JFK to New Jersey, and calls in New Jersey that may have bounced off cell towers across the river) were sufficient to satisfy venue's demands for every count. That was error—or at least debatable—under this Court's precedent.

## II. Senator Menendez Presents No Flight Risk or Danger.

The other § 3143(b) prong is also satisfied. The Government conceded below that Senator Menendez does not pose a flight risk or danger if released pending appeal. ECF 839 at 2. That is no surprise, as Senator Menendez has been free for the duration

of these proceedings without incident. And given how quickly the district court moved this complex case from indictment to sentencing, there ought to be time for appellate review before imprisoning a man who devoted half a century to public service.

## **CONCLUSION**

The Court should grant release pending appeal.

Date: May 13, 2025

Respectfully submitted,

*/s/ Noel J. Francisco*
Noel J. Francisco
  *Counsel of Record*
John Henry Thompson
JONES DAY
51 Louisiana Ave, N.W.
Washington, DC 20001
(202) 879-3939
njfrancisco@jonesday.com
jhthompson@jonesday.com

Meir Feder
JONES DAY
250 Vesey Street
New York, NY 10281-1047
(212) 326.3939
mfeder@jonesday.com

David K. Suska
JONES DAY
150 West Jefferson, Suite 2100
Detroit, MI 48226-4438
dsuska@jonesday.com

*Counsel for Defendant-Appellant*
*Robert Menendez*

20

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume and typeface requirements of Fed. R. App. P. 27(d) because it includes 5,198 words and has been prepared in proportionally spaced typeface using Microsoft Word 2016 in 14-point Garamond font.

May 13, 2025        */s/ Noel J. Francisco*
             Noel J. Francisco

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on May 13, 2025, I electronically filed the above document with the Clerk of the Court of the United States Court of Appeals for the Second Circuit by using the appellate ACMS system. I certify that all participants in the case are registered ACMS users and that service will be accomplished by the appellate ACMS system.

May 13, 2025                               */s/ Noel J. Francisco*
                                          Noel J. Francisco

**APPENDIX FOR DEFENDANT-APPELLANT
ROBERT MENENDEZ'S MOTION FOR
<u>RELEASE PENDING APPEAL</u>**

**TABLE OF CONTENTS**

**Page**

GX 1302: Excerpts of Summary Chart (texts and other messages)............................. A1

GX 1303: Excerpts of Summary Chart (texts and other messages)............................. A6

GX 1304: Excerpts of Summary Chart (texts and other messages).......................... A10

GX 5C-200: Check ................................................................................................ A19

GX 8B-3: Email Message ..................................................................................... A21

GX A101-14: Text Message Thread .................................................................... A23

GX C104-4: Text Message Thread....................................................................... A25

DX 1302: Excerpts of Summary Chart (texts and other messages).......................... A29

DX 1304: Excerpts of Summary Chart (texts and other messages).......................... A33

Excerpts of Trial Transcript.................................................................................. A39

# GX 1302:
# Excerpts of Summary Chart
# (texts and other messages)

| No. | Date | Time (ET) | From | To | Detail |
|---|---|---|---|---|---|
| 310 | July 23, 2018 | 4:26 PM | Viv Montemayor | Wael Hana | Email: "Please find the attached White Paper Read-on for the meeting of the Egyptian Delegation with Sen. Menendez" Attachment: 4-page document, titled "WHITE PAPER" describing Egyptian-US security partnership and describing Egyptian requests:<br>"•Releasing the suspended amounts of U.S. aid, specifically:<br>- $65.7 millions from FY2014;<br>- $195 millions from FY2016; and<br>- $195 millions from FY2017 and providing guarantees for expedite issuance of export licenses for the equipment needed to be procured.<br>•Depositing the U.S. aid funds appropriated for FY2018 in Egypt's account at the US Federal Bank;"<br>"•Approving LORs submitted since 2015 for procurement of equipment and ammunition needed in countering terrorism, a number of which require Congressional approval" (GX G101) |
| 311 | July 23, 2018 | 5:28 PM | Wael Hana | Nadine Arslanian | Email: Subject: White Paper.pdf Attachment: Egyptian white paper (GX C411) |
| 312 | July 23, 2018 | 10:51 PM | Nadine Arslanian | Robert Menendez | Text: Sending Egyptian white paper (GX A101-13, A101-D) |
| 313 | July 25, 2018 | 11:53 AM | Robert Menendez | Robert Kelly | Email: "Please print out for me" Attachment: Egyptian white paper (GX A407) |
| 314 | July 25, 2018 | 12:15 PM | | | Scheduled meeting with Egyptian delegation and Senator Robert Menendez (GX C410) |
| 315 | July 25, 2018 | 11:52 PM | Khaled Shawky | Wael Hana | WhatsApp: [*Good evening, dear one. I really want you to understand that I did not basically know, before today, that there is a personal connection between him and her; I was under the impression that she is a friend of yours.*] (GX C206-4, GX C206-4T) |
| 316 | July 25, 2018 | 11:52 PM | Khaled Shawky | Wael Hana | WhatsApp: [*I didn't know when I was setting the tables; otherwise, I would have had her seated at the main table.*] (GX C206-4, GX C206-4T) |
| 317 | July 25, 2018 | 11:53 PM | Khaled Shawky | Wael Hana | WhatsApp: [*Anyway, the mistake was corrected. Please explain this to the Senator.*] (GX C206-4, GX C206-4T) |
| 318 | July 25, 2018 | 11:53 PM | Khaled Shawky | Wael Hana | WhatsApp: [*Also, explain it to her so that she will not continue to be upset.*] (GX C206-4, GX C206-4T) |
| 319 | July 25, 2018 | 11:54 PM | Khaled Shawky | Wael Hana | WhatsApp: [*Have a good night.*] (GX C206-4, GX C206-4T) |
| 320 | July 26, 2018 | 6:06 PM | Robert Menendez | Nadine Arslanian | Text: "Tell Will I am going to sign off this sale to Egypt today. Egypt: 46,000 120MM Target Practice Rounds and 10,000 Rounds Tank Ammunition: $99 million<br><br>NOTE: These tank rounds are for tanks they have had for many years. They are using these in the Sinai for the counter-terrorism campaign." (GX A101-14) |

| No. | Date | Time (ET) | From | To | Detail |
|---|---|---|---|---|---|
| 698 | May 22, 2019 | 4:34 PM | "HH HH" | Wael Hana | WhatsApp: [*Will call u within an hour* ] (GX C104-1, GX C104-1T) |
| 699 | May 22, 2019 | 4:34 PM | Wael Hana | "HH HH" | WhatsApp: [*Anything Abdi said* ] (GX C104-1, GX C104-1T) |
| 700 | May 22, 2019 | 4:35 PM | "HH HH" | Wael Hana | WhatsApp: "https://www.facebook.com/139682466097037/posts/2355971884468073?s=640089121&sfns=mo" Link to facebook post sharing al-Borsa article (GX C104-3, 10B-2)  |
| 701 | May 22, 2019 | 4:42 PM | Wael Hana | Nadine Arslanian | Text: "https://www.alborsaanews.com/2019/05/21/1205949" (GX C102-5) |
| 702 | May 22, 2019 | 4:44 PM | Wael Hana | Nadine Arslanian | Text: "Its the only place will accept to publish his report" (GX C102-5) |
| 703 | May 22, 2019 | 4:50 PM | Nadine Arslanian | Wael Hana | Text: "Can you please translate word for word what is written on there the picture" (GX C102-5) |
| 704 | May 22, 2019 | 5:26 PM | Wael Hana | Nadine Arslanian | Email: Attaches English document reporting that agricultural office of U.S. Embassy in Cairo "pointed to the potential disruption of markets" as a result of the decertification of existing certifiers and approval of IS EG Halal Certified. (C501) |
| 705 | May 22, 2019 | 5:26 PM | Wael Hana | Nadine Arslanian | Text: "look up your email and ur text" (GX C102-5) |
| 706 | May 22, 2019 | 5:30 PM | Wael Hana | Nadine Arslanian | Text: "email or what's app" (GX C102-5) |
| 707 | May 22, 2019 | 5:30 PM | Wael Hana | Nadine Arslanian | Call: 0 seconds (GX 6A-112) |
| 708 | May 22, 2019 | 5:31 PM | Nadine Arslanian | Wael Hana | Text: "Email" (GX C102-5) |
| 709 | May 22, 2019 | 5:31 PM | Wael Hana | Nadine Arslanian | Text: "done" (GX C102-5) |
| 710 | May 22, 2019 | 5:31 PM | Nadine Arslanian | Wael Hana | Text: "I'll call u in 10" (GX C102-5) |
| 711 | May 22, 2019 | 5:31 PM | Wael Hana | Nadine Arslanian | Text: "look it up" (GX C102-5) |
| 712 | May 22, 2019 | 5:58 PM | Nadine Arslanian | Wael Hana | Call: 3 minutes (GX 6A-112) |
| 713 | May 22, 2019 | 6:02 PM | Nadine Arslanian | Robert Menendez | Call: 0:00 (GX 6A-112) |
| 714 | May 22, 2019 | 6:03 PM | Nadine Arslanian | Robert Menendez | Text: "Mon amour, Do you want me to text or email you the info?" (GX A101-33) |
| 715 | May 22, 2019 | 6:03 PM | Robert Menendez | Nadine Arslanian | Call: 2 minutes, 28 seconds (GX 6A-112) |
| 716 | May 23, 2019 | 8:07 AM | Wael Hana | Nadine Arslanian | Text: "GM look up ur email and call me plz" (GX C102-6) |
| 717 | May 23, 2019 | 8:23 AM | Wael Hana | Nadine Arslanian | Email: Hana forwards Ali Abdi email re "IS EG Letter to GOE". Text of forwarded email does not indicate how Hana acquired it. (C414) |
| 718 | May 23, 2019 | 8:25 AM | Wael Hana | Nadine Arslanian | Text: Hana sends text of Ali Abdi email re "IS EG Letter to GOE". Text does not indicate how Hana acquired forwarded email. (GX C102-6) |
| 719 | May 23, 2019 | 8:44 AM | Nadine Arslanian | Robert Menendez | Text: 5163951745@mms.att.net texts Ali Abdi email re "IS EG Letter to GOE" to Menendez Email Account (GX B203) |
| 720 | May 23, 2019 | 5:08 PM | Robert Menendez | Nadine Arslanian | Call: 6 minutes, 8 seconds (GX 6A-112) |
| 721 | May 23, 2019 | 5:15 PM | Wael Hana | Nadine Arslanian | Text: "https://www.alborsaanews.com/2019/05/21/1205949" (GX C102-6) |

*(NB: Additional name attributions: GX 1305)*

A3

| No. | Date | Time (ET) | From | To | Detail |
|-----|------|-----------|------|-----|--------|
| 722 | May 23, 2019 | 5:17 PM | Nadine Arslanian | Robert Menendez | Text: 5163951745@mms.att.net texts "https://www.alborsaanews.com/2019/05/21/1205949" to Menendez Email Account. (GX A404) |
| 723 | May 23, 2019 | 5:18 PM | Nadine Arslanian | Robert Menendez | Text: "I just emailed it to you mon amour de la vie" (GX A101-34) |
| 724 | May 23, 2019 | 5:31 PM | Robert Kelly | Ted McKinney | Email: Subject: "Article from Senator Menendez" Body: "Under Secretary McKinney, Please find attached the article that Senator Menendez and you discussed with English translation." Attachment is article with URL https://www.alborsaanews.com/2019/05/21/1205949, and English document reporting that agricultural office of U.S. Embassy in Cairo "pointed to the potential disruption of markets" as a result of the decertification of existing certifiers and approval of IS EG Halal Certified; English document is the same as the one Hana sent Arslanian on May 22, 2019. (GX 8B-16) |
| 725 | May 23, 2019 | 5:34 PM | Ted McKinney | Ken Isley | Email: Forwards Robert Kelly's email and Al-Borsa article, states: "Ken: I took a call from Senator Menendez of New Jersey about a halal certifier in New Jersey. I will call you." (GX 8B-10) |
| 726 | May 23, 2019 | 6:32 PM | Robert Menendez | Nadine Arslanian | Text: "Mon amour we should meet Will tomorrow night or sometime Sunday." (GX A101-34) |
| 727 | May 23, 2019 | 6:35 PM | Nadine Arslanian | Robert Menendez | Text: "Ok . whichever you prefer. He is buying a Rolex now" (GX A101-34) |
| 728 | May 23, 2019 | 6:36 PM | Robert Menendez | Nadine Arslanian | Text: "Wow. Let's shoot for tomorrow night." (GX A101-34) |
| 729 | May 23, 2019 | 6:42 PM | Nadine Arslanian | Robert Menendez | Text: "Great" (GX A101-34) |
| 730 | May 23, 2019 | 7:50 PM | Nadine Arslanian | Robert Menendez | Text: "We just now left. Benny." (GX A101-34) |
| 731 | May 23, 2019 | 7:52 PM | Nadine Arslanian | Robert Menendez | Text: "I'm starving. I think we are going to capitol grille for dinner. If you and Mike and Mike want to join" (GX A101-34) |
| 732 | May 23, 2019 | 7:53 PM | Robert Menendez | Nadine Arslanian | Text: "I don't get into Newark until 8:30pm" (GX A101-34) |
| 733 | May 23, 2019 | 7:55 PM | Nadine Arslanian | Robert Menendez | Text: "That's 30 min but maybe you the boys want you to themselves. Which I can understand" (GX A101-34) |
| 734 | May 23, 2019 | 7:55 PM | Nadine Arslanian | Robert Menendez | Text: "Ii didn't tell Will where or when we are traveling" (GX A101-34) |
| 735 | May 23, 2019 | 7:57 PM | Robert Menendez | Nadine Arslanian | Text: "Ok. The other Mike is ill." (GX A101-34) |
| 736 | May 23, 2019 | 8:00 PM | Nadine Arslanian | Robert Menendez | Text: "Ahh' his wife is lucky she can play nurse" (GX A101-34) |
| 737 | May 23, 2019 | 8:03 PM | Robert Menendez | Nadine Arslanian | Text: "Do you guys want to go to El Cid? If so, can you drive me home? Mike is also not well so he doesn't want to smoke. If we do this then we can skip tomorrow with Wael." (GX A101-34) |
| 738 | May 23, 2019 | 8:03 PM | Nadine Arslanian | Robert Menendez | Text: "Yes" (GX A101-34) |
| 739 | May 23, 2019 | 8:04 PM | Nadine Arslanian | Robert Menendez | Text: "Perfect" (GX A101-34) |
| 740 | May 23, 2019 | 8:04 PM | Robert Menendez | Nadine Arslanian | Text: "Ok you will get there before us. Just go upstairs" (GX A101-34) |
| 741 | May 23, 2019 | 8:04 PM | Robert Menendez | Nadine Arslanian | Text: "See Juan" (GX A101-34) |
| 742 | May 23, 2019 | 8:04 PM | Nadine Arslanian | Robert Menendez | Text: "Ok mon amour" (GX A101-34) |
| 743 | May 24, 2019 | 9:48 AM | Ted McKinney | Ken Isley / Zhulieta Willbrand | Email: "Let's continue to gather all relevant facts before I respond to Senator Menendez. Also important to me is that you reassure Post in Egypt that we have their back. They should not worry about this call from the Senator. It is what it is, and the very nature of this strange issue was bound to generate some interesting questions or calls. Thanks for reassuring them." (GX 8B-12) |

*(NB: Additional name attributions: GX 1305)*

A4

53

| No. | Date | Time (ET) | From | To | Detail |
|-----|------|-----------|------|-----|--------|
| 956 | June 28, 2019 | 10:33 AM | Nadine Arslanian | Fred Daibes | Voicemail: "Good morning, Fred, this is Nadine. I am sorry to reach out to you. Um, Bob and I will be back Friday. Um, I dropped off a paper at your lobby because I did not want it to go through Will. I have not told Bob yet, because he is going to flip out against Will. Um, but my mortgage, I haven't paid it, and I had been counting on the money Will's giving me to do it, and he hasn't given me anything yet. So, if you could please have him forward it, because he wants me to sign a book of promissory notes, and I'm not signing anything before I tell Bob, and I'm not telling him before his business trip is over. So please, if you could have Will, um, electronically the note, um, he's been telling me for three weeks now he's going to do it, and now he wants me to sign all these papers. Which I can't sign anything without Bob reading it first. Obviously there's no trust, so I don't know what's going to happen. But, um, I dropped it off in your lobby, because I don't want anybody else having access to it, if you could please have him electronically, that's the only way they'll accept it. Um, the mortgage company, it has to go through a specific electronic transfer. So, um, I will tell Bob on Friday. After we get back, because I'm not telling him on the trip. And, uh, I'm sure we'll see you after that, but, uh, if you could please, one time only do me the favor of talking to Will, because, uh, he said that he doesn't need me for anything and I haven't done anything to help him, and a whole bunch of other stuff that I need to be in the office eight hours a day and he refuses to return any phone calls, or um, see me, um, anyway, um, thank you Fred." (GX D108) |
| 957 | June 28, 2019 | 11:53 AM | John Moldovan | Nadine Arslanian | Text: "Nadine did you review the note I sent you" (GX B222) |
| 958 | June 28, 2019 | 3:04 PM | Nadine Arslanian | John Moldovan | Text: "I am not in the country. Left right after the MRI" (GX 222) |
| 959 | June 28, 2019 | | | | Robert Menendez and Nadine Arslanian fly from Newark International Airport to Panama City Airport (GX 8J-1, 8J-5) |
| 960 | July 1, 2019 | 3:16 PM | John Moldovan | Sylvia Diaz (cc Wael Hana, Jamela Maali, and two others) | Email: "We are happy to engage your office's services for the purpose of forming the corporation. Regarding the activities to be performed, as IS EG HALAL CERTIFIED INC is a government agency, we would not have the option of permitting a Free Zone Company to handle our operations." (GX 4C1-A) |
| 961 | July 5, 2019 | | | | Robert Menendez and Nadine Arslanian fly from El Dorado International Aiport (Bogota) to Newark International Airport (GX 8J-1, 8J-5) |
| 962 | July 10, 2019 | 7:42 PM | John Moldovan | Maria Paola Baiocchi Cazenave (cc Wael Hana) | Email: attaching IS EG Halal Certified financial statements showing $222,444 retained earnings in May 2019 and $302,660 retained earnings in June 2019. (GX 4C1-K) |

A5

# GX 1303:
# Excerpts of Summary Chart
# (texts and other messages)

| Row | Date | Time (ET) | From | To | Detail |
|---|---|---|---|---|---|
| 335 | January 28, 2019 | 5:50 PM | Nadine Arslanian | Wael Hana | Text: "I am going to do my nails and call Bob from there. Are you around at 7:30 to get me from the nail salon in Cresskill? and go to the mall? I have to do to errands for a Bob. But I could t rent a car it's not going through on my credit card" (GX B105-32) |
| 336 | January 28, 2019 | 6:30 PM | Wael Hana | Nadine Arslanian | Text: "ok send me the address" (GX B105-32) |
| 337 | January 28, 2019 | 7:20 PM | Nadine Arslanian | Wael Hana | Text: "If you are not around, I'll go tomorrow" (GX B105-32) |
| 338 | January 28, 2019 | 7:21 PM | Wael Hana | Nadine Arslanian | Text: "i have my driver he is on the way to pick me up from park café" (GX B105-32) |
| 339 | January 28, 2019 | 7:21 PM | Wael Hana | Nadine Arslanian | Text: "u let me know what u want me to do" (GX B105-32) |
| 340 | January 28, 2019 | 7:46 PM | Robert Menendez | Nadine Arslanian | Text: "What's happening in Cresskill?" (GX A101-71) |
| 341 | January 28, 2019 | 7:49 PM | Nadine Arslanian | Robert Menendez | Text: "I loooove that you care enough to check up on me" Sends picture of feet with tissues between toes. (GX A101-71, A101-FF)  |
| 342 | January 28, 2019 | 7:49 PM | Nadine Arslanian | Robert Menendez | Text: "I'm waiting for the Uber to go back home" (GX A101-71) |
| 343 | January 28, 2019 | 7:55 PM | Wael Hana | Elvis Parra | Text: WhatsApp "send me that date in April and the name of the judge" (GX C115-2) |
| 344 | January 28, 2019 | 8:03 PM | Wael Hana | Nadine Arslanian | Text:<br>"FYI<br>the insurance policy<br>have not it's subject to audit" (GX B105-32) |
| 345 | January 28, 2019 | 8:18 PM | Elvis Parra | Wael Hana | WhatsApp: Texts screenshot of therobingroom.com entry for Judge Arthur Batista (GX C115-2, C115-B)  |
| 346 | January 28, 2019 | 8:19 PM | Wael Hana | Elvis Parra | WhatsApp: "what day" (GX C115-2) |

*(NB: Additional name attributions: GX 1305)*

A7

| Row | Date | Time (ET) | From | To | Detail |
|---|---|---|---|---|---|
| 347 | January 28, 2019 | 8:20 PM | **Elvis Parra** | **Wael Hana** | WhatsApp: "April 8th" (GX C115-2) |
| 348 | January 28, 2019 | 8:20 PM | **Wael Hana** | **Elvis Parra** | WhatsApp: "ok" (GX C115-2) |
| 349 | January 28, 2019 | 8:20 PM | **Wael Hana** | **Nadine Arslanian** | Text: Screenshot of therobingroom.com entry for Judge Batista (GX C102-12, C102-F)  |
| 350 | January 28, 2019 | 8:20 PM | **Wael Hana** | **Nadine Arslanian** | Text: "April 8th" (GX C102-12) |
| 351 | January 28, 2019 | 9:09 PM | **Nadine Arslanian** | **Wael Hana** | Text: "Call when u can" (GX C102-12) |
| 352 | January 28, 2019 | 9:10 PM | **Wael Hana** | **Nadine Arslanian** | Call: 5 minutes, 41 seconds (GX 6A-112) |
| 353 | January 29, 2019 | 10:07 AM | **Nadine Arslanian** | **Wael Hana** | Text: "Good morning. If you have time today can we go to the mall I have to order something for Bob that I need to get up by Friday if you are busy at the office can I borrow your car for two hours?" (GX B105-32) |
| 354 | January 29, 2019 | 11:00 AM | **Robert Menendez (4744)** | **Nadine Arslanian (Flip Phone)** | Call: 5 minutes, 58 seconds (GX 6A-312-1) |
| 355 | January 29, 2019 | 11:06 AM | **Nadine Arslanian** | **Wael Hana** | Call: 34 seconds (GX 6A-112) |
| 356 | January 29, 2019 | 11:12 AM | **Nadine Arslanian** | **Wael Hana** | Call: 0 seconds (GX 6A-112) |
| 357 | January 29, 2019 | 11:17 AM | **Wael Hana** | **Elvis Parra** | WhatsApp: "ur home address" (GX C115-3) |
| 358 | January 29, 2019 | 11:22 AM | **Nadine Arslanian** | **Wael Hana** | Text: "Hurry Please" (GX B105-32) |
| 359 | January 29, 2019 | 11:26 AM | **Nadine Arslanian** | **Wael Hana** | Call: 30 seconds (GX 6A-112) |
| 360 | January 29, 2019 | 11:30 AM | **Elvis Parra** | **Wael Hana** | WhatsApp: (sends file, now deleted) (GX C115-3) |
| 361 | January 29, 2019 | 11:30 AM | **Wael Hana** | **Nadine Arslanian** | Text: "Elvis Parra 19 Bethany Circle, Closter NJ" (GX B105-32) |
| 362 | January 29, 2019 | 11:30 AM | **Nadine Arslanian** | **Wael Hana** | Text: "What about the rest?" (GX B105-32) |
| 363 | January 29, 2019 | 11:32 AM | **Wael Hana** | **Nadine Arslanian** | Text: "E&K Trucking Inc 400 Delancy Street, Newark, NJ 07105  ELVIS Parra 18 Bethany Circle Closter NJ 07624" (GX B105-32) |
| 364 | January 29, 2019 | 11:32 AM | **Nadine Arslanian** | **Wael Hana** | Text: "Thank you now I need what the charges are" (GX B105-32) |
| 365 | January 29, 2019 | 11:33 AM | **Wael Hana** | **Nadine Arslanian** | Call: 24 seconds (GX 6A-112) |

*(NB: Additional name attributions: GX 1305)*

A8

| Row | Date | Time (ET) | From | To | Detail |
|---|---|---|---|---|---|
| 366 | January 29, 2019 | 11:34 AM | Wael Hana | Nadine Arslanian | Text: "this matter involves only four counts and is a relatively small indictment. The largest of the counts is a second degree count . defendant he is USA citizen and he has no criminal history" (GX B105-32) |
| 367 | January 29, 2019 | 11:34 AM | Nadine Arslanian | Wael Hana | Call: 33 seconds (GX 6A-112) |
| 368 | January 29, 2019 | 11:35 AM | Wael Hana | Nadine Arslanian | Text: "indictment no: 16-12-00217-s state of new jersey V. Elvis Parra" (GX B105-32) |
| 369 | January 29, 2019 | 11:35 AM | Nadine Arslanian | Wael Hana | Call: 39 seconds (GX 6A-112) |
| 370 | January 29, 2019 | 11:36 AM | Nadine Arslanian (Flip Phone) | Robert Menendez | Calls: 2x 0 seconds (GX 6A-206-1) |
| 371 | January 29, 2019 | 11:39 AM | Nadine Arslanian (Flip Phone) | Robert Menendez | Text: "Call me please when u can i hope my scarf is warm xo" (GX B301) |
| 372 | January 29, 2019 | 12:21 PM | Wael Hana | Nadine Arslanian | Text: "all good" (GX B105-32) |
| 373 | January 29, 2019 | 12:24 PM | Robert Menendez | Nadine Arslanian (Flip Phone) | Call: 1 minute, 39 seconds (GX 6A-206-1) |
| 374 | January 29, 2019 | 12:26 PM | Nadine Arslanian | Wael Hana | Call: 20 minutes, 18 seconds (GX 6A-112) |
| 375 | January 29, 2019 | 12:33 PM | Wael Hana | Fred Daibes | Text: "on my way" (GX C209-1) |
| 376 | January 29, 2019 | 1:42 PM | Wael Hana | Nadine Arslanian | Text: "don't forget to send your address" (GX B105-32) |
| 377 | January 29, 2019 | 1:49 PM | Nadine Arslanian | Wael Hana | "41 Jane drive Englewood Cliffs NJ 07632" (GX B105-32) |
| 378 | January 29, 2019 | 1:49 PM | Nadine Arslanian | Wael Hana | Text: "THANK YOU your heiness" (GX B105-32) |
| 379 | January 29, 2019 | 5:01 PM | Robert Menendez (4744) | Gurbir Grewal | Call: 7 minutes (GX 6B-2401) |
| 380 | January 31, 2019 | 12:49 PM | Robert Menendez | Nadine Arslanian | Text: "How is the work going??" (GX A101-72) |
| 381 | January 31, 2019 | 1:21 PM | Nadine Arslanian | Robert Menendez | Text: I did not go downstairs. Billy stop by. I was on the phone with Katie. I found where the leak is coming from downstairs" (GX A101-72) |
| 382 | January 31, 2019 | 5:20 PM | Nadine Arslanian | Robert Menendez | Text: Pictures of basement (GX A101-72, A101-GG to A101-JJ)  |

(NB: Additional name attributions: GX 1305)

A9

# GX 1304:
# Excerpts of Summary Chart
# (texts and other messages)

| | Date | Time (ET) | From | To | Detail |
|---|---|---|---|---|---|
| 18 | December 11, 2020 | 3:47:53 PM - 3:48:32 PM | Robert Menendez | | Web activity history: visits several Department of Justice webpages for U.S. Attorney's Office for the District of New Jersey (GX A301-15) |
| 19 | December 11, 2020 | 3:48 PM | Robert Menendez | | Search History: "nj us attorney staff directory" (GX A301-15) |
| 20 | December 11, 2020 | 3:49 PM | Robert Menendez | | Web activity history: visits several Department of Justice webpages for U.S. Attorney's Office for the District of New Jersey (GX A301-15, A301-16) |
| 21 | December 11, 2020 | 3:50 PM | Robert Menendez | | Search History: "U.S. Attorneys Office Newark NJ" (GX A301-17) |
| 22 | December 11, 2020 | 3:52 PM | Robert Menendez | | Search History: "U.S. Attorneys Office Newark NJ rachel" (GX A301-17) |
| 23 | December 14, 2020 | 4:31 PM | Michael Soliman | Robert Menendez | Signal: "Carpenito made public that he's leaving via press release from DOJ. Wildstein called me asking if he can now write a story since other reporters will likely write now. Do you want me to guide him a certain way on what to include and what not to? Or just ask him to keep waiting, not sure how much longer he will because he's competitive in being first." (GX A113-3, GX A113-PH3) |
| 24 | December 14, 2020 | 8:23 PM | Robert Menendez | Michael Soliman | Signal: "Let me sleep on that tonight. Who is Carpenito's first assistant? Meaning who takes over the office until there is a new U S Attorney" (GX A113-3, GX A113-PH3) |
| 25 | December 14, 2020 | 8:26 PM | Michael Soliman | Robert Menendez | Signal: "Upon United States Attorney Carpenito's departure, First Assistant U.S. Attorney, Rachael A. Honig, will serve as Acting U.S. Attorney under the Vacancies Reform Act until a replacement is named." (GX A113-3, GX A113-PH3) |
| 26 | December 14, 2020 | 8:28 PM | Robert Menendez | Michael Soliman | Signal: "OMG 🥴" (GX A113-3, GX A113-PH3) |
| 27 | December 14, 2020 | 8:28 PM | Michael Soliman | Robert Menendez | Signal: "😀" (GX A113-3, GX A113-PH3) |
| 28 | December 14, 2020 | 8:28 PM | Michael Soliman | Robert Menendez | Signal: "I know" (GX A113-3, GX A113-PH3) |
| 29 | December 15, 2020 | 8:30 AM | Philip Sellinger | | Philip Sellinger travels to Washington, D.C. area (GX 12A-2)  |
| 30 | December 15, 2020 | 11:54 AM | Robert Menendez | Fred Daibes | Call: 1 second (GX 6A-615) |
| 31 | December 15, 2020 | 12:25 PM | Fred Daibes | Robert Menendez | Call: 34 seconds (GX 6A-615) |
| 32 | December 15, 2020 | 2:30-3:00 PM | | | Menendez calendar: "Meeting with Phil Sellinger" (GX 3A-17) |
| 33 | December 15, 2020 | 5:45 PM | Philip Sellinger | | Philip Sellinger travels out of Washington, D.C. area (GX 12A-2) |
| 34 | December 17, 2020 | 8:59 AM | Philip Sellinger | Robert Menendez | Voicemail: "Hey, uh, Bob, Philip Sellinger, uh, hope you're managing through the snow OK, if you could give me a call, uh, I'd appreciate it today, my um, cell is 201-259-2994. Thanks very much. Bye." (GX A119, A119-A) |
| 35 | December 17, 2020 | 10:49 AM | Robert Menendez | Philip Sellinger | Call: 3 minutes (GX 6B-501) |
| 36 | December 17, 2020 | 3:58 PM | Robert Menendez | Michael Soliman | Signal: "Please do a little checking on Salas time as superior court judge and Prosecutor. Thanks" (GX A113-4, GX A113-PH4) |
| 37 | December 17, 2020 | 3:59 PM | Michael Soliman | Robert Menendez | Signal: "Will do. Just to be clear; you mean Suarez – Hudson?" (GX A113-4, GX A113-PH4) |
| 38 | December 17, 2020 | 4:00 PM | Michael Soliman | Robert Menendez | Signal: "The person we spoke about . . . ." (GX A113-4, GX A113-PH4) |
| 39 | December 17, 2020 | 4:00 PM | Robert Menendez | Michael Soliman | Signal: "Yes Suarez Hudson" [thumbs-up emoji added to message] (GX A113-4, GX A113-PH4) |

*(NB: Additional name attributions: GX 1305)*

A11

2

| | Date | Time (ET) | From | To | Detail |
|---|---|---|---|---|---|
| 71 | April 20, 2021 | 4:55 PM | Robert Menendez | Michael Soliman | Signal: "Can't believe she included her husband!" (GX A113-7, GX A113-PH7) |
| 72 | April 20, 2021 | 4:55 PM | Michael Soliman | Robert Menendez | Signal: "I know. Sloppy!" (GX A113-7, GX A113-PH7) |
| 73 | April 20, 2021 | 4:56 PM | Michael Soliman | Robert Menendez | Signal: "Hopefully nothing more after this" (GX A113-7, GX A113-PH7) |
| 74 | April 20, 2021 | 4:56 PM | Michael Soliman | Robert Menendez | Signal: "Do you think she's still okay on WH front?" (GX A113-7, GX A113-PH7) |
| 75 | April 20, 2021 | 4:57:20 PM | Robert Menendez | Michael Soliman | Signal: "Don't know but I'm trying to find out. Also beginning to do a Plan B just in case." (GX A113-7, GX A113-PH7) |
| 76 | April 20, 2021 | 4:57:30 PM | Michael Soliman | Robert Menendez | Signal: "Got it 👍" (GX A113-7, GX A113-PH7) |
| 77 | April 29, 2021 | 1:33 PM | Michael Soliman | Robert Menendez | Signal: "If Philip looks for guidance, can I guide him?" (GX A113-9, GX A113-PH9) |
| 78 | April 29, 2021 | 1:38 PM | Robert Menendez | Michael Soliman | Signal: "Yes" (GX A113-9, GX A113-PH9) |
| 79 | April 29, 2021 | 1:38 PM | Michael Soliman | Robert Menendez | Signal: "Okay" (GX A113-9, GX A113-PH9) |
| 80 | May 2, 2021 | 10:17 PM | Michael Soliman | Robert Menendez | Signal: "Also I think if you call Sellinger, you'll be comfortable with what he says." (GX A113-8, GX A113-PH8) |
| 81 | May 2, 2021 | 10:28 PM | Robert Menendez | Michael Soliman | Signal: "Ok we'll talk" (GX A113-8, GX A113-PH8) |
| 82 | May 2, 2021 | 10:29 PM | Michael Soliman | Robert Menendez | Signal: "👍" (GX A113-8, GX A113-PH8) |
| 83 | May 20, 2021 | 8:28 PM | Robert Menendez | Philip Sellinger | Text: "Hi Phil, might you be available to play golf on Saturday afternoon? I have to check my club availability if you are." (GX A118-3) |
| 84 | May 20, 2021 | 8:52 PM | Philip Sellinger | Robert Menendez | Text: "Bob Bob. Can I let you know tomorrow? And what time are you thinking about as I have family coming in for a dinner. Thanks. Philip" (GX A118-3) |
| 85 | May 20, 2021 | 9:03 PM | Robert Menendez | Philip Sellinger | Text: "Sure. Probably can't be until 12:30. If it doesn't work no problem. Let me know" (GX A118-3) |
| 86 | May 21, 2021 | 11:15 AM | Philip Sellinger | Robert Menendez | Text: "Bob Tomorrow works for me. But I need to get home by 515pm. Seems that should not be a problem. Philip" (GX A118-3) |
| 87 | May 23, 2021 | 5:56 PM | Philip Sellinger | Robert Menendez | Text: "Bob- Yesterday was fun. My 60 degree wedge is missing from my bag. John may have inadvertently placed it in yours. Would you ask your pro shop to check your bag. If it is there, I can make arrangements to pick it up. Thanks. Philip" (GX A118-3) |
| 88 | May 26, 2021 | 7:49 PM | Robert Menendez | Philip Sellinger | Call: 1 minute, 14 seconds (GX 6A-615) |
| 89 | May 26, 2021 | 7:50 PM | Robert Menendez | Philip Sellinger | Call: 25 seconds (GX 6A-615) |
| 90 | June 14, 2021 | 2:01 PM | Sheikh Sultan bin Jassim al Thani | Robert Menendez | Signal:<br>"Dear Senator…<br><br>I was so pleased to speak with you briefly and looking forward to seeing you in the near future.<br><br>Please send me the contact details to : sultan@heritageadvisors.co.UK<br><br>Best regards,<br>Sultan"<br>(GX A112, GX A112-PH1) |
| 91 | June 14, 2021 | 2:05 PM | Robert Menendez | Sheikh Sultan bin Jassim al Thani | Signal: "Dear Shiek Al-Thani, it was a pleasure speaking with you as well. Fred Daibes, Daibes Construction (201) 336-2222 cell, (201) 840-0050 office fdaibes@daibes.com Shukran" (GX A112, A112-PH1) |
| 92 | June 15, 2021 | 4:44 AM | Sheikh Sultan bin Jassim al Thani | Fred Daibes (cc Shaun Doherty) | Email:<br>"Dear Fred<br>Hope you are keeping well.<br>I am travelling to the US next week and wondered if you may be available to discuss a business opportunity? Please let me know when is convenient for you to meet in New York.<br>I am copying Shaun Doherty, CEO of Heritage Advisors Limited, who I would like to introduce you to at our meeting next week and will be main point of contact at our London office." (GX D302) |

(NB: Additional name attributions: GX 1305)

A12

5

| | Date | Time (ET) | From | To | Detail |
|---|---|---|---|---|---|
| 110 | June 30, 2021 | 3:21 PM | Jason Tuber | Robert Menendez | Signal: "No red flags from the WH counsels office for Phils interview. DOJ will circle back with the WH in the next few days and, barring anything unexpected, begin the full FBI background check" (GX A115, GX A115-PH2) |
| 111 | June 30, 2021 | 3:35 PM | Robert Menendez | Philip Sellinger | Text: "Hi, I hear you had a good interview today." (GX A118-4) |
| 112 | June 30, 2021 | 4:24 PM | Philip Sellinger | Robert Menendez | Text: "Hi. Thanks for the email. I thought it went well. But am glad to hear there was positive feedback. Alice was very helpful in my preparation." (GX A118-4) |
| 113 | June 30, 2021 | 4:45 PM | Robert Menendez | Philip Sellinger | Text: "This is what I got. FYI" Attaches screenshot of text message saying "No red flags from the WH counsels office for Phils interview. DOJ will circle back with the WH in the next few days and, barring anything unexpected, begin the full FBI background check" (GX A118-4, GX A118-A)<br><br> |
| 114 | June 30, 2021 | 12:04 PM | Sheikh Sultan bin Jassim al Thani | Fred Daibes (cc Shaun Doherty) | Email: "Thank you for the opportunity to view today. It was nice to meet you and I look forward to speaking again soon, as we progress with our projects.<br>I am copying Shaun, who will be main contact in our London office." (GX D308) |
| 115 | July 1, 2021 | 11:24 AM | Shaun Doherty | Fred Daibes and Sheikh Sultan bin Jassim al Thani (cc Michael McManus) | Email: "Following the meeting between principals, shall we arrange a call on Tuesday (6th) ?<br>It would be good to discuss the specific's of the transaction and the opportunity.<br>Let me know what time suits, and I will send out the diary invite and the dial-in coordinates." (GX 4F-26) |
| 116 | July 13, 2021 | | | | Court in United States v. Daibes schedules trial for January 11, 2022. (GX 1401) |
| 117 | July 24, 2021 | 1:51 PM | Fred Daibes | Robert Menendez | WhatsApp: Sends screenshot of Rep Meeks tweet thanking Qatar. (GX A104-1, A104-A)<br><br> |
| 118 | July 25, 2021 | 7:46 PM | Fred Daibes | Ali Al-Thawadi | Text: "Hi Ali our mutual friend will be issuing a statement on Monday on the Qatar contribution" (GX 3D-1) |

*(NB: Additional name attributions: GX 1305)*

A13

| | Date | Time (ET) | From | To | Detail |
|---|------|-----------|------|-----|--------|
| 161 | September 27, 2021 | 10:16 AM | Fred Daibes | Robert Menendez | WhatsApp: Image of desktop screen with multiple Patek Philippe watches, showing prices ranging from $9,990.00 to $23,990.00. (GX A104-4, A104-C)  |
| 162 | September 27, 2021 | 10:17 AM | Fred Daibes | Robert Menendez | WhatsApp: "How about one of these" (GX A104-4) |
| 163 | September 27, 2021 | 12:54 PM - 1:38 PM | Robert Menendez | | Search and Web Activity History: multiple searches including "patek philippe", "patek philippe most popular model," "patek philippe aquanaut," "Pre-owned Patek Philippe Calatrava Manual Wind 37mm 5196R-001," and "expo.com watches patek philippe" as search terms and visiting multiple websites regarding Patek Philippe watches (GX A301-21) |
| 164 | September 29, 2021 | 10:16 AM | Fred Daibes | Robert Menendez | WhatsApp: "https://www.congress.gov/bill/117th-congress/senate-resolution/390?loclr=cga-search" Link is to Congress.gov page tracking S. Res. 390, "A resolution expressing appreciation for the State of Qatar's efforts to assist the United States during Operation Allies Refuge." As of October 1, 2021, the "Latest Action" listed was "09/28/2021 Referred to the Committee on Foreign Relations" (GX A104-4; GX 10G-1)  |

*(NB: Additional name attributions: GX 1305)*

A14

11

| | Date | Time (ET) | From | To | Detail |
|---|---|---|---|---|---|
| 165 | September 30, 2021 | 5:51 PM | Fred Daibes | Robert Menendez | WhatsApp: Picture of Robert Menendez, Nadine Menendez, and Emir of Qatar. (GX A104-5, GX A104-D)<br> |
| 166 | October 8, 2021 | | Robert Menendez & Nadine Menendez | | Robert Menendez and Nadine Menendez flight to Qatar scheduled departure (GX 8J-1, GX 8J-2) |
| 167 | October 10, 2021 | 5:53 AM | Robert Menendez | Nadine Menendez | WhatsApp: Sends picture of Robert Menendez and Nadine Menendez with Emir of Qatar (GX A103-12, A103-C)<br> |
| 168 | October 10, 2021 | 5:55 AM | Robert Menendez | Nadine Menendez | WhatsApp: "Sheikh TAMIM BIN HAMAD AL-THANI" (GX A103-12) |
| 169 | October 16, 2021 | 6:05 AM | Fred Daibes | Robert Menendez | Signal: "Good morning my friend John the driver will be waiting for you at the airport. John's phone #(917)623-7331" (GX A111-1, A111-PH1) |
| 170 | October 17, 2021 | 12:18 PM | Fred Daibes | John Pilot | Call: 18 seconds (GX 6A-820) |
| 171 | October 17, 2021 | 3:37 PM | Robert Menendez & Nadine Menendez | | Flight back from Egypt scheduled arrival time into JFK (GX 8J-1, GX 8J-2) |
| 172 | October 17, 2021 | 3:37 PM | John Pilot | Robert Menendez | Call: 0 seconds (GX 6A-615) |
| 173 | October 17, 2021 | 3:37 PM | John Pilot | Robert Menendez | Call: 42 seconds (GX 6A-615) |
| 174 | October 17, 2021 | 3:45 PM | Robert Menendez | John Pilot | Call: 19 seconds (GX 6A-615) |
| 175 | October 17, 2021 | 4:04 PM | Robert Menendez | John Pilot | Call: 41 seconds (GX 6A-615) |

(NB: Additional name attributions: GX 1305)

A15

12

| | Date | Time (ET) | From | To | Detail |
|---|---|---|---|---|---|
| 176 | October 18, 2021 | 11:12 AM | Robert Menendez | | Search History: "how much is one kilo of gold" (GX A125)<br><br>10/18/2021 11:12:14 AM(UTC-4) — Safari — Source file: File system Extraction.zip/root/private/var/mobile/Containers/Data/Application/8DF88 22B-B3D3-4968-BE68-8B1B1C3DCE53/Library /Preferences/com.apple.mobilesafari.plist : 0x2024 (Size: 13556 bytes) — how much is one kilo of gold |
| 177 | October 18, 2021 | 11:12 AM | Robert Menendez | | Search History: "how much is one kilo of gold worth" (GX A125)<br><br>10/18/2021 11:12:43 AM(UTC-4) — Safari — Source file: File system Extraction.zip/root/private/var/mobile/Containers/Data/Application/8DF88 22B-B3D3-4968-BE68-8B1B1C3DCE53/Library /Preferences/com.apple.mobilesafari.plist : 0x1FF3 (Size: 13556 bytes) — how much is one kilo of gold worth |
| 178 | October 18, 2021 | 11:37 AM | Nadine Menendez | Fred Daibes | Text: "The sweater looks great on you . So does the color .<br>I ran downstairs to get a glazed donut and my perfect husband said he did not keep the box of donuts<br>Next time I will take a donut in the very beginning. LOL<br>Have a great day !" (GX D102-1) |
| 179 | October 18, 2021 | 11:38 AM | Fred Daibes | Nadine Menendez | "Lol he made me take the box with me." (GX D102-1) |
| 180 | October 18, 2021 | 11:39 AM | Nadine Menendez | Fred Daibes | "He told me. He said I would eat them and then be upset with him for letting me eat them. He is most probably correct. But I would've had just one… Lol" (GX D102-1) |
| 181 | October 25, 2021 | 12:20 PM | Fred Daibes | Robert Menendez | Signal: Picture of 1 kilo gold bar from Border Gold website, displaying price $59,431.20  (GX A111-1, GX A111-PH1)<br> |

*(NB: Additional name attributions: GX 1305)*

A16

13

| | Date | Time (ET) | From | To | Detail |
|---|---|---|---|---|---|
| 182 | October 25, 2021 | 12:38 PM | Nadine Menendez | Fred Daibes | "Master Fred, this very, very sick friend was so looking forward to a glazed donut today. .<br><br>Sorry we missed dinner last night . I couldn't lift my head off the pillow.<br><br>I told my perfect husband to meet you for dinner, but he said he wanted to take care of me.<br><br>Have a great week ." (GX D102-1) |
| 183 | October 25, 2021 | 12:53 PM | Fred Daibes | Nadine Menendez | Text: "He's a good man your husband. Hope to see you soon" (GX D102-1) |
| 184 | October 25, 2021 | 12:53 PM | Fred Daibes | Nadine Menendez | Text: "Next time I will bring you a donut" (GX D102-1) |
| 185 | October 25, 2021 | 12:56 PM | Nadine Menendez | Fred Daibes | Text: "Choukran. Yes I'm very lucky . You are two of a kind in this universe" (GX D102-1) |
| 186 | October 26, 2021 | 6:23 PM | Robert Menendez | Philip Sellinger | Call: 58 seconds (GX 6A-615) |
| 187 | October 27, 2021 | 9:12 AM | Robert Menendez | Nadine Menendez | Text: "Put your find your friends on" (GX A103, GX A103-11) |
| 188 | November 3, 2021 | 9:01 AM | Sheikh Sultan bin Jassim al Thani | Fred Daibes | WhatsApp Call: 3 minutes, 5 seconds (GX D209) |
| 189 | November 4, 2021 | 11:20 AM | Fred Daibes | Robert Menendez | WhatsApp: Sending image of Congress.gov Bill alert email showing that [Senator-5] joined as cosponsor to S. Res. 390 – A resolution expressing appreciation for the State of Qatar's efforts to assist the United States during Operation Allies Refuge. (GX A104-5, A104-E) |
| 190 | November 4, 2021 | 11:37 AM | Fred Daibes | Sheikh Sultan bin Jassim al Thani | WhatsApp Call: 27 seconds (GX D209) |
| 191 | November 20, 2021 | 11:21 PM | Robert Menendez | | Search History: "i kilo gold bar" (GX A301-1) |

(NB: Additional name attributions: GX 1305)

A17

14

| | Date | Time (ET) | From | To | Detail |
|---|---|---|---|---|---|
| 192 | November 26, 2021 | | | | Daibes rejects plea offer from U.S. Attorney's Office for the District of New Jersey in United States v. Daibes, begins more focused preparations for trial in advance of jury selection scheduled for on or about January 11, 2022. (GX 1401) |
| 193 | December 2, 2021 | 11:28 AM | Philip Sellinger | Robert Menendez | Call: 50 seconds (GX 6A-615) |
| 194 | December 7, 2021 | 5:07 PM | Robert Menendez | Philip Sellinger | Call: 1 minute, 20 seconds (GX 6A-615) |
| 195 | December 9, 2021 | 11:45 AM | Sheikh Sultan bin Jassim al Thani | Fred Daibes | Text: "I am travelling to the US next week, are you free to catch up on Thursday 16th evening or Friday 17th?" (GX D310) |
| 196 | December 9, 2021 | 6:01 PM | Michael Soliman | Robert Menendez | Signal: "Thursday of next week he's getting sworn in" (GX A113-13, A113-PH13) |
| 197 | December 10, 2021 | | | | U.S. Attorney's Office for the District of New Jersey offers Daibes another plea deal (which Daibes rejects in or about mid-December). (GX 1401) |
| 198 | December 13, 2021 | 7:40 PM | Robert Menendez | | Search History: "gold price today" (GX A301, GX A301-2) |
| 199 | December 16, 2021 | | | | Philip Sellinger sworn in as U.S. Attorney for the District of New Jersey. (GX 1401) |
| 200 | December 16, 2021 | 7:47 PM | Michael Soliman | Robert Menendez | Signal: "I spoke w Phil if you want to chat whenever you're avail" (GX A113-10, GX A113-PH10) |
| 201 | December 16, 2021 | 7:51 PM | Robert Menendez | Michael Soliman | Signal "At dinner. Will check in later" (GX A113-10, GX A113-PH10) |
| 202 | December 17, 2021 | 10:58 PM | Robert Menendez | Michael Soliman | Signal "Did the person Phil named get disclosed?" (GX A113-11, GX A113-PH11) |
| 203 | December 17, 2021 | 10:59 PM | Michael Soliman | Robert Menendez | Signal: "Nothing yet. I've been searching online and haven't seen any announcements" (GX A113-11, GX A113-PH11) |
| 204 | December 18, 2021 | 2:55 PM | Robert Menendez | | Search History: "phillip sellinger us attorney" (GX A301-3) |
| 205 | December 18, 2021 | 2:56 PM | Robert Menendez | | Web activity: visited https://www.google.com/url?q=https://www.justice.gov/usao-nj/divisions&usg=AOvVaw343OzbsyvEZMtVuOvNb2MW (GX A301-3) |
| 206 | December 18, 2021 | 2:56 PM | Robert Menendez | | Web activity: visited https://www.google.com/url?q=https://www.justice.gov/usao-nj/adminstrative-division&usg=AOvVaw2fkyuviWnIg1unWe3kdg8V (GX A301-3) |
| 207 | December 18, 2021 | 2:56 PM | Robert Menendez | | Web activity: visited https://www.google.com/url?q=https://www.justice.gov/usao-nj/divisions&usg=AOvVaw343OzbsyvEZMtVuOvNb2MW (GX A301-3) |
| 208 | December 18, 2021 | 8:34 PM | Robert Menendez | | Search History: "border gold" (GX A301-4) |
| 209 | December 18, 2021 | 8:35 PM | Robert Menendez | | Search History: "border gold i kilo gold bar" (GX A301-5)  |
| 210 | December 22, 2021 | 12:07 PM | Erica Jackson | Philip Sellinger and Others | Email: Formal notice that Philip Sellinger is recused from United States v. Daibes, 18-cr-655 (SDW). (GX 8M-1) |
| 211 | December 23, 2021 | 1:53 PM | | | Daibes trial, scheduled for 1/11/22, adjourned (GXs 8D-1, GX 1401) |
| 212 | December 23, 2021 | 9:09 PM | Fred Daibes | Nadine Menendez | Text: "That's great you both need a good relaxing night enjoy how is he feeling" (GX D102-2) |
| 213 | December 23, 2021 | 9:11 PM | Nadine Menendez | Fred Daibes | Text: "Better having heard the date is postponed. He is FIXATED on it." (GX D102-2) |

*(NB: Additional name attributions: GX 1305)*

A18

# GX 5C-200:
# Check

PRINTED ON LINEMARK PAPER - HOLD TO LIGHT TO VIEW. FOR ADDITIONAL SECURITY FEATURES SEE BACK.

Case: 25-333, 05/13/2025, DktEntry: 38.1, Page 50 of 317

| 0067592 | 11-24 |
|---|---|
| Office AU # | 1210(8) |

**CASHIER'S CHECK**

6759202328

Remitter: **JOHN MOLDOVAN**
Operator I.D.: nj001560    u645151

July 19, 2019

PAY TO THE ORDER OF     ***NATIONSTAR MORTGAGE LLC D/B/A MR COOPER***

***Twenty-three thousand five hundred sixty-eight dollars and 54 cents***     **\*\*$23,568.54\*\***

Payee Address:
Memo:          0008345603 LOAN AUTH W.HANA/SEG TO N.A

**WELLS FARGO BANK, N.A.**
2011 LEMOINE AVE
FORT LEE, NJ 07024
FOR INQUIRIES CALL (480) 394-3122

VOID IF OVER US $   23,568.54

AUTHORIZED SIGNATURE

�串6759202328�串 ⑈121000248⑈4861 513562⑈

A20

# GX 8B-3:
# Email Message

**To:**      McKinney, Ted - OSEC, Washington, DC[Ted.McKinney@usda.gov]
**Cc:**      Hafemeister, Jason - OSEC, Washington, DC[Jason.Hafemeister1@usda.gov]; Willbrand, Zhulieta - OSEC, Washington, DC[zhulieta.z.willbrand@usda.gov]; Isley, Ken - FAS[Ken.Isley@fas.usda.gov]; Whitley, Daniel - FAS[Daniel.Whitley@fas.usda.gov]; Hamilton, Clay - FAS[Clay.Hamilton@fas.usda.gov]; Brewster, Ryan - FAS[Ryan.Brewster@fas.usda.gov]; Knupp, Courtney - FAS[Courtney.Knupp@fas.usda.gov]; Dries, Mark - FAS[Mark.Dries@fas.usda.gov]; Nishiura, Katherine - FAS[Katherine.Nishiura@fas.usda.gov]; Anderson, Laura - FAS[Laura.K.Anderson@fas.usda.gov]; Ramos, Karina - FAS[Karina.Ramos@fas.usda.gov]; Fulton, Catherine - FAS[Catherine.Fulton@fas.usda.gov]
**From:**      Bertsch, Charles - FAS
**Sent:**      Thur 4/25/2019 12:33:10 PM
**Subject:**      TFAA ALERT:  Egypt delists most U.S. Halal certifiers leaving only one that is not in the business

• **Egypt delists U.S. halal certifiers following beef audit:** Egypt's Head of the Central Administration for Veterinary Quarantine sent a letter to Post Cairo this morning, stating that it is delisting all but one U.S. halal certifier, as a result of its recent beef audit in the United States. (This audit occurred from March 18-29.  During this audit, the Egyptians met with eight halal certifiers.)  While the letter states that Egypt is accepting the equivalence of the U.S. food safety system, the letter also indicates that Egypt is suspending Halal Transactions of Omaha and delisting six other certifiers.  The letter does state that Egypt is approving ISEG Islamic Center, but provides no explanation as to why this organization, which as we understand is not in the halal business, was approved, or why others were delisted or suspended.  All beef imports into Egypt are required to have a halal certificate.  In 2018, the U.S. beef exports to Egypt were approximately $65.9 million. Post has requested a meeting with the Minister of Agriculture to follow up on this issue.

Charles R. Bertsch
Deputy Administrator (acting)
Office of Agreements and Scientific Affairs
USDA/Foreign Agricultural Service
charles.bertsch@fas.usda.gov
202 720-6278



GOVERNMENT EXHIBIT 8B-3
23 Cr. 490 (SHS)

A22

# GX A101-14:
# Text Message Thread

From: +12012908400 Bob Menendez (owner)
To: +15163951745 Mon Fiance Parfait

Tell Will I am going to sign off this sale to Egypt today. Egypt: 46,000 120MM Target Practice Rounds and 10,000 Rounds Tank Ammunition: $99 million
NOTE: These tank rounds are for tanks they have had for many years. They are using these in the Sinai for the counter-terrorism campaign.

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15163951745 Mon Fiance Parfait | 7/26/2018 6:06:18 PM(UTC-4) | | |

**Status:** Sent

7/26/2018 6:06:15 PM(UTC-4)

Source Extraction:
File System
Source Info:
File system Extraction.zip/root/private/var/mobile/Library/SMS/sms.db : 0x1792C4C (Table: message, chat, handle; Size: 153837568 bytes)

---



From: +15163951745 Mon Fiance Parfait
To: +12012908400 Bob Menendez (owner)

I'm home love of my life.  Thank you for an  amazing night, breakfast  and train ride.  Miss you already.  I know it's crazy because I just left you but I do ❤

**Attachments:**



Title: IMG_5003.jpeg
Size: 138493
File name: ~/Library/SMS/Attachments/1b/11/8FC4ECA0-49D7-44C1-AEC8-DD9F352E9F5F/IMG_5003.jpeg
~/Library/SMS/Attachments/1b/11/8FC4ECA0-49D7-44C1-AEC8-DD9F352E9F5F/IMG_5003.jpeg

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +12012908400 Bob Menendez | | 7/26/2018 6:14:36 PM(UTC-4) | |

**Status:** Read

7/26/2018 6:14:04 PM(UTC-4)

Source Extraction:
File System
Source Info:
File system Extraction.zip/root/private/var/mobile/Library/SMS/sms.db : 0x1793B34 (Table: message, handle, attachment, chat; Size: 153837568 bytes)
File system Extraction.zip/root/private/var/mobile/Library/SMS/Attachments/1b/11/8FC4ECA0-49D7-44C1-AEC8-DD9F352E9F5F/IMG_5003.jpeg :  (Size: 138493 bytes)

---

From: +12012908400 Bob Menendez (owner)
To: +15163951745 Mon Fiance Parfait

Wow you got home fast? Why the picture of my apt building?

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15163951745 Mon Fiance Parfait | 7/26/2018 6:15:35 PM(UTC-4) | | |

**Status:** Sent

7/26/2018 6:15:35 PM(UTC-4)

Source Extraction:
File System
Source Info:
File system Extraction.zip/root/private/var/mobile/Library/SMS/sms.db : 0x17937 handle; Size: 153837568 bytes)

GOVERNMENT
EXHIBIT
A101-14
23 Cr. 490 (SHS)

A24

877

# GX C104-4:
# Text Message Thread

GOVERNMENT
EXHIBIT
C104-4
23 Cr. 490 (SHS)

201005499823@s.whatsapp.net Hh Hh

Wael i need a written diagram for the office force

**Status:** Read
**Platform:** Mobile

5/28/2019 7:10:05 PM(UTC+0)

Source Extraction:
Advanced Logical

201005499823@s.whatsapp.net Hh Hh

By tasks and titles

**Status:** Read
**Platform:** Mobile

5/28/2019 7:10:19 PM(UTC+0)

Source Extraction:
Advanced Logical

15515744550@s.whatsapp.net Will Hana

ok

**Status:** Sent
**Platform:** Mobile

5/28/2019 7:10:28 PM(UTC+0)

Source Extraction:
Advanced Logical

201005499823@s.whatsapp.net Hh Hh

With salaries

**Status:** Read
**Platform:** Mobile

5/28/2019 7:10:28 PM(UTC+0)

Source Extraction:
Advanced Logical

15515744550@s.whatsapp.net Will Hana

ok

**Status:** Sent
**Platform:** Mobile

5/28/2019 7:10:32 PM(UTC+0)

Source Extraction:
Advanced Logical

SDNY_00003649

SUBJECT TO PROTECTIVE ORDER-- PROTECTED

15515744550@s.whatsapp.net Will Hana

1- Gazmend Lita manager members 75k
2-Bob Alvino 125 k
3-Wayne onello 75 k
2- Nader moussa 72 k
4-nicholas Dalessio 45 k
5-

nadine arslan 120 k

attorney Howard Dorian 72 k

attorney Zare Khorozian (NJ-NY-DC) 45 k
CPA
Dave Specter 15 k
شركة ثانيا
1-Jamela Maali 45 k
2-Mais Odetalla 40 k
3-christina Impell 40 k

4-Rony Daibes. 35 k

**Status:** Sent
**Platform:** Mobile

5/28/2019 10:06:41 PM(UTC+0)

Source Extraction:
Advanced Logical

201005499823@s.whatsapp.net Hh Hh

Titles

**Status:** Read
**Platform:** Mobile

5/28/2019 10:22:38 PM(UTC+0)

Source Extraction:
Advanced Logical

201005499823@s.whatsapp.net Hh Hh

Tasks

**Status:** Read
**Platform:** Mobile

5/28/2019 10:22:41 PM(UTC+0)

Source Extraction:
Advanced Logical

201005499823@s.whatsapp.net Hh Hh

annual ?

**Status:** Read
**Platform:** Mobile

5/28/2019 10:22:57 PM(UTC+0)

Source Extraction:
Advanced Logical

15515744550@s.whatsapp.net Will Hana

year

**Status:** Sent
**Platform:** Mobile

5/28/2019 10:23:26 PM(UTC+0)

Source Extraction:
Advanced Logical

242

SDNY_00003650

SUBJECT TO PROTECTIVE ORDER-- PROTECTED

A27

15515744550@s.whatsapp.net Will Hana

53 weeks

**Status:** Sent
**Platform:** Mobile

5/28/2019 10:23:41 PM(UTC+0)

Source Extraction:
Advanced Logical

201005499823@s.whatsapp.net Hh Hh

Each of them task and titles

**Status:** Read
**Platform:** Mobile

5/28/2019 10:23:49 PM(UTC+0)

Source Extraction:
Advanced Logical

15515744550@s.whatsapp.net Will Hana

ok

**Status:** Sent
**Platform:** Mobile

5/28/2019 10:24:00 PM(UTC+0)

Source Extraction:
Advanced Logical

15515744550@s.whatsapp.net Will Hana

1- Gazmend Lita manager members 75k
2-Bob Alvino 125 k inspector
3-Wayne onello 75 k inspector and IT
2- Nader moussa 72 k inspectors
4-nicholas Dalessio 45 k Office assistance
5-

nadine arslan 120 k Vice president

attorney .Howard Dorian 72 k

attorney . Zare Khorozian (NJ-NY-DC) 45 k
CPA, Company accounting
Dave Specter 15 k
مندر تاريا
1-Jamela Maali 45 k account manager
2-Mais Odetalla 40 k account manager
3-christina Impell 40 k account manager

4-Rony Daibes. 35 k web IT

**Status:** Sent
**Platform:** Mobile

5/28/2019 10:29:09 PM(UTC+0)

Source Extraction:
Advanced Logical

15515744550@s.whatsapp.net Will Hana

5 M
ابدع رزق بكره ومافيش حاجه خرجت له اليوم

**Status:** Sent
**Platform:** Mobile

5/29/2019 10:10:52 PM(UTC+0)

Source Extraction:
Advanced Logical

243

SDNY_00003651

SUBJECT TO PROTECTIVE ORDER-- PROTECTED

# DX 1302:
# Excerpts of Summary Chart
# (texts and other messages)

| No. | Date | Time (ET) | From | To | Detail |
|---|---|---|---|---|---|
| colspan 6 | **August 8, 2017 – January 19, 2022** |||||
| 1 | December 31, 2017 | 7:22 AM | **Nadine Arslanian** | **Robert Menendez** | Text: "I want to wish you all the very very best for the new year." and "In 4 1/2 hours it's going to be your birthday . I will text you happy birthday and I hope it's going to be the best year ever for you and I would like to take you out to lunch for your birthday. I'm looking forward to catching up. Nadine (GX A101-1)<br><br>Full text:<br>"I want to wish you all the very very best for the new year. I'm not sure if Peter told you , ████████ ████████<br><br>My kids will be going back to school next Saturday and Sunday I would love to go to dinner with you or to lunch whatever is easier the following week. In 4 1/2 hours it's going to be your birthday . I will text you happy birthday and I hope it's going to be the best year ever for you and I would like to take you out to lunch for your birthday. I'm looking forward to catching up. Nadine<br><br>I have not text I'll plan on texting anybody Merry Christmas or happy new year but I will definitely wish you a happy birthday" (GX A101-1) |
| 1-1 | December 31, 2017 | 8:19 PM | **Robert Menendez** | **Nadine Arslanian** | Text: " OMG I didn't know. Feel so badly for you. All from a fall?  Terrible. I hope you are feeling better." (GX A101-1) |
| 2 | December 31, 2017 | 8:21 PM | **Robert Menendez** | **Nadine Arslanian** | Text: "Would love to get together but as I said once before I don't want to interfere with your boyfriend." (GX A101-1) |
| 2-1 | January 29, 2018 | 6:41 PM | **Nadine Arslanian** | **Wael Hana** | Text: " So sick since Saturday night.  Made an appointment tomorrow with my primary doctor at 11:45. The chemical smell in my head is so painful it burned so much and gives me such a bad headache. I was with my dad at his doctors today. Spoke to Andy about some of the results my dad got. Texted him about half an hour ago. I am staying here But looking verymuch forward to tomorrow night." (HANA B105-100) |
| 2-2 | January 29, 2018 | 6:50 PM | **Wael Hana** | **Nadine Arslanian** | Text: " Feel good and I will talk to you tomorrow if you need any help let me know" (HANA B105-100) |
| 2-3 | January 29, 2018 | 6:55 PM | **Nadine Arslanian** | **Wael Hana** | Text: " Thank you Wael" (HANA C102-100) |
| 3 | January 31, 2018 | 4:45 PM | **Nadine Arslanian** | **Robert Menendez** | Text: "Now re-election!!!!" (GX A101-2) |
| 4 | January 31, 2018 | 4:46 PM | **Robert Menendez** | **Nadine Arslanian** | Text: "Yes! Are you around Friday?" (GX A101-2) |
| 5 | January 31, 2018 | 4:46 PM | **Nadine Arslanian** | **Robert Menendez** | Text: "Yes. I will be" (GX A101-2) |
| 5-1 | January 31, 2018 | 6:45 PM | **Nadine Arslanian** | **Wael Hana** | Text: "On my way" (HANA C102-100) |
| 5-2 | January 31, 2018 | 6:45 PM | **Wael Hana** | **Nadine Arslanian** | Text: "I'm" (HANA C102-100) |
| 5-3 | January 31, 2018 | 11:25 PM | **Nadine Arslanian** | **Wael Hana** | Text: "Thank you for such a fun night.  I can't believe how late we stayed." (HANA C102-100) |
| 5-4 | February 1, 2018 | 3:59 PM | **Wael Hana** | **Nadine Arslanian** | Text: "any time" (HANA C102-100) |
| 5-5 | February 1, 2018 | 5:34 PM | **Wael Hana** | **Nadine Arslanian** | Text: "what u up to" (HANA C102-100) |

(NB: Additional name attributions: GX 1305)

**DX 1302**

1

A30

| No. | Date | Time (ET) | From | To | Detail |
|-----|------|-----------|------|-----|--------|
| 5-6 | February 1, 2018 | 5:38 PM | Nadine Arslanian | Wael Hana | Text: " I was going to go to Lord and Taylor to pick up sweaters , but ████████████████ ██████████████████ I think I'm gonna turn around and go home what are you guys up to? I left Andy a  message  10 min ago about his brother. I left a message with my doctor to call me back about an hour ago still has not .   I am hoping he will since they have office hours till 8 PM tonight. Are you going to park cafe or elsewhere?"  (HANA C102-100) |
| 5-7 | February 1, 2018 | 5:40 PM | Wael Hana | Nadine Arslanian | Text: "going to park café"   (HANA C102-100) |
| 5-8 | February 1, 2018 | 5:41 PM | Wael Hana | Nadine Arslanian | Text: " in 20 or 30"   (HANA C102-100) |
| 5-9 | February 2, 2018 | 6:41 PM | Nadine Arslanian | Wael Hana | Text: "we r here"   (HANA C102-100) |
| 5-10 | February 1, 2018 | 7:48 PM | Nadine Arslanian | Wael Hana | Text: " I started driving to park cafe and then turned around after speaking to Andy and came home. He also said from my voice I am not feeling well. I am in bed with the lidocaine 5%patch and the codeine tablets. Hope John got your tequila" (HANA C102-100) |
| 5-11 | February 1, 2018 | 7:49 PM | Wael Hana | Nadine Arslanian | Text: "he did" (HANA C102-100) |
| 5-12 | February 1, 2018 | 7:49 PM | Wael Hana | Nadine Arslanian | Text: "lol" (HANA C102-100) |
| 5-13 | February 1, 2018 | 7:49 PM | Wael Hana | Nadine Arslanian | Text: "see u tomorrow"  (HANA C102-100) |
| 5-14 | February 1, 2018 | 7:50 PM | Nadine Arslanian | Wael Hana | Text: " I bought this thinking I was gonna be able to make it to Park Café just in case John didn't get a chance to get your tequila. I will bring it next time" [attaches image of bottle of tequila]  (HANA C102-100) |
| 5-15 | February 1, 2018 | 7:50 PM | Wael Hana | Nadine Arslanian | Text: "thanks"  (HANA C102-100) |
| 6 | February 2, 2018 | 6:00 PM | Robert Menendez | Nadine Arslanian | Call: 58 seconds (GX 6A-112) |
| 7 | February 2, 2018 | 6:03 PM | Robert Menendez | Nadine Arslanian | Text: "https://www.google.com/search?q=acappella%20west%20restaurant" (GX A101-3) |
| 8 | February 2, 2018 | 11:50 PM | Nadine Arslanian | Robert Menendez | Text: "Thank you for a great night." (GX A101-3) |
| 9 | February 2, 2018 | 11:54 PM | Robert Menendez | Nadine Arslanian | Text: "Glad your home safe. Enjoyed your company. We'll have to do it again!" (GX A101-3) |
| 10 | February 3, 2018 | 11:29 AM | Nadine Arslanian | Robert Menendez | Call: 3 seconds (GX 6A-112) |
| 11 | February 3, 2018 | 11:49 AM | Robert Menendez | Nadine Arslanian | Call: 5 minutes, 58 seconds (GX 6A-112) |
| 12 | February 3, 2018 | 12:01 PM | Wael Hana | Nadine Arslanian | Text: "what u doing today" (GX C102-1) |
| 13 | February 3, 2018 | 12:01 PM | Nadine Arslanian | Wael Hana | Text: "I'm at a meeting for the gala now. What are you guys doing?" (GX C102-1) |
| 14 | February 3, 2018 | 12:02 PM | Wael Hana | Nadine Arslanian | Text: "will be at ani at 230" (GX C102-1) |
| 15 | February 3, 2018 | 12:06 PM | Nadine Arslanian | Wael Hana | Text: "I think we should be done by then if so I will meet you" (GX C102-1) |
| 16 | February 3, 2018 | 1:22 PM | Nadine Arslanian | Wael Hana | Text: "I'm done" (GX C102-1) |
| 17 | February 3, 2018 | 1:23 PM | Wael Hana | Nadine Arslanian | Text: "be there 245" (GX C102-1) |
| 18 | February 3, 2018 | 1:26 PM | Nadine Arslanian | Wael Hana | Text: "Ok" (GX C102-1) |
| 19 | February 3, 2018 | 2:42 PM | Nadine Arslanian | Wael Hana | Text: "I'm back . At our table. At least for this Saturday LOL" (GX C102-1) |
| 20 | February 3, 2018 | 3:01 PM | Nadine Arslanian | Wael Hana | Text: "they have kebbe Naye" (GX C102-1) |
| 21 | February 3, 2018 | 3:01 PM | Wael Hana | Nadine Arslanian | Text: "3 m" (GX C102-1) |
| 22 | February 3, 2018 | 3:02 PM | Nadine Arslanian | Wael Hana | Call: 34 seconds (GX 6A-112) |
| 23 | February 3, 2018 | 3:02 PM | Nadine Arslanian | Wael Hana | Text: "No rush" (GX C102-1) |
| 24 | February 3, 2018 | 4:40 PM | Nadine Arslanian | Robert Menendez | Text: "Do you know albio sires? What is your international position?" (GX A101-4) |

(NB: Additional name attributions: GX 1305)

2

A31

| No. | Date | Time (ET) | From | To | Detail |
|---|---|---|---|---|---|
| 55-4 | February 27, 2018 | 10:18 AM | Nadine Arslanian | Robert Menendez | Text: "I was getting my hair blowdried so I would look pretty when I saw you. But I am going to call you from New Jersey. I cancelled the meeting with the General. I am not flying to DC. just to see him . We will arrange for a day anytime that's good for you and I will fly down and see you both. I will call you from New Jersey at 3:15pm. I miss you . I'm not sure if it's appropriate to put that in the text, but…" (GX A101-5) |
| 56 | March 5, 2018 | 2:51 PM | Wael Hana | Nadine Arslanian | Text: "call me" (GX B105-38) |
| 57 | March 5, 2018 | 5:44 PM | Nadine Arslanian | Robert Menendez | Text: "general khaled shawky col aymen habib col ahmed atia" (A101-99) |
| 58 | March 5, 2018 | 5:45 PM | Nadine Arslanian | Robert Menendez | Text: "wael hana antranig aslanian Nadine Arslanian" (A101-99) |
| 59 | March 5, 2018 | 5:50 PM | Nadine Arslanian | Robert Menendez | Text: "We need 2 different invitations.please. The. First three names are for the Egyptian army and the second three names are us. Could you please email me the 2 separate invitations to my email nad070@yahoo.com whenever you get a chance." (A101-99) |
| 60 | March 5, 2018 | 5:57 PM | Nadine Arslanian | Robert Menendez | Text: "Wael and I would like to meet with you this weekend to discuss the points of the meeting on the 13 th . It's important ." (A101-99) |
| 61 | March 5, 2018 | 7:28 PM | Robert Menendez | Nadine Arslanian | Text: "Would need the generals direct email." (A101-99) |
| 62 | March 5, 2018 | 7:31 PM | Wael Hana | Nadine Arslanian | Text: sends picture of Major General Khaled Shawky's business card (GX B105-37, B105-A)  |
| 63 | March 5, 2018 | 7:32 PM | Nadine Arslanian | Robert Menendez | Text: sends picture of Major General Khaled Shawky's business card (GX A101-99, A101-BB)  |
| 64 | March 5, 2018 | 7:32 PM | Nadine Arslanian | Robert Menendez | Text: "I just sent you his email." (GX A101-99) |

(NB: Additional name attributions: GX 1305)

6

A32

# DX 1304:
# Excerpts of Summary Chart
# (texts and other messages)

| | Date | Time (ET) | From | To | Detail |
|---|---|---|---|---|---|
| | | | | (cc Danny Daibes, Shaun Doherty) | |
| 106 | June 29, 2021 | 5:27 PM | Fred Daibes | Robert Menendez | Text: "Good afternoon my brother. The Sultan is coming over tomorrow morning at 10:00." (GX D101-4) |
| 107 | June 29, 2021 | 7:03 PM | Robert Menendez | Fred Daibes | Text: "Great. I am give a call before my flight to Houston if you'd like." (GX D101-4) |
| 108 | June 29, 2021 | 7:05 PM | Fred Daibes | Robert Menendez | Text: "Yes that would be great. Thank you" (GX D101-4) |
| 109 | June 29, 2021 | 7:06 PM | Robert Menendez | Fred Daibes | Text: "Text me when he arrives" (GX D101-4) |
| 110 | June 30, 2021 | 3:21 PM | Jason Tuber | Robert Menendez | Signal: "No red flags from the WH counsels office for Phils interview. DOJ will circle back with the WH in the next few days and, barring anything unexpected, begin the full FBI background check" (GX A115, GX A115-PH2) |
| 111 | June 30, 2021 | 3:35 PM | Robert Menendez | Philip Sellinger | Text: "Hi, I hear you had a good interview today." (GX A118-4) |
| 112 | June 30, 2021 | 4:24 PM | Philip Sellinger | Robert Menendez | Text: "Hi. Thanks for the email. I thought it went well. But am glad to hear there was positive feedback. Alice was very helpful in my preparation." (GX A118-4) |
| 113 | June 30, 2021 | 4:45 PM | Robert Menendez | Philip Sellinger | Text: "This is what I got. FYI Attaches screenshot of text message saying "No red flags from the WH counsels office for Phils interview. DOJ will circle back with the WH in the next few days and, barring anything unexpected, begin the full FBI background check" (GX A118-4, GXA118-A)<br><br>No red flags from the WH counsels office for Phils interview. DOJ will circle back with the WH in the next few days and, barring anything unexpected, begin the full FBI background check<br>1h<br><br>GOVERNMENT EXHIBIT A118-A 23 Cr. 490 (SHS) |
| 114 | June 30, 2021 | 12:04 PM | Sheikh Sultan bin Jassim al Thani | Fred Daibes (cc Shaun Doherty) | Email: "Thank you for the opportunity to view today. It was nice to meet you and I look forward to speaking again soon, as we progress with our projects. I am copying Shaun, who will be main contact in our London office." (GX D308) |
| 114-1 | June 30, 2021 | 6:29 PM | Fred Daibes | Sheikh Sultan bin Jassim al Thani (cc Shaun Doherty) | Email: "Thank you for coming to visit. It was truly a pleasure to get to spend some time with with you and show you around Edgewater" (GX D308) |
| 115 | July 1, 2021 | 11:24 AM | Shaun Doherty | Fred Daibes and Sheikh Sultan bin Jassim al Thani(cc Michael McManus) | Email: "Following the meeting between principals, shall we arrange a call on Tuesday (6th)? It would be good to discuss the specifics of the transaction and the opportunity. Let me know what time suits, and I will send out the diary invite and the dial-in coordinates." (GX 4F-26) |
| 116 | July 13, 2021 | | | | Court in United States v. Daibes schedules trial for January 11, 2022. (GX 1401) |
| 116-1 | July 15, 2021 | | | | Daibes' trial is scheduled for January 11, 2022. (DX 1615) |

(NB: Additional name attributes: DX 1305)

12

A34

| Summary Chart, 1976 – November 12, 2023 | | | | | |
|---|---|---|---|---|---|
| | Date | Time (ET) | From | To | Detail |
| 116-2 | July 21, 2021 | | | | Senator Chris Murphy (CT) issues a tweet: (DX 118)  |



*(NB: Additional name attributes: DX 1305)*

13

A35

| Summary Chart, 1976 – November 12, 2023 | | | | | |
|---|---|---|---|---|---|
| | Date | Time (ET) | From | To | Detail |
| 116-3 | July 21, 2021 | | | | World Food Program Executive Director issues a statement announcing that Qatar will contribute $100 million to help with a hunger crisis. (DX 440)<br><br><br><br>**Statement by WFP Executive Director on Qatari funding for humanitarian operations in Yemen**<br><br>WASHINGTON – I am deeply heartened by the announcement from Qatar that it will contribute US$100 million to humanitarian operations in Yemen, where conflict, COVID and economic decline are driving a grinding hunger crisis which is in danger of slipping into famine without adequate funding. This contribution reinforces the opportunity for regional peace and security.<br><br>Qatar's support, part of which will go to WFP, is critical for staving off famine in Yemen and will save millions of lives. I am very encouraged by this latest development in Qatar's partnership with WFP and my sincere thanks go to the government and people of Qatar for this much-needed expression of solidarity. |
| 116-4 | July 22, 2021 | | | | Press Release: "Murphy, Young, Coons Statement on Qatar's $100 Million Contribution for Humanitarian Support in Yemen." (DX 2111) |

*(NB: Additional name attributes: DX 1305)*

14

| | Date | Time (ET) | From | To | Detail |
|---|---|---|---|---|---|
| | | | | | Summary Chart, 1976 – November 12, 2023 |
| | | | | |  |

(NB: Additional name attributes: DX 1305)

15

A37

| Summary Chart, 1976 – November 12, 2023 | | | | | |
|---|---|---|---|---|---|
| | Date | Time (ET) | From | To | Detail |
| 116-5 | July 24, 2021 | | | | Representative Meeks, Chairman of the House Foreign Affairs Committee, issues a tweet to thank Qatar for providing "relief to the worst humanitarian crisis in the world."  (GX A104-A, DX 2037)<br><br> |

# Excerpts of Trial Transcript

414

O5H3MEN2                    Tate - Direct

1    to the two as being a father and a son who lived in Maryland of

2    Egyptian descent.  And we talked as we were checking in and

3    they invited us for a drink.

4    Q.  Did you join Dr. Ahmed Abdel Kareem and these two other

5    gentlemen?

6    A.  After I checked in, I dropped my bags, and joined them for

7    a drink.

8    Q.  Where were they sitting at the time?

9    A.  They were sitting at the bar restaurant area adjacent to

10   the check-in in the front of the hotel.

11   Q.  Were they sitting with anyone else?

12   A.  They were.  They were sitting with Mr. Hana.

13   Q.  Did you join them?

14   A.  I did.

15   Q.  Had you ever met Mr. Hana before then?

16   A.  No.  This was the first time I met Mr. Hana.

17   Q.  Where did you sit when you joined Dr. Ahmed Abdel Kareem

18   and Mr. Hana?

19   A.  It was a U-shaped table, and there was only one seat

20   available when I walked up, and that was beside Mr. Hana, so I

21   sat with him.

22   Q.  Did you introduce yourself to Mr. Hana?

23   A.  I did, I did.

24   Q.  Did he introduce himself to you?

25   A.  He introduced himself to me and I asked him, you know, who

O5H3MEN2                          Tate - Direct

1   are you with?  Is that who you worked with?  And he said I'm

2   with you.

3               THE COURT:  "I'm with you" meaning you, the witness?

4               THE WITNESS:  Yes, sir.

5               THE COURT:  Okay.

6   Q.  What did you understand that to mean?

7   A.  I didn't know how to take that.  I was -- it was an unusual

8   introduction.

9   Q.  Did you speak with Mr. Hana that evening?

10  A.  I did.

11  Q.  What did you discuss with him that evening?

12  A.  We discussed a few different things.  I guess first, he

13  said he had met with U.S. regulatory officials, President Sisi

14  and President Trump.

15  Q.  Was Donald Trump president at the time in 2019?

16  A.  He was.

17  Q.  You mentioned President Sisi.  Who is President Sisi?

18  A.  President Sisi was and continues to be the president of

19  Egypt.

20  Q.  How long has President Sisi been the president of Egypt?

21  A.  I don't know the exact number, but 8 or 10 years.

22  Q.  What did Mr. Hana say about President el-Sisi during the

23  dinner?

24  A.  He said that the Egyptian president had instructed him to

25  increase bilateral trade.  There were three specific

O5H3MEN2                    Tate - Direct

1    commodities he mentioned.  They wanted to see increased trade

2    in Egypt in wheat, beef and citrus.

3    Q.  You used the term bilateral trade.  What does that refer

4    to?

5    A.  Bilateral trade would mean U.S. shipments to Egypt and

6    Egyptian shipments to the U.S.  At the time Egypt was

7    interested in shipping citrus to the United States, and of

8    course, the United States is a large producer of beef and

9    wheat.

10   Q.  How did you respond to Mr. Hana when he made that comment?

11   A.  I explained how global markets work.  At the time U.S.

12   wheat was expensive as compared to our competitors.  I

13   explained that we of course had wheat and would be happy to

14   sell it to the Egyptians, but our price would be high.  So I

15   essentially told him that in the U.S. we believe in free

16   markets.  We have products.  If you would like to buy them, we

17   can help you with that.

18   Q.  During your meeting with Mr. Hana, did he discuss any other

19   meetings he had in D.C.?

20   A.  Yes, he mentioned two other meetings.

21   Q.  What other meetings did he mention?

22   A.  He told me he would meet with an undersecretary at USDA,

23   and that he would also meet with Dr. Ahmed.

24   Q.  While you were in D.C., did you have any other meetings

25   scheduled?

O5H3MEN2                          Tate - Direct

1   A.  I did.  I did.  The following morning, I had a meeting

2   scheduled between myself and the USDA undersecretary, and the

3   Egyptian vice minister of agriculture, Mona Mehrez, and

4   Dr. Ahmed.

5   Q.  You mentioned the term undersecretary.  What does that term

6   refer to?

7   A.  The undersecretary would be the head of a section within

8   the USDA.  So, sort of the secretary's deputies, his set of

9   deputies.

10  Q.  How far removed is that from you in the chain of command?

11  A.  Quite far.

12          THE COURT:  Up or down?

13          THE WITNESS:  The undersecretary has a higher position

14  than I do.

15  Q.  Despite the term "under."

16          You said that Mr. Hana mentioned also meeting with

17  Dr. Ahmed Abdel Kareem while he was in D.C.  What did he say

18  about that?

19  A.  He said that they would meet the following day to discuss

20  halal.

21  Q.  Did you have any meetings with Dr. Ahmed Abdel Kareem the

22  next day?

23  A.  Yes, Dr. Ahmed, I scheduled four meetings with halal

24  certifiers for Dr. Ahmed.  At the time I did not know that

25  Mr. Hana was representing a halal certifier.

O5K3MEN1

1    motions that need immediate attention at 1 a.m. in the morning.

2              If the parties can't figure out a way to deal with it,

3    I'll impose some rules where they can deal with it so they will

4    deal with it.

5              Second matter which I'm not too pleased.  As part of

6    the point about nothing last minute, the issue here about that

7    summary witness, it looks like the parties started dealing with

8    the summary chart three weeks ago.  Yet a few hours ago, I get

9    the last word on a debate about that summary chart.  That's

10   just a specific of what I'm talking about.

11             Now, I cannot deal with the specific objections to the

12   500-plus exhibits in that summary chart in a few hours.  I

13   can't and I'm not going to.  I don't know if the parties are

14   engaging in games here.  If so, they should stop.

15             I don't want any party's order of proof disrupted.

16   The government claims that its order of proof is going to be

17   disrupted to the extent that that summary witness cannot go on

18   today or early tomorrow morning.  I just cannot see my way to

19   dealing with a number of exhibits -- disputes about exhibits on

20   a 500-plus exhibit summary chart.

21             So I'm going to have to deal with that.  I'll read the

22   materials tonight, and have to deal with that tomorrow after

23   trial.

24             Government, can you put in other people or deal with

25   it in some way?  I want to keep this trial moving.  We have to

O5K3MEN1

1    end at 4 today for a personal issue dealing with one of the

2    lawyers.  By the way, what I want to do, assuming there is

3    another lawyer on that team who can be here, I want to read

4    into the record today after 4, we'll end at 4, my decision on

5    precluding Dr. Rosenbaum.  I've already given you my decision

6    but this is a fuller opinion.  So, that's what I want to do it

7    at 4 o'clock.

8              Government, I asked you a question.

9              MR. MONTELEONI:  Yes, your Honor.  We can fill

10   tomorrow with someone other than the summary witness.

11             THE COURT:  Done.  Then we'll have argument on it

12   right after the trial tomorrow.  And again, a summary chart,

13   which normally goes in without too much objection, when your

14   discussions started three weeks ago, you just can't have a

15   frenzied flurry of documentation hours before court.

16             The next item which I'm not too pleased is the defense

17   motion to preclude what I'll call the love e-mail.  That's

18   B201-10, I believe it's 404-1.  You know what that is.  It has

19   a love and heart emojis and the core of it is "Tell Will I am

20   going to sign off this sale to Egypt today."  And then it goes

21   on.

22             Witness number 1, first of all, I don't need oral

23   argument on that.  You've had documents submissions back and

24   forth.  Just as importantly, this issue was decided in -- not

25   on the specific one.  In my opinion, in my denying of the

1   defense motion for a mistrial on the opening.  And I'm not

2   going to preclude the introduction of B201-10.

3          Witness 1 can basically say what the government says

4   he's going to say.  He can explain the context giving rise to

5   Mr. Menendez's ability to influence aid to Egypt in the

6   relevant time period.  I'm not going to allow any evidence that

7   Mr. Menendez actually approved a sale or released a hold on a

8   sale.  He can testify to the amounts by the United States of

9   military aid, including foreign military financing and foreign

10  military sales.  He can testify to the powers and

11  responsibilities of the Senate Foreign Relations Committee, of

12  the chairman of that committee, and of Congress itself.

13         He cannot testify, and the government indicates he's

14  not going to, I want to reiterate, he cannot testify to holds

15  that other named senators placed on military aid to Egypt or

16  other named senators signed off on aid to Egypt.  There cannot

17  be testimony, as I've said, of a hold or of release of a hold

18  by the senator.  That should be clear.

19         So I'm admitting GX B201-10 over objection.

20         In that motion, I think the defense is pushing too

21  hard.  I couldn't have been clearer, I believe, in my decision

22  on speech or debate and in the decision denying the motion for

23  a mistrial.

24         Mr. Fee, this is a promise, as again it starts off

25  with lots of heart emojis and I believe it's the senator saying

O5K3MEN1

1   love, and there is a heart emoji and exclamation points.  "Tell

2   Will I am going to sign off this sale to Egypt today."  Then he

3   talks about the specifics.

4           That is a promise to undertake a legislative act.  The

5   legislative act is the signing off on the hold, that is placing

6   a hold or signing off on a hold, releasing a hold.  That's the

7   legislative act.  This 404-1, which is the same as B201-10, is

8   a promise.  Mr. Fee argues that 404-1 is evidence of a

9   legislative act and is precluded.  Well, it's certainly not

10  precluded by my opinion.

11          The defense opted not take an interlocutory appeal

12  from that opinion.  That's their decision, that's okay.  If

13  there is a conviction, I have no idea what this jury will do,

14  we're a long way from that.  If there is a conviction, the

15  defense will have the opportunity to appeal it.  They didn't

16  appeal it now.  So what I decided there is the law of the case

17  and the parties are bound by it.

18          The defense cites *Helstoski* for the proposition that

19  there is "no doubt evidence of a legislative act may not be

20  introduced by the government in a presentation under" the

21  bribery statute.  And referring to *U.S. v. Johnson*, 383 U.S.

22  169 (1966); *U.S. v. Brewster*, 408 U.S. 501 (1972).

23          And I thought about that because they said "no doubt

24  evidence of a legislative act may not be introduced."  So I was

25  thinking that that may be more expansive than what's precluded

O5K3MEN1

1    in my opinion.

2            But I looked at those cases, and in each case, it was

3    a past legislative act that was at issue.  In *Johnson*, the

4    speech given in the House of Representatives was the basis of

5    the criminal charge.  In *Helstoski*, what was at issue was also

6    past legislative acts.  Speech and debate clause "precludes any

7    showing of how a legislator acted, voted or decided.  Promises

8    by a member to perform an act in the future are not legislative

9    acts."  "Tell Will I am going to sign off this sale to Egypt

10   today" is a promise.

11           I'm not sure how I can be clearer.  If the defense is

12   going to raise this issue time and time and time again, the

13   trial is going to be completely bogged down.  I can't be more

14   explicit.  Promises to perform acts are not legislative acts.

15           Who is the government going to call?  Where do you

16   stand?

17           MR. MARK:  Your Honor.

18           THE COURT:  Ms. Blakely, line the jury up please.

19           MR. MARK:  May I ask -- Mr. Tate is on direct

20   examination.  There is one issue that the parties wanted to

21   raise to the Court.

22           THE COURT:  Go ahead.

23           MR. MARK:  There is some feedback.

24           THE COURT:  There is one additional item the parties

25   want to raise.  Go ahead.

O5K3MEN1

1          MR. MARK:  Thank you.  On Friday, there were a couple

2     of issues that your Honor avoided taking sidebar on.  One of

3     them got resolved, one of them didn't just because the press of

4     time.  And that relates to some testimony I am going to proffer

5     to your Honor that I understand the defense intends to object

6     to.

7          Which is that Mr. Tate, while he was in the embassy,

8     was trained on countersurveillance techniques, as all State

9     Department or as many people in embassy are.  And he observed

10    certain surveillance towards the end of his tour in Egypt,

11    particularly around the time that the halal issue came up.  He

12    is going to detail the nature of the surveillance that he

13    observed, both at his home and out on the street.  And that

14    this increased in frequency.

15         THE COURT:  I don't understand.  Who is surveilling

16    whom?  What did he say?  What's the nature of the surveillance?

17         MR. MARK:  Yes.  So at his home, he is going to detail

18    two particular incidents that when he was away for the weekend

19    he returned, and his home smelled like smoke and there was a

20    cigarette butt left in the toilet.  Looks like they intended

21    for him to see that there was people in his home.

22         The other instance is a time when he was away for the

23    weekend and he returned and electronics he had out on a table

24    were no longer on the table.  They were on the ground.  Another

25    sort of, appeared to him, intentional show that people had been

O5K3MEN1                      Tate - Cross

1   Q.  Good morning, Mr. Tate.

2   A.  Good morning, sir.

3   Q.  I have a question for you.  Which is in deciding which

4   company and how many companies will become a halal certifier

5   for Egypt, it's Egypt that decides that, correct?

6   A.  Egypt does make those decisions, yes.

7   Q.  And the United States can have its opinion heard, as it did

8   here, but at the end of the day, it's Egypt that makes that

9   decision; isn't that true?

10  A.  The decision must be made in line with Egypt's

11  international commitments under the WTO.  But yes, they make

12  the decision.

13  Q.  And Egypt makes the decision both in terms of how many

14  certifiers there will be, and who, whether it's one or more,

15  those certifiers are; is that correct?

16  A.  Egypt makes the decision, yes.

17  Q.  Thank you.  And the U.S., you've testified, was concerned

18  that if there were only one certifier, that that would be a

19  monopoly and that would drive up prices for Egyptian consumers;

20  is that correct?

21  A.  That was one of our concerns, yes, sir.

22  Q.  That's because as you said, on direct examination, the U.S.

23  is generally opposed to monopolies, right?

24  A.  I think it's fair to say that the U.S. generally opposes

25  monopolies, correct.

O5K3MEN1                    Tate - Cross

1    Q.  But again, the choice was Egypt's as to whether it would or

2    would not permit a monopoly in this situation; is that correct?

3    A.  The decision to determine which certifiers may or may not

4    certify halal beef belonged to the Egyptian government, yes.

5    Q.  What I asked you was Egypt also made the decision that it

6    was going to allow a single certifier in this case, correct?

7    A.  That was a decision they communicated to us in April.

8    Q.  And it was communicated, you had a specific conversation I

9    think you testified at the Frankfurt Airport with Ms. Mehrez,

10   I'm sorry, my pronunciation of the names may not be as good as

11   yours.  She said she wanted a single certifier for Egypt,

12   correct?

13   A.  Dr. Mehrez said that a single certifier would be better for

14   Egypt.

15   Q.  Now, Egypt made the decision to proceed with a single

16   certifier in this case even though the United States protested;

17   am I right?

18   A.  Egypt ultimately did make that decision, yes.

19   Q.  What I asked you was, they did that even in the face of

20   opposition from the United States, correct?

21   A.  They did not change course because of opposition from the

22   United States.

23   Q.  And just to be specific, it started, if I'm not mistaken,

24   with you.  You attempted to talk Dr. Ahmed Abdel Kareem, who if

25   I recall correctly, he was the head of the Egyptian delegation

O5K3MEN1                    Tate - Cross

1    that came to the United States for the audit, correct?

2    A.  He was the head of the delegation and he joined at the end

3    of the audit, yes.

4    Q.  You attempted to talk him out of proceeding with a single

5    certifier, correct?

6    A.  I think the first time anyone mentioned a single certifier

7    to me was Dr. Mehrez, and I advocated against that.  And then

8    in the subsequent meeting we had with the Egyptian government

9    on April 11, we again advocated that Egypt allow for multiple

10   certifiers.

11   Q.  And at that meeting, the -- am I right that Dr. Ahmed was

12   at that meeting on April 11?

13   A.  Yes, sir.  He was at that meeting.

14   Q.  And at that meeting he in fact indicated to you that he was

15   concerned with the existing U.S. halal certifiers, correct?

16   A.  He had a number of concerns that he had enumerated

17   throughout -- in that meeting and at other times, yes.

18   Q.  Just to answer the question I asked.  He expressed

19   concerns, yes or no, and if you can't answer it yes or no just

20   let us know, that he said that he was concerned with U.S. -- he

21   was, quote, he was concerned with U.S. halal certifiers.  Do

22   you remember?

23   A.  Sir, to be perfectly clear, the answer to that is yes.

24   But, his concerns were not a consistent set of concerns.  They

25   varied according to the meeting and according to the date.

O5K3MEN1                    Tate - Cross

1    Q.  Let me just to be clear on this.  If I could show you

2    what's in evidence as Government Exhibit C104-B.  And going to

3    the third paragraph.

4           By the way, you remember this exhibit, right?

5    A.  Yes, sir.

6    Q.  And this is a letter from Ali Abdi who was your boss,

7    right?

8    A.  Yes, sir.

9    Q.  And at the end of the third paragraph it says, does it not,

10   he was -- and just interrupt myself.  Referring to Dr. Ahmed

11   Abdel Kareem.  He was, however, concerned with U.S. halal

12   certifiers.  Right?

13   A.  Yes, sir.  That's what the letter says, correct.

14   Q.  Thank you.  And as you mentioned -- you can take that down.

15   As you mentioned, you yourself attempted to talk Dr. Mehrez

16   and, just Dr. Mehrez was the Deputy Minister of Agriculture for

17   Egypt, correct?

18   A.  Yes, sir.  The vice minister or deputy minister.  She was

19   the number 2.

20   Q.  You attempted on your own to talk her out of the position

21   that a single certifier was appropriate when you ran into her

22   at the Lufthansa lounge in the Frankfurt Airport, correct?

23   A.   In that encounter in the Frankfurt Airport, she was

24   suggesting a single certifier, and I did advocate that was not

25   in the best interest of neither Egypt nor the United States.

O5K3MEN1                    Tate - Cross

1     Q.  And she disputed?

2     A.  She did not respond to the substance of my points, but

3     continued to make her point that Egypt needed a single

4     certifier.

5     Q.  Then, you testified that the undersecretary of agriculture

6     Mr. McKinney also raised this issue with Dr. Mehrez.  Is that

7     correct?

8     A.  Yes, sir, that's correct.

9     Q.  And again it was to no avail.  Egypt maintained its

10    position that a single certifier was appropriate, right?

11    A.  Egypt did not change their position, that's correct.

12    Q.  And then, you and your boss, Mr. Ali Abdi, raised it with

13    the general organization for import export control, which you

14    referred to as GOEIC I think.  And you argued there, too, it

15    would violate Egypt's obligations, but GOEIC at that time

16    deferred to the Egyptian Ministry of Agriculture, correct?

17    A.  That's correct.  GOEIC was one of several engagements we

18    had with the government of Egypt.

19    Q.  Again, those did not serve to change Egypt's mind, right?

20    A.  Egypt ultimately did not change their position, correct.

21    Q.  And then ultimately, and the last step of this process at

22    even higher levels, the chargé d'affaires himself, which was

23    acting embassador Thomas Goldberger I think his name was?

24    A.  Yes, sir, that's correct.

25    Q.  He raised it with the agricultural minister himself, right?

O5K3MEN1                    Tate - Cross

1    A.  Yes, sir, the chargé d'affaires raised it with the Ministry

2    of Agriculture.

3    Q.  Egypt didn't change its position; am I right?

4    A.  That's correct.

5    Q.  Now, Egypt wanted one instead of many certifiers; am I

6    right?

7              MR. MARK:  Objection.

8              THE COURT:  I'll allow it.

9    A.  I'm sorry.  Can you repeat the question?

10   Q.  Sure.  They wanted one, not many certifiers.  That's what

11   Egypt wanted?

12   A.  Egypt ultimately chose a single certifier.  I couldn't tell

13   what you they wanted.

14   Q.  I want to go back and I'll talk some more about the audit.

15   During the audit, according to your testimony, some certifiers

16   were insisting on a transverse cut in order to slaughter

17   animals and others were okay with a lateral cut.

18              Do you remember your testimony on that?

19   A.  That was not exactly my testimony.

20   Q.  Okay.  So if you could clarify.  Because what I thought you

21   said was that this was an issue that arose, and that I think

22   your testimony was that some were okay with a lateral cut, and

23   some were okay with a transverse cut, right?

24   A.  My testimony was -- "insisting" was not in my testimony.

25   The halal certifiers operating in the United States often do

O5kWmen4                         Moldovan - Direct

1   BY MR. MARK:

2   Q.  After you stopped working for IS EG Halal, did your office

3   stay in that building, or did it move?

4   A.  No.  I didn't have an office at that point.

5   Q.  OK.  So when you left, then you lost your office?

6   A.  Correct.

7   Q.  Now, who owned the building at 125 River Road?

8   A.  Freddy.

9   Q.  Did Mr. Hana ever talk about Fred Daibes with you?

10  A.  Yeah, occasionally.

11  Q.  Did he talk about whether he had a personal relationship

12  with Mr. Daibes?

13  A.  Yeah, I think so.  I mean they -- you know, they would -- I

14  mean the three of us would go out together, you know, beyond

15  business.

16  Q.  Are you talking about the three of you, is that you,

17  Mr. Hana and Fred Daibes?

18  A.  That's correct.

19  Q.  Where would you go out apart from business?

20  A.  To give you an example, Freddy took me out on my birthday

21  along with Mr. Hana, you know, just the three of us at a nice

22  steak dinner here in Manhattan.  That's just one example.

23  Q.  And did you observe whether Mr. Hana and Mr. Daibes had a

24  business relationship?

25  A.  I wasn't sure what the extent of their relationship was

O5kWmen4                    Moldovan - Direct

1    business-wise, but certainly I -- I was there for the

2    possibility of them going into certain real estate investments

3    together.

4                MR. WEITZMAN:  Objection, your Honor.

5                THE COURT:  Yes.  Sustained.

6          I don't know what that means, sir.  You were there for

7    the possibility of them going into certain real estate

8    investments, what do you mean by that?

9                THE WITNESS:  Sure, Judge.  So Freddy is known as a

10   real estate developer, and Mr. Hana wanted to get involved in

11   that, and you know, they would talk about prospecting certain

12   locations from time to time.

13   BY MR. MARK:

14   Q.  And when you said they'd talk about, would Mr. Hana talk

15   with you about that ever?

16   A.  He did.

17   Q.  Were you ever present for conversations with Mr. Daibes

18   about that as well?

19   A.  Once.

20               THE COURT:  Prospecting certain locations for?

21               THE WITNESS:  To build new properties, Judge.

22   BY MR. MARK:

23   Q.  Now, are you familiar with a woman by the name of Nadine

24   Arslanian?

25   A.  I am.

O5kWmen4                    Moldovan - Direct

1   Q.  Have you ever met her?

2   A.  Yes.

3   Q.  How did it come about that you met her?

4   A.  Through Mr. Hana.

5   Q.  Did Mr. Hana ever ask you to do anything for her?

6   A.  He did.

7   Q.  What did he ask you to do for her?

8   A.  He introduced her to me as a new client that needed help

9   with a foreclosure issue.

10  Q.  Did he explain to you what the foreclosure issue was?

11  A.  No, not -- not when he introduced me to Ms. Arslanian, no.

12  She -- she told me what the issue was.

13  Q.  What did Ms. Arslanian tell you was the foreclosure issue?

14  A.  She said that the bank was essentially going to foreclose

15  on her house and essentially that Will was going to pay her

16  outstanding debt.  And by Will, I mean Mr. Hana.

17  Q.  Did you ever come to have a role in any payment for her to

18  avoid foreclosure?

19  A.  I did.

20  Q.  How did that come about?

21  A.  You know, at some point, Mr. Hana had the money that she

22  owed wired to me directly.  I then physically went to the bank

23  to execute a wire transfer to the bank in order to satisfy that

24  debt.

25  Q.  From what account did Mr. Hana wire money to your account?

O5lWmen2                    Paul - Direct

1    Q.  When did you start in the Bureau of Political-Military

2    Affairs in the State Department?

3    A.  I started there on April 6, 2012.

4    Q.  What was the title of your position in the Bureau of

5    Political-Military Affairs in the State Department?

6    A.  I was the director of congressional and public affairs.

7    Q.  How long did you hold that title?

8    A.  For 11-1/2 years.

9    Q.  Could you provide the jury with a brief summary of your

10   professional career before joining the State Department in that

11   position?

12   A.  Yes.  Prior to joining the State Department, I had worked

13   for the U.S. Army Staff.  I had worked for the State Department

14   and the Defense Department in Iraq.  I had worked for the

15   office of the secretary of defense, undersecretary of policy.

16   I had also worked for a dual U.S.-U.K. mission in the West

17   Bank.  I've also worked in Steve Israel's office as his

18   military legislative assistant.

19   Q.  Mr. Paul, what is the State Department?

20   A.  So, the State Department is the executive branch agency

21   that is responsible for the conduct of America's foreign

22   relations and its diplomacy.

23   Q.  What is the political-military affairs bureau in the State

24   Department?

25   A.  So, the State Department is organized into a group of

O5lWmen2                    Paul - Direct

1    multiple bureaus.  Each bureau is responsible for a different

2    function.  That can be either a geographic region or a -- some

3    sort of substantive function.  And so the Bureau of

4    Political-Military Affairs is the part of the State Department,

5    the organization within the State Department, that is

6    responsible essentially for what we call America's defense

7    diplomacy.  This is the overlap between, as it suggests, the

8    military and foreign policy.

9         So the Bureau of Political-Military Affairs conducts a wide

10   variety of tasks.  These include negotiating with countries

11   around the world to enable agreements that let U.S. forces

12   deploy overseas with legal protections.  It includes security

13   assistance, managing the taxpayer grant assistance funds that

14   enable, that we give to other countries to let them by American

15   defense articles and training.  And it includes oversight of

16   all major arms transfers, to the tune of about $180 billion a

17   year.

18             MR. MONTELEONI:  Mr. Paul, I'm going to just ask you

19   if you can make sure to speak slowly in your answers for the

20   benefit of the court reporter and of the jurors.

21   Q.  So, you mentioned a number of the functions of the

22   political-military affairs bureau in the State Department, but

23   I'd like to ask you, in general terms, what were your duties

24   and responsibilities as the director of congressional and

25   public affairs for the political-military affairs bureau?

O51Wmen2                    Paul - Direct

1    A.  So, as the director of congressional and public affairs, I

2    was essentially responsible for the bureau's relationships with

3    Congress, with the media and with American civil society.  In

4    that role I managed a team that assisted in that job.  I also

5    was the senior adviser to the assistant secretary, who is the

6    head of the Bureau of Political-Military Affairs, on all

7    matters relating to Congress, including strategy, legislation,

8    member interests.

9        I was also the representative of the assistant secretary to

10   Congress whenever that person was not present.  So it was my

11   role essentially, with a particular focus on the congressional

12   piece, to essentially manage the bureau's relationships with

13   all the Hill, Capitol Hill, and to advise the bureau on how to

14   conduct its relations with Congress.

15   Q.  Now, you mentioned security assistance and arms transfers

16   as among the activities that are within the purview of the

17   political-military affairs bureau.

18       Did you, in your office as director of congressional and

19   public affairs, have any involvement in those activities?

20   A.  Yes.  So, extensively so.

21       Much of the activities that the State Department conducts,

22   in terms of both security assistance, which is the funding,

23   again, that we give to other countries to procure defense

24   capabilities from the U.S., and in terms of arms transfers, the

25   actual mechanism for the transfer of arms, many of those

O51Wmen2                    Paul - Direct

```
 1   require congressional notification, which is a process by which
 2   we have to inform Congress before we can take certain actions.
 3   Of course, the funding I'm talking about is provided by
 4   Congress, so there is regular engagement with Congress to
 5   provide that funding and, you know, to do so in the way that is
 6   most expedient for the State Department, from its perspective.
 7   And of course, Congress also writes the laws that dictate, or
 8   at least determine in many cases, how that funding can be used
 9   and under what circumstances arms transfers may take place.
10   Q.  You mentioned congressional notifications as among the
11   activities that you were involved in in your time in the office
12   of congressional and public affairs.
13       About how familiar with the process of congressional
14   notifications did you become as a result of your position?
15   A.  So, I was there for about 11-1/2 years.  I would say the
16   bureau notifies the Congress, on average, somewhere in the
17   region of 300 notifications a year.  So -- and I was part of
18   the approval process for every one of those notifications.  So
19   I would say I was very familiar with the congressional
20   notification process.
21   Q.  I'm going to ask you some more detailed questions about the
22   congressional notification process, but first I want to ask you
23   some very basic background.
24       First, how many houses of Congress are there?
25   A.  There are two, the U.S. House of Representatives and the
```

O5lWmen2                    Paul - Direct

1    United States Senate.

2    Q.  In the course of your duties at the State Department, have

3    you heard of the term "congressional committee"?

4    A.  Yes.

5    Q.  What is a congressional committee?

6    A.  So, within each house, the members organize themselves into

7    groups or committees to take certain actions or to conduct

8    certain activities.  For example, there might be a committee on

9    appropriations that decides where Congress is going to send the

10   funds that have been raised with the taxpayer.  There might be

11   committees that oversee certain government functions, and so

12   this is the way Congress organizes itself within each house to

13   do its day-to-day work.

14   Q.  Focusing on the Senate's congressional committees, who sits

15   on those committees?

16   A.  So, the senators sit on the Senate committees.

17   Q.  Are all of the members of the committee equal, or do some

18   hold leadership positions?

19   A.  So, within each committee -- first of all, there is a

20   majority and minority.  So the makeup of each committee

21   reflects in sort of a microcosm the makeup of the broader

22   Senate.  So, for example, if you have a Senate that is a

23   majority of one party and a minority of another, within the 100

24   seats in the Senate, in each committee there will be a majority

25   of that same party and a minority of the party that has fewer

O5lWmen2                    Paul - Direct

1   seats in the Senate.  And so the person who leads, essentially,

2   the committee is the senior member, which we call the chair,

3   chairperson, who is the senior person on the committee for the

4   majority.  And likewise for the minority, the senior person,

5   the senator is the ranking member.  So it's the senator -- the

6   chair on the majority side and the ranking member on the

7   minority side.

8           THE COURT:  If I understand your testimony, sir, and I

9   don't want to put words in your mouth, on each committee, the

10  senior member of the committee who comes from the party that

11  holds the majority of seats in the Senate is the chair of that

12  committee.  Is that correct?

13          THE WITNESS:  That's exactly right, your Honor.

14          THE COURT:  And the senior member that comes from the

15  party that does not hold the majority of seats in the Senate is

16  called the ranking member?

17          THE WITNESS:  That is correct, your Honor.

18          THE COURT:  Thank you.

19  BY MR. MONTELEONI:

20  Q.  In addition to the senators who sit on a Senate committee,

21  does the committee have any employees who are not themselves

22  members of Congress?

23  A.  Yes.  So, both the chair and the ranking member will

24  employ, typically, a professional staff.  These are

25  congressional staffers, experts in their fields, who conduct

O5lWmen2                    Paul - Direct

1    the day-to-day business within the committee, informing the

2    members and doing the work of the committee on a daily basis.

3    Q.  So, you said that both the chair and the ranking member

4    would have a staff.  Is that a shared staff, or are there

5    essentially two separate staffs?

6    A.  It's two separate staffs.  There's a majority staff and a

7    minority staff, and they answer separately to the chair and to

8    ranking member.

9    Q.  Are these referred to as the professional staff of the

10   committees?

11   A.  Correct.

12   Q.  To be clear, who does the staff of the majority party on

13   the committee report to?

14   A.  The staff of the majority committee of the party -- on the

15   committee report to the chair.

16   Q.  Who does the staff of the minority party on the committee

17   report to?

18   A.  To the ranking member.

19   Q.  Have you heard of the senator named Robert Menendez?

20   A.  Yes, I have.

21   Q.  During the time period from early 2018 to September 2023,

22   did Menendez have any leadership positions on any congressional

23   committees?

24   A.  Yes.  At the beginning of that time period, Senator

25   Menendez was the ranking member on the Senate Foreign Relations

O5lWmen2                    Paul - Direct

1    Committee.  This is the committee of the Senate that oversees

2    the activities of the State Department.  And then from January

3    2020 onwards -- no, January 2021 onwards, he was the chair of

4    the committee.

5    Q.  So, you referred to the Senate Foreign Relations Committee

6    as the committee that oversees the State Department.  How is

7    the Senate Foreign Relations Committee commonly referred to

8    within the U.S. government?

9    A.  So, it's commonly referred to by its initials, SFRC.

10   Q.  So, you mentioned that as the parties in the makeup of

11   Congress shifted, Menendez moved from ranking member to chair

12   of the Senate Foreign Relations Committee.  And I apologize if

13   I missed that.  Did you testify as to when that shift happened?

14   A.  If I recall correctly, it would have been January of 2021.

15   Q.  And by the way, in 2016 and 2017, did Menendez hold any

16   leadership positions on the committee?

17   A.  No, but he was on the committee.

18   Q.  Now, have you heard the term "foreign military financing"

19   during the time that you were director of the office of

20   congressional and public affairs?

21   A.  Yes.

22   Q.  And about how regularly did you supervise or participate in

23   activities related to foreign military financing in that

24   position?

25   A.  On an almost daily basis.

O51Wmen2                    Paul - Direct

1   Q.   How is foreign military financing typically referred to in

2   the U.S. government?

3   A.   Again, by its initials, FMF.

4   Q.   What is foreign military financing?

5   A.   So, foreign military financing is U.S. taxpayer funding or

6   money that comes from the U.S. taxpayer that is appropriated by

7   Congress, which means that Congress takes it and provides it

8   to, in this case, the State Department in order to provide

9   America's defense partners with the capability to buy military

10  equipment or training on a grant basis.

11  Q.   When you say on a grant basis, what does that mean?

12  A.   We give it to them.  There's no need to pay it back.  It's

13  not a loan.  We provide countries around the world with FMF to

14  buy American defense equipment.

15  Q.   You said that Congress appropriates the money.  Can you

16  explain what it means for Congress to appropriate funds?

17  A.   So, the U.S. Treasury, on an annual basis, collects our

18  taxes.  It can collect other receipts.  From there, Congress,

19  which, under the Constitution, holds the power of the purse,

20  determines how that money is going to be spent writ large and

21  assigns it to certain departments and agencies and appropriates

22  it into certain accounts from which it then can be drawn down.

23  Q.   So with respect to foreign military financing, who

24  determines the total maximum amount of foreign military

25  financing grant money that could be made available to another

O51Wmen2                    Paul - Direct

1   Department.  What does the State Department do to make those
2   funds available to the foreign nations?
3   A.  So, the funds actually stay in the Treasury until they are
4   obligated by the State Department.  This is where the State
5   Department essentially decides the funds will go to a certain
6   country.
7   Q.  Can you explain, what does the term "obligate" mean
8   exactly?  What does the State Department do to obligate funds?
9   A.  So, it depends on, again, the country in particular, but
10  for most countries a notification to Congress is required.  So
11  the State Department essentially assents to take this funding
12  that Congress has appropriated and make it available to country
13  X for them to then spend it against some sort of defense sales.
14  Q.  So, I'm going to go into the process for doing that in a
15  moment, but just to be clear, to obligate the funds to a
16  country is to make them available to that country?
17  A.  Correct, it's to make them available.
18  Q.  All right.  Now, when a congressional notification is
19  required to make foreign military financing grant money
20  available to a foreign nation, does your office actually draft
21  the congressional notification itself?
22  A.  No.  The notification is drafted by the office of security
23  assistance.
24  Q.  What, if any, role does your office have in the review or
25  the approval of the congressional notifications?

O51Wmen2                      Paul - Direct

1    A.  So, my office was one of those that is in the approval

2    chain.  So all congressional notifications for FMF would have

3    had to have gone through myself or my office in order to be

4    approved and to move forward.

5    Q.  About how much of your time personally was spent on review

6    or approval of congressional notifications for foreign military

7    financing?

8    A.  A significant amount.

9    Q.  During your time in the State Department, what country has

10   been the single largest recipient of foreign military financing

11   grant money from the U.S.?

12   A.  During my time in the State Department, the single largest

13   recipient of grant assistance funding for military financing

14   was Israel.

15   Q.  What country has been the second largest?

16   A.  Egypt.

17   Q.  You mentioned that for some countries, congressional

18   notifications were required before obligating that foreign

19   military financing grant money to the country.

20        Was Egypt among those countries for which a congressional

21   notification was required?

22   A.  Yes, Egypt is a mandatory notification.

23   Q.  During the time that you were in the State Department,

24   approximately how much money did Congress appropriate in total

25   foreign military financing grant money to Egypt every year?

O5lWmen2                    Paul - Direct

1    A.  Approximately $1.3 billion.

2    Q.  On an annual basis?

3    A.  On an annual basis.

4    Q.  What, if any, conditions were placed on that grant money

5    under the law?

6    A.  So, dating back to about 2011, 2012, Congress has directed

7    in the annual Appropriations Act that a certain proportion of

8    the funds to Egypt can only be released conditional on Egypt

9    making progress on certain human rights aspects.  There are

10   more recent examples, that there must be a certification that

11   Egypt is making progress on, for example, the release of

12   political prisoners.  And so that as applies to up to about 300

13   million out of that $1.3 billion.

14   Q.  All right.  You said that since about 2011 or 2012, there

15   have been a series of conditions on up to about 300 million of

16   this money, and those conditions have pertained to subjects

17   such as human rights and release of political prisoners.

18       I want to set that amount of money for a moment, but just

19   so we know what we're setting aside, the government will in

20   your testimony today be calling that conditional grant money.

21   A.  Sure.

22   Q.  All right.

23       So we're going to leave aside the conditional grant money

24   for a moment and come back to that.  First, I want to focus on

25   the rest of the foreign military financing grant money, the

O5lWmen2                    Paul - Direct

1  portion that doesn't have any of the special conditions on it.

2      For purposes of your testimony, are you comfortable

3  referring to that as just grant money without special

4  conditions?

5  A.  Yes.

6  Q.  By the way, does grant money without special conditions

7  have any conditions on it at all?

8  A.  Yes, it does.  All foreign military financing has some

9  conditions set by Congress, whether that is that it can only be

10 used for the purposes of defense capabilities, for defense

11 forces or, for example, that it cannot go to units that are

12 being credibly alleged to be involved in gross violations of

13 the human rights.

14 Q.  So let's assume that all of those general conditions are

15 going to be satisfied and just talk about the process for

16 making a grant of the foreign military financing grant money to

17 Egypt, the kind without the special conditions.  So, in my

18 questions, just to be clear, not talking about any actual

19 decision to approve or not approve any specific grant of money

20 to Egypt, but just about the process for doing so.  Is that all

21 right?

22 A.  Yes.

23 Q.  So after Congress appropriates the total amount foreign

24 military financing grant money to Egypt and focusing only on

25 the money without the special conditions, before notifying

O51Wmen2                          Paul - Direct

1   Congress, does the State Department do any review to determine

2   whether or not to actually go ahead and obligate that money?

3   A.  Yes.  I mean there is an annual -- the money is available

4   for up to two years under the way the law is written.  So the

5   State Department has two years to decide to move forward up to

6   the end of the fiscal year following the year in which Congress

7   provided it.  And there is a process of discussion with the

8   government of Egypt, how they intend to spend the money they

9   are getting, you know, what sort of capabilities they require

10  and, again, regular review of is this in line with U.S.

11  policies and that sort of discussion.

12  Q.  And at the end of that review period, what does the State

13  Department typically do?

14  A.  So, typically, the State Department will decide that it

15  wants to obligate that $1.3 billion to Egypt, and it will move

16  forward with a congressional notification.

17  Q.  Now, after the congressional notification is transmitted to

18  Congress, a formal notification, are there any legal

19  restrictions on the State Department immediately making those

20  funds available to Egypt?

21  A.  Yes.  So, the way foreign military financing notifications

22  work is that, by law, by the annual Appropriations Act, it is

23  essentially a 15-day notify and wait.  So you cannot actually

24  obligate the funding; you cannot actually make it available to

25  Egypt until 15 days have passed since you informed Congress

O5lWmen2                    Paul - Direct

1   that you intend to do so.

2   Q.  What's the purpose of that law?

3              THE COURT:  Let me see if I understand this.

4              Congress will appropriate a certain amount of money

5   for foreign military financing, correct?

6              THE WITNESS:  Yes.  Yes, your Honor.

7              THE COURT:  All right.  And will Congress say X amount

8   to Egypt and Y amount to Israel, and so forth?

9              THE WITNESS:  For those specific countries, yes, your

10  Honor.

11             THE COURT:  OK.  And then the State Department knows

12  Congress has said Congress wants the United States to give X

13  amount to Egypt in foreign military financing.  So that's a

14  direction, as it were, to another branch of government from

15  Congress.  What's the next step for the State Department?

16             THE WITNESS:  So, within that $1.3 billion that Egypt

17  gets, your Honor, there is up to 300 million of it that is

18  subject to conditions.

19             THE COURT:  Right.  We're putting that aside.

20             THE WITNESS:  So, for the rest of the $1 billion, the

21  next step is, first of all, to discuss with Egypt how it would

22  like to use it and then to move forward with a notification to

23  Congress that it intends to obligate.

24             THE COURT:  OK.  So the notification is, I take it, an

25  actual document that says we intend to dispense this amount of

O5lWmen2                    Paul - Direct

1   money to Egypt for this purpose; is that what it does?

2           THE WITNESS:  Technically, to Egypt's accounts here in

3   the U.S., but yes, your Honor.

4           THE COURT:  OK.

5           MR. MONTELEONI:  Thank you, your Honor.

6   Q.  So, you testified that after that formal notification

7   document saying that the State Department intends to obligate

8   those funds to Egypt goes out, there's a 15-day waiting period

9   before the State Department can go ahead and actually make

10  those funds available to Egypt.  What's the purpose of that

11  waiting period?

12  A.  So, in theory, that period is for Congress to conduct its

13  oversight of the funding of the State Department and to ask any

14  questions it wants to about the policy and to assure that U.S.

15  taxpayer dollars are being spent in accordance with Congress's

16  intent in the appropriations bill.

17  Q.  And if there are certain members of Congress who have

18  concerns with an obligation of funds to Egypt, what can they do

19  during that waiting period?

20  A.  So, anytime during that 15-day period, certain members of

21  Congress can reach out to the State Department and ask us to

22  what we call hold the obligation of those funding -- of that

23  funding, which is to say to not obligate it even once the 15

24  days have expired.

25  Q.  And can any member of Congress hold foreign military

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A74

O5lWmen2                    Paul - Direct

1    financing grant money after a congressional notification?

2    A.  Holds on FMF grant notifications are limited to the chair

3    and ranking of the Senate Foreign Relations Committee and the

4    Senate appropriations subcommittee on foreign operations.

5    That's the parallel committee that appropriates the funds in

6    the first place.

7    Q.  I want to come back to holds and ask a bit more about them

8    in a minute, but first I just want to talk about the rest of

9    the process when there's no holds.  So assuming that the State

10   Department gives its formal notification and intent to make

11   funds available to Egypt and everything goes smoothly and

12   there's no holds, what's the next step after the 15 days?

13   A.  So, the State Department will instruct the Treasury to

14   transfer the money.  In the case of Egypt, it goes to an

15   interest-bearing account at the Federal Reserve Bank of New

16   York from where it is then available for Egypt to draw down

17   against requirements or arms sales.

18   Q.  You said that Egypt has a federal -- an interest-bearing

19   account in its name at the Federal Reserve Bank of New York?

20   A.  That is correct.

21   Q.  Does every foreign country that receives foreign military

22   financing grant money have a bank account like that set up at

23   the Federal Reserve?

24   A.  No.  It is just Egypt and Israel.

25   Q.  All right.  So we've talked about the process for

O5lWmen2                    Paul - Direct

1   been progress --

2           THE COURT:  Slow down a little.

3           MR. MONTELEONI:  Thank you, your Honor.

4   Q.  If the secretary of state doesn't certify that Egypt is

5   making this progress and also doesn't make the determination

6   that it's in an interest of national security to waive that

7   requirement for certification, in that case is the State

8   Department allowed to notify Congress of its intent to obligate

9   those funds?

10  A.  No, it is not.

11  Q.  And during the time that you've been at the State

12  Department, has Egypt always, in fact, received the full amount

13  of the foreign military financing grant money that has been

14  appropriated?

15  A.  No, it has not.

16  Q.  Does that have to do with these certifications and waivers?

17  A.  Precisely.

18  Q.  From your experience as the director of the office of

19  congressional and public affairs, do you have any understanding

20  of what Egypt's position was on the conditions on this

21  conditional grant money?

22  A.  Yes.  I would say Egypt did not like the idea that there

23  were conditions in the first place and certainly did not like

24  when funding was withheld.

25  Q.  And what legislation were these -- what types of

O51Wmen2                    Paul - Direct

1   legislation were these conditions attached to?

2   A.  These are in the annual Appropriations Act.

3   Q.  What committee is responsible for appropriations

4   legislation?

5   A.  The committee on appropriations.

6   Q.  All right.  So you mentioned the idea of a hold on foreign

7   military financing grant money.  What is a hold on this money?

8   A.  So, a hold is where the chair or ranking member of one of

9   the relevant committees or their, you know, appointed

10  representatives, in the form of a professional staff member,

11  directs the State Department in this context not to obligate

12  the funding; that even when the clock runs out, as we say, on

13  those 15 days, that the State Department cannot move forward

14  until that member says go ahead.

15  Q.  So is the chair or the ranking member of the Senate Foreign

16  Relations Committee, is their ability to place a hold on this

17  money written into law?

18  A.  No, there is no legal basis for this, but the State

19  Department will respect their hold.

20  Q.  If it's not written into law, why will the State Department

21  respect a hold placed by the chairman or ranking member of the

22  Senate Foreign Relations Committee?

23  A.  Well, because the chair and the ranking member of the

24  Senate Foreign Relations Committee have an immense amount of

25  influence and sway over the State Department.  That is the

O51Wmen2                    Paul - Direct

1    committee that confirms our leadership in the form of our

2    assistant secretaries, our secretary.  It confirms our

3    ambassadors, the United States ambassadors around the world.

4    It writes the laws that, you know, define what we do, how we

5    operate.  So there are any number of steps that, in theory, a

6    chair or ranking member who would be unhappy with the State

7    Department could take were we to break the hold.

8    Q.  If the chairman or the ranking member of the Senate Foreign

9    Relations Committee wants to place a hold on the State

10   Department's obligation of foreign military financing grant

11   money to Egypt, how do they do it?

12   A.  So, typically, it would be communicated via email from

13   their staff.

14   Q.  So when the staff members communicate these holds via

15   email, whose authority are they exercising?

16   A.  That of the chair or ranking member they work for.

17   Q.  And what will the State Department do when it receives this

18   notification of the hold?

19   A.  It will ensure that everyone is aware not to move forward

20   with the obligation and then start the conversation with

21   Congress about how we can get the hold lifted in order to move

22   forward.

23   Q.  Will the State Department go ahead and just transfer the

24   money to Egypt's bank account if the chair or ranking member of

25   the SFRC is maintaining a hold on it?

O5lWmen2                    Paul - Direct

1    A.  No.

2    Q.  How does a hold end?

3    A.  So, one of two ways.  Either in the end the member lifts

4    the hold and the State Department could obligate the funding,

5    or we get to the end of that two-year period availability, the

6    funding expires and it's returned to Treasury and can no longer

7    be used by the State Department in foreign military financing.

8    Q.  You mentioned lifting a hold.  Have you ever heard the term

9    "clearing a hold"?

10   A.  Yes, lifting a hold, clearing a hold, signing off.

11   Q.  All meaning the same thing?

12   A.  All the same.

13   Q.  How is that communicated to the State Department that a

14   hold gets lifted?

15   A.  By email, typically.

16   Q.  Again, typically by the staff?

17   A.  Typically by the staff, yes.

18   Q.  Now, we've talked about foreign military financing grant

19   money going to Egypt.  Once Egypt receives the grant money in

20   its bank account, what does it typically spend the money on?

21   A.  So, it spends the money on American defense articles and

22   services typically through a process we call the foreign

23   military sales system, or FMS.

24   Q.  So you've used the term "defense articles and services."

25   What's a defense article?

O5lWmen2                    Paul - Direct

1  A.  So, this is defined by law in the Arms Export Control Act,

2  but these are essentially what you would think of as weapons

3  and associated defense articles, everything from bombs to

4  trucks to cargo aircraft, military cargo aircraft, to fighter

5  jets.

6  Q.  Is ammunition a defense article?

7  A.  Yes.

8  Q.  And you also mentioned services.  What type of services are

9  included in the foreign military sales program?

10  A.  So, that would typically be things like military training.

11  Q.  And now, in general terms, what is Egypt allowed to spend

12  foreign military financing grant money on?

13  A.  In general terms it can procure anything it wishes from

14  the -- from the U.S. government through the foreign military

15  sales system that the U.S. government agrees to.

16  Q.  So you mentioned foreign military sales or, I believe you

17  called it FMS.  What are foreign military sales?

18  A.  So, foreign military sales, or FMS, are

19  government-to-government contracts, where the United States

20  government agrees with a foreign government that we will sell

21  or provide it with a defense capability.  It could be a fleet

22  of fighter jets.  It could just be a couple of dozen rifles or

23  anything in between.

24      So these are government-to-government contracts in which

25  the U.S. government will then turn around to U.S. industry and

O5lWmen2                    Paul - Direct

1    request them to build this capability and will then transfer

2    that capability over to the foreign partner.

3    Q.   So you mentioned the Arms Export Control Act.  What is the

4    Arms Export Control Act?

5    A.   So, the Arms Export Control Act of 1976, or the AECA, is

6    sort of the framing legislation that guides arms transfers in

7    general.

8    Q.   Does the Arms Export Control Act require anything regarding

9    congressional notifications?

10   A.   Yes.

11   Q.   What does the Arms Export Control Act require regarding

12   congressional notifications for sales through the foreign

13   military sales program?

14   A.   So, full foreign military program sales that are above a

15   certain dollar threshold, in terms of their value, the Arms

16   Export Control Act, Section 36(B), requires that Congress be

17   notified before those sales can go forward.

18   Q.   Now, what is the State Department's process for foreign

19   military sales that require this congressional notification?

20   A.   So, this, again, is the Bureau of Political-Military

21   Affairs in the State Department, in this case, the office of

22   regional security and arms transfers, that is in the lead.  The

23   way it works is that the partner country will reach out to the

24   U.S. government with a request for capability.  The Defense

25   Department will definitize that request -- so turn it into an

O51Wmen2                    Paul - Direct

1    actual case that can move forward -- and then hand that over to

2    the State Department for policy and legal review.  The State

3    Department will review the case against U.S. policy, U.S.

4    national interests, U.S. law, as applicable, and if it is a

5    major sale above that notification threshold, will prepare a

6    notification to Congress.

7    Q.  All right.  So you used a number of terms and I want to

8    just break them down.

9        First, what is a case in foreign military sales?

10   A.  So, in this context a case is essentially an arms sale.  It

11   could just be, again, a dozen firearms, but it could also be a

12   fleet of jets with all the training and all the spare parts

13   that accompany them.

14   Q.  So you said that the foreign nation makes a request.  Have

15   you heard the term letter of request?

16   A.  Yes.

17   Q.  What is a letter of request in this context?

18   A.  So, that is the initial written request from the foreign

19   country that says to the United States government we would like

20   X.

21   Q.  How are letters of request typically referred to in the

22   U.S. government?

23   A.  By their initials, LORs.

24   Q.  So you said that when the U.S. government receives a letter

25   of request from a foreign nation, it would definitize that

O5lWmen2                    Paul - Direct

1    request.  In the most general and high-level terms, what does

2    it mean to definitize a request?

3    A.  So, they'll work with the industry to figure out what the

4    actual or approximate cost might be, how long it will take to

5    build, you know, what gadgets or additions need to be added or

6    subtracted, so just to turn it into something that looks a lot

7    more like a contract.

8    Q.  Now, in the context of foreign military sales that require

9    congressional notification, when does the State Department get

10   a case?

11   A.  So, once the department of defense has developed a draft

12   letter of offer and acceptance, which is the contract vehicle

13   that ultimately will go back to the other country, it comes

14   over to the State Department for that policy review.

15   Q.  So once the State Department gets a case, what is this

16   policy review that the State Department does?

17   A.  So, the State Department ultimately has the authority, the

18   approval authority, within the U.S. government on foreign

19   military sales on whether an arms transfer will occur or not,

20   and so before it does so, there is, first of all, a

21   presidential-level policy called the conventional arms transfer

22   policy that lists out a variety of factors that should be

23   considered, such as regional balance of power, U.S. domestic

24   industry impacts, human rights impacts.  And then, as

25   applicable, the State Department will also look at relevant

O51Wmen2                    Paul - Direct

1   laws that might apply to the sale.

2   Q.  If the State Department decides at the end of the policy

3   review that it wants to proceed with a foreign military sales

4   case to sell some type of defense articles to Egypt and that

5   this is of a dollar value that requires congressional

6   notification, what, if any, contact does the State Department

7   have with Congress before the formal notification?

8   A.  So, the notification process for arms sales is different to

9   the notification process we just discussed for security

10  assistance in that the security assistance notification process

11  begins with the notification and then 15 days count forward.

12      For arms transfer, there's actually an informal process

13  before the notification, which is now in called the tiered

14  review process.

15  Q.  So why is this informal review process called the tiered

16  review process?

17  A.  Because it is structured into three tiers, depending on to

18  whom the arms are going, essentially.

19  Q.  And what is the purpose of this tiered review, informal

20  review process?

21  A.  So, it is intended to provide a confidential space for

22  discussion between the executive branch and the Senate Foreign

23  Relations Committee and its counterpart, the House Foreign

24  Affairs Committee, to work through any concerns about sales

25  before they are formally notified to Congress.

O5lWmen2                      Paul - Direct

1   Q.  Why is there a process of working out these concerns before
2   they're formally notified to Congress?
3   A.  Well, because once an arms sale is formally notified to
4   Congress, the only way that Congress can stop it, in practical
5   terms, is through something called a joint resolution of
6   disapproval.  And the way it works in the Senate is that a
7   joint resolution of disapproval has what they call expedited
8   procedures, which means after it sits for ten days, any senator
9   can bring it to the floor of the Senate for debate.

10      And what the State Department doesn't want, because of the
11  optics, because of the impact on relationships, is for a
12  partner country's name to be essentially dragged through the
13  mud in a floor debate on the Senate.  So to make sure that when
14  an armed sale gets formally notified there is as little chance
15  as possible of someone objecting to it and that if they do
16  object to it we know that at least the chair or ranking member
17  of the foreign relations committee, the two most influential
18  actors in the Senate on foreign policy, will have -- will
19  support the arms transfer.

20      So essentially it is to ensure that when the sale goes
21  forward it goes forward as smoothly as possible.
22  Q.  So you described this informal tiered review process as a
23  confidential process.  Is the status of a foreign military
24  sales case during that tiered review process public?
25  A.  It is not.

O51Wmen2                          Paul - Direct

1   Q.  Now, how long is this informal tiered review process

2   supposed to take?

3   A.  So, it's supposed to take up to 40 days, in principle.

4   Q.  Is that 40 days for each tier or different amounts of time

5   for different tiers?

6   A.  Different amounts of time for different tiers.

7   Q.  What is the tier that has the shortest amount of time that

8   it's supposed to take?

9   A.  That is tier one, which is for NATO allies, our closest

10  allies across five other countries, and that is 20 days.

11  Q.  And what is the longest amount of time that the process is

12  supposed to take, in the longest tier?

13  A.  That is tier three, which is for all major arms sales to

14  countries in the Middle East other than Israel as well as some

15  long-range missiles, and that is 40 days.

16  Q.  And what's the other tier?

17  A.  Tier two, 30 days, everyone else in the world.

18  Q.  By the way, you mentioned NATO allies.  What are NATO

19  allies?

20  A.  Sorry.  The North Atlantic Treaty Organization was formed

21  in the 1950s and constitutes the U.S., Canada and most European

22  countries in a mutual defense alliance, in which if any of us

23  are attacked the others will come to their defense.

24  Q.  So now which tier is Egypt in?

25  A.  So, Egypt is in tier three.

O5lWmen2                    Paul - Direct

1    Q.  You previously testified that tier three has the longest

2    intended review period, the 40-day period.  Why does tier three

3    have the longest review period?

4    A.  So, for two principal reasons.  The first is that it's

5    generally been the State Department's experience that arms

6    sales to the Middle East are the most controversial when they

7    move forward to Congress but also that there are certain laws

8    that apply specifically to those arms sales.  In particular,

9    Section 36(H) of the Arms Export Control Act requires us to

10   consider Israel's qualitative military edge in the context of

11   every sale to the region.  We must do an analysis, do an

12   assessment of whether or not Israel's ability to defend itself

13   will be impacted by the sale.  And we provide that in

14   classified form to Congress to accompany each such

15   notification.

16   Q.  So you testified that for tier three countries, this

17   informal review process is supposed to take 40 days.  In

18   practice, how long does it usually take?

19   A.  In practice it can take a much longer time.

20   Q.  How is -- why does this process get extended?

21   A.  So -- so, similarly to the security assistance CN process

22   we were talking about, although here it has not yet been

23   notified, the State Department doesn't want to move forward on

24   a case in which there will be a joint resolution of

25   disapproval.  So until we have, particularly on those tier

O51Wmen2                    Paul - Direct

1    three, those Middle East countries, agreement from all four

2    corners, as it were, by which I mean the chair and ranking

3    member of the Senate Foreign Relations Committee and the House

4    Foreign Affairs Committee, the State Department will negotiate

5    through that period for as long as it takes to get them on

6    board before it moves forward.

7    Q.  All right.  You used a couple of terms I just want to go

8    back to.  I think you said CN for a moment, talked about the

9    security assistance CN.  What's a CN?

10   A.  Congressional notification.

11   Q.  All right.

12       Now, you mentioned the four corners.  Who are the four

13   corners?

14   A.  So, the four corners are the chair and ranking member of

15   the Senate Foreign Relations Committee and the House Foreign

16   Affairs Committee.

17   Q.  Now, will the State Department formally notify a foreign

18   military sale to a tier three country that has not been agreed

19   to by each of the four corners, typically?

20   A.  That would be not typically.

21   Q.  And we've talked about holds in the context of transfers of

22   foreign military financing grant money to foreign countries.

23   Does the concept of holds apply to foreign military sales as

24   well?

25   A.  Yes, but only during this informal notification period.

O5lWmen2                    Paul - Direct

1   Once the sale is notified and the clock tolls, then the State

2   Department can move forward and the U.S. government can move

3   forward with the sale, there is no means to hold an arms sale

4   case like there is a security assistance case once it has been

5   formally notified.

6   Q.  Now, before it's been formally notified, when it's in

7   informal tier review process, who can place a hold on a foreign

8   military sale case?

9   A.  So, it would have to be the chair or the ranking member of

10  the Senate Foreign Relations Committee or the House Foreign

11  Affairs Committee through their staff, because typically others

12  are not even aware that these cases exist.

13  Q.  And again, in my questions, I'm not asking about any

14  decisions on any particular foreign military sales case, just

15  asking about the process.  If the chairman or the ranking

16  member of the Senate Foreign Relations Committee wants to

17  approve a foreign military sales case during the tier review

18  process, what do they do?

19  A.  So, they would typically either communicate it through

20  their staff, who would email the State Department, Bureau of

21  Political-Military Affairs and say OK or clear, or words like

22  that, or it would be communicated, again, through staff, in a

23  regular briefing between the executive branch and Congress.

24  Q.  When the staff members make that communication to the State

25  Department, whose authority are they exercising?

O5lWmen2                    Paul - Direct

1   A.  It is that of the chair or ranking member for whom they

2   work.

3   Q.  Have you heard the term "sign off" in relation to foreign

4   military sales cases?

5   A.  Yes.

6   Q.  What does it mean to sign off on a foreign military sales

7   case in tier review?

8   A.  To approve it, to OK, to clear.

9   Q.  Now, if a chairman or ranking member of the Senate Foreign

10  Relations Committee just does nothing and doesn't affirmatively

11  sign off on or clear a foreign military sales case, will the

12  State Department take any typically proceed with the sale?

13  A.  No.  The State Department will typically take that as a

14  hold, particularly on tier three cases.

15  Q.  And in addition to just doing nothing, could the chairman

16  or ranking member of the Senate Foreign Relations Committee

17  also affirmatively communicate a hold on a foreign military

18  sales case?

19  A.  Yes.

20  Q.  All right.  And I believe you already testified about this,

21  but can you remind the jury when they would do that if they

22  want to do that?

23  A.  They would do that during the tier review process before

24  full notification.

25  Q.  In the circumstance where the chairman or ranking member

O51Wmen2                    Paul - Direct

1    wants to affirmatively communicate a hold to the State

2    Department on a foreign military sales case, what do they do?

3    A.  So, they would typically have their staff send an email to

4    the State Department that says, you know, the chair or ranking

5    member places a hold on X sale, whatever it might be.

6    Q.  Is the ability of the chair or ranking member of the Senate

7    Foreign Relations Committee to sign off on or to place a hold

8    on a foreign military sales case written into law?

9    A.  No, it is not.

10   Q.  All right.  If it's not written into law, how would they

11   have that ability?

12   A.  So, this is, this informal process is one that dates back

13   to the 1970s, and again, it's premised on -- the idea that the

14   reason the State Department would respect such a hold, again

15   it's premised on the idea that the chair and the ranking member

16   of the Senate Foreign Relations Committee have immense sway

17   over the State Department.  Again, they confirm our

18   ambassadors, our senior leaders.  They write our laws.  So the

19   State Department is always very, very reluctant to, as we say,

20   blow a hold or to move forward when there's a hold from a chair

21   or ranking member or our committee of jurisdiction.

22             MR. MONTELEONI:  Your Honor, I have more than a few

23   more minutes for this witness.  This might be a good time for a

24   break.

25             THE COURT:  All right.  Let's do it.

O51Wmen2                        Paul - Direct

1              Ladies and gentlemen, take an hour for lunch.

2              Once again, in the courtroom, I'm going to ask you to

3    remain for a few moments so the jurors can take the elevators.

4              And ladies and gentlemen of the jury, I'm informed

5    that you'll have your deliberation room back on Tuesday.  All

6    right?

7              Take an hour, please, for lunch.  Enjoy the lunch.

8    Keep an open mind.  Don't watch any news or listen.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O51Wmen2

1          (Jury not present)

2          THE COURT:  All right.  You may be seated.

3          You may step down, sir.

4          MR. FEE:  Your Honor, may I just raise one

5  controversial point, nothing about the substance?

6          You should leave, sir.  Not a question for you.

7          (Witness not present)

8          MR. FEE:  I just wanted to note, for obvious reasons

9  relating to speech and debate, Mr. Monteleoni is phrasing most

10  of these questions, many of them in the hypothetical.  I don't

11  know the government's intention.  I just want to be sure we're

12  clear, on cross, we're going to have to do the same and we hope

13  that the government is not going to interpose that sort of

14  objection on cross.

15          MR. MONTELEONI:  I think the questions in a similar

16  form to sort of the type of questions that we posed, unless

17  it's some very far-out hypothetical --

18          THE COURT:  You're going to go through the process.

19          MR. FEE:  That's right.

20          THE COURT:  All right.  What else?

21          MR. FEE:  That's it.

22          THE COURT:  Mr. Richenthal, you were standing.

23          MR. RICHENTHAL:  Only because I thought your Honor was

24  standing.

25          THE COURT:  Well, I am right now.
           (Luncheon recess)

O5lWmen2

```
 1
 1                            AFTERNOON SESSION

 2                                2:00 p.m.

 3              (In open court; jury present)

 4              THE COURT:  You may continue with your direct

 5     examination of this witness.

 6              MR. MONTELEONI:  Thank you.

 7     BY MR. MONTELEONI:

 8     Q.  Mr. Paul, before the break --

 9              THE COURT:  Gentlemen, if both of you would slow down

10     so the reporter can take down what's being said.

11              MR. MONTELEONI:  Thank you, your Honor.

12     Q.  Mr. Paul, before the break, you testified about holds on

13     foreign military sales.  How long can a hold on a foreign

14     military sale case last?

15     A.  So, a hold on a foreign military sale case during the

16     tiered review period can theoretically last indefinitely.  I've

17     seen them last for years.

18     Q.  If a hold on a foreign military sales case lasts for a very

19     long time, what, if any, impact does that have on whether the

20     sale ultimately goes through?

21     A.  Ultimately, it may kill the sale for a few reasons.  First

22     of all, prices rise over time.  So the costs of, for example, a

23     fighter jet today, if it is held for several years, may

24     increase significantly and make it untenable for the partner.

25     Alternatively, the partner may tire of waiting and turn to
```

O5L3MEN3                    Paul - Direct

1   another country to provide a similar capability.  So, a hold

2   can overtime kill an arms transfer.

3   Q.  So as a practical matter, how much say does the chairman or

4   ranking member of the Senate Foreign Relations Committee have

5   over whether a foreign military sales case to Egypt goes

6   through?

7   A.  For a case --

8            MR. FEE:  Objection.

9            THE COURT:  I'll allow that.  You may answer.

10  A.  Can you repeat the question?

11  Q.  As a practical matter, how much say does the chairman or

12  ranking member of the Senate Foreign Relations Committee have

13  over whether a foreign military sales case to Egypt goes

14  through?

15           THE COURT:  Objection is noted.

16  A.  As a practical matter, the chairman or chair or ranking

17  member of the Senate Foreign Relations Committee has immense

18  influence over whether a sale notified to that committee goes

19  through.

20  Q.  You testified before the break that your office reviewed,

21  that your office was part of the approval chain for,

22  congressional notifications for foreign military financing

23  grant money.

24      What, if any, role did your office have in the review of

25  congressional notifications for foreign military sales cases?

O5L3MEN3                        Paul - Direct

1   A.  The same role.  My office and I in particular was part of

2   the approval for every foreign military sales notification

3   before it went to Congress.

4   Q.  Did you receive copies of each of the congressional

5   notification documents for foreign military sales cases?

6   A.  Yes, I did.

7   Q.  You also testified that before a foreign military sale is

8   formally notified to Congress, it's informally submitted to the

9   State Department for -- so to the Senate Foreign Relations

10  Committee, rather, for tiered review.

11          Did you receive copies of each of the submissions of

12  foreign military sales cases into tiered review?

13  A.  Yes, I did.

14  Q.  Did you receive these through your direct e-mail or through

15  any sort of group e-mail address?

16  A.  Either through my direct e-mail address or through my

17  office distribution e-mail address.

18  Q.  What was your office distribution e-mail address?

19  A.  It is PM-CPA@state.gov.

20  Q.  What is PM-CPA stand for?

21  A.  That is political military affairs, the bureau.  CPA,

22  that's congressional and public affairs, which is my office,

23  @state.gov, which is the State Department.

24  Q.  I'd like to look at an example.

25          MR. MONTELEONI:  Mr. Florczyk, could you please show

O5L3MEN3                     Paul - Direct

1   the witness, the parties, and the Court the document marked for

2   identification as Government Exhibit 8A-2.

3   Q.  Mr. Paul, do you recognize this document?

4   A.  Yes, I do.

5   Q.  What type of document is it?

6   A.  This is an e-mail submitting a potential arms transfer into

7   the tiered review process.

8   Q.  Did you receive this e-mail in the course of your duties as

9   the director of the office of congressional and public affairs

10  for the political and military affairs bureau of the State

11  Department?

12  A.  Yes, I did.

13          MR. MONTELEONI:  We offer Government Exhibit 8A-2 in

14  evidence.

15          THE COURT:  Admitted without objection.

16          (Government's Exhibit 8A-2 received in evidence)

17          MR. MONTELEONI:  Mr. Florczyk, can you please publish

18  for the jury.

19  Q.  Now, Mr. Paul, what is the date of this e-mail?

20  A.  So this e-mail is dated Wednesday, June 20, 2018.

21  Q.  Who is this e-mail from?

22  A.  It is from Charles Comer.

23  Q.  Who is Charles Comer?

24  A.  So Charles, he goes by Ken, Comer, was the foreign military

25  sales team chief in the office of regional securities and arms

O5L3MEN3                    Paul - Direct

1    transfers in the bureau of military affairs.  He is the person
2    who day-to-day manages the foreign military sales process.
3    Q.  Is the office for regional security and arms transfer the
4    acronym that's on there in the signature line?
5    A.  Yes, PM-ORSAT.
6    Q.  State Department use a lot of acronyms?
7    A.  Yes.  Y-E-S.
8    Q.  About how commonly did Charles Comer send foreign military
9    sales cases into the tiered review as you've testified this
10   document is?
11   A.  It was almost always, either he or one of the people on his
12   team.
13   Q.  Directing your attention to the "to" line at the top of the
14   page.  And directing your attention to the domains of the
15   first two addressees where their e-mail addresses end with the
16   words foreign.senate.gov.  What does foreign.senate.gov
17   signify?
18   A.  So that indicates that they are professional staff of the
19   Senate Foreign Relations Committee.
20   Q.  Who are these two particular addressees with
21   foreign.Senate.gov e-mail addresses?
22   A.  So these are the Senate Foreign Relations Committee
23   professional staff who would be two of the four horsemen.
24   Q.  Who are the four horsemen?
25   A.  So, for each committee there are two staffers, one for the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A98

O5L3MEN3                    Paul - Direct

1    majority, for the chair, one for the ranking member, who deal

2    specifically with arms transfers.  And the four of them are

3    known collectively as the four horsemen.

4    Q.  Who do they report to with respect to these foreign

5    military sales and tier review?

6    A.  So they would report to the ranking member or to the chair.

7    Q.  Who are the two recipients in the "to" line with e-mail

8    addresses that end in mail.house.gov?

9    A.  Those are their House Foreign Affairs Committee

10   counterparts.

11   Q.  All together, are these all the horsemen?

12   A.  That's all the horsemen, correct.

13   Q.  What is Mr. Comer communicating to these Senate Foreign

14   Relations Committee and House Foreign Affairs Committee

15   staffers in this e-mail in general terms?

16   A.  So in general terms, he's communicating that the State

17   Department has completed its policy and legal review of a

18   proposed arms transfer.  And that the State Department is

19   putting it into the tiered review process, seeking the approval

20   of the committees in order to formally notify it and move

21   forward with the sale.

22   Q.  Directing your attention to the body of the e-mail.  The

23   second line.  Where it says attached draft certification is

24   provided to you as a Tier 3 40-day review.

25            What does that mean?

O5L3MEN3                    Paul - Direct

1    A.  So this is a sale that is to the government of Egypt.

2    Egypt is a Tier 3 country.  So the committee's at a starting

3    point and in principle have 40 days to review it.

4    Q.  Directing your attention to the next sentence.  Where it

5    says "We anticipate forwarding the case for AECA 36(b)

6    statutory notification after culmination of the review period

7    on 07/30/18."

8         First, what is AECA 36(b) statutory notification?

9    A.  That is Section 36(b) of the Arms Export Control Act, which

10   requires the notification of certain foreign military sales to

11   Congress.

12   Q.  And does this statutory notification that's cited here, is

13   that the official formal notification to Congress that we've

14   been discussing?

15   A.  Yes, that would be when they get to it the formal

16   notification to Congress.

17   Q.  Again, I'm not asking about any particular sale.  But about

18   how common was it for sales to Egypt to actually clear tiered

19   review within the 40-day period that's specified here during

20   the whole time you were in the State Department?

21        MR. FEE:  Objection, your Honor.

22        THE COURT:  I'll allow that.

23   Q.  Sorry.  Again, not asking about any particular sale.  But

24   about how common was it for sales to Egypt to clear within this

25   40-day review period during the time that you were in the State

O5L3MEN3                    Paul - Direct

1  Department?

2  A.  As a general matter, extremely uncommon.

3  Q.  Directing your attention to the subject line.  What does it

4  mean that the subject line reads 18-AE (Egypt) 120mm tank ammo?

5  A.  So 18-AE is the number of the case of the foreign military

6  sales case.  In this case 18 indicates this was in 2018.  Egypt

7  obviously is the country for which the capability was destined.

8  And the defense articles in question in the sale are

9  120-millimeter tank ammunition.

10  Q.  Are there attachments to this e-mail?

11  A.  Yes.  There is the draft formal notification that the State

12  Department would intend to send forward to Congress upon

13  completion of the tiered review.  And a copy of a set of

14  questions and answers that we attach to every transmittal.

15         MR. MONTELEONI:  I'd like to take a look at the draft

16  congressional notification.  Mr. Florczyk, can you please take

17  us to page 2 of the document.  Show us the whole page first.

18  Q.  Mr. Paul, what are we looking at here?

19  A.  This is a draft formal notification to Congress of the sale

20  that was described in the e-mail.  In this case, it is a

21  foreign military sale to the government of Egypt worth

22  $99 million for approximately in total 56,000 rounds of

23  120-millimeter tank ammunition.

24         MR. MONTELEONI:  Mr. Florczyk, could you please expand

25  the top half of the page.

O5L3MEN3                        Paul - Direct

1   Q.   Directing your attention to the first bullet, who is the

2   prospective purchaser here?

3   A.   So that would be the government of Egypt.

4   Q.   Where it says total estimated value.  What does that mean?

5   A.   So that's the top line cost of the sale.

6   Q.   What is the total estimated value in this case?

7   A.   Up to $99 million.

8   Q.   Under the major defense equipment (MDE) heading, what does

9   that mean, first of all?

10  A.   So, major defense equipment is a category of defense

11  articles that discriminates certain weapons from trucks and

12  that sort of thing.  So this describes the major defense

13  equipment included in the sale.

14  Q.   What is, in general terms, the major defense equipment

15  included in the sale in this particular sale?

16  A.   Again, about 56,000 tank rounds.

17  Q.   Is that 46,000 rounds that are described as Tracer -- or

18  actually, there is a lot of descriptions for this first line.

19          What is this 46,000?

20  A.   Right.  This is target practice Tracer rounds, which is a

21  round that when you fire it, you can see a sort of streak of

22  light shooting out the back so you can see where it went.  And

23  then the others are cone stabilized discarding sabot, which is

24  a sabot round is a metal rod round that is a penetrator of

25  armor.

O5lWmen4                    Maali - Direct

1   A.  Not -- I don't believe so.

2   Q.  When did you learn that she was in a relationship with

3   Mr. Menendez?

4   A.  Sometime early 2019, maybe.

5   Q.  And how did you learn that?

6   A.  We had another dinner, but I don't think it was a

7   fund-raiser that night.  I think we just had another dinner.

8   Q.  And who was at that dinner?

9   A.  I can't remember.  I know Fred was there, myself, the

10  senator, Nadine, but I can't remember who else was there.

11  Q.  Do you think it was just the four of you?

12  A.  No.  There was other people there.  I remember the table

13  being a large table, and I just can't remember who was there.

14  Q.  Do you recall, was that at a restaurant?

15  A.  Yes.

16  Q.  What restaurant?

17  A.  It was at Le Jardin.

18  Q.  So this was a dinner with Mr. Daibes and Mr. Menendez;

19  approximately how many times have you dined with both of them?

20  A.  About, maybe about a handful of times.

21  Q.  Sorry.  Maybe about a handful of times you said?

22  A.  Uh-huh.

23          THE COURT:  You have to say yes or no.  You said

24  uh-huh.

25          THE WITNESS:  Oh.  Sorry.

O51Wmen4                         Maali - Direct

1   BY MR. MARK:

2   Q.   Approximately how many times do you think you've met

3   Mr. Menendez?

4   A.   Several.

5   Q.   And from the times that you've met Mr. Menendez, have you

6   observed Mr. Daibes's relationship with Mr. Menendez?

7   A.   I have.

8   Q.   What was it like?

9   A.   They're friends, and from what I've heard from the both of

10  them, they've been friends for well over 30 years.

11       MR. MARK:   Now, Mr. Hamill, could you please show for

12  the witness only what's been marked for identification as

13  Government Exhibit 3D-2.  And the parties.

14  Q.   Ms. Maali, do you recognize your email address in this

15  email?

16  A.   I do.

17  Q.   And do you recognize Fred Daibes's email address in this

18  email?

19  A.   I do.

20  Q.   And did Fred Daibes ever email you documents to ask you to

21  print them out?

22  A.   He has.

23  Q.   And when he would email you documents to print them out,

24  would you do as he requested?

25  A.   Of course.

1002

O51Wmen4                        Maali - Direct

1    MR. MARK:  The government offers Government Exhibit

2    3D-2 into evidence.

3    THE COURT:  Admitted, without --

4    MR. WEITZMAN:  Objection, your Honor.  Sorry.

5    Objection.

6    THE COURT:  Basis.

7    MR. WEITZMAN:  Relevance.

8    THE COURT:  I'll take it subject to connection.

9    (Government Exhibit 3D-2 received in evidence)

10    MR. MARK:  May we publish?

11    THE COURT:  Yes.

12    MR. MARK:  Mr. Hamill, could you please publish this.

13    Q.  Ms. Maali, here, was this an email that Mr. Daibes sent to

14    you so you could print it out?

15    A.  Correct.

16    Q.  All right.  And do you see that it's a forward of another

17    email?

18    A.  Yes.

19    Q.  And do you see it's a forward of an email from Robert

20    Menendez to Fred Daibes?

21    A.  It is.

22    Q.  And do you see that Mr. Menendez's email account is listed

23    as bobmenendez54@gmail.com?

24    A.  Correct.

25    Q.  And do you see that there's an attachment to this email?

1040

O5L3MEN5

1  bribe was given for an act that was actually performed, the act
2  doesn't have to have been performed.
3      MR. MONTELEONI:  Exactly.  And the jury's not going to
4  hear that the act was performed.  But what does have to be
5  shown in the next couple sentences to sustain a conviction, it
6  is necessary to show the corrupt understandings.
7      THE COURT:  Just let me look at that.  That's simply
8  your point on contemporaneous knowledge.
9      MR. MONTELEONI:  Exactly.  They say evidence of the
10 members' knowledge of the alleged bribe payer's illicit reasons
11 for paying money is sufficient to carry the case to the jury.
12     THE COURT:  Let me look at it.  Yes, it seems to me it
13 is all the same simple, if not simplistic, point.
14     MR. MONTELEONI:  Right.  But we couldn't put in that
15 evidence, if any mention of the legislative act between the
16 bribe payer or between the bribe payer and the member was
17 precluded.
18     You couldn't prosecute Brewster if any time anyone
19 mentions postage rate legislation that was precluded.  The
20 whole point we have to prove that the bribe payer thought that
21 he was going to reward Brewster for postage rate legislation,
22 and Brewster agreed to accept the money in that way.  But if
23 there is no discussion of the postage rate legislation that's
24 possible, then the case could not proceed and the Supreme Court
25 should have dismissed it.

O5L3MEN5

1    THE COURT:  But I'm precluding any discussion of the

2    hold.  I'm precluding a statement that he put the hold on or

3    took the hold off.

4    MR. MONTELEONI:  But, your Honor, that's the

5    representation is exactly how you prove the knowledge of the

6    corrupt motive.  And again there is also a prospective

7    component.  Let's not forget, every time he is doing this and

8    saying what's he done in the past, in this continued set of

9    conduct, that obviously incentivizes the other side to believe

10   he is going to keep doing it, especially in a conspiracy count.

11   But especially here, in the case of this September FMF scare

12   they hadn't even gotten their money yet.  Egyptians were

13   waiting for their money.  So anything he's saying about this is

14   obviously going to be viewed in the light of what is this going

15   to mean for my money, and it is obviously a representation I am

16   not going to go tell my staff to hold this tomorrow.  You are

17   going to get your money.

18   So, there is, first of all, a forward looking

19   component to it.  But more broadly, this is the proof of the

20   contemporaneous understandings and beliefs between the bribe

21   payer and the bribe recipient which is at the core of the

22   corrupt exchange.  That's the gravamen of the corruption

23   offense, and if that was precluded, there could be no such

24   prosecution.

25   And we know from the Supreme Court that there can --

O5L3MEN5

1  and I should say this is very critical evidence in our case,

2  and to go beyond what the Supreme Court has done, what the

3  Third Circuit again has very explicitly said you actually can

4  totally prove this.

5           THE COURT:  In the case --

6           MR. MONTELEONI:  In the *McDade* case which then Judge

7  Alito, I think it is a well-respected, well-cited opinion,

8  applying *Brewster* from 1994.

9           THE COURT:  Just give me the cite.

10          MR. MONTELEONI:  I'll give it again.  28 F.3d 283, 293

11  (3d Cir. 1994).  And it's no surprise that it came after

12  *Helstoski* because it's consistent with *Helstoski*.  What we

13  can't put on, much though we would like to, is the evidence of

14  what he actually did.  But what he's saying about what he did,

15  what people are saying about what he did, who are part of this

16  corrupt exchange, that's how we prove the parts that we're

17  allowed to prove.

18          THE COURT:  I will take a look at the Alito Third

19  Circuit opinion.

20          MR. WEITZMAN:  That case was also a motion to dismiss,

21  not evidentiary rulings.

22          But I would draw your attention, let me be clear about

23  what our position is.  Our position is not that they can't, you

24  know, rely on evidence that shows a conversation that reflects

25  a promise, if there was such a conversation, where a senator

1043

O5L3MEN5

1 says I will sign off on X if you pay me money.  Of course,
2 that's admissible under all the case law.

3 　　　　What they can't do is you can't inject the legislative
4 act and say you therefore know that there is a corrupt
5 agreement because he took that legislative act.  And that's
6 what they're trying to do here.

7 　　　　I understand this may be more challenging for the
8 government to prove its case.  We've said from the beginning
9 that government cannot prove the case they promised.  The
10 Supreme Court has identified that very problem that says that's
11 not a concern.  In *Helstoski* they say, quote, we do not accept
12 the government's arguments.  Without doubt the exclusion of
13 such evidence will make prosecutions more difficult.

14 　　　　THE COURT:  That's what I was referring to earlier.

15 　　　　MR. WEITZMAN:  Indeed the speech and debate clause was
16 designed to preclude prosecution of members for legislative
17 acts.  If they had evidence of a promise, and your Honor's
18 ruled about one document or series of documents that your Honor
19 has interpreted as a promise.  We disagree but we stand by your
20 Honor's ruling.  If they had evidence of a promise, they can
21 put it in.  They cannot put in activity that the senator takes
22 in putting a hold, or lifting a hold or someone else asking
23 about a hold that he put on or didn't put on, in an effort to
24 prove a corrupt agreement that we believe never existed.

25 　　　　MR. MONTELEONI:  We are not planning on arguing to the

O5vWmen2                    McKinney - Direct

1   really took care of those special organs or special cuts, and

2   in their case, it was livers.

3   Q.  During your time as under secretary, about how much of your

4   time did you personally spend on matters pertaining to Egypt?

5   A.  Relatively little.

6   Q.  Do you remember ever being personally involved in any

7   matters related to exporting agricultural products to Egypt

8   during your time as under secretary?

9   A.  Yes, there were two.

10  Q.  Which matters do you remember being personally involved in?

11  A.  The first one was with a broad stroke.  It was not

12  infrequent that I would travel to Dubai, in the United Arab

13  Emirates, which hosted an annual enormous food show; it's where

14  a lot of buying and selling would take place.  And while there,

15  I would usually go over to the offices of the Gulf Cooperation

16  Council, which represented many of the Middle Eastern states.

17  Didn't represent Egypt, who is not a member, but by

18  approximation, by geography, they would share a lot of that.

19  So I would visit there, and that would be the first one.

20  Q.  And what was the second matter that you were personally

21  involved in?

22  A.  The second one occurred in late April, when we learned that

23  the government of --

24              THE COURT:  Late April of what year, sir?

25              THE WITNESS:  I'm sorry.  Thank you, sir.

O5vWmen2                    McKinney - Direct

1   A.  Late April of 2020 -- 2019.  Late April of 2019, when we

2   learned that the country of Egypt had delisted or stopped the

3   services of a number of halal certifiers in the U.S.  These are

4   certifiers that are at the beef plants certifying the halal

5   process is followed, and they would be delisting or not using

6   any of their services.

7   Q.  And what did you learn that Egypt was going to do after it

8   delisted the services of certain halal certifiers?

9   A.  They were going to replace the several with one halal

10  certifier.

11  Q.  What was the name of the single certifier that was going to

12  replace the others?

13  A.  I didn't know initially, but I believe it was IS EG, and

14  there's a space between the S and the E.  IS EG, I believe, was

15  the name of it.

16  Q.  How did you learn of this decision by the country of Egypt?

17  A.  I may have learned verbally from staff, but most

18  definitively when I received an email that wrapped up and

19  summarized that.

20          MR. MARK:  Ms. Wechsler, would you please publish for

21  the jury what is already in evidence as Government Exhibit

22  8B-3.

23          You can enlarge the top half.  Thank you.

24  Q.  Mr. McKinney, do you recognize this exhibit?

25  A.  Yes, I do.

O5vWmen2                    McKinney - Direct

1   Q.   What is this email?

2   A.   Well, this is an email that's entitled TFAA alert, and that

3   was basically one of the most significant alerts or notices

4   that I could get on something that was breaking open, a new

5   issue, an issue that needed my immediate attention.

6   Q.   And it refers to an acronym, TFAA.   What does that refer

7   to?

8   A.   Sure.   That was my portfolio.   Trade and Foreign

9   Agricultural Affairs is associated, or was, with my under

10  secretary title.   So TFAA was for all who are involved in my

11  portfolio.

12  Q.   And generally speaking, what did this TFAA alert relate to?

13  A.   Well, the headline describes it.   That was when we learned

14  officially, at least I learned the first time, that Egypt was

15  going to delist most halal, U.S. halal-based certifiers and,

16  most critically, was going to replace them with a single one,

17  which we learned had never certified halal in their history.

18  Q.   When you were alerted that Egypt had proceeded to go with a

19  single halal certifier, how important, if at all, did you

20  consider this issue?

21  A.   Very, very important.   We immediately swung into action

22  just because of the very unique and highly unusual nature of

23  the decision.   This was very, very unusual in the practices of

24  TFAA.

25  Q.   And why did you consider this issue important?

O5vWmen2                        McKinney - Direct

1   Q.  How did Mr. Menendez contact you in May of 2019?

2   A.  I believe it was a staff member that notified my chief of

3   staff to expect a call on my cell phone, and I was informed

4   that he would be calling.

5   Q.  Did you know to expect the call -- you knew to expect this

6   call from your chief of staff, you said?

7   A.  Yes.  I came back from a meeting and she said in about an

8   hour Senator Menendez would be calling, and he did.

9   Q.  Approximately how long was your call in May 2019 with

10  Mr. Menendez?

11  A.  It was fairly short.

12  Q.  Did anyone else appear to be on the phone call, other than

13  him?

14  A.  Not that I knew.

15  Q.  Was anyone else from the U.S. Department of Agriculture on

16  the phone call with you?

17  A.  No.  I wanted to take this alone.

18  Q.  Do you remember every single word Mr. Menendez said during

19  the call?

20  A.  No, I don't.

21  Q.  Do you remember the substance of the phone call?

22  A.  Absolutely I do.

23  Q.  What, in sum, did Mr. Menendez say to you during the call?

24  A.  Well, there were three topics.  First, he referenced a news

25  article that had been brought to his attention.  It was written

O5vWmen2                    McKinney - Direct

1  in Arabic but had English translation, and so he made reference

2  of that.  That led then to him saying would you please quit

3  interfering with my constituent.  And after that, I wanted to

4  explain why my team and I were undertaking the actions we were,

5  including all of the letters.

6      I started into that discussion.  I was interrupted and

7  stopped, and then the call ended shortly thereafter because it

8  didn't have much more to go.

9  Q.  You testified that you don't remember every word

10  Mr. Menendez used?

11  A.  Correct.

12  Q.  Do you remember some specific words or phrases that

13  Mr. Menendez used?

14  A.  I will never forget the words.

15  Q.  What words or phrases do you remember?

16  A.  Stop interfering with my constituent.

17  Q.  Did you understand from the call what constituent

18  Mr. Menendez was talking about?

19  A.  Yes, I did.

20  Q.  What constituent did you understand Mr. Menendez to be

21  referring to?

22  A.  It was the single halal certifier, IS EG.

23  Q.  What did you understand Mr. Menendez to mean when he said

24  he wanted you to stop interfering?

25          MR. FEE:  Objection.  His understanding is not

O5vWmen2                        McKinney - Direct

1   relevant, your Honor.

2           THE COURT:  Sustained.

3   BY MR. MARK:

4   Q.  Did you have an understanding from participating in the

5   call what he was referring to when he said stop interfering?

6           MR. FEE:  Objection.

7           THE COURT:  I will allow it.

8           You may answer.

9           THE WITNESS:  Did you say allow?

10          THE COURT:  You may answer.

11  A.  Yes, I felt very clearly he was referencing to the halal

12  certifier that was mentioned in the news article and that he

13  was asking me to stop all the activities that we were

14  undertaking to seek clarification, add back some halal

15  certifiers, continue some, the things that were listed in those

16  emails and that letter that were shown earlier.

17  Q.  Did he use the word "please" in the phone call?

18  A.  Not that I recall.

19  Q.  Did Mr. Menendez discuss -- you said Mr. -- strike that.

20          You mentioned that Mr. Menendez referenced a press article?

21  A.  Yes, sir.

22  Q.  Did he ask you about the accuracy of that article during

23  the call?

24  A.  He did not -- I do not recall he asking about the accuracy.

25  He referenced its contents.

O5vWmen2                          McKinney - Direct

1    Q.  What was the focus of the call, the press article or what
2    you said he said about stop interfering with IS EG?
3    A.  When I walked away, I felt very strongly that it was the
4    message, the action I was to take, which was stop interfering.
5    Q.  During the call, how did you respond to Mr. Menendez's
6    request that you stop interfering with IS EG?
7    A.  Well, I started to try to explain why we were undertaking
8    the actions, get at the points, like monopolization, disruption
9    of flow of market, perhaps loss of market share, those kinds of
10   things, and didn't get very far in until I was interrupted,
11   sir.
12   Q.  Why did you try to explain those matters to Mr. Menendez on
13   the call?
14   A.  Because they were very serious.  I used the word
15   "draconian" in the letter.  We'd never heard that before.
16        Lots of times when a country would entertain or change like
17   this, others might follow suit.  The precedent was very
18   important here.  All the things that were involved, as we
19   discussed in the documents before, were at hand, and we felt
20   like we had to address this right now.  And that's why we
21   escalated it so relatively quickly and took the actions or were
22   attempting to take the actions that we did.
23   Q.  How did Mr. Menendez respond when you tried to explain
24   these negative impacts of Egypt's decision?
25   A.  I was interrupted very early into my explanation.  I didn't

O5vWmen2                    McKinney - Direct

1    get very far.

2    Q.  What did Mr. Menendez say when he interrupted you?

3              THE COURT:  Wait.  Wait.  Who interrupted you?

4              THE WITNESS:  When I was trying -- the senator

5    interrupted me when I was trying to explain, sir.

6              THE COURT:  I see.

7    BY MR. MARK:

8    Q.  And I just was asking you what did Mr. Menendez say when he

9    interrupted you?

10   A.  I don't remember exactly, sir.  I recall, though, he said

11   let's not bother with that or that's not important or let's not

12   go there, something of that nature.  But he stopped my

13   explanation.

14   Q.  What was Mr. Menendez's tone during the phone call with

15   you?

16   A.  It was serious.  I would say, at least in a couple cases,

17   curt.  Again, I was cut off.  Serious to maybe even very

18   serious are the best words I can describe, sir.

19   Q.  Based on Mr. Menendez's tone and demeanor during the call,

20   and what he said to you, did you understand that he was

21   expressing his concerns or that he was making a demand?

22             MR. FEE:  Objection.

23             THE COURT:  Sustained as to form.

24   BY MR. MARK:

25   Q.  Based on Mr. Menendez's tone and demeanor, what was your

O5vWmen2                    McKinney - Direct

1   understanding of the message he was conveying to you?

2              MR. FEE:  Objection.

3              THE COURT:  Did you believe he was attempting to

4   convey a message to you, sir?  Yes or no.

5              THE WITNESS:  Yes.

6   BY MR. MARK:

7   Q.  What was that message?

8   A.  Stop.  Stop interfering.

9   Q.  How influential in the Senate -- actually --

10             THE COURT:  Did he say what the alleged interference

11  was?

12             THE WITNESS:  Well, by virtue -- sir, by virtue of

13  opening with the news article, which got at this issue and

14  mentioned the company in question, I felt very clearly that's

15  what he was referencing.  And so when words like "stop

16  interfering with my constituent" -- and it was that, stop

17  interfering with my constituent -- in my mind there was no

18  doubt who that was and what the issue involved.

19             THE COURT:  Who was involved and what was the issue

20  involved of which there was no doubt in your mind?

21             THE WITNESS:  That we stop undertaking the activities

22  that we'd been working on to try to bring back halal

23  certifiers, to rethink the decision made by the U.S. -- by the

24  Egyptian government and see about instituting practices that

25  would not interrupt the flow of beef and beef livers.

O5vWmen2                    McKinney - Direct

1    Q.  During your conversations with other members of Congress

2    when you were serving as under secretary, had any member of

3    Congress ever cut you off when you were trying to explain your

4    agency's actions and decisions?

5              MR. FEE:  Objection.  Relevance.

6              THE COURT:  No.  I will allow that.

7              Did any member of Congress ever interrupt an

8    explanation by you, if you can recall one way or the other?

9              THE WITNESS:  No.  I had never had an interruption

10   like that.

11   BY MR. MARK:

12   Q.  Based on Mr. Menendez's tone and demeanor during the call

13   and what he said to you --

14             THE COURT:  Well, he doesn't know his demeanor.  He

15   only knows his tone, unless it was a video call.

16             Go ahead.

17   BY MR. MARK:

18   Q.  Based on Mr. Menendez's tone and what he said to you, what,

19   if anything, did you feel pressured to do?

20             MR. FEE:  Objection.  No relevance to his feelings.

21             THE COURT:  Pardon me?

22             MR. FEE:  His feelings are not relevant to this case.

23             THE COURT:  That was not asking feelings.

24             In your interpretation, what was, if anything, the

25   senator asking you to do?

O5vWmen2                    McKinney - Direct

1          THE WITNESS:  He was telling me --

2          THE COURT:  -- that you perceived?

3          THE WITNESS:  I felt he was telling me to stand down

4    and stop doing all of the things that we were doing to try to

5    revive some sense of competition in the U.S. beef market.

6    BY MR. MARK:

7    Q.  Now, Mr. McKinney, you said that you recall that he said to

8    stop interfering with his constituent.  About how many times

9    did he say to stop interfering to you during that call?

10   A.  At least two and possibly a third.  I believe that is how

11   the conversation ended after I was interrupted.  So I don't

12   know if it was two or three, but I know it was at least two and

13   perhaps that third.

14   Q.  When he said stop interfering to you, from participating on

15   the call, did you understand that he was trying to convince you

16   or telling you to do that?

17          MR. FEE:  Your Honor --

18          THE COURT:  Sustained as to form.

19   BY MR. MARK:

20   Q.  Did you have an understanding from being at that call what

21   he was trying to do?

22          MR. FEE:  Objection.  No foundation.  Calls for

23   speculation.

24          THE COURT:  Just a moment.

25          What was your understanding of what Mr. Menendez was

O5vWmen2                    McKinney - Direct

1   asking you to do?  Your understanding.

2           THE WITNESS:  My understanding was that he was telling

3   me, in so many words, stand down, stop all the effort to try to

4   figure out how to keep the several halal certifiers and let lie

5   the fact that there was now one.  That is exactly how I felt,

6   and I relayed that to several of my team afterwards.

7   BY MR. MARK:

8   Q.  During the call did he discuss the merits of the decision

9   to go to a single halal certifier?

10  A.  No.  That was the part I was trying to explain and was

11  interrupted.

12  Q.  And how did the call with Mr. Menendez end?

13  A.  Well, when I couldn't explain and he had referenced the

14  article, he closed by saying please stop interfering with my

15  constituent.

16          THE COURT:  When he referenced the article, had you

17  seen this article previously?

18          THE WITNESS:  I had not seen it.  I was aware it was

19  there.  It was still coming to me by way of my team.

20          THE COURT:  That I don't understand.  The article

21  itself was coming to you by way of your team?

22          THE WITNESS:  Yeah -- to answer your question, I had

23  not seen that article.  I had not read it yet by that time.

24          THE COURT:  What did Mr. Menendez -- so I take it,

25  therefore, he described the article to you if you hadn't seen

O63Wmen3                    McKinney - Cross

1    You don't say in here that, you would agree, that the
2    senator said anything about stop interfering with my
3    constituent, right?
4    A.  I did not put that in here.  I verbalized it.
5    Q.  Not in this email, correct?
6    A.  That is correct.
7         MR. FEE:  Let's go back to the draft response for a
8    moment, Government Exhibit 8B-49, and let's go to page 14.
9    Q.  Now, Mr. McKinney, you reviewed these on Friday.  Do you
10   recall?
11   A.  Let me just understand this one.
12        MR. FEE:  Yes.  Can you cut out the white, Mr. Kelly,
13   so it's easier to read.
14   A.  OK.  Go ahead.
15   Q.  And you testified on Friday that these had been prepared in
16   preparation for a second meeting or interaction with Senator
17   Menendez, right?
18   A.  Yeah, that's correct.
19   Q.  All right.
20   A.  I believe that's correct.
21   Q.  And it didn't actually happen, but at the time you and your
22   staff worked on these briefing points, fair to say?
23   A.  That's right.
24   Q.  And the purpose is to respond to Senator Menendez's inquiry
25   regarding the Egyptian news article regarding halal certifiers

O63Wmen3                    McKinney - Cross

1    of U.S. beef.  Do you see that, Mr. McKinney?

2    A.   That's correct.

3    Q.   And then if you zoom back out, it touches on a number of

4    the points you've covered here, Mr. McKinney; is that fair to

5    say?

6    A.   Do you mean on the guidance points, sir?

7    Q.   Yes, sir.  I'm sorry.

8    A.   Yes, sir, that's correct.

9    Q.   All right.

10   A.   Well, and there's a continuation.  The last bullet point

11   talks about the go forward, which was not GAIN-related, but

12   yes.

13   Q.   Understood, understood.

14        And again, nowhere in here do you reference or describe

15   Senator Menendez as having said that he wanted you to stop

16   interfering with his constituent, correct?

17   A.   That's correct.

18             MR. FEE:  We can put that down briefly.

19   Q.   On Friday, you said, you used the words "curt" and

20   "serious" to "very serious" to talk about Senator Menendez's

21   tone on this call, right?

22   A.   Correct.

23   Q.   But so we're absolutely clear, you are not testifying that

24   Senator Menendez actually made any threats to, say, interfere

25   with U.S.D.A. funding on that call, right?

1980

O63Wmen3                  McKinney - Cross

1   A.  That's correct.  He made no threats.

2   Q.  No threats to stop passing U.S.D.A. nominees, right?

3   A.  That's correct.

4   Q.  Nothing like that?

5       He didn't say he was going to haul you before Congress for

6   testimony?

7   A.  That's correct.  He did not.

8   Q.  And he could do that, right?  That's what a senator could

9   do, right?

10  A.  Yes, and they do.

11  Q.  And to your knowledge, senator -- well, they do, but not in

12  this instance, right, Mr. McKinney?

13  A.  No.  That's correct, not in this instance.  He did not say

14  that.

15  Q.  And to your knowledge, Senator Menendez never contacted

16  your boss, the agriculture secretary, Sonny Perdue, right?

17          THE COURT:  Do you know whether or not he ever

18  contacted the secretary of agriculture?

19          THE WITNESS:  I don't believe he did, but I don't

20  know.  Maybe they did, maybe they didn't.  I don't -- I didn't

21  ever know that he did.

22  BY MR. FEE:

23  Q.  And you would agree that it would have been more aggressive

24  to jump over your head and contact your boss, right?

25          MR. MARK:  Objection.

O63Wmen3                    McKinney - Cross

1     THE COURT:  Sustained.

2  BY MR. FEE:

3  Q.  Well, when you wanted to escalate the IS EG Halal issue,

4  you went from the agricultural *attaché* at the Egyptian embassy

5  in the United States and you went to their boss, the

6  ambassador, right?

7  A.  In a sequence following traditional diplomatic protocol, I

8  did do those steps.

9  Q.  Right.  So first the under secretary or the lower level

10  person and then escalation from there if you don't get the

11  results you want, right?

12  A.  No.  Starting with the ag. *attaché* to the ambassador and

13  then to the deputy minister, if you're referencing Egypt.

14  Q.  Got it.

15     But Senator Menendez, to your knowledge, did not escalate

16  above your head, right?

17     MR. MARK:  Objection.

18     THE COURT:  I'll allow it.

19  A.  That's -- to my knowledge, that's correct.

20  Q.  And if you wanted information about the IS EG Halal issue,

21  it was better to contact you rather than Secretary Perdue,

22  correct?

23     MR. MARK:  Objection.

24     THE COURT:  Sustained.

25  BY MR. FEE:

O63Wmen3                     McKinney - Cross

1   Q.  To your knowledge, did Secretary Perdue know anything about

2   IS EG Halal?

3              MR. MARK:  Objection.

4              THE COURT:  I'll allow that.

5   A.  We informed him at the very end to keep him informed.

6   Q.  At the very end after you learned about the FBI

7   investigation?

8   A.  I don't remember if it was before that or after that, but

9   we informed him about that time about where this was going.

10             MR. FEE:  OK.  Let's pull back up those briefing

11  point, 8B-49, and if you can focus on the guidance points.

12  Q.  So I just want to be clear.  These were being prepared

13  after the call with Senator Menendez to get ready for another

14  call, right?

15  A.  That is correct.

16  Q.  And what you are proposing here, if we just start at the

17  bottom, you're going to confirm that FAS is working with USTR

18  to continue pressure on the government of Egypt to provide a

19  detailed audit report, ensuring transparency, right?

20  A.  Yes, sir.

21  Q.  And USTR is U.S. trade representative?

22  A.  Yes.

23  Q.  And the rest of these points reflect that the U.S.D.A.,

24  after the call with Senator Menendez, was not going to change

25  its position on IS EG one bit, right?

1991

O63Wmen3                    McKinney - Cross

1     So between May 23 and June 19, you are still planning to

2  respond to Senator Menendez, correct?

3  A.  Yes.  Loosely, yes.

4  Q.  Well, it's almost a month, just short of a month, where you

5  had received the call but had not yet responded, correct?

6  A.  That's correct.

7  Q.  And during that month, you told your team in Cairo to stick

8  to their guns, so to speak, on IS EG Halal, correct?

9  A.  I would not characterize it that way, sir.

10          MR. FEE:  Let's put up just for the witness GX -- oh,

11  no.  It's in GX 8B-49.  I'm sorry.  You can put it back up and

12  go through.  Sorry.

13  Q.  Sir, you would agree that the draft response as of June 19

14  reflected that you were still maintaining your opposition on

15  behalf of the U.S.D.A. to IS EG Halal, correct?

16          MR. MARK:  Objection.  Asked and answered.

17          THE COURT:  I'll allow it.

18  A.  We had stopped the outreach, but we were still hoping for

19  information to come back from that which we'd already advanced.

20  Q.  Got it.

21  A.  So we were still standing there, hoping for a response, but

22  we weren't keeping up the outreach, the solicitation.  We were

23  hoping for a response in there.

24  Q.  But when the call from Senator Menendez happened, you

25  reached out to your team in Cairo and you told them you had

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A127

O63Wmen3                    McKinney - Cross

1    their back and you'd take the heat, right?

2    A.  If there was retribution, I would take the heat.

3    Q.  That's right.  But there was no retribution, correct, sir?

4    A.  That's correct.

5            MR. MARK:  Objection.

6            THE COURT:  Sustained.

7            MR. MARK:  Move to strike.

8            THE COURT:  The jury will disregard the answer.

9    BY MR. FEE:

10   Q.  So that month, May 23, or roughly a month, to June 19, you

11   didn't hear from Senator Menendez during that month, correct?

12   A.  Correct.

13   Q.  No phone call to you from Senator Menendez, correct?

14   A.  Correct.

15   Q.  Nothing to your staff from his office?

16   A.  Not that I know of, sir.

17   Q.  And the first time the prosecutors in this case asked to

18   speak with you, did you wait a month to get back to them?

19           MR. MARK:  Objection.

20           THE COURT:  I'll allow it.

21           If you know --

22   A.  Say it again, sir?

23   Q.  Sure.  When the U.S. government, the FBI reached out to you

24   and said, hey, we want to talk to you about your phone call

25   with Senator Menendez, did you wait a month to get back to

O63Wmen3                    McKinney - Cross

1    them?

2            MR. MARK:  Objection.  Assumes a fact.

3            THE COURT:  I'll allow it.  If he knows.

4    A.  I don't know how long it was.  I know they knocked on my

5    condominium door.

6            THE COURT:  Sir, if you don't know how long it was --

7            THE WITNESS:  I don't know how long.

8            THE COURT:  -- you don't know how long --

9            THE WITNESS:  I don't know how long.

10           THE COURT:  -- it was.

11           THE WITNESS:  All right.

12           THE COURT:  Do you get the idea that the more you

13   volunteer the longer you'll be here?

14           THE WITNESS:  Sorry.

15   BY MR. FEE:

16   Q.  All right.  Sir, you would agree that given that it took a

17   month for you to even draft the response, this was not your top

18   priority, getting back to Senator Menendez?

19           MR. MARK:  Objection.

20           THE COURT:  Sustained as to form.

21   BY MR. FEE:

22   Q.  Sir, you would agree that as of May 23 getting back to

23   Senator Menendez was not your top priority, correct?

24           MR. MARK:  Objection.

25           THE COURT:  I'll allow that.

1994

O63Wmen3                    McKinney - Cross

1    A.  This is at the height of the negotiations with China, so

2    no, it was not my priority, and I did pay heed.  I didn't want

3    to elevate it any more.

4    Q.  And sir, in fact, during that month -- so that's from the

5    time of the call to when you heard about the FBI, just so we're

6    clear, that's the May 23 to June 19, roughly?

7    A.  Roughly.

8    Q.  And during that month, no one alerted you to Senator

9    Menendez taking any other actions with respect to IS EG Halal,

10   correct?

11              MR. MARK:  Objection.

12              THE COURT:  I'll allow it.

13   A.  That's correct.  I knew of no other information, no other

14   actions.

15   Q.  And the bottom line is that Egypt wanted IS EG, as you

16   understood the situation, to be the single halal certifier,

17   right?

18              THE COURT:  We've been over this and over it and over

19   it.  Move on.

20              MR. FEE:  Yes, your Honor.

21              Just one moment, your Honor?

22              No further questions, your Honor.

23              THE COURT:  Thank you.  Is there any redirect here?

24              MR. FEE:  Oh, no.  We have other people.

25              THE COURT:  Oh, I am sorry.  Of course.

O63Wmen3                    McKinney - Cross

1    I apologize.

2    MR. SOLANO:  Not necessary, your Honor.

3  CROSS-EXAMINATION

4  BY MR. SOLANO:

5  Q.  Good afternoon, Mr. McKinney.

6  A.  Good afternoon.

7  Q.  I want to go back to when you learned that Egypt was going

8  to go to a single halal certifier in the spring of 2019.

9  A.  Yes, sir.

10  Q.  You've testified that you took certain steps to try to get

11  them to change that decision, and in part, your constituents,

12  the U.S.D.A.'s constituents, were asking the U.S.D.A. to do

13  that, correct?

14  A.  Yes, but they were behind me.  I was leading that and they

15  were offering their support and their encouragement.

16  Q.  And you testified, I think you approximated the share of

17  the beef liver market in Egypt to be about 60 percent coming

18  from the U.S., correct?

19  A.  Beef livers to Egypt -- yes, beef livers to Egypt, about 60

20  percent share plus or minus.

21  Q.  And we could pull it up, but it was actually higher, right?

22  In that email that you drafted to Senator Menendez, it's more

23  like 70 percent, correct?

24  A.  Yeah.  I didn't remember exactly, sir.

25  Q.  Understood.  But it was more like 70 percent of the market,

O66Wmen3                        Grewal - Direct

1    Q.  Yes.

2    A.  Yes.

3    Q.  To the best of your memory, how did that come about?

4    A.  My recollection is that at some point prior to the phone

5    call, my cousin, who's friendly with the senator, had asked if

6    she could pass along my number, that he had requested it.  And

7    some point after that conversation -- I said yes.  But at some

8    point after that conversation, I received a phone call.

9               THE COURT:  Now, I would imagine, sir -- tell me if

10   I'm wrong -- that the telephone number of the New Jersey

11   attorney general is a publicly available number.  Is it not?

12              THE WITNESS:  The A.G.'s office number, yes, your

13   Honor.

14              THE COURT:  All right.

15              THE WITNESS:  My cousin was asking to pass along my

16   cell phone.

17              THE COURT:  Go ahead.

18   BY MR. RICHENTHAL:

19   Q.  Your personal cell phone or your government cell phone?

20   A.  I believe my cousin would only have my personal number.

21   Q.  Without giving us the full number, what were the last four

22   digits of the number you had at that time?

23   A.  6162.

24   Q.  Did you end up on a phone call with Senator Menendez?

25   A.  I did.

O66Wmen3                    Grewal - Direct

1    Q.  Did he call you or did you call him?

2    A.  I believe he called me.

3    Q.  Do you recall the precise date of the conversation?

4    A.  I do not.

5    Q.  What occurred in the conversation, in sum?

6    A.  I recall that the conversation happened -- I don't recall

7    the date, but I recall the time.  It happened during my evening

8    wrap-up meeting with my staff.  Every day I would meet with the

9    key leadership team in my office to see what happened during

10   the day and what was the plan for the following day.  And so it

11   must have been around five, 5:30 in the evening.

12       I recall getting the call, stepping out of the meeting, and

13   my office had a bunch of different rooms off of it, and I

14   walked into a side room.  And the senator made small talk with

15   me.  I believe it was pretty early on in my tenure, and so I

16   don't recall the exact substance of the small talk.  And then

17   he raised a concern about my office's handling of matters

18   involving Hispanic defendants as compared to non-Hispanic

19   defendants -- in particular, matters handled by the office of

20   the insurance fraud prosecutor.

21   Q.  Let me just pause for one second.  Where were you when this

22   happened?  I just mean where in the state of New Jersey.

23   A.  Sorry.  Sorry to cut you off.

24   Q.  Where were you when this happened?  I just mean where in

25   the state.

O66Wmen3                    Grewal - Direct

1    A.  I was in the Hughes Justice Complex in Trenton, where my

2    main office is.

3    Q.  And do you recall what area code came up on your screen

4    when Senator Menendez called you?

5    A.  I recall it to be a 202 number.

6    Q.  Now let me go back.  I think you said that he mentioned

7    your office's handling of matters involving certain Hispanic

8    individuals?

9    A.  I believe what he said to me was that he had a concern

10   about how my office -- the office of insurance fraud

11   prosecutor, in particular -- was treating Hispanic defendants

12   versus non-Hispanic defendants in the same industry.  And I

13   recall that that industry related to trucking.

14   Q.  Did you understand him to be talking about a particular

15   case or set of cases, or more broadly?

16   A.  That -- that was my reaction to when he raised the concern.

17   I said is this about a pending criminal matter, to which he

18   responded yes.  And I said are they represented?  And he said

19   yes.  And I believe I inquired by whom?

20       My recollection is that he said -- again, I don't know if

21   it was one defendant or multiple defendants, but rather -- the

22   defendant or defendants were represented by Michael Critchley,

23   and to which I responded, well, Michael is a fine lawyer, and

24   he could raise whatever concerns he has with the staff.

25   Q.  First, when you said Michael's a fine lawyer, what did you

O66Wmen3                          Grewal – Direct

1    mean by that?

2    A.  Michael Critchley is probably one of the finest criminal

3    defense attorneys in the state of New Jersey.

4    Q.  And then I believe you said that he could raise concerns,

5    if any, with someone else, or other people, with whom?

6    A.  With the team handling the matter.

7    Q.  That is the line prosecutors?

8    A.  That's correct.

9    Q.  What relationship, if any, did that have to do with the

10   policy or practice you testified about a few minutes ago?

11   A.  It was entirely consistent with how I handled outreach like

12   that, whether it was from a defense attorney or, in this case,

13   the senior senator.

14   Q.  And by the senior senator, you mean Senator Menendez?

15   A.  That's correct.

16   Q.  Did Senator Menendez appear to be confused by what you were

17   saying to him?

18               MR. WEITZMAN:  Objection.

19               THE COURT:  Sustained.

20   BY MR. RICHENTHAL:

21   Q.  Did he ask you any questions about what you said?

22   A.  I don't recall any follow-up questions.  The conversation

23   just shifted back to more small talk and ended shortly

24   thereafter.

25   Q.  Approximately how long was the conversation?

O66Wmen3                    Grewal - Direct

1   A.  Say five, five minutes, six minutes.  Not a long
2   conversation.
3   Q.  Did you pass on to the line prosecutors or team that you'd
4   received this conversation -- excuse me, received this message
5   from Senator Menendez?
6   A.  I did not.  I did not get into what the case was about or
7   who the defendants were.  And I view my job as insulating the
8   team from any type of pressure or interference from the
9   outside, and so I wasn't going to relate to anyone in the
10  office that there was this inquiry.  And I left it to the fact
11  that Michael could raise it with the team if there was an
12  issue.
13  Q.  What concern, if any, did you have if the team learned of
14  this phone call?
15           MR. WEITZMAN:  Objection.
16           THE COURT:  No.  Given the answer, I will allow it.
17  A.  I don't want my teams to feel pressured or intimidated
18  or -- you know, in any way.  I want them to make the calls in
19  their cases based on the facts of their cases before them, free
20  from any influence from the outside.
21  Q.  I think you said this call occurred in early 2019.  Is that
22  right?
23  A.  I don't recall the exact month, but it was early 2019,
24  fairly early in my tenure, I guess.
25           THE COURT:  Well, you said that before, but if I

O66Wmen3                         Grewal - Direct

1    understand your testimony, sir, it was January of 2018 when you

2    were confirmed as attorney general.  Is that right?

3              THE WITNESS:  That's right.

4              THE COURT:  So this would be about a year after you

5    were confirmed.

6              THE WITNESS:  Probably a year, yeah.  I would still

7    consider that fairly early, but yeah, you're right, about a

8    year after.

9    BY MR. RICHENTHAL:

10   Q.  Did there come a time another time when you spoke with

11   Senator Menendez?

12   A.  I did have another conversation with him, yes.

13   Q.  How did that come about?

14   A.  I just received a phone call from him asking for a meeting

15   with me in his Newark office.

16   Q.  And you said you received a phone call from him.  Do you

17   recall on what phone you received that call?

18   A.  Probably the 6162 number.

19   Q.  Approximately how long after the first phone call did the

20   second phone call come?

21   A.  I'd venture to say that the second phone call probably

22   happened in the fall of 2019.

23   Q.  Do you recall the precise words he used when he invited you

24   to a meeting?

25   A.  Something to the effect of, general, would love to sit down

O66Wmen3                    Grewal - Direct

1    with you or would like to sit down with you in person in my

2    Newark office.

3        I said I'll have my office set it up.

4            THE COURT:  You say he referred to you as general?

5            THE WITNESS:  I think -- I have a recollection of

6    that.  People often did that, would call me general at the

7    time.

8            THE COURT:  Because you were an attorney general, is

9    that correct?

10            THE WITNESS:  That's correct, yeah.

11            THE COURT:  All right.

12   BY MR. RICHENTHAL:

13   Q.  What did you understand him to mean by my Newark office?

14   A.  His in-state official office in Newark, New Jersey.

15   Q.  That is his Senate office?

16   A.  Yeah.  That's my understanding, that it's a Senate office

17   in the state.

18   Q.  Now, did he say what he wanted to meet with you about?

19   A.  He did not.

20   Q.  Did you agree to meet?

21   A.  I did.

22   Q.  What did you think the meeting would be about?

23   A.  I expected it to be on a policy issue or, you know,

24   something that our office was working on.  At the time I recall

25   we were doing a lot of work around issues with our immigrant

O66Wmen3                    Grewal - Direct

1   communities.  I was thinking that might be a topic, but I
2   didn't inquire about the subject matter of the meeting.  I just
3   had my secretary call his office to set it up.
4   Q.  If you had known the meeting would be about a particular
5   pending matter, would you have agreed to meet?
6   A.  A pending criminal matter?
7   Q.  Yes.
8           MR. WEITZMAN:  Objection, your Honor.
9           THE COURT:  Sustained.
10  A.  No.
11          THE COURT:  Sustained.  The jury will disregard the
12  answer.
13  BY MR. RICHENTHAL:
14  Q.  Did you think the meeting was about an individual pending
15  matter?
16  A.  I did not think that was the subject matter of the meeting.
17          THE COURT:  In the normal course, sir, would you ask a
18  staff member to determine in advance what the subject of a
19  meeting with a federal officeholder was going to be about?
20          THE WITNESS:  I think I -- I've started to do that,
21  and I probably --
22          THE COURT:  No.  In this instance.
23          THE WITNESS:  I don't recall if I asked Diane to ask
24  what the meeting was about.
25          THE COURT:  This is a staff member of yours, Diane?

O66Wmen3                    Grewal - Direct

1   quite sure what you mean when you said it was just like, oh.

2              THE WITNESS:  I think it was just a look of surprise,

3   your Honor, that somebody was with me.  That's what I took it

4   to mean, that he wasn't expecting, based on his facial

5   expression, somebody to walk in with me.

6              THE COURT:  So is it fair -- and again, I don't want

7   to put words in your mouth -- to say what you saw was a look of

8   surprise, and you inferred that was the reason for the

9   surprise?

10             THE WITNESS:  Correct.

11             THE COURT:  OK.  Thank you.

12  BY MR. RICHENTHAL:

13  Q.  Had you had other meetings with elected officials during

14  your tenure as attorney general?

15  A.  Yes.

16  Q.  Generally speaking, did you meet with them just you and

17  them, or were others around?

18  A.  I would always bring somebody with to the meetings.  And

19  generally the meetings that I had with members of the federal

20  delegation, there were staffers will.

21  Q.  And just to be clear, sir, when you say staffers, are you

22  referring to your own, or are you referring to someone on the

23  delegation?

24  A.  Both.  I would have somebody with me, and the meetings that

25  I've had with Congresspeople, the other senator from New

O66Wmen3                    Grewal - Direct

1   Jersey, they generally had other members of their staff there

2   for follow-up, do-outs, things of that nature.

3               THE COURT:  What's a do-out?

4               THE WITNESS:  Any follow-up action item, your Honor,

5   from the meeting, say they were going to send us something or

6   we were going to send them something.  Those sorts of things I

7   refer to as do-outs.

8               THE COURT:  Thank you.

9   BY MR. RICHENTHAL:

10  Q.  Approximately how long did the meeting last?

11  A.  Not long.  I would say maybe 10 to 15 minutes at most.

12  Q.  What happened at the meeting, in sum?

13  A.  In sum, it was the same as the phone call.  Some initial

14  small talk and conversation.  I recall when we sat down, the

15  senator was on my left.  I was sort of in front of him on the

16  circular table.  And Andrew was to my right.

17      I have a recollection that the senator had a folder in

18  front of him that he opened up.  And then he again raised the

19  same issue that he raised on the phone call with me earlier in

20  the year.  And that was his concern about how our office of

21  insurance fraud prosecutor was treating Hispanic defendants

22  versus non-Hispanic defendants.  At that point, my reaction

23  was, is this the same matter that you called me about when Mike

24  Critchley's representing the individual or individuals?  He

25  said yes.  And my response was, well, then Mike, again, can

O66Wmen3                    Grewal - Direct

1   raise those issues with the prosecutors who are handling the

2   case.  I can't talk to you about this.

3   Q.  Could you see what was in the folder?

4   A.  I have a vague recollection that it looked like a press

5   release, but it -- that's all -- from the format of a press

6   release that our office would put out, because I remember

7   seeing, I thought, like the logo for the A.G.'s office on the

8   top of the document.  But I couldn't see any details.

9           THE COURT:  You think it was one of your office's

10  press releases.

11          THE WITNESS:  Correct.

12          THE COURT:  OK.

13  BY MR. RICHENTHAL:

14  Q.  In expressing this concern, did he provide anything to you;

15  that is, physically give you anything?

16  A.  No, he didn't.  As soon as I responded in the same way I

17  responded on the phone, I believe he just closed the folder,

18  and we just made more small talk and Andrew and I left shortly

19  thereafter.

20  Q.  What, if anything, did you understand him to be asking you

21  to do with respect to this alleged discrimination?

22  A.  There wasn't an explicit ask.  What I understood the upshot

23  of this conversation to be was that he didn't like how this

24  matter was being handled by our office and wanted it handled

25  differently.

O66Wmen3                    Grewal - Direct

1          MR. WEITZMAN:  Objection, your Honor.  The first

2    sentence answers the question.

3          THE COURT:  Just a moment.

4          MR. WEITZMAN:  The rest is speculation, your Honor.

5          THE COURT:  Yes.  Sustained.  The jury will disregard

6    the second sentence.

7          Proceed.

8    BY MR. RICHENTHAL:

9    Q.  What, if anything, did you understand Senator Menendez to

10   want you to do about what he was raising to you?

11         MR. WEITZMAN:  It's the same question, your Honor.

12   It's already been asked and answered.

13         THE COURT:  Just a moment.

14         Did you have an understanding as to what, if anything,

15   Senator Menendez wanted you to do?  I will allow that.

16         MR. WEITZMAN:  Your Honor, I think he can ask what the

17   senator said, but understanding reads into speculation about

18   scienter.

19         THE COURT:  Thank you.

20         You can answer the question, sir, if you can.

21   A.  Can you repeat the question?

22   BY MR. RICHENTHAL:

23   Q.  What, if anything, did you understand Senator Menendez to

24   be indicating you should do about the alleged concern he was

25   raising?

O66Wmen3                    Grewal - Direct

1   Q.  Did you and Mr. Bruck discuss the meeting after the
2   meeting?
3   A.  I recall the meeting was a short meeting.  We rode the
4   elevator down, and I remember standing in front of the car
5   that -- at the time we had a state trooper detail with us.  I
6   remember before walking into the car, looking at each other and
7   I believe Andrew said to me, whoa, that was gross.
8       That was the last conversation I had with Mr. Bruck about
9   it.
10  Q.  That was gross?
11  A.  Gross.
12  Q.  What concern, if any, did you have about conveying to the
13  team or its supervisors that you had this meeting?
14  A.  I didn't have the information about what case it was, but
15  even if I did, I wouldn't convey it to the team.  Again, I want
16  them to be able to do their work without any concern about any
17  outside influence or concern that the senior senator for New
18  Jersey was concerned about the way they were handling the
19  matter.  I'm trying to insulate my team so they could look at
20  the facts of their case, make their decisions based on those
21  facts, not anything outside of -- outside of those facts.
22  Q.  Now, prior to this meeting, had Senator Menendez ever
23  raised a concern to you about the treatment by your office of
24  Hispanic defendants?
25  A.  Just on that first phone call.

O66Wmen3                    Grewal - Direct

1    Q.  Yes.  Other than the meeting and the phone call, did he

2    ever raise such a concern with you before?

3    A.  No.

4    Q.  Did he ever raise such a concern with you again?

5    A.  Some concern or that type of concern?

6    Q.  That concern, the concern of alleged mistreatment of the

7    Hispanic individuals.

8    A.  He did not.

9    Q.  Did he ever raise this particular case or cases with you

10   again; that is, subsequent to the meeting you just testified

11   about?

12   A.  He did not.

13   Q.  Now, you testified a few minutes ago about the team or the

14   line prosecutors.  Do you recall ever speaking with the team or

15   the line prosecutors about this particular case at all?

16   A.  I did not.

17   Q.  Do you recall ever taking action on this particular case at

18   all?

19   A.  I don't know what the case is.  I did not take any actions.

20   Q.  To this day, do you know what case specifically Senator

21   Menendez was talking about?

22   A.  I do not.

23   Q.  Now, I think I had asked you whether you conveyed the

24   meeting to the prosecutors.  Did you convey the meeting to

25   their supervisors?

2742

O66Wmen3                    Grewal - Direct

1   A.  I did not.  I don't know what Andrew did after that

2   meeting, but I certainly didn't.

3   Q.  Based on your meeting with Mr. Bruck, did you expect that

4   he would?

5   A.  I -- Andrew was there.  If there were any follow-ups

6   necessary, my -- again, my expectation was a policy meeting.

7   This meeting was very different from a policy meeting, so I

8   don't know what Andrew did or didn't do.

9   Q.  You said your expectation was that it would be a policy

10  meeting?

11  A.  That's correct.

12  Q.  What did you mean by that?

13  A.  As we talked about earlier, I thought it would be about,

14  you know, the work of our office, maybe some of the initiatives

15  we had underway, maybe along the lines of how we were

16  interacting with our immigrant communities.  I had issued a law

17  enforcement directive on that topic not too long before the

18  meeting, I imagine.  I don't recall the exact dates.  We were

19  doing a lot of work around policing, a lot of work to address

20  the disparities in the prison population.  I thought it would

21  be any number of those types of things.

22  Q.  If you had known that the meeting was what it actually was,

23  would you have gone?

24          MR. WEITZMAN:  Objection, your Honor.

25          THE COURT:  Sustained.

O663MEN4                           Grewal - Cross

1    You got the heads up he was going to call you?

2    A.  I did get the heads up.  But I remember it not being

3    temporally close to when I had that conversation.  So, it was a

4    bit out of the blue.

5    Q.  Your cousin asked if Senator Menendez -- if he can give or

6    she can give Senator Menendez your number to call you, right?

7    A.  That's correct.

8    Q.  And you understand that your cousin and Senator Menendez

9    are quite close friends, right?

10   A.  That's my understanding.

11   Q.  Senator Menendez was polite during that call, right?

12   A.  Always polite, yes.

13   Q.  He was complimentary of the work you were doing, correct?

14   A.  That's correct.

15   Q.  And then he told you that he had some -- he had heard from

16   constituents who were Hispanic that they were being singled out

17   by the office of insurance fraud prosecutors, right?

18   A.  That's not my recollection, him using the word

19   "constituents."

20   Q.  You don't recall him saying "constituents"?

21   A.  My recollection is that he had concerns about how the --

22   how OIFP was treating non-Hispanic defendants -- sorry.

23   Hispanic defendants as compared to non-Hispanic defendants in

24   the trucking industry.

25   Q.  You understand his constituents are statewide in New

2772

O663MEN4                    Grewal - Cross

1   Jersey, right?

2          MR. RICHENTHAL:  Objection.

3          THE COURT:  I'll allow that.

4   A.  That's my understanding, yes.

5   Q.  You prosecute crimes occurring in New Jersey, right?

6   A.  True, but I don't know if the defendants are New Jersey

7   residents.

8   Q.  Fair enough.  In any event, he was hearing -- he had

9   mentioned Hispanic defendants, plural, not just one, right?

10  A.  My recollection is plural, yes.

11  Q.  Other than alerting you to this issue, he didn't ask you to

12  take any corrective action on that call, right?

13  A.  He did not.

14  Q.  He didn't mention any particular case, right?

15  A.  Because I said to him, I asked a question, is this about a

16  pending matter, to which he responded yes.  And I said I cannot

17  speak about that pending matter, and I asked if they were

18  represented.  And my recollection he mentioned they were

19  represented by Mike Critchley.  And I said Mike can raise the

20  issues with the prosecutor or the court.

21         THE COURT:  When you said they, who were you referring

22  to just now?

23         THE WITNESS:  The defendants that he referenced when

24  he made the outreach.

25  Q.  When he first raised the issue, he didn't name a particular

O663MEN4                    Grewal - Cross

1   case or defendant, right?

2   A.  We didn't get to that.

3   Q.  In the very first sentence, he didn't say this concerns X

4   case?

5   A.  That's correct.

6   Q.  He didn't blurt out the name of any particular defendant or

7   any particular case?

8   A.  He didn't blurt anything.  He was very calm.

9   Q.  He didn't tell you he wants the case dismissed in any way,

10  right?

11  A.  He did not say that.

12  Q.  He didn't mention he wants the defendant or defendants to

13  get a better deal, correct?

14  A.  He did not say that, no.

15  Q.  He didn't even ask you to call the prosecutors on any

16  particular case, right?

17  A.  He did not ask me to call anybody.

18  Q.  And it was you who asked who is the defense lawyer on that

19  case, right?

20  A.  I think my first question was, does this concern a pending

21  matter.  When he responded yes, and I said are the defendants

22  represented, and I distinctly remember Mike Critchley coming

23  up.  And I said, well, Mike can raise the issues.

24  Q.  So, he gave you the name of the defense lawyer after you

25  asked whether the individual or individuals are represented?

O663MEN4                          Grewal - Cross

1    A.  That's my recollection, yes.

2    Q.  And he didn't ask you to call the defense lawyer, right?

3    A.  No.

4    Q.  I think you've answered this, but I want to be clear.  At

5    all times in this short conversation, Senator Menendez was

6    polite and respectful, correct?

7    A.  He's always been extremely polite and respectful in all our

8    interactions.

9    Q.  He didn't threaten you in any way, right?

10   A.  No.

11   Q.  He didn't tell you that, you know, you better look into

12   this or I'm going to haul you in front of Congress?

13   A.  No.

14   Q.  He didn't tell you that he would enact any sort of

15   legislation that would discriminate against New Jersey, right?

16   A.  No, he did not.

17   Q.  Or that he would target you in any way or badmouth you or

18   anything else, right?

19            MR. RICHENTHAL:  Objection to "anything else."

20   Q.  Fair enough.  He didn't threaten to badmouth you to state

21   legislators or anything else?

22   A.  He didn't make that threat.

23            THE COURT:  He didn't threaten any retaliatory action,

24   correct?

25            THE WITNESS:  He did not.

O663MEN4                        Grewal - Cross

1   Q.  In fact, you would agree with me that you weren't afraid of

2   any retribution in any way from Senator Menendez, right?

3               MR. RICHENTHAL:  Objection.

4               THE COURT:  Sustained.

5   Q.  You would agree with me you were not afraid of any

6   retribution from Senator Menendez as a result of this call,

7   right?

8               MR. RICHENTHAL:  Objection.

9               THE COURT:  Sustained.

10              Were you concerned that there would be retribution

11  from Senator Menendez as a result of this call?

12              THE WITNESS:  The only thing, Judge, that I was

13  concerned about, was at that point upsetting somebody who was a

14  close political ally of the governor's.  So I didn't, that was

15  my concern, of sort of being on his bad side.

16  Q.  Do you recall being interviewed in June 2022?

17  A.  I think it was on the 23rd.  Am I correct?

18  Q.  You're off by a day, but pretty close.  I'll give it to

19  you.  Do you recall telling the prosecutors and the FBI you

20  were not afraid of retribution from Senator Menendez?

21  A.  I don't recall what I told them, but I wasn't afraid of

22  retribution.

23  Q.  You said retribution is more a concern for you when you

24  deal with state senators, not U.S. senators like Senator

25  Menendez, correct?

O663MEN4                    Grewal - Cross

1    A.  That's something I probably would have said.

2    Q.  So Senator Menendez, in connection with this call in

3    January of 2019, after you told him you can't speak to him

4    about this matter, he didn't get upset with you, right?

5              MR. RICHENTHAL:  Objection.

6    A.  He just moved on.

7    Q.  He didn't threaten you in any way, right?

8              MR. RICHENTHAL:  Asked and answered.

9              THE COURT:  I'll allow it.

10   A.  He did not.

11   Q.  He didn't threaten to use any of his official powers as a

12   senator to retaliate against you, right?

13             MR. RICHENTHAL:  Same objection.

14             THE COURT:  I'll allow it.

15   A.  He didn't threaten to retaliate against me.  Again, my

16   concern was not upsetting somebody who is an ally of the

17   governor's.

18   Q.  You recall that in the first couple of proffers or meetings

19   you had with the federal government, you didn't recall the

20   details of this January 2019 call, right?

21   A.  That's possible, yes.

22   Q.  The first time you mentioned it to the prosecutors was on

23   April 25, 2024, before this trial, right?

24   A.  I had two meetings early on.  That was probably the third

25   time I talked to them, yeah.

O675men4                     Uribe - Direct

1    and his company.

2    Q.  Mr. Uribe, what is your understanding of what a subpoena

3    is?

4    A.  A subpoena would be a document issued by an authority, in

5    this case the New Jersey attorney general's office, requesting

6    information related to investigations of an individual -- in

7    this case Elvis Parra and E & K company.

8    Q.  To your understanding, what did the subpoena require

9    Phoenix to do?

10   A.  We were required to provide all available information in

11   regards to insurance policies issued to E & K Trucking company.

12   Q.  Did the subpoena require Phoenix to produce documents

13   related to E & K Trucking?

14   A.  Yes, it did.

15   Q.  To whom did it require Phoenix to produce the documents?

16   A.  It was required to be produced -- I'm sorry, Ms. Lara.

17   Would you repeat your question, please?

18   Q.  You said that the subpoena required you to produce

19   documents --

20   A.  Available to us, yes.

21   Q.  What entity was investigating E & K Trucking, to your

22   understanding?

23   A.  The New Jersey attorney general's office.

24   Q.  What was the New Jersey attorney general's office?

25   A.  The prosecutors for New Jersey.

O675men4                    Uribe - Direct

1    Q.  In approximately what year did Phoenix get the subpoena for
2    documents related to E & K?
3    A.  2014.
4    Q.  What was your understanding of the focus of the
5    investigation into E & K Trucking?
6    A.  The investigation was focusing on insurance fraud relating
7    to workers compensation policy.
8    Q.  What did you do after Phoenix received the subpoena?
9    A.  We collected the documents that were available to us as
10   indicated in the subpoena, and we turned those documents to the
11   attorneys for the firm Mr. Andy Aslanian, and he was in charge
12   of replying or answering the subpoenas to the state.
13   Q.  In approximately what year did Phoenix get the subpoena for
14   documents related to E & K?
15   A.  2014.
16   Q.  You mentioned, I believe, Andy Aslanian?
17   A.  Yes, I did.
18   Q.  Who is Andy Aslanian?
19   A.  Andy Aslanian is the attorney for Phoenix Risk Management.
20   He is also a person that he is a very good friend of mine that
21   I consider almost like a family member.
22          MS. POMERANTZ:  Ms. Wechsler, would you please display
23   what is in evidence as Government Exhibit 2A-8?
24   Q.  Mr. Uribe, who is this?
25   A.  That is Uncle Aslanian.  Andy Aslanian.

O675men4                          Uribe - Direct

1   Q.  Did Phoenix collect any materials in response to the

2   subpoena?

3   A.  Yes, we did.

4   Q.  Who handled responding to the subpoena on behalf of

5   Phoenix?

6   A.  Ana Peguero and myself.

7   Q.  What did you do?

8   A.  I helped Ana make up the documents available to us.

9   Q.  What was your initial reaction when Phoenix was subpoenaed

10  in 2014?

11  A.  No reaction, just a document to require us to provide

12  information.

13  Q.  Did Ana Peguero express any concerns to you initially about

14  Phoenix being subpoenaed in 2014?

15  A.  No, she did not.

16  Q.  Are you familiar with someone named Suzanna Lopez?

17  A.  Yes, I am.

18  Q.  Who is Suzanna Lopez?

19  A.  Suzanna Lopez is, was the detective in charge of the

20  investigation for the New Jersey attorney general's office.

21  Q.  Did there come a time when you learned that Detective Lopez

22  contacted Ana Peguero?

23  A.  Yes.

24  Q.  How did you learn that Detective Lopez contacted Ana

25  Peguero?

O67Wmen5                    Uribe - Direct

1           Go ahead.  You may answer.

2    A.  With the passing of years, unfortunately, Will's, his

3    business, it started to deteriorate, one after the other.

4           MR. FEE:  Move to strike.  Nonresponsive.

5           THE COURT:  I'll allow it.

6           Next question.

7    BY MS. POMERANTZ:

8    Q.  Approximately when did it start to deteriorate?

9    A.  Somewhere in the 2013, '14 year.

10   Q.  What, if anything, did Will say to you about his financial

11   situation around this time?

12   A.  His businesses were doing bad and he was facing a number of

13   issues with his gas station.  The trucking company didn't

14   perform well at all, and he had some issues with the

15   restaurants as well.

16   Q.  Did you understand Will's financial situation to improve or

17   to get worse?

18   A.  It got worse.

19   Q.  Did you understand that he continued to have his

20   businesses?

21   A.  Trucking company, it stop operating.  There were some

22   issues with the gas station, where he either lost the contract

23   or the franchise.  And I don't know the outcome of the, how bad

24   the businesses with -- the restaurant businesses performed.

25       This is also the time where Will lost, unfortunately, his

O67Wmen5                         Uribe - Direct

1   home as well.

2   Q.  What did you understand Will to do for -- withdrawn.

3          In this time period, did you go to meals with Will?

4   A.  We used to go out to meal once in a while, yes.  Often, I

5   would say.

6   Q.  Who paid when you went out for meals with him?

7   A.  Can I ask which period of time you're talking about, ma'am,

8   please?

9   Q.  So, in the period after he had lost his businesses.

10  A.  Well, when -- when Will started doing bad and he and I used

11  to go out together, I would, I will take care of it.  I will

12  pay for the bill, yes.  I used to pay for the bill.

13  Q.  What did you understand Will to do for work in 2018?

14  A.  My understanding is that Will was doing some studies for

15  his transportation -- for his meat company.

16  Q.  I want to now focus on your conversation with Will about

17  the New Jersey attorney general's case against Elvis.  Can you

18  remind us, when was your conversation with Will?

19  A.  Early 2018.

20  Q.  Where were you?

21  A.  One afternoon I was sitting at Andy's office, and I was in

22  Andy's office, just visiting for one afternoon, talking about

23  the Elvis case and the new subpoena that we received for

24  Prestige.

25  Q.  What was your relationship -- withdrawn.

O67Wmen5                    Uribe - Direct

1           You said that you were at Andy's office.  How did the
2    New Jersey attorney general's case come up with Will in 2018?
3    A.   This afternoon Andy and I are talking about both
4    investigations against Elvis and the Prestige Express subpoenas
5    when Will overheard the conversation and pulled me outside to
6    the hallway.  And that's when he and I spoke about these, this
7    investigation.
8    Q.   What did Will say to you?
9    A.   In substance, something like, brother, if this case is
10   about the Parra problem, situation, investigation, for sum of
11   about 200 to $250,000 -- I don't recall the exact amount -- he
12   will mail, he got a way to make these things go away.
13   Q.   Did you and Will talk about the investigation into
14   Prestige?
15   A.   Don't have a full recollection, but we did talk about -- we
16   did talk about both investigations going on at this point, yes,
17   ma'am.
18   Q.   Did he mention any particular names when he said that he
19   could help make the case go away?
20   A.   Yes, he did.
21   Q.   What names?
22   A.   Mentioned the name of Nadine and Senator Menendez.
23   Q.   What did he say about them?
24   A.   He being in some form of relationship with Nadine, he could
25   go to Nadine.  Nadine will work with -- go to Senator Menendez.

O675men6                    Uribe - Direct

1   about the New Jersey attorney general's case?

2   A.  Yes.

3   Q.  About when did you speak with her directly?

4   A.  March of 2019.

5   Q.  Why did you speak with her directly?

6   A.  Time is passing by, nothing is developing in a way that

7   gave me assurance that this deal is to be complete.  I lost

8   hope for Will, I decided to talk to Nadine directly since I met

9   her before, I knew about her.

10  Q.  Did you first speak with Nadine in person or by phone in

11  March 2019?

12  A.  We spoke via phone.

13  Q.  Had you spoken with Nadine on the phone before this call?

14  A.  Never before.

15  Q.  Did you have her phone number before this call?

16  A.  No, I did not.

17  Q.  How did you get her number?

18  A.  I got it from Andy Aslanian.

19  Q.  Was the call short or long?

20  A.  Somehow long, yes.

21  Q.  What did Nadine say during the call?

22  A.  There were many things that we spoke about.  Nadine put a

23  line of complaints about how her life was not going well and

24  that most men that had promised her things in the past never

25  come through.  Among those men she was listing Will to the fact

3001

O675men6                         Uribe - Direct

1    that he hasn't come through to the promises he had made to her.

2    Q.  What did she complain about with respect to Will?

3    A.  Among other things, that Will did not provide her the car

4    that she wanted.

5    Q.  How did Nadine sound on the call?

6    A.  Upset, disappointed on most mens in her life, angry.

7    Q.  Had you heard about Will promising to get Nadine a car

8    before this call?

9    A.  Through our conversations prior to this, yes, I heard that

10   Will was going to provide a car to Nadine.

11   Q.  What did Will say to you about this?

12   A.  Will said that from the proceeds that he was going to get

13   from the deal once the deal is completed and the guys pay what

14   they agreed to, he was going to buy from that money a car for

15   Nadine.

16   Q.  When you said "the guys" who are you referring to?

17   A.  Bienvenido Hernandez and Elvis Parra.

18   Q.  When Nadine complained that Will had not gotten her a car,

19   what did you say in response?

20   A.  In substance:  Fortunately, it is a car.  If the problem is

21   the car, I will provide the car as long as she helps me.

22   Q.  You said as soon as she helps you.  What did you say about

23   that to her?

24   A.  She knew -- she acknowledged knowing part of the deal in

25   this conversation.

O675men6                    Uribe - Direct

1  Q.  What do you mean by that?

2  A.  She acknowledged having been, talked to Will about every

3  solution for Elvis Parra and Elvis' Hernandez ceased

4  prosecution at this time.  And I promised her -- she did not

5  know about the other part of the deal.  At this time I promised

6  her that she is able to comply and help me complete this deal,

7  I will provide her for a car.

8  Q.  What did she say in response?

9  A.  She agreed to the terms.

10  Q.  Did the names Prestige Trucking, Phoenix Risk Management,

11  and Ana Peguero, come up during the call?

12  A.  Yes.

13  Q.  And when those names came up, what did Nadine say in

14  response?

15  A.  She knew nothing about it.

16  Q.  What did you say in response?

17  A.  That I was surprised, in substance, because Will knew the

18  whole deal.

19  Q.  What did Nadine say in response?

20  A.  She only knew about E & K.

21  Q.  Why did you agree to help Nadine get a car on this phone

22  call?

23  A.  I want this deal done not only because Elvis is like a

24  family member, person that I respect and care for too, or an

25  investigation is going on with Prestige, or because in reality

O6aWmen4                              Uribe - Direct

1   Q.  Mr. Uribe, where did you write these names down?

2   A.  In a piece of paper.

3   Q.  Did you have the piece of paper, or did someone give it to

4   you?

5   A.  Someone gave it to me.

6   Q.  Who gave you the piece of paper?

7   A.  Nadine did.

8   Q.  And where were you when she gave you the piece of paper?

9   A.  Sitting in a -- in the backyard from Mr. Menendez.

10  Q.  What happened that led Nadine to bring you a piece of paper

11  in the backyard?

12  A.  Mr. Menendez allow -- called for Nadine by something like

13  *mon amour*, and he also rang a bell, little bell that he had on

14  the table.

15  Q.  After he rang the little bell and called out *mon amour*, did

16  Nadine bring you a piece of paper?

17  A.  Yes, she did.

18  Q.  And after that, where did Nadine go?

19  A.  She went back into her home.

20  Q.  When you were writing those names on a piece of paper, was

21  Nadine there?

22  A.  She was not.

23  Q.  What happened after you wrote down the names on the piece

24  of paper?

25  A.  Mr. Menendez fold the piece of paper and put him in his

O6aWmen4                    Uribe - Direct

1    pants pocket.

2    Q.  And what happened next?

3    A.  At this time Mr. Menendez suggested that I should be going.

4    He -- we just had a glass of Grand Marnier, and he advised me

5    that area was -- has a lot of cops and it will be smart for me

6    not to be drinking and driving in that area.

7    Q.  Now, Mr. Uribe, you testified that you gave Robert Menendez

8    the names on a piece of paper.  What did you ask him to do in

9    the backyard?

10   A.  One more time I ask Mr. Menendez that my bigger concern is

11   the ongoing investigation into Prestige Express, to please find

12   out if that investigation will finally lead to my daughter Ana

13   Peguero and Phoenix Risk Management, and I beg him to please do

14   anything on his power to stop anything that could cause harm to

15   my family.

16   Q.  Now, after you were in the backyard and it came time to

17   leave, where did you go?

18   A.  We went out to the, to the driveway, same way we came in.

19   Q.  Who went out to the driveway?

20   A.  At this point, Nadine, the senator, myself.

21   Q.  And what, if anything, happened in the driveway?

22   A.  Nadine show Senator Menendez have I told her to -- how I

23   taught her how to opening her car without using the control

24   remote.

25   Q.  To take a step back, while you were in the backyard,

O6aWmen4                    Uribe - Direct

1    besides the Grand Marnier, did you or Robert Menendez smoke

2    anything?

3    A.  Mr. Menendez smoke a cigar.

4    Q.  Why did you go to meet with Robert Menendez on September 5,

5    2019?

6    A.  Nadine invited me to her home.  I got the opportunity to

7    explain one more time what is that that I needed or was looking

8    for Mr. Menendez to do for me and my family, and I couldn't

9    miss that opportunity.

10   Q.  What, if any, other business did you have with Robert

11   Menendez?

12   A.  None.

13   Q.  During this conversation in the backyard, did you tell

14   Robert Menendez that you had been making payments on the

15   Mercedes for Nadine?

16   A.  We did not talk about payments on the car.

17   Q.  And why didn't you bring it up?

18   A.  Once again, I don't have any doubt that Mr. Menendez has

19   knowledge of me making the payments.  He did not bring the

20   topic and I didn't bring it neither.

21            MR. FEE:  Your Honor, I'd move to strike.  The

22   first --

23            THE COURT:  No.  I'll allow it.  You can cross.

24   BY MS. POMERANTZ:

25   Q.  When you say you had no doubt that Robert Menendez knew

O6aWmen4                    Uribe - Direct

1   that you paid for the Mercedes, what do you mean?

2   A.  I'm sitting on a -- on Nadine's patio, talking to

3   Mr. Menendez, asking for help for my family.  I don't think I

4   would have gotten there if I am not the one complying with part

5   one of my agreement with Nadine.

6   Q.  When you say complying with part one of my agreement with

7   Nadine, what do you mean?

8   A.  I'm sorry.  I take that back.  Complying with my commitment

9   to Nadine as the agreement we sealed on March 12 of 2019, at

10  the Villa Amalfi.

11  Q.  Now, you testified that you sat with Robert Menendez in the

12  backyard for about an hour on September 5, 2019.  Before you

13  met with him that night, did Nadine ever tell you not to tell

14  Robert Menendez that you were making payments on her Mercedes?

15  A.  No.

16  Q.  Before you met with him that night, did Nadine tell you not

17  to talk about certain topics with him?

18  A.  No.

19  Q.  Did Nadine ever tell you to keep any secrets from Robert

20  Menendez before you met with him that night?

21  A.  No.

22  Q.  Did she ever tell you to hide anything from him before you

23  met with him that night?

24  A.  No.

25          MS. POMERANTZ:  Ms. Wechsler, let's pull up Government

O6bWmen3                    Uribe - Cross

1   Q.  You committed illegal activities through those very

2   companies of which they were the owners on paper, correct?

3   A.  I will call that I failed to file my taxes under those

4   companies that I control and manage.

5   Q.  Under your family's names?

6   A.  And they were registered to my family's name.

7   Q.  And in doing that, you put them in harm's way to shield

8   yourself, correct?

9        MS. POMERANTZ:  Objection.

10        THE COURT:  Sustained.

11   BY MR. SOLANO:

12   Q.  Mr. Uribe, didn't you put them at risk of legal problems by

13   making them the owners of companies that were evading taxes?

14        MS. POMERANTZ:  Objection.

15        THE COURT:  I'll allow it.

16        You can answer.  If you can answer it, you may, sir.

17   A.  My family could be at risk, yes.

18   Q.  And you're here now testifying against my client --

19   Mr. Hana, correct?

20        MS. POMERANTZ:  Objection.

21        THE COURT:  I'll allow it.

22   A.  I am here to testify as a witness for the prosecutors, sir.

23   Q.  And one of the defendants is Mr. Hana, correct?

24   A.  That is correct.

25   Q.  And you're doing that in the hopes that you get a sentence

O6bWmen3                    Uribe - Cross

1   of no incarceration, isn't that right?

2   A.  I will hope to get that, yes.

3           MR. SOLANO:  No further questions, your Honor.

4           THE COURT:  All right.  Thank you.

5           Mr. Fee, cross-examination.

6           MR. FEE:  Yes.

7   CROSS-EXAMINATION

8   BY MR. FEE:

9   Q.  Mr. Uribe, you have testified that you have pled guilty to

10  committing fraud, right?

11  A.  Yes.

12  Q.  And you would agree that fraud means telling lies to get

13  money, right?

14          MS. POMERANTZ:  Objection.

15          THE COURT:  Well, let's see.

16  A.  I will just have a definition of fraud as having a

17  wrongdoings, something that is illegal.

18  Q.  When you committed fraud, you told lies to get money,

19  right, Mr. Uribe?

20  A.  When I committed these fraud, I -- yes.

21  Q.  You lied to customers of your insurance companies who

22  thought they were getting policies when they weren't, right?

23  A.  I will say the fact that I use an unauthorized insurance

24  carrier to issue those policies turned into a lie to my

25  customers as me no having my diligence of checking the validity

O6bWmen3                          Uribe - Cross

1    of those companies, sir.

2    Q.  You lied to them, right?

3            MS. POMERANTZ:  Objection.

4            THE COURT:  I'll allow it.

5            Did you lie to them?

6    A.  Yes, I did.

7    Q.  You lied to a bank to get money, right?

8    A.  Yes, I did.

9    Q.  You lied to the federal government in the form of the

10   United States Small Business Administration to get more money,

11   right?

12   A.  Yes, I did.

13   Q.  And then you ran, for over 15 years, insurance companies

14   that you were not allowed to operate under New Jersey law,

15   right?

16   A.  That is incorrect, in your answer -- in your question, sir.

17   Q.  You ran insurance businesses for over 15 years that you

18   were not allowed to run under New Jersey law, correct?

19   A.  It was less than 15 years, sir.

20   Q.  How long did you operate insurance businesses that you were

21   not legally allowed to operate under New Jersey law?

22   A.  Give and take 13 years.

23   Q.  So you would agree that you have been committing frauds and

24   other crimes for at least the last 13 years, correct?

25   A.  Yes.

O6bWmen3                          Uribe - Cross

1   Q.  And all of those crimes, day after day after day, required
2   you to tell lies, right?
3              MS. POMERANTZ:  Objection.
4              THE COURT:  Sustained as phrased.
5   BY MR. FEE:
6   Q.  You told lies for all of those 13 years, correct?
7              MS. POMERANTZ:  Objection.
8              THE COURT:  Sustained.
9   BY MR. FEE:
10  Q.  Sir, every day you were running your insurance businesses
11  you were breaking the law, right?
12  A.  Yes.
13  Q.  And the way in which you were breaking the law every single
14  day was you were deceiving the New Jersey insurance commission,
15  correct?
16  A.  I wouldn't say that way.  I was acting as the general
17  manager and insurance adviser or on insurance agency.
18  Q.  The lie of those businesses was that you were falsely
19  depicting your son Omar and your daughter Ana as running those
20  businesses when, in fact, you were, correct?
21  A.  Correct.
22  Q.  So every day you were running those businesses you were
23  effectively telling a lie, correct?
24             MS. POMERANTZ:  Objection.
25             THE COURT:  I'll allow it.

O6bWmen3                        Uribe - Cross

1   A.  Yes.

2   Q.  And when you do something for that long, you get good at

3   it, right, Mr. Uribe?

4           MS. POMERANTZ:  Objection.

5           THE COURT:  Sustained.

6   BY MR. FEE:

7   Q.  You're a very good liar, aren't you?

8           MS. POMERANTZ:  Objection.

9           THE COURT:  Sustained.

10  BY MR. FEE:

11  Q.  In fact, you lied in this courtroom on Friday and then

12  again on Monday, wouldn't you agree, Mr. Uribe?

13          MS. POMERANTZ:  Objection.

14          THE COURT:  I'll allow that.

15          Did you lie in this courtroom, sir?

16          THE WITNESS:  No, I did not, sir.

17  BY MR. FEE:

18  Q.  And I'll get to that, but before we do, the frauds you were

19  running for all these years, you involved your actual family,

20  your flesh and blood, right?

21  A.  Yes.

22  Q.  You took your son Omar, and after the state of New Jersey

23  said, Mr. Uribe, you cannot run any insurance business, you

24  made Omar the owner of Phoenix, correct?

25  A.  Correct.

O6bWmen3                        Uribe - Cross

1    Q.  But you were, in fact, running Phoenix and not Omar, right?

2    A.  Correct.

3    Q.  And Omar, your son, at the time he was the owner of

4    Phoenix, in name only, he knew you had already lost your

5    insurance license, didn't he, Mr. Uribe?

6            MS. POMERANTZ:  Objection.

7            THE COURT:  Did he know you had already lost your

8    insurance license?  If you know.

9            THE WITNESS:  Yes.

10   BY MR. FEE:

11   Q.  It was no secret to anyone that you had been convicted of

12   insurance fraud in the state of New Jersey in 2011, correct,

13   Mr. Uribe?

14           MS. POMERANTZ:  Objection.

15           THE COURT:  Sustained.

16   BY MR. FEE:

17   Q.  Well, you would agree that the New Jersey insurance fraud

18   prosecutor released a press release about your conviction for

19   defrauding seven clients, correct?

20   A.  I don't know what the press release was, sir.

21   Q.  Do you remember a press release being issued when you were

22   convicted of defrauding seven insurance clients, Mr. Uribe?

23   A.  I don't have a recollection sitting here right now, sir.

24   Q.  You would agree that in the insurance business in New

25   Jersey, it is important to monitor the public statements of the

O6bWmen3                          Uribe - Cross

1   New Jersey insurance fraud prosecutor, sir?

2              MS. POMERANTZ:  Objection.

3              THE COURT:  Sustained.

4              MR. FEE:  Let's show the witness what's been marked as

5   DX 499, please.  Let's zoom in on the main body of that,

6   please.

7   Q.  Read what I've circled, Mr. Uribe, and let me know when

8   you're done.

9   A.  I just read.

10  Q.  Does that refresh your recollection that the New Jersey

11  insurance fraud prosecutor issued a press release when you were

12  convicted, pled guilty to defrauding seven of your insurance

13  client, Mr. Uribe?

14  A.  Still does not refresh my recollection, sir.

15  Q.  OK.  Well, you did that, though; you defrauded seven of

16  your insurance clients and pled guilty to that offense, sir,

17  correct?

18  A.  If that is what expressed by the insurance commissioners,

19  then I have to believe that's what they found.

20  Q.  Because you committed so much fraud over so many years,

21  sitting here today, you can't remember that you pled guilty to

22  defrauding seven of your insurance clients in 2011, isn't that

23  right, Mr. Uribe?

24             MS. POMERANTZ:  Objection.

25             THE COURT:  Sustained.

O6bWmen3                    Uribe - Cross

1    BY MR. FEE:

2    Q.  You don't remember defrauding seven insurance clients and

3    pleading guilty to it, is that your testimony, sir?

4            MS. POMERANTZ:  Objection.

5            THE COURT:  No.  I'll allow it.

6    A.  I remember pleaing to insurance fraud and theft by

7    deception, sir.

8    Q.  The nature of your fraud was telling your clients they had

9    insurance and then stealing their insurance premiums, isn't

10   that correct, sir?

11   A.  I will not agree with that.  The nature of the fraud became

12   from the fact that I placed the policies with the unauthorized

13   carrier, the nonauthorized carriers to do business in New

14   Jersey.  I collected their premium, that policy being from an

15   unauthorized carrier made me took the premiums, but I did not

16   steal it from them, sir.

17   Q.  So your testimony is that the New Jersey insurance fraud

18   prosecutor mischaracterized in his press release your guilty

19   plea to stealing the premiums from your insurance clients; is

20   that your testimony, sir?

21           MS. POMERANTZ:  Objection.

22           THE COURT:  I'll allow it.

23           MS. POMERANTZ:  It's not in evidence.

24   A.  If that is the characterization the department of insurance

25   has on me, then that's what they found.

O6bWmen3                      Uribe - Cross

1   Q.  So they just got that wrong?

2              MS. POMERANTZ:  Objection.

3              THE COURT:  Sustained.

4              MR. FEE:  You can put that down.  Thank you,

5   Mr. Kelly.

6   Q.  You also roped in to your daily ongoing insurance fraud

7   scheme --

8              THE COURT:  Why don't you take out the word "roped."

9   It may save an objection or two.

10             MR. FEE:  Thank you, your Honor.

11  Q.  You also got involved your sister Raisa, correct?

12             MS. POMERANTZ:  Objection.  Vague.

13             THE COURT:  Let's have a specific question.

14  BY MR. FEE:

15  Q.  Your sister Raisa also worked for the insurance business

16  that you were not legally permitted to run in the state of New

17  Jersey, correct?

18  A.  Correct.

19  Q.  Your brother Antonio Worked for the insurance business that

20  you were not legally allowed to run in the state of New Jersey,

21  correct?

22  A.  Correct.

23  Q.  And your daughter Ana worked there and eventually was named

24  the fake owner of Phoenix, correct?

25             THE COURT:  Sustained.

O6bWmen3                          Uribe - Cross

1           MS. POMERANTZ:  Objection.

2           THE COURT:  Mr. Fee, you know how to ask questions

3     that don't lead to objections, sir.

4     BY MR. FEE:

5     Q.  Well, sir, is she the fake owner of Phoenix, Ana Peguero,

6     during the time you were actually operating it?

7     A.  She's not the fake owner.  She is the legal owner of the

8     agency.

9     Q.  Who was actually running Phoenix, sir, at the time you were

10    involved, sir?

11    A.  I was.

12    Q.  Now, Ana used to be friends with your actual daughter,

13    correct?

14    A.  With my -- Vanessa, my daughter Vanessa, yes.

15    Q.  Your daughter by birth, Vanessa?

16    A.  Say that again, sir.  I missed it.

17    Q.  Ana used to be friends with Vanessa, correct; that's how

18    you first came to know Ana?

19    A.  How did you refer to my daughter Vanessa before, sir?

20    Q.  Your daughter by birth, your birth daughter Vanessa.

21    A.  Vanessa is not my daughter by birth.

22    Q.  Tell me.

23    A.  Vanessa and my son Omar are my son and daughter from my

24    wife Martha that came into my life at age three and age one.

25    And so today Omar is my older son and Vanessa is my older

O6bWmen3                    Uribe - Cross

1    daughter.

2    Q.  Did you take legal custody of Vanessa?

3    A.  No.

4    Q.  OK.  But you call Vanessa your daughter as well?

5    A.  And I will call it to the rest of my life, sir.

6    Q.  Yes, sir.

7        And that's how you first met Ana, correct, through Vanessa?

8    A.  Yes.

9    Q.  And then when Ana was 19 years old, she reached out to you

10   for help, right?

11   A.  Run that by me again, sir?  Ask me the question again.

12   That would be more proper.

13   Q.  When Ana was 19 years old, she reached out to you for help,

14   correct?

15   A.  Don't remember at what age exactly, but somewhere when she

16   was very young she reach out to me, correct.

17   Q.  And at the time she reached out to you for help, she had

18   actually fallen out, had a fight, with your daughter Vanessa,

19   correct?

20   A.  I am not aware of such fight, sir.

21   Q.  Well, they had stopped being friends by the time Ana

22   reached out to you, correct?

23   A.  I have no knowledge of such acts, my friend, sir.

24   Q.  You say you don't remember that Ana and Vanessa had a

25   falling out at the time Ana reached out to you; is that your

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A176

O6bWmen3                    Uribe - Cross

1    testimony?

2    A.  That is my testimony.

3         MR. FEE:  Let's show the witness 3542-28, page 3,

4    paragraph 5.  Just the witness and the lawyers, please.

5    Q.  Read that, Mr. Uribe, and let me know when you have had a

6    chance to do it.

7    A.  OK.

8         I did.

9    Q.  Sir, does that refresh your recollection that at the time

10   Ana reached out to you, she had lost touch with your daughter

11   Vanessa?

12   A.  My understanding of losing touch doesn't mean that they

13   have what I understood you said before, falling out, like a

14   dispute or something like that.  They just lost touch to each

15   other.  They went different directions, to my understanding.

16   Q.  So Ana wasn't in touch with your daughter Vanessa at the

17   time she reached out to you, sir; is that what you're saying?

18   A.  I don't know how much touch they have between they -- to

19   each other, sir.

20   Q.  OK.  So Ana calls you and she says I'm pregnant and I need

21   a job, right?

22   A.  Yes.

23   Q.  And she's in a tough situation and was coming to you, sir,

24   for some security and some protection, fair to say?

25        MS. POMERANTZ:  Objection.

O6bWmen3                    Uribe - Cross

1              THE COURT:  I'll allow it.

2              Was Ana coming to you for security and protection, if

3      you know?

4              THE WITNESS:  Your Honor, my best west -- my best way

5      of saying is that she came to me looking for help.

6              THE COURT:  All right.  Thank you.

7      BY MR. FEE:

8      Q.  So this 19-year-old pregnant woman comes to you looking for

9      help, and you install her as the owner of the insurance company

10     that you are secretly operating, correct?

11             MS. POMERANTZ:  Objection.

12             THE COURT:  Sustained as to form.

13             Mr. Fee, ask the question.

14     BY MR. FEE:

15     Q.  You took Ana and you made her the owner of Phoenix,

16     correct?

17     A.  Yes, I did, sir.

18     Q.  And that was your decision, to put Ana as the owner of

19     Phoenix, correct?

20     A.  Yes, it was.

21          Can I add to your question, please?

22     Q.  No.

23          And that happened only after your son Omar refused to

24     participate any longer in Phoenix, right?

25     A.  That happened when my son left to Seattle.

O6bWmen3                        Uribe - Cross

1   Q.  Because your son wanted to be a lawyer and no longer wanted
2   to be involved in your illicit insurance business?
3               MS. POMERANTZ:  Objection.
4               THE COURT:  Sustained.
5               Did your son no longer wish to be involved with
6   Phoenix?
7               THE WITNESS:  Your Honor, my son didn't like insurance
8   and wants to be a lawyer.
9               THE COURT:  All right.
10  BY MR. FEE:
11  Q.  Sir, you said your son didn't like insurance; is that what
12  you just said?
13  A.  He didn't have the passion for insurance.  He didn't like
14  it.
15  Q.  And your testimony is that your son understood that you
16  were illegally barred from operating an insurance agency,
17  correct?
18  A.  I don't have --
19              MS. POMERANTZ:  Objection.
20              THE COURT:  If you know.
21  A.  I don't remember making any statement of my son going away
22  from me because my operation was illegal, sir.
23  Q.  So you made Ana the actual owner, the -- excuse me.  Let me
24  rephrase.
25      You made Ana the owner on paper of Phoenix, correct?

O6bWmen3                    Uribe - Cross

1   A.  Yes.

2   Q.  But you were controlling the profits of Phoenix, right?

3   A.  Yes.

4   Q.  And then for another 11 years after you made Ana the owner

5   on paper of Phoenix, she was working with you in this business,

6   correct?

7           MS. POMERANTZ:  Objection.  Misstates prior testimony.

8           THE COURT:  Was Ana working with you in the insurance

9   business for 11 years?

10          THE WITNESS:  Ana was working with me for, don't

11  remember exactly the year she came to me, back into the office,

12  but yes, 11 year could be a right number.

13          THE COURT:  OK.

14  BY MR. FEE:

15  Q.  And you decided what happened with the money that Phoenix

16  made during those 11 years, correct; that was your decision?

17  A.  Yes.

18  Q.  What was the nicest car you owned during those 11 years?

19          MS. POMERANTZ:  Objection.

20          THE COURT:  I'll allow it.

21  A.  Mercedes-Benz.

22  Q.  But Ana's name was on the paperwork as owner of Phoenix,

23  right?

24          THE COURT:  You've established that.

25          MS. POMERANTZ:  Objection.

3590

O6cWmen4

1          MR. WEITZMAN:  I think we're likely to have a week,

2    week and a half, maybe two, in the defense case.  Part of it

3    depends, your Honor.  We still don't know all the witnesses

4    that they are withdrawing.  For example, your Honor, they've

5    given us notice of -- I don't know how many -- five witnesses

6    that they're no longer intending to call.  There are still, I

7    think, three cooperators on their list.  And I can name them,

8    but I don't want to name them in public.

9          THE COURT:  All right.  Talk to the government and

10   narrow down the list as much as you can, but that's a real

11   problem.  Two weeks for a defense case and June 24, that will

12   be a real problem, because this jury was asked for a six-week

13   trial, which would have ended June 21, and a couple of weeks

14   thereafter, which ends July 5, but we've got that July 4th

15   weekend in there, and people are going to get jammed up with

16   July 4th and subsequent issues.

17         I think everybody needs to be considerably more

18   efficient than they have been so far.  There's a lot of

19   duplication on the cross.  Again, it was an important cross, so

20   I gave you some leeway, but we were on that patio for an

21   awfully long time.  And for that matter, as I've said, both

22   sides are doing a lot of putting in things that are in, and

23   you're just repeating for the jury things that have been in.

24   Now, I allowed that for ten minutes simply because it was ten

25   minutes and there were two points that I thought made sense for

O6cWmen4

1    the jury to hear now, lest they be under a misimpression.  But

2    I urge you to cut down a lot of the simple presentation of

3    things that are already in evidence and save them for the

4    summations, where they more properly belong, as the defense was

5    arguing.

6              Let me just get rid of one item.  And we'll pick it up

7    again at -- do we have things that we can discuss before the

8    jury comes back?

9              MR. RICHENTHAL:  I think there's nothing that needs to

10   be, and therefore, we can return at 2:30.

11             THE COURT:  All right.

12             MR. RICHENTHAL:  But as I said, we're happy to --

13             THE COURT:  No.  I want this jury to have as much time

14   under its belt as possible, and everyone needs to have lunch

15   here.

16             But I do want to handle the Menendez motion to strike

17   the evidence from Ms. Maali concerning GX 3D-2, the Eastern

18   Mediterranean Security and Energy Partnership Act of 2019.  It

19   was a couple of lines from her plus the introduction of that GX

20   30-2, which was an email from Mr. Daibes to, in effect, Ms.

21   Maali, which had as an attachment the bill, the Eastern

22   Mediterranean Security and Energy Partnership Act of 2019.  I

23   guess it was an act at that point.  And that was the

24   attachment, and it was received by Mr. Daibes from Mr. Menendez

25   in an email from Menendez to Daibes, subject S1102.docx, and

3592

O6cWmen4

1    that attachment, based on the evidence, is simply the Eastern

2    Mediterranean Security and Energy Partnership Act of 2019.  And

3    Menendez has moved to strike that as well as the references in

4    the summary chart of Daibes forwarding it on to Hana and then

5    Hana forwarding it on to Helmy, or not.

6         The public sharing of a piece of legislation is not a

7    legislative act subject to speech or debate protections.  The

8    mere mentioning of a piece of legislation is not a legislative

9    act.  The text itself and sending the text itself is not a

10   legislative act; that is, the text of an act.  There's not a

11   reference to a legislative act in the testimony or the chart or

12   the exhibit, so there's no speech or debate issue with this

13   evidence.  I cite *Gravel*, 408 U.S. 625; *Hutchinson v. Proxmire*,

14   443 U.S. 111, at 133; *Doe v. McMillan* 412 U.S. 306, at 313-14.

15        There's no speech or debate issue in this

16   transmission.

17        Is Ms. Arkin going to testify anywhere along here?

18        MR. RICHENTHAL:  Yes, your Honor, possibly as soon as

19   Monday.  It's a little hard to predict.  Our hope is that

20   Ms. Arkin can take the stand early next week.

21        THE COURT:  What questions are you going to ask her

22   about this act?

23        MR. RICHENTHAL:  About the act itself?

24        THE COURT:  Yes.

25        MR. RICHENTHAL:  Not very much, your Honor.

O6cWmen4

1          THE COURT:  What are you going to ask her?

2          MR. RICHENTHAL:  Beyond the act, I can answer, but I

3    want to make sure I answer accurately to the Court's first

4    question.

5          THE COURT:  Yes.

6          MR. MARK:  So, we haven't decided definitively, but

7    there are a couple of references in the act, not to the

8    substance of the act but references in the act to the Eastern

9    Mediterranean gas forum.  She can explain what the Eastern

10   Mediterranean gas forum is.  So she can give context to some of

11   those words.

12         THE COURT:  She can explain.  It seems to me she can

13   explain, if she has knowledge, what the Eastern Mediterranean

14   gas forum is.  Yes.

15         Go ahead.  What else?

16         MR. MARK:  That is going to be pretty focused.  There

17   are just a couple of references like that to words and language

18   in it.  She's not going to testify about the nature of that or

19   anything to that extent.

20         THE COURT:  I don't want her testifying to the

21   development of the act, the votes on the act or anything of

22   that nature.

23         MR. MARK:  And we were not going to elicit that sort

24   of testimony.

25         THE COURT:  All right.  What else, outside of the act,

O6C5men5                    Sellinger - Direct

1    with -- working at, at the time.

2    Q.  What was your understanding of the purpose of the meeting

3    with Robert Menendez on December 15, 2020?

4    A.  The purpose was to pursue my interest in becoming U.S.

5    Attorney under President Biden.

6    Q.  What did you and Menendez generally discuss in the meeting?

7              THE COURT:  Before you get to that, I gather Biden had

8    been elected but he wasn't yet -- the inauguration had not yet

9    taken place; is that right?

10             THE WITNESS:  Correct, your Honor.  The inauguration

11   was on or about January 20th, I believe, is typically

12   Inauguration Day.

13             THE COURT:  Thank you.  Ms. Pomerantz asked what did

14   you and Menendez generally discuss in the meeting.

15             THE WITNESS:  We started talking about my priorities

16   if I became U.S. Attorney, talked by my vision for the office.

17   I ran through the generally -- the various units within the

18   office that I would focus on, certainly spoke about civil

19   rights and other general priorities, violent crime and the

20   like.  We then moved to discussing the selection of leadership

21   within the office and the approach.  The senator asked me what

22   my approach would be to selecting leaders and I told him some

23   of the things that I had been looking for that -- personality

24   traits and other characteristics that would be important to me,

25   and thereafter he mentioned Fred Daibes.

O6C5men5                    Sellinger - Direct

1    Q.  Did any particular cases come up during the meeting?

2    A.  Yes.  Senator Menendez mentioned that Fred Daibes had a

3    case before the United States Attorney's office and Senator

4    Menendez believed that he was being treated -- he,

5    Mr. Daibes -- was being treated unfairly, and Senator Menendez

6    hoped that if I became U.S. Attorney that I would look at it

7    carefully.

8    Q.  How many particular cases came up during that meeting?

9    A.  One.

10   Q.  Who brought up the case?

11   A.  Senator Menendez.

12   Q.  Were you talking about particular cases at the time he

13   brought up the Daibes criminal case?

14   A.  No.  It was towards the tail end of the meeting and we were

15   talking, as I said, about the -- we had talked about my

16   priorities for the office, my vision for the office, selecting

17   leadership for the office and the like.

18   Q.  Did Senator Menendez explain what he meant by unfairly?

19   A.  No.

20   Q.  To take a step back, when he brought up the Daibes criminal

21   case, what case did you understand him to be referring to?

22   A.  I didn't know.  I didn't know anything about it.

23   Q.  How did you respond to Menendez?

24   A.  I told the senator that any cases that came before me as

25   United States Attorney I would look at carefully, and I said

O6C5men5                     Sellinger - Direct

1   that either then or in a call we had the following day, or

2   both, and that was the end of that conversation.

3   Q.  Can you remind the jury about how many charged criminal

4   cases does the U.S. Attorney's office for the District of New

5   Jersey have ongoing at any given time?

6   A.  Approximately 1,500.

7   Q.  Before that conversation with Menendez on December 15,

8   2020, had you heard of Fred Daibes?

9   A.  Yes.

10  Q.  How had you heard of him?

11  A.  I was involved in a lawsuit at my former firm, Greenberg

12  Traurig, where I represented a real estate developer adverse to

13  Mr. Daibes and his bank and in connection with that lawsuit.  I

14  believe that was the first time I heard of Mr. Daibes.

15  Q.  Were there other ways that you had heard of him?

16  A.  Yes.  Separate and apart from that, at one point many

17  months earlier than December 2020, in a conversation before we

18  were having any discussions about becoming U.S. Attorney in

19  2020, he commented that he had spoken to the prior United

20  States Attorney about a case involving Mr. Daibes, was unhappy

21  about the way it was resolved, and that -- when I say it was

22  resolved, the conversation -- and that the prior U.S. Attorney

23  had placed responsibility on the resolution of whatever the

24  conversation was on his then First Assistant United States

25  Attorney.

O6C5men5                    Sellinger - Direct

1   Exhibit 12A-3.

2   A.  Yes.

3   Q.  Do you recognize this?

4   A.  Yes.  This is my calendar entry from my former firm

5   Greenberg Traurig, on December 18.

6           MS. POMERANTZ:  Your Honor, the government offers

7   Government Exhibit 12A-3.

8           THE COURT:  Hearing no objection, admitted.

9           (Government's Exhibit 12A-3 received in evidence)

10          MS. POMERANTZ:  Can we publish that for the jury?

11  BY MS. POMERANTZ:

12  Q.  Directing your attention to the middle of the page where it

13  says CB, what is CB?

14  A.  Cory Booker.

15  Q.  What does this CB entry show?

16  A.  It shows that I had a -- if you can enlarge it a little bit

17  for me?  It shows that I had a meeting scheduled, it looks like

18  at 10:30 to 11:30.  Oh, I'm sorry.  As I look at it, it

19  actually looks like it is from 11:00 to 12:30.  That is what is

20  blocked out in my calendar.

21  Q.  What was your understanding of the purpose of your meeting

22  with Cory Booker?

23  A.  Again, as with Senator Menendez, the application process to

24  become U.S. Attorney.

25  Q.  What did you and Cory Booker discuss in the meeting?

O6C5men5                    Sellinger - Direct

1    A.   We certainly discussed my vision for the office, my

2    priorities and the like.  We talked a fair amount about civil

3    rights.  And we also spoke a fair amount about criminal justice

4    reform legislation that Senator Booker had sponsored.  One such

5    piece of legislation passed into law but I believe there were

6    seven other bills that Senator Booker had sponsored on criminal

7    justice reform and I believe we had a reasonably detailed

8    discussion about that.

9    Q.   What, if any advice, did Robert Menendez give you before

10   your conversation with Booker on December 18, 2020?

11   A.   Senator Menendez had told me about the various bills that

12   Senator Booker had sponsored or co-sponsored and thought it

13   would be good for me to be prepared to talk about those in my

14   meeting with Senator Booker.

15   Q.   During your December 18, 2020 conversation with Booker, did

16   any particular cases come up during the meeting?

17   A.   No.

18   Q.   Now, you testified that when you met with Robert Menendez

19   on December 15, 2020, he brought up the Daibes criminal case to

20   you.  Did you speak with Robert Menendez about Daibes again?

21   A.   Yes, just can I have the question read back, please?

22            THE COURT:  Why don't you state it again.

23   Q.   Did you speak with Robert Menendez about Daibes again after

24   December 15, 2020?

25   A.   Yes.  On, I believe it was the following day, I called

3624

O6C5men5                    Sellinger - Direct

1   Senator Menendez back and I said to him that if I became U.S.

2   Attorney, I would look at all cases carefully but I want him to

3   know that I had this prior representation of developers in a

4   case that was adverse to Mr. Daibes that might lead to my

5   potentially being recused or removed from any case in the U.S.

6   Attorney's office, and I explained to him that the process was,

7   which I intended to follow, was to disclose to him the

8   circumstances of my prior representation, the details of the

9   case and the adversity, and that that disclosure would be made

10  to the Department of Justice and either the Department of

11  Justice process somebody else at the department would make the

12  decision whether I am not -- I should be recused.

13              (Continued on next page)

O6cWmen6                    Sellinger - Direct

1          THE COURT:  When you say somebody else, what do you

2     mean?  Somebody other than you?

3          THE WITNESS:  Somebody other than me.  I really didn't

4     know at that time who, who it was.

5          THE COURT:  If you know, is there a separate unit or

6     division or office within the Department of Justice that

7     handles these issues?

8          THE WITNESS:  I now know, since I've become U.S.

9     Attorney, that there's a small group of very senior attorneys

10    within the Department of Justice who make that determination.

11    I really didn't know anything about the details at the time.

12         THE COURT:  So if I understand you, the determination

13    of whether or not you are to be recused -- that is, to not have

14    anything to do with the proceeding -- is not made by you or

15    anyone in the District of New Jersey.  Is that what you're

16    saying?

17         THE WITNESS:  Correct.  The process is very clear,

18    that if there's a potential conflict of interest, that I make

19    disclosure of that and I do not make any decision as to whether

20    or not I would be recused.

21         THE COURT:  All right.

22         THE WITNESS:  And I communicated that to Senator

23    Menendez.

24         THE COURT:  Thank you.

25    BY MS. POMERANTZ:

3631

O6cWmen6                    Sellinger - Direct

 1   to -- the challenges in getting me approved and ultimately, and

 2   having me approved, those were all after the meeting.

 3            THE COURT:  The December 15 meeting.

 4            THE WITNESS:  Correct, your Honor.

 5            THE COURT:  OK.  So it was sometime between December

 6   15 and the end of 2020 when Menendez told you that he was not

 7   going to nominate you to the president.  Is that what you're

 8   saying?

 9            THE WITNESS:  Yes.

10            THE COURT:  All right.

11   BY MS. POMERANTZ:

12   Q.  Did Robert Menendez tell you why you were not going to be

13   nominated?

14   A.  No.  He told me that he was unable to have the White House

15   nominate me, and therefore, he wasn't going to recommend me.

16   He did not say specifically why, but he talked about the

17   process at the White House, that they wanted several

18   candidates, and we had discussed along the way various --

19   various things that the White House was looking at in 2020 as

20   part of its process.  But when he told me that I was not going

21   to get nominated, he didn't get into any specifics.

22   Q.  Was the conversation when he told you that you were not

23   going to be nominated after the call when you told him about

24   the recusal or potential recusal?

25   A.  Yes.  It was towards the end of December.

O6cWmen6                    Sellinger - Direct

1   Q.  Now, when Robert Menendez told you that you were not going

2   to be put forward, did he tell you who he was going to

3   recommend?

4   A.  No.

5   Q.  Did there come a time when you learned who he recommended

6   to be the U.S. Attorney for the District of New Jersey?

7   A.  Yes.  There was scuttlebutt in the legal community and

8   there were articles at some point reporting on it.

9   Q.  And who did you learn he had recommended?

10  A.  Esther Suarez.

11  Q.  After you learned that Robert Menendez had recommended

12  Esther Suarez, did you have any conversations with him about

13  the position of U.S. Attorney for the District of New Jersey?

14  A.  For several months I did not, but again, sometime in the

15  spring, there was scuttlebutt in the legal community that the

16  Suarez nomination, potential nomination, was hitting

17  roadblocks.  At some point I said to the senator that if that

18  process was not consummated and if she was not nominated, I

19  would be interested in speaking again about becoming U.S.

20  Attorney, continuing our discussion.

21  Q.  What was Robert Menendez's response to you?

22  A.  At that time he told me that Ms. Suarez was going back for

23  a second interview -- I believe it was a White House

24  interview -- and we could speak after that, depending on how it

25  went.

O6cWmen6                    Sellinger - Direct

1    Q.  Approximately when did you have this conversation with

2    Robert Menendez?

3    A.  I think it was probably around early April or sometime

4    during that month.

5          THE COURT:  April 2021?

6          THE WITNESS:  I'm sorry.  Yes, your Honor.

7    BY MS. POMERANTZ:

8    Q.  Are you familiar with someone named Michael Soliman?

9    A.  Yes.

10   Q.  And who is that?

11   A.  He had been the director of Senator Menendez's New Jersey

12   office for a number of years but had left a number of years

13   before 2020 and became a political consultant of some kind.

14   Q.  How did you meet Michael Soliman?

15   A.  I probably met Mr. Soliman around the same time that I met

16   the senator.  So in connection with help that I was providing

17   to the senator's campaigns, I developed a relationship with

18   Mr. Soliman as well.

19   Q.  Did there come a time when you spoke with Soliman about the

20   position of U.S. Attorney for the District of New Jersey?

21   A.  Yes.

22   Q.  And approximately when?

23   A.  Late March.  Now I'm recalling the calendar entry for that

24   day, I believe.  So I may have been a little late in my

25   conversations with Senator Menendez relative to my interest if

O6i5men1      Sellinger - Cross

1 Q. And it would be improper to prosecute someone based on

2 partisan politics; correct?

3 A. Yes.

4 Q. Do you agree that you and Senator Menendez have had

5 discussions, have you not, about how improper it is to

6 weaponize the U.S. Attorney's office or DOJ for partisan

7 politics?

8     MS. POMERANTZ: Objection.

9     THE COURT: Sustained.

10 BY MR. WEITZMAN:

11 Q. Have you and Senator Menendez had discussions about

12 problems involving the use of Department of Justice and the

13 U.S. Attorney's office prosecutions for partisan politics?

14 A. I don't recall a conversation about partisan politics, no.

15 Q. In any event, Senator Menendez asked you to look into the

16 Daibes case, correct?

17 A. Yes.

18 Q. And you said that you would look into that case like you

19 would look into all cases; correct?

20 A. That's not the way I said it. What I said was if I became

21 U.S. Attorney, I would look at all cases that came before me or

22 the front office, carefully.

23 Q. And that would be your duty, correct, as U.S. Attorney?

24 A. Yes. That's the job.

25 Q. Is it correct to say that what he asked you to do was to

O6i5men1                    Sellinger - Cross

1    execute your duty as U.S. Attorney?

2             MS. POMERANTZ:  Objection.

3             THE COURT:  Sustained.  Sustained.

4    BY MR. WEITZMAN:

5    Q.  Did you perceive his request to look into the Daibes case

6    as doing anything other than your official duty?

7             MS. POMERANTZ:  Objection.

8             THE COURT:  I will allow it.

9             THE WITNESS:  I did not believe he was asking me to do

10   anything other than my official duty.  In fact, I didn't

11   believe he was asking me to do anything.

12   BY MR. WEITZMAN:

13   Q.  That was my next question.

14            Senator Menendez didn't ask you to resolve or handle

15   the Daibes matter in any particular way, correct?

16   A.  Correct.

17   Q.  He didn't pressure you, correct?

18   A.  He did not.

19   Q.  He didn't threaten you, correct?

20   A.  No.

21   Q.  He didn't say that your recommendation to be the next U.S.

22   Attorney was in any way conditioned on decisions you would make

23   in the Daibes case?

24   A.  No.

25   Q.  He didn't use aggressive language when he spoke to you

O6i5men1                          Sellinger - Cross

1    about this, right?

2    A.  No.

3    Q.  He was calm; correct?

4    A.  Yes.

5    Q.  Respectful?

6    A.  Yes.

7    Q.  Deferential?

8           THE COURT:  That's a hard one.

9           MR. WEITZMAN:  That is withdrawn.

10   BY MR. WEITZMAN:

11   Q.  After you said you would take a look at all cases that come

12   before you, the conversation moved on; right?

13   A.  Yes.

14   Q.  During the entire time -- I'm sorry -- during the entire

15   U.S. Attorney vetting process this is the only time Senator

16   Menendez permanently mentioned the Daibes case to you; correct?

17          MS. POMERANTZ:  Objection.

18          THE COURT:  No.

19          Is this conversation the only time that Mr. Menendez,

20   himself, raised the Daibes case with you?

21          MR. WEITZMAN:  During the vetting process, your Honor.

22          THE COURT:  During the vetting process.

23          THE WITNESS:  Yes.

24   BY MR. WEITZMAN:

25   Q.  He never mentioned the Daibes case to you once you became

O6i5men1                    Sellinger - Cross

1   U.S. Attorney, correct?

2   A.   Correct.

3   Q.   Fair to say that in that December 15th conversation, you

4   didn't believe he was asking you to put your thumb on the scale

5   of justice in the Daibes case; correct?

6   A.   Correct.

7   Q.   And in fact, Senator Menendez has never asked you to put

8   your thumb on the scale of justice in connection with any case

9   as U.S. Attorney; correct?

10              MS. POMERANTZ:  Objection.

11              THE COURT:  Sustained as phrased.

12   BY MR. WEITZMAN:

13   Q.   Has Senator Menendez ever asked you to put your thumb on

14   the scale of justice in connection with any case pending before

15   the U.S. Attorney's office?

16              MS. POMERANTZ:  Objection.

17              THE COURT:  Sustained as phrased.

18   Q.   Has Senator Menendez ever asked you to weigh in,

19   improperly, in any case pending before the U.S. Attorney's

20   offers.

21              MS. POMERANTZ:  Objection.

22              THE COURT:  I will allow it.

23              THE WITNESS:  You will allow that?

24              THE COURT:  Yes.

25              THE WITNESS:  The only conversation about any case

O6i5men1                    Sellinger - Cross

1    that I have had with the senator was the case that -- the

2    conversation that we have just spoke about.

3    BY MR. WEITZMAN:

4    Q.  Now, you had mentioned that at an earlier time before you

5    were being considered for U.S. Attorney, Senator Menendez had

6    mentioned the Daibes case to you, correct?

7    A.  He had mentioned -- he had mentioned a matter involving

8    Mr. Daibes.

9    Q.  And he had mentioned, many months before you were being

10   considered for U.S. Attorney, that he had spoken to the prior

11   U.S. Attorney about the Daibes case; correct?

12   A.  Yes.

13   Q.  And that prior U.S. Attorney was Craig Carpenito, correct?

14   A.  Correct.

15   Q.  He was a Trump appointee, correct?

16   A.  Correct.

17   Q.  And he wasn't asking you to weigh in on his conversation

18   with Craig Carpenito, right?

19           MS. POMERANTZ:  Objection.

20           THE COURT:  I don't know what that means.

21   Q.  Did he ask you to intervene on behalf of Fred Daibes and

22   Craig Carpenito?

23   A.  No.

24   Q.  This was a social conversation between you two?

25           MS. POMERANTZ:  Objection.

O6i5men1                     Sellinger - Cross

1  Correct?

2  A.  Correct.

3  Q.  You never told anybody else who worked for Senator

4  Menendez, *Don't worry, I won't have to be recused in the Daibes*

5  *matter.*  Right?

6  A.  Correct.

7  Q.  Because that would not be a judgment call that you,

8  yourself could make; correct?

9  A.  The process is I make disclosure and an official at the

10 Department of Justice makes the determination.

11             THE COURT:  And you follow whatever that determination

12 is, correct?

13             THE WITNESS:  Of course.  Yes.

14 BY MR. WEITZMAN:

15 Q.  Now, after you told Senator Menendez about this potential

16 conflict and potential recusal, he continued to try to -- he

17 continued to discuss the U.S. Attorney position with you;

18 correct?

19 A.  Yes.

20 Q.  And in fact, he helped set up a meeting between you and

21 Cory Booker, right?

22 A.  He did help facilitate my meeting with Senator Booker, yes.

23 Q.  Do you recall that meeting occurred on December 18, 2020?

24 A.  Yes.

25 Q.  And that was two days after you discussed the potential

O6i5men1                    Sellinger – Cross

1    conflict with Senator Menendez; right?

2    A.  Yes.

3    Q.  The purpose of that meeting, sir, was that in order to get

4    Senator Booker's buy-in on your potential recommendation to be

5    the next U.S. Attorney?

6    A.  In substance.

7    Q.  And did the meeting go well?

8    A.  Yes.  I thought it did.

9    Q.  Now, in late December 2020, you got a call from Senator

10   Menendez; right?

11   A.  I had a number of conversations with him, he and the staff

12   in late December.

13   Q.  And there was one particular call where Senator Menendez

14   told you that the White House was not going to accept your

15   recommendation as U.S. Attorney; correct?

16   A.  Yes.  The recommendation of me to be U.S. Attorney.

17   Q.  And instead the White House went with Esther Suarez; is

18   that correct?

19   A.  He did not mention the name of who the nominee or the

20   suggested recommended nominee would be.

21   Q.  You learned, though, that it was Esther Suarez; right?

22   A.  Yes.  There came a time when I learned that.

23   Q.  And during the call when Senator Menendez told you that you

24   would not be the nominee, did he tell you that the president

25   was interested in a diverse candidate?

O6i5men1                    Sellinger - Cross

1          MS. POMERANTZ:  Objection.  Assumes a fact.

2          THE COURT:  Did he ever tell you that?

3          THE WITNESS:  We did have discussions late in the year

4    about the White House process and diversity was one of the

5    considerations.

6    BY MR. WEITZMAN:

7    Q.  Did he tell you that there was a memo from the White House

8    counsel's office, Dana Remus, to all senators, specifically

9    seeking and requesting diverse candidates in late December,

10   2020?

11         MS. POMERANTZ:  Same objection.

12         THE COURT:  You can answer that.  Did he tell you

13   there was such a memo?

14         THE WITNESS:  He told me there was such a memo --

15   well, either he or his staff told me -- I believe he -- I think

16   they both told me, I should say, and they sent me a copy of the

17   memo.  Mr. Turner sent me a copy of the memo.

18         MR. WEITZMAN:  Let's put up Defendant's Exhibit 193,

19   and if you can zoom in?  This is for the witness.

20   BY MR. WEITZMAN:

21   Q.  Is this the memo that you received a copy of, if you

22   recall?

23   A.  Give me a moment to read it, please?

24   Q.  Yes.

25   A.  Is there a way to make it darker?

O6iWmen2                        Soliman - Direct

1   intend to."  Do you see that?

2   A.  Yes.

3   Q.  What did you understand him to mean by the Hispanic idea

4   and I don't intend to?

5   A.  That, you know, that he does not intend to put forward to

6   the White House a name of someone who's Hispanic.

7   Q.  And do you see the next line:  "I don't know that Philip is

8   saying this to anyone because he's smarter than that.  But his

9   name has been out there before"?

10      So, first, who did you understand Philip to be?

11  A.  Philip Sellinger.

12  Q.  And what did you understand Mr. Menendez to be saying by

13  smarter than that and name out before?

14  A.  That Sellinger is not talking to reporters.

15  Q.  Meaning what?

16  A.  Meaning he's not leaking that he might be under

17  consideration.

18  Q.  Just to pause for a second, Mr. Soliman.  Did you know

19  Philip Sellinger at the time?

20  A.  Yes.

21  Q.  How did you know him?

22  A.  I knew him through Senator Menendez.

23  Q.  For approximately how long had you known him?

24  A.  Probably about, probably about 12 years.

25  Q.  What was the nature at this time -- that is, summer 2020 --

O6iWmen2                    Soliman - Direct

1    of your relationship with Mr. Sellinger?

2    A.  I -- I had not really seen him much.  I probably -- you

3    know, before the pandemic, I probably saw him once a year, if

4    that.  Maybe spoke with him twice a year.

5    Q.  And did you have an understanding of the senator's

6    relationship with Mr. Sellinger?

7    A.  Somewhat.

8    Q.  What was your understanding?

9    A.  Mr. Sellinger was someone who supported the senator for

10   years, and I think they golfed together occasionally.

11   Q.  I asked you about the reference to November in the email.

12   Do you recall that?

13   A.  Yes.

14   Q.  Did a Democrat win the presidency in November?

15   A.  Yes.

16   Q.  Who?

17   A.  Joe Biden.

18   Q.  Now, based on your experience, what effect, if any, did the

19   election of Mr. Biden have on the ability of Senator Menendez

20   to influence the selection for the U.S. Attorney for the

21   District of New Jersey?

22   A.  That the White House would be deferential to the senators

23   from their own party.

24   Q.  What do you mean by the senators from their own party?

25   A.  The Biden White House is Democrat.  Senator Menendez and

O6iWmen2                          Soliman - Direct

1   Senator Booker are both Democrats, so generally the rule is

2   that the White House would look to them for names to forward.

3           THE COURT:  And those were the two senators from New

4   Jersey, is that correct?

5           THE WITNESS:  That's correct.

6   BY MR. RICHENTHAL:

7   Q.  Now, after the presidential election -- that is, after

8   November 2020 -- did you discuss with Senator Menendez any

9   potential candidates to serve as the U.S. Attorney for New

10  Jersey?

11  A.  At some point, yes.

12  Q.  Now, there's a binder in front of you, Mr. Soliman, but I'm

13  also going to ask Ms. Wechsler to put a series of exhibits on

14  your screen one at a time.  OK?

15  A.  Yes.

16  Q.  They're marked for identification as GX A113-PH1 through

17  PH13, GX A114-PH, GX A131, GX A421 and GX A422.  Whether you

18  want to use the binder or the screen is entirely up to you,

19  sir.  Just let me know when you're done leafing through those

20  exhibits.

21  A.  Are you scrolling -- OK.

22      Can you go back one?  Or I could do it over -- I could look

23  at the binder.

24      OK.

25  Q.  Have you had a chance to leaf through all of those?

O6iWmen2                         Soliman - Direct

1   after December 14, 2020 -- when that understanding changed;

2   that is, you understood he was seriously considering

3   nominating -- excuse me, recommending for nomination someone

4   else?

5   A.  Yes.

6   Q.  Did you understand at that time -- that is, mid-December --

7   why he was seriously considering someone else?  Just at that

8   time itself.

9   A.  I don't think in mid-December, no.

10  Q.  Did you later come to an understanding as to why he was

11  seriously considering someone else?

12  A.  Yes.

13          MR. WEITZMAN:  Objection to form.

14          THE COURT:  I'll allow it.

15  BY MR. RICHENTHAL:

16  Q.  How did you come to a different understanding as to why he

17  was -- excuse me, withdrawn.

18      How did you come to an understanding as to why he was

19  considering someone else; with whom did you speak?

20  A.  It was most likely Fred Turner.

21  Q.  And again, what was Fred Turner's role at the time?

22  A.  Chief of staff.

23  Q.  What do you recall Mr. Turner telling you about why someone

24  else was now being seriously considered?

25          MR. WEITZMAN:  Objection.

3888

O6iWmen2                    Soliman - Direct

1    A.  That --

2              MR. WEITZMAN:  Objection.  Hearsay, your Honor.

3              THE COURT:  Sustained.

4              MR. RICHENTHAL:  It's an agent statement, your Honor,

5    I'm happy to lay a foundation.

6              THE COURT:  No.  I think that's correct.  He's chief

7    of staff.  Agency.  I'll allow it.

8              You may answer, sir.

9    BY MR. RICHENTHAL:

10   Q.  Mr. Soliman, just to back up, for clarity, I think you said

11   in mid-December you did not have an understanding as to why

12   Senator Menendez was seriously considering someone else, is

13   that correct?

14   A.  Correct.

15   Q.  Did you later come to an understanding as to why he was

16   seriously considering someone else?

17   A.  Yes.

18   Q.  Was that based on a conversation you had with Mr. Turner?

19   A.  Yes.

20   Q.  The chief of staff?

21   A.  Yes.

22   Q.  What did you learn from your conversation with Mr. Turner?

23   A.  That the senator and Mr. Sellinger had a falling out and

24   that the senator was going to go in a different direction.

25   Q.  Now, you just said falling out.  Did you have an

O6iWmen2                          Soliman - Direct

1    understanding as to what the falling out was?

2    A.  No.

3    Q.  Whom did you understand Senator Menendez seriously

4    considered next; that is, after Mr. Sellinger?

5    A.  Esther Suarez.

6    Q.  Now, prior to this time, had Mr. Menendez ever raised

7    Ms. Suarez with you as a potential candidate for U.S. Attorney?

8    A.  Not with me.

9    Q.  Did you know who Ms. Suarez was?

10   A.  Yes.

11   Q.  For approximately how long had you known of her?

12   A.  I've known of her since she was installed as Hudson County

13   prosecutor.

14   Q.  To your knowledge, had she ever been a federal prosecutor?

15   A.  No.

16   Q.  Now, sticking with the same approximate time frame --

17   mid-December 2020 or thereabouts -- what, if anything, did

18   Mr. Menendez ask you to do with respect to Ms. Suarez?

19   A.  He asked me -- he or -- I don't think he asked me, but

20   someone on his behalf asked me to help her with the press.

21          MR. RICHENTHAL:  Ms. Wechsler, can you go to the next

22   exhibit, A113-PH4.

23   Q.  Is that on your screen, Mr. Soliman?

24   A.  Yes.

25   Q.  What's the date of this exchange, at least starting at the

O6iWmen2                          Soliman - Direct

1   top?

2   A.  December 15, 2020.

3            MR. RICHENTHAL:  Can we scroll down now, please.

4            I'm sorry.  Ms. Wechsler, can you go back up.  Stop.

5   Q.  Do you see the exchange beginning December 17, 2020?

6   A.  Yes.

7   Q.  And again, just to orient ourselves, who is blue and who is

8   off-white?

9   A.  Senator Menendez is blue and I'm off-white.

10  Q.  Do you see where he wrote:  "Please do a little checking on

11  Salas time as superior court judge and prosecutor, thanks"?

12  A.  Yes.

13  Q.  And you responded:  "Will do.  Just to be clear, do you

14  mean Suarez -- Hudson"?

15  A.  Correct.

16  Q.  Why did you respond that way?

17  A.  Because there -- because he said Salas, who was a different

18  person, so I wanted to make sure we were talking about the same

19  person.

20  Q.  Now, you continued:  "The person we spoke about"; that's

21  the bottom of the page --

22           MR. RICHENTHAL:  Ms. Wechsler, can you just scroll

23  slowly to the next.

24  Q.  -- do you see that?

25  A.  Yes.

3891

O6iWmen2                          Soliman - Direct

1    Q.  Are you referring to a conversation you had with

2    Mr. Menendez separate from this text exchange?

3    A.  I don't remember.

4    Q.  And how did he respond?

5    A.  He said, yes, Suarez, Hudson.  He was answering my first

6    question.

7                THE COURT:  So it wasn't Salas; it was Suarez --

8                THE WITNESS:  Correct.

9                THE COURT:  -- is that correct?

10               THE WITNESS:  That's correct.

11               THE COURT:  All right.

12               MR. RICHENTHAL:  If we could just go back up for one

13   moment, Ms. Wechsler.  Stop.

14   Q.  What did you understand Senator Menendez to be asking you

15   to do by, quote, a little checking, end quote?

16               MR. RICHENTHAL:  And you can now go to the next page,

17   Ms. Wechsler.

18   A.  To vet her, to figure out what has been written negatively

19   about her in the press, positively about her, what could come

20   up about her publicly.

21   Q.  You just used the term "vet."  In the context of your work,

22   what did you mean by vet?

23   A.  To do a little bit of research on her, on what's in the

24   public domain about her.

25   Q.  Public domain, meaning what?

3892

O6iWmen2                    Soliman - Direct

1   A.  Press, media.

2           MR. RICHENTHAL:  Can we go down, Ms. Wechsler.

3   Q.  You then wrote:  "Sent you the Suarez articles.  Other than

4   the Katie Brennan issue and a comment about the news media,

5   there wasn't much else I could find that sticks out but will

6   keep searching."

7       Let's just pause there.  First, what did you mean by the

8   Suarez articles?

9   A.  There was a series of clips, newspaper articles that I had

10  emailed to the senator so he could read through them about her.

11  Q.  Clips about what?

12  A.  About Esther Suarez.

13  Q.  You also referred to the Katie Brennan issue?

14  A.  Yes.

15  Q.  What was the Katie Brennan issue?

16  A.  There was a senior staff member on Governor Murphy's

17  election campaign that was accused of rape by Katie Brennan,

18  and the case was moved to Esther Suarez's jurisdiction as

19  prosecutor of Hudson County.  And she was heavily attacked on

20  her handling of that case.  So it was, the series of articles

21  that I sent to him were in and around that time period.

22  Q.  In your judgment, were they positive articles or negative

23  articles or something else?

24  A.  Negative.

25  Q.  Why did you send them to him?

O6iWmen2                         Soliman - Direct

1   Q.  Do you see you wrote:  "This of course assumes he doesn't

2   have intel on the WH"?

3   A.  Correct.

4   Q.  What did you mean by that?

5   A.  The white House.

6   Q.  What did you mean by, this of course assumes he doesn't

7   have intel into?

8   A.  That he doesn't have sources at the White House that he

9   could speak to himself.

10  Q.  What connection, if any, did that have to the idea of,

11  quoting, blaming it on the White House, end quote?

12  A.  Can you ask that again?

13  Q.  You mentioned -- I'll just quote you:  "We can say

14  something along the lines of blaming it on the White House."

15  Do you see that?

16  A.  Yes.

17  Q.  At the end of that message, you wrote:  This, of course,

18  assumes he doesn't have intel into the White House?

19  A.  Yes.

20  Q.  Do you see that?

21  A.  Yes.

22  Q.  Why did you say, this, of course, assumes he doesn't have

23  intel into the White House?

24  A.  Well, he could check -- he could check what we're saying to

25  him if he has intel into the White House.

O6iWmen2                          Soliman - Direct

1          MR. RICHENTHAL:  Now, Ms. Wechsler, can we keep going

2     with it.

3          One moment, your Honor?

4     Q.  And the "he" is Mr. Sellinger in that text, is that

5     correct?

6     A.  Yes.

7     Q.  Now, two days lower, January 28, 2021, see that message on

8     your screen?

9     A.  Yes.

10    Q.  This is Fred Turner again:  "I chatted with Philip this

11    morning as we discussed."

12         First, again, who was Philip?

13    A.  Philip Sellinger.

14    Q.  Then he wrote:  If we ultimately pull the plug on him, and

15    I didn't indicate we were, he would likely understand that it's

16    because of the White House and not because of any other

17    intervening events/conversations, etc."  Do you see that?

18    A.  Yes.

19    Q.  What did pull the plug mean?

20    A.  Take him out of the mix for U.S. Attorney.

21    Q.  Meaning inform him he was not going to be recommended?

22    A.  That's correct.

23         MR. RICHENTHAL:  Now, I want to scroll down a little

24    more.  Ms. Wechsler, can we go to the next page.

25         Stop there.

O6iWmen2                    Soliman - Direct

1   Q.   Now, do you see that at the bottom here, that it says --

2   this is from Mr. Turner:  "As a reminder, here's the letter we

3   got from WH counsel last month"?  Do you see that?

4   A.   Yes.

5          MR. RICHENTHAL:  Can we scroll down again,

6   Ms. Wechsler.

7          Stop there.

8   Q.   Is that the letter you understood Mr. Turner to be

9   referring to?

10  A.   Yes.

11         MR. RICHENTHAL:  Ms. Wechsler, can you blow it up, or

12  can I ask the defense to put on the screen DX 193.

13  Q.   OK.  Do you see that, Mr. Soliman?

14  A.   Yes.

15  Q.   Approximately how long before the text exchange we've been

16  talking about was this memo dated?

17  A.   A month.

18  Q.   Now, do you see the memo says --

19         MR. RICHENTHAL:  Ms. Wechsler, can we actually blow up

20  the second paragraph.

21  Q.   Do you see that, Mr. Soliman?

22  A.   Yes.

23  Q.   And do you see the last sentence:  "We are particularly

24  focused on nominating individuals with legal experiences that

25  have been historically underrepresented"?

O6i5men3                          Soliman - Direct

1    said:  Also beginning plan B, just in case.

2              Do you see that?

3    A.  Yes.

4    Q.  On April 20, 2021, did there come a time when Mr. Menendez

5    turned to plan B?

6    A.  If plan B means another person, then yes.

7    Q.  Who did he turn to?

8    A.  Mr. Sellinger.

9    Q.  Prior to turning to Mr. Sellinger, what did you understand

10   had occurred with respect to Ms. Suarez' potential nomination?

11   A.  That Senator Menendez put her name forward to the White

12   House, that the White House interviewed her, rejected her,

13   Senator Menendez went back, asked for a second interview, but I

14   don't believe the White House granted one?

15             THE COURT:  You said he asked for a second interview,

16   who did he ask -- I take it a second interview of Ms. Suarez?

17             THE WITNESS:  Of Ms. Suarez by the White House.

18             THE COURT:  OK.  Thank you.

19   Q.  I think you just said that Mr. Sellinger ended up being

20   plan B; is that right?

21   A.  Yes.

22   Q.  Now, in 2021, spring 2021, to be precise, did you have the

23   opportunity to discuss the U.S. Attorney position with

24   Mr. Sellinger?

25   A.  At some point in the spring or summer, yes.

O6i5men3                    Soliman - Direct

1   Q.  Just to pause and ask you one background question.  Are you

2   a lawyer, Mr. Soliman?

3   A.  No.

4   Q.  Did you have an understanding at the time, at least in

5   general, about what the word "recusal" meant?

6   A.  Yes.

7   Q.  In the context of a federal position?

8   A.  I mean, a layman's interpretation, yes.

9   Q.  What was your interpretation, what was your understanding

10  at the time?

11          MR. WEITZMAN:  Objection.

12          THE COURT:  I will allow his view of what the word

13  "recusal" means.

14  Q.  Mr. Soliman, in spring 2021 or summer 2021, what did you

15  understand the word "recusal" meant?

16  A.  To insulate yourself from subject matter.

17  Q.  Did there come a time, in that time period, when you spoke

18  about potential recusal with Mr. Sellinger?

19  A.  Yes.

20  Q.  What did you talk with him about?

21  A.  We spoke by phone.  He told me that he was trying to reach

22  the senator, that he could not reach the senator.  He wanted me

23  to let the senator know that he checked with Main Justice and

24  that in fact he did not have to recuse himself from an issue.

25  Q.  Let me pause for one second.  What did you understand the

O6i5men3                         Soliman - Direct

1    bottom line to be from this conversation with Mr. Sellinger as

2    to whether he was going to recuse himself?

3             MR. WEITZMAN:  Objection, your Honor.

4             THE COURT:  I will allow it.

5    A.  That he did not have to recuse himself.

6    Q.  Did you share that understanding of your conversation with

7    anyone, Mr. Soliman?

8    A.  Yes.

9    Q.  With whom did you share it?

10   A.  With the senator.

11   Q.  Senator Menendez?

12   A.  Yes.

13   Q.  What did you tell Senator Menendez about the conversation

14   with Mr. Sellinger?

15   A.  I told him that Mr. Sellinger said he was having a

16   difficult time reaching him and that the issue -- he wanted to

17   let him know that the issue that he thought he had to recuse

18   himself from, that he checked with Main Justice and that, in

19   fact, he did not have to recuse himself from it.

20            THE COURT:  When was this, sir, approximately?

21            THE WITNESS:  It was in the spring or summer of 2021.

22            THE COURT:  Thank you.

23            THE WITNESS:  Sure.

24   BY MR. RICHENTHAL:

25   Q.  Mr. Soliman, you just used the words "the issue"?

O6i5men3                    Soliman - Direct

1   A.  Yes.

2   Q.  Do you recall saying that?

3   A.  Yes.

4   Q.  At the time when you had this conversation with

5   Mr. Sellinger and then Mr. Menendez, did you know what case or

6   cases Mr. Soliman was talking about?

7   A.  No.

8   Q.  Did you come to an understanding later, based on

9   conversations with Mr. Menendez, about what case or cases

10  Mr. Sellinger was talking about?

11  A.  Yes.

12  Q.  What case or cases?

13          MR. WEITZMAN:  Objection.  Time frame.

14          THE COURT:  Yes.

15  Q.  Subsequent to your conversation with Mr. Sellinger in

16  spring or summer of 2021, did you talk with Mr. Menendez about

17  the issue of potential recusal of Mr. Sellinger?

18  A.  Yes.

19  Q.  Approximately when was the second conversation, that is --

20  let me back up.

21      You conveyed to Mr. Menendez your conversation with

22  Mr. Sellinger?

23  A.  Yes.

24  Q.  In or before spring or summer 2021?

25  A.  Yes.

O6i5men3                    Soliman - Direct

1   Q.  At the time, did you know what case Mr. Sellinger was

2   talking about?

3   A.  No.

4   Q.  Did you later come to an understanding?

5   A.  Yes.

6   Q.  Was that based on an understanding -- excuse me.

7       Was that understanding based on another conversation you

8   had with Mr. Menendez?

9   A.  Yes.

10  Q.  That second conversation, approximately when did it take

11  place?

12  A.  January of 2022.

13  Q.  Based on that second --

14          THE COURT:  I'm sorry.  January of 2022?

15          THE WITNESS:  Yes.

16          THE COURT:  OK.

17          THE WITNESS:  Correct.

18  Q.  Based on that second conversation, what matter did you

19  understand Mr. Sellinger had been talking about?

20          MR. WEITZMAN:  Objection, your Honor.  He can't

21  testify to what Mr. Sellinger had been talking about.

22          THE COURT:  No, he is testifying to his understanding.

23  I will allow that.

24  Q.  Mr. Soliman --

25  A.  Yes.

3939

O6i5men3                    Soliman - Direct

1   Q.   -- based on your second conversation with Senator

2   Menendez, what case did you understand Mr. Sellinger had been

3   talking about?

4   A.   The Daibes case.

5   Q.   What did you understand the Daibes case was?

6   A.   It regarded bank fraud.

7   Q.   Was it a criminal case, sir?

8   A.   Yes.

9   Q.   Now, to go back in time for a second, when you conveyed to

10  Mr. Menendez the conversation you had with Mr. Sellinger in

11  spring or summer of 2021, did Mr. Menendez express any

12  confusion about what Mr. Sellinger had been referring to?

13  A.   Can you give me the time frame again?  I'm sorry.

14  Q.   Mr. Sellinger and you had a conversation in spring or

15  summer of 2021?

16  A.   Right.

17  Q.   You then conveyed your understanding of that conversation

18  with Senator Menendez.  When you conveyed that understanding,

19  that is, that Mr. Sellinger did not have to recuse, did Senator

20  Menendez express any confusion to you?

21  A.   No.

22  Q.   Did he seem to not understand what Mr. Sellinger was

23  talking about?

24          MR. WEITZMAN:  Objection.

25          THE COURT:  Sustained.

O6i5men3                    Soliman - Direct

1    Q.  What was his demeanor in the conversation?

2            MR. WEITZMAN:  Objection.

3            THE COURT:  Was this a telephone conversation or in

4    person?  If you know.

5            THE WITNESS:  I don't remember.

6    Q.  Withdrawn.

7        What was his tone in the conversation?

8    A.  It was unremarkable.

9    Q.  Did he express any confusion to you about what you were

10   saying to him?

11   A.  No.

12   Q.  Did he ask any questions?

13   A.  No.

14           MR. RICHENTHAL:  Ms. Wechsler, can you put on the

15   screen A113-PH8?  And when I say the screen for everyone,

16   please, it is in evidence.

17   Q.  Mr. Soliman, is that on your screen?

18   A.  Yes.

19   Q.  This is dated May 2, 2021; is that right?

20   A.  That's correct.

21   Q.  Do you see the second message here that is beginning:

22   Thanks?

23   A.  Yes.

24   Q.  And is that you or Senator Menendez?  That is the

25   off-white?

O6i5men3                    Soliman - Direct

1   A.  The off-white is me, sorry.

2   Q.  You wrote:  Thanks.  Also, I think if you call Sellinger,

3   you will be comfortable with what he says.

4           Do you see that?

5   A.  Yes.

6   Q.  How did Senator Menendez respond?

7   A.  "OK.  We'll talk."

8   Q.  How did you respond?

9   A.  *Thumbs up.*

10  Q.  When you referred here to "Sellinger," was that Philip

11  Sellinger?

12  A.  Yes.

13  Q.  And when you wrote:  If you call Sellinger, you will be

14  comfortable with what he says.  To the best of your

15  recollection, what were you referring to?

16  A.  I mean, this was on the heels of the Esther Suarez negative

17  news event so either it could have been that the senator wanted

18  me to make sure that Mr. Sellinger didn't have anything

19  negative in his history and to have that conversation with him

20  or it was the message Mr. Sellinger relayed to me about the

21  recusal.

22          MR. WEITZMAN:  Objection, your Honor.  Move to strike.

23  He doesn't recall.

24          THE COURT:  Request denied.

25  Q.  Mr. Soliman, regardless of whether this message --

O6i5men3                          Soliman - Direct

1          THE COURT:  You don't know which it was, one or the

2     other?

3          THE WITNESS:  Correct.

4          THE COURT:  It was one or the other.

5          THE WITNESS:  That's correct.

6     BY MR. RICHENTHAL:

7     Q.  Could it also have been both?

8          MR. WEITZMAN:  Objection, your Honor.  Leading?

9     Q.  Was it necessarily one or the other or could it have been

10    both?

11         MR. WEITZMAN:  Objection, your Honor; leading.

12         THE COURT:  No.  That's all right.

13    A.  It could have been both.

14    Q.  Now, regardless of what you were referring to in this text

15    message, do you recall informing Senator Menendez about your

16    conversation with Mr. Sellinger in spring or summer of 2021?

17    A.  Yes.

18    Q.  Did Mr. Menendez, thereafter, recommend someone for the

19    position of the U.S. Attorney for New Jersey?

20    A.  Yes.

21    Q.  Who did he recommend after that conversation?

22    A.  Mr. Sellinger.

23    Q.  Was Mr. Sellinger in fact thereafter nominated by the

24    president?

25    A.  Yes.

O6i5men3                    Soliman - Direct

1   Q.  Was he confirmed?

2   A.  Yes.

3   Q.  Did he take office?

4   A.  Yes.

5   Q.  Approximately when, if you recall, did he take office?

6   A.  December of 2021.

7   Q.  Now, directing your attention to that time period, in other

8   words after Mr. Sellinger took office, did you have an

9   opportunity to speak again with Mr. Menendez about

10  Mr. Sellinger?

11  A.  Yes.

12  Q.  What, if anything, did Mr. Menendez ask you to do with

13  respect to Mr. Sellinger?

14  A.  He said to me that the issue that Mr. Sellinger said he did

15  not have to recuse himself from, that in fact he recused

16  himself from it and he wanted to understand why, so he wanted

17  me to call him and ask him why.

18  Q.  Senator Menendez wanted you to call Mr. Sellinger?

19  A.  Yes.

20  Q.  I think you again used the phrase "the issue."

21  A.  Yes.

22  Q.  What was the issue?

23  A.  The Daibes matter.

24  Q.  Approximately when did this conversation take place,

25  Mr. Soliman?

O6i5men3                    Soliman - Direct

1    A.   January of 2022?

2    Q.   To the best of your recollection, did this conversation

3    occur in person or on the phone?

4    A.   I don't remember.

5          THE COURT:   You are talking about the conversation

6    with Mr. Menendez?

7          MR. RICHENTHAL:   Yes, your Honor.

8          THE COURT:   All right.

9    Q.   What was your principal means of communication between you

10   and Mr. Menendez in that approximate time period, that is,

11   January 2022?

12   A.   Text messaging, sometimes phone calls.

13   Q.   You say phone calls.  Are you referring to the same

14   application you testified about before lunch, that is Signal,

15   or some other one?

16   A.   It would be Signal if it was convenient or regular -- a

17   regular phone call.

18         THE COURT:   I take it Signal, based on what you said,

19   I take it Signal is simply the normal way of communicating with

20   the office of Senator Menendez; is that correct?

21         THE WITNESS:   Yes.

22         THE COURT:   OK.

23   Q.   You testified about Mr. Menendez asking you to contact

24   Mr. Sellinger.  How did Mr. Menendez sound when he made that

25   request to you?

O6i5men3                          Soliman - Direct

1          MR. WEITZMAN:  Objection.

2          THE COURT:  Sustained.

3    Q.  What was his demeanor when he made that request?

4          MR. WEITZMAN:  Objection.  He hasn't said whether --

5          THE COURT:  Let's establish.  Was it in person?

6    Telephone call?

7    Q.  Do you recall, Mr. Soliman, whether it was in person or a

8    telephone call?

9    A.  I don't recall.

10   Q.  Forget demeanor.  What was his tone when he said this to

11   you?

12   A.  Inquisitive, confused.

13   Q.  Did you in fact call Mr. Sellinger, as Mr. Menendez asked

14   you to do?

15   A.  I did not.

16   Q.  Did you tell Mr. Menendez you called Mr. Sellinger?

17   A.  Yes.

18   Q.  What did you tell him?

19   A.  I told him that I tried Mr. Sellinger and that he didn't

20   call me back.

21   Q.  Was that true?

22   A.  No.

23   Q.  In the course of your work for Mr. Menendez, had you ever

24   previously told him you did something for him that you did not

25   in fact to do?

O6i5men3                    Soliman - Direct

1    A.  No.

2    Q.  Now, going forward a bit, directing your attention to

3    March 2022, so approximately two months later, did there come a

4    time when you and Mr. Menendez again discussed the Daibes

5    matter?

6    A.  Yes.

7    Q.  How did that come back?

8    A.  I had called Mr. Sellinger proactively on a different

9    issue, and within the course of that conversation we both

10   accepted we hadn't seen each other, it was a little bit after

11   the pandemic but he was still being careful, as was I, and we

12   said why don't we have lunch we set up a date.  And I let the

13   senator know that I was having lunch with Mr. Sellinger.

14   Q.  Why did you let the senator know you were having lunch with

15   Mr. Sellinger?

16   A.  I had a relationship with him, I knew Mr. Sellinger through

17   the senator, and often times if I met with high-ranking

18   officials in the state I would let him know.

19   Q.  In that conversation with Mr. Menendez what, if anything,

20   did he say about the Daibes matter?

21   A.  He said that he wanted me to speak with Mr. Sellinger about

22   it.

23   Q.  What, if anything, did he say he wanted you to tell

24   Mr. Sellinger about it?

25   A.  He said that he wanted Mr. Sellinger to give Mr. Daibes all

3947

O6i5men3                          Soliman - Direct

1   due process.

2   Q.  What, if anything, did he say about the U.S. Attorney's

3   handling at the time of the Daibes matter?

4   A.  That they were being unresponsive to Mr. Daibes' counsel.

5   Q.  How did Senator Menendez say this to you?

6              MR. WEITZMAN:  Objection.  Vague.

7              THE COURT:  Sustained.

8   Q.  What was Mr. Menendez' tone in saying this to you?

9   A.  Frustrated.

10  Q.  Just to be clear, sir, frustrated with you or frustrated

11  with the U.S. Attorney's office?

12  A.  With the U.S. Attorney's office.

13  Q.  In your conversation, did you understand him to want the

14  Daibes matter to be handled as it had been handled or a

15  different way?

16             MR. WEITZMAN:  Objection.

17             THE COURT:  Sustained.

18  Q.  What did you understand Mr. Menendez to want to occur with

19  respect to the Daibes matter?

20             MR. WEITZMAN:  Objection.

21             THE COURT:  I will allow it.  If anything.

22  Q.  If anything?

23  A.  Can you ask the question again?

24  Q.  Based on your conversation and Mr. Menendez' request to

25  you, what did you understand him to want to occur, if anything,

O6i5men5                    Soliman - Cross

1   To the extent that, you know, the community was going to try to

2   pressure him publicly, it wasn't going to work.

3   Q.  Those types of campaigns can backfire on a candidate,

4   correct?

5   A.  That they don't work.

6           MR. WEITZMAN:  Can we put up Government Exhibit A113?

7           THE COURT:  I'm not sure what you mean, sir.  Does the

8   senator, if people are supporting a particular candidate I take

9   it, to your knowledge, the senator is aware of that

10  information; correct?

11          THE WITNESS:  Yes.

12          THE COURT:  And I assume he incorporates that into

13  whatever he is going to do?

14          THE WITNESS:  Yes, but he is not going to be bullied

15  into choosing someone because of public pressure.

16          THE COURT:  All right.  Thank you.

17  BY MR. WEITZMAN:

18  Q.  Actually, before you put up the next government exhibit, so

19  the issue is the public pressure campaign, correct?

20  A.  Yes.

21  Q.  Nonetheless, Senator Menendez was supportive of Jamel

22  Semper; correct?

23  A.  For?

24  Q.  For a front office position, as you testified?

25  A.  Yes.

O6i5men5                          Soliman - Cross

1            MR. WEITZMAN:  If we can turn to Government Exhibit

2    A113-PH 8?

3            Now, in May 2021, early May and throughout April, or

4    in April -- late April 2021, you were having conversations with

5    Phil Sellinger; correct?

6    A.  I think it was a conversation, one conversation, yes.

7    Q.  Only one conversation?

8    A.  I think so.

9    Q.  You don't recall speaking to him by phone?

10   A.  I do.  With Mr. Sellinger, yes.

11   Q.  OK.  I'm sorry, then let me ask again.

12           In late April 2021 you were communicating with

13   Mr. Sellinger by phone, correct?

14   A.  Yes.

15   Q.  And you were speaking to him about the nomination as U.S.

16   Attorney; right?

17   A.  Yes.  Yes, to the extent that I testified.  That was the

18   depth of it.

19   Q.  And one of the things that Senator Menendez was keen on

20   that we just talked about this, was increasing diversity in the

21   front office of the U.S. Attorney's office to?

22           MR. RICHENTHAL:  Objection to "keen on" and "just

23   talked about this."

24           MR. WEITZMAN:  Let me rephrase.

25   Q.  One of the things that Senator Menendez indicated to you

O6i5men5                    Soliman - Cross

1    was his desire for there to be more diversity in the front

2    office of Phil Sellinger's U.S. Attorney's office; correct?

3              MR. RICHENTHAL:  Objection.  Misstates.

4              THE COURT:  I will allow it.

5              THE WITNESS:  Yes.

6    Q.  In this government exhibit you said:  Thanks.  Also I think

7    you'll call Sellinger, you'll comfortable with what he says.

8         Sir, isn't it correct that the thing that you were telling

9    Senator Menendez that he would be comfortable Sellinger saying

10   was his commitment to diversity at the U.S. Attorney's office?

11             MR. RICHENTHAL:  Objection.  Argument.

12             THE COURT:  Sustained.

13   Q.  Sir, do you recall that in connection with Senator

14   Menendez' desire for additional diversity at the U.S.

15   Attorney's office, you had such a conversation with Phil

16   Sellinger?

17   A.  I don't.

18   Q.  You don't have that recollection as you sit here?

19   A.  No.

20   Q.  When you say in this text chain "you will be comfortable

21   with what he says," you don't have a clear recollection of what

22   you are referring to; isn't that correct?

23   A.  Right.  Correct.  There is one of two things I mentioned.

24   Q.  Could it be one of three things, including diversity?

25             MR. RICHENTHAL:  Objection.  Asked and answered,

O6i5men5                    Soliman - Cross

1   argument.

2              THE COURT:  Sustained.

3   Q.  You say it could be one of two things.  You don't know

4   which of those two things it could be; correct?

5   A.  Correct.

6   Q.  And despite all the interviews you had with the government,

7   you can't narrow which of the two things it is, correct?

8              MR. RICHENTHAL:  Objection.

9              THE COURT:  Sustained.

10  Q.  This line doesn't refer to the Daibes case; correct?

11  A.  Which line?

12  Q.  This line, this text message.  You are not referring to the

13  Daibes case in this, are you?

14             MR. RICHENTHAL:  Objection.

15             THE COURT:  Sustained.

16             What are you referring to when you say:  I think you

17  if you call Sellinger, you will be comfortable with what he

18  says.

19             THE WITNESS:  As I testified earlier, it is Sellinger

20  wanted to get this message to the senator so he was, it seemed

21  like good news so it was either that about the recusal or that

22  there was nothing in his history that we should be worried

23  about because we were just coming off the Esther Suarez series

24  of negative articles.

25  Q.  And your job, in connection with the senator, was to make

4048

O6i5men5                    Soliman - Cross

1   Q.  That was March 30th, do you recall?

2   A.  It was the end of March.

3   Q.  And that was a lunch unrelated to your work with Senator

4   Menendez; right?

5   A.  That's correct.

6   Q.  And it had nothing to do with Senator Menendez or the

7   Daibes case; right?

8           MR. RICHENTHAL:  Objection.

9           THE COURT:  Sustained.

10  Q.  It was a friendly lunch between you -- two friends, you and

11  Phil Sellinger; right?

12  A.  Yes.

13  Q.  You testified that you told Senator Menendez about the

14  lunch?

15  A.  Yes.

16  Q.  And it was common for you to tell Senator Menendez when you

17  were meeting with politicians, elected officials, or other

18  people who were important in his orbit; correct?

19  A.  That's correct.

20  Q.  And I think you testified that Senator Menendez asked you

21  to pass along a message to Phil Sellinger?

22  A.  Yes.

23  Q.  And the message was:  Provide Daibes all due process?

24  A.  Yes.

25  Q.  When the senator asked this of you, was his tone calm?

4049

O6i5men5                    Soliman - Cross

1   A.  He was frustrated.

2   Q.  He was frustrated.  He wasn't angry, though?

3   A.  No.

4   Q.  And he was frustrated because he said the U.S. Attorney's

5   office was non-responsive to Daibes' lawyer?

6          MR. RICHENTHAL:  Objection to why he was --

7          THE COURT:  Yes.

8          To your knowledge, do you have an understanding as to

9   why he was frustrated?

10          THE WITNESS:  No.

11  Q.  Did he express to you that there was some

12  non-responsiveness?

13  A.  Yes.  Yes, he did.

14  Q.  We did that on direct, right?

15  A.  Yes.

16  Q.  And so he thought the U.S. Attorney's office was

17  non-responsive to Fred Daibes' lawyer.  That's what he told

18  you, right?

19          MR. RICHENTHAL:  Objection to what he thought versus

20  what he said.

21          THE COURT:  Sustained.

22  Q.  He told you that he thought that the U.S. Attorney's office

23  was non-responsive to Daibes' lawyer; correct?

24  A.  Correct.

25  Q.  So he just wanted process, due process?

O6i5men5                    Soliman - Cross

1          MR. RICHENTHAL:  Objection, your Honor, to asking this

2     witness to opine what another person wanted.

3          THE COURT:  What did he say he wanted?  The question

4     is what he said he wanted.

5          THE WITNESS:  He wanted Mr. Daibes to get all due

6     process.

7     BY MR. WEITZMAN:

8     Q.  He didn't ask you to relay to Phil Sellinger that he wanted

9     any particular treatment or result in the Daibes case; correct?

10    A.  Correct.

11    Q.  He didn't ask you to relay that he wants Daibes to get a

12    particular plea offer in that case from Phil Sellinger;

13    correct?

14    A.  Correct.

15    Q.  Or that the case should be dismissed, correct?

16    A.  Correct.

17    Q.  You didn't perceive Senator Menendez' request as an effort

18    to interfere with Daibes' case, did you?

19          MR. RICHENTHAL:  Objection.

20          THE COURT:  Did you perceive it that way?  Did you see

21    what Senator Menendez told you to do as an effort to interfere

22    with the case involving Daibes at the U.S. Attorney's office at

23    that time?

24          THE WITNESS:  No.

25    Q.  You didn't perceive the message that you were asked to

O6i5men5                    Soliman - Cross

1   relay as an effort to pressure Phil Sellinger, did you?

2   A.  No.

3   Q.  Or to threaten Phil Sellinger, right?

4   A.  No.

5   Q.  You didn't perceive it as a threat?

6       Now, when you arrived at the lunch with Mr. Sellinger you

7   didn't bring up the Daibes cause, correct?

8   A.  Correct.

9   Q.  That's because Mr. Sellinger told you that if you are going

10  to talk about the senator or any cases, he would have to report

11  back; correct?

12  A.  I don't know if it is because of it.  I mean I would have

13  brought it up anyway because I'm not a lawyer but I did not

14  bring it up.

15  Q.  You didn't discuss Mr. Daibes' case at all in that lunch,

16  correct?

17  A.  Correct.

18  Q.  Or since that lunch with Phil Sellinger, correct?

19  A.  That's correct.

20  Q.  You have never mentioned the Daibes case to anybody who

21  works at the U.S. Attorney's office, correct?

22  A.  Correct.

23  Q.  In fact, the 2022 lunch was the last time you spoke to

24  Mr. Sellinger; right?

25  A.  I ran into him here and I said hello, so.

O6O5men3                          Arkin – Direct

1    A.   A few months.  I can't remember exactly when the title

2    changed but duties were largely the same.

3    Q.   And thereafter you were deputy staff director?

4    A.   Yes.

5    Q.   For approximately how long did you serve in that position?

6    A.   Until about October 2023.

7    Q.   From approximately 2018 until fall 2023, to whom did you

8    report while you worked at the SFRC?

9    A.   To the two different staff directors and to Senator

10   Menendez.

11   Q.   Who were the staff directors?

12   A.   Jessica Lewis and Damian Murphy.

13   Q.   What, generally, were your duties and responsibilities for

14   the time period you worked for the SFRC?

15   A.   They varied a little bit.  I think I just described the

16   policy and deputy staff director responsibilities, and then

17   later I also picked up what we would call a regional portfolio.

18   I handled three different regional portfolios over my tenure at

19   SFRC.

20   Q.   In the context of your work at the SFRC, what is a regional

21   portfolio or regional policy portfolio?

22   A.   We -- the SFRC breaks down its staff largely the same way

23   the state department organizes itself geographically so we

24   have, for example, the Middle East bureau at the State

25   Department which is called Near Eastern Affairs.  The Senate

4462

O6O5men3                    Arkin - Direct

1    Foreign Relations Committee has a team on the Middle East and

2    North Africa.  Similarly, they have an East Asia and affairs

3    bureau, we have a team on East Asia.  There is a bureau of

4    international organizations we have a team that does

5    international organizations and refugees.

6            THE COURT:  What team were you on?

7            THE WITNESS:  I was on the Middle East and North

8    Africa team, and then I moved to the Europe team, and the

9    Western hemisphere team subsequently.

10   BY MR. RICHENTHAL:

11   Q.  Focusing on your team in the Middle East or North Africa

12   team, did that include the countries, among others Egypt and

13   Qatar?

14   A.  Yes.

15           THE COURT:  What years were you on the Middle East and

16   North Africa team?

17           THE WITNESS:  From about November 2018 through

18   March 2022.

19   Q.  Who was responsible for that region policy portfolio prior

20   to you?

21   A.  Dana Stroul.

22   Q.  Now, you testified a few minutes ago that Mr. Menendez

23   became ranking member of the SFRC in approximately March 2018;

24   is that right?

25   A.  Yes.

O6O5men3                    Arkin - Direct

1    Q.  Did there come a time when he became chair of the SFRC?

2    A.  Yes.

3    Q.  Approximately when was that?

4    A.  January 2021.

5    Q.  Did he serve in that position until approximately September

6    of 2023?

7    A.  Yes.

8    Q.  Focusing on the chair of the SFRC, what are the principal

9    responsibilities of that role?

10   A.  The chair, in concurrence with the ranking member, usually

11   on SFRC, sets the agenda for the committee including the

12   hearings that the committee will have, the nominations it will

13   consider, treaties it will ratify, what legislation to move

14   through the committee.

15   Q.  You just used the word "concurrence."  What do you mean by

16   that?

17   A.  The Senate Foreign Relations Committee, unlike many others

18   in the Senate, mostly historically has worked with the

19   concurrent -- the chair proposes an agenda and the ranking

20   member agrees to that.  Whether or not they agree on the

21   substance which is the supported piece of legislation or

22   nomination, they agree on the agenda that moves forward.

23   Q.  I think you just used "historically".  You mean as required

24   or practice?

25   A.  Practice.

O6O5men3                    Arkin - Direct

1  Q.  How do the duties and responsibilities tend to compare from

2  the chair and the ranking member?

3  A.  The chair sets the agenda and proposes legislation or

4  nominations to move forward and the ranking member agrees or

5  does not.

6  Q.  In your experience, what influence, if any, does the chair

7  of the ranking member of the SFRC have in the Executive Branch?

8  A.  It can have quite a lot depending on the issue and

9  depending on the way the chair or ranking member chooses to use

10 it.

11 Q.  What do you mean by that?

12 A.  The chair sets the agenda for which nominations can move

13 forward, for example, which is very important for the Executive

14 Branch; ratifying treaties, moving legislation that necessarily

15 impacts the Executive Branch.  They also set hearings.  They

16 can also -- they approve spending that the state department

17 USAID and other agencies want to move forward.  They approve

18 arms sales.  So it is an important role when you have the

19 influence.

20         MR. WEITZMAN:  Your Honor, objection.  401, 403, as

21 well as the topic that we discussed earlier.

22         THE COURT:  I will allow that.

23 BY MR. RICHENTHAL:

24 Q.  Ms. Arkin, I think this is the second time you said USAID,

25 what is USAID?

O6O5men3                    Arkin - Direct

1          (Jury not present)

2          THE COURT:  The witness has just indicated to me that

3     she would make one addition to that statement so let's do that

4     when the jury comes back.  All right?

5          You are excused.  You may step down and I will see you

6     in an hour.

7          (Witness not present)

8          THE COURT:  This is another example that I would have

9     appreciated knowing about the issues far enough in advance so

10    they could be handled both expeditiously and in a conscientious

11    manner.

12          Based on the correspondence over the weekend, it looks

13    like there were discussions, back in early June, of this

14    witness.  There is really absolutely no reason why I should be

15    getting letters about this weekend and important speech or

16    debate issues involving her prospective testimony over the

17    weekend starting, if I remember exact oh correctly it is either

18    Friday night or sometime on Saturday.  The party have got to do

19    better in teeing these things up in advance.

20          Now, Mr. Weitzman, I didn't understand your objection

21    as the witness was giving basic background information.  How is

22    anything she said impinging on speech and debate?  Unless that

23    wasn't your objection.

24          MR. WEITZMAN:  It is my objection, which is if it

25    doesn't impinge on speech and debate it seems to me to be

4475

O6O5men3                    Arkin - Direct

1    totally irrelevant to the case and here is the issue, your

2    Honor.

3            THE COURT:  But in part, sir, the fact of the matter

4    is all discussions that this staffer had concerning Egypt are

5    not, do not implicate speech or debate.

6            MR. WEITZMAN:  Correct, your Honor.

7            THE COURT:  It seems to me what your argument is is

8    anything having to do with Egypt is speech or debate.  Now we

9    are all agreed on, I think on the basic concepts, that is,

10   communications that the senator had with staff about specific

11   legislation about votes, about committee meetings, about

12   placing your lifting holds, that's core legislative acts, and

13   that impinges on speech and debate but it is not any

14   conversation regarding Egypt.  We all know the language about

15   not making legislature super citizens.  The case that you are

16   citing to me from the recent case from the D.C. Circuit, which

17   did not arise in the context of an ongoing trial, if I remember

18   correctly, really talks about the context of the conversation

19   so I am going to have to understand the context of the

20   communications here that we are talking about.  But I don't

21   believe anything to date, sir, has impinged on speech and

22   debate.

23           Now, tell me why you think I am wrong.

24           MR. WEITZMAN:  So, your Honor, the question and

25   answers from the government during Ms. Arkin's direct elicited

O6O5men3                    Arkin - Direct

1    that the chairman, and during large parts of this time period

2    Senator Menendez was the chairman, has the power to approve aid

3    and that was at line -- I don't know what page this, is so

4    apologies -- but I see here the quote is:  They approve arms

5    sales so it is an important role when you have the influence.

6    And then subsequently there were a series of questions about a

7    Senate resolution.

8            THE COURT:  And she described what a Senate resolution

9    is, it is the sense of the Senate I think she said.  It is an

10   expression of sentiment.  All of that is just absolutely

11   general questions and answers.  You just can't press speech or

12   debate as far as you want.  I am receptive to the argument of

13   speech and debate and protections the constitution gives it but

14   not when you go this far.  You are undercutting your arguments.

15           MR. WEITZMAN:  Your Honor, I think the objections I

16   raised were different than the ones raised in the letter, just

17   to distinguish the two.  The speech and debate objection about

18   setting up this framework which is what the government is

19   attempting to do where Senate resolutions can't be advanced

20   other than by the chairman.  That, I believe, is what they're

21   intending, where they're intending to go and this was not in

22   the 3500 which is why we haven't raised it.  But the only

23   relevance I can imagine is a line from Ms. Arkin that would

24   suggest that it takes the chairman's OK to advance a Senate

25   resolution to the full floor of Congress.  If that is what they

4477

O6O5men3                    Arkin - Direct

1    intend to elicit that is, I think, squarely prohibited under

2    speech and debate and contrary to their representations and

3    your Honor's ruling about the scope of what they can do with

4    respect to Senate resolution 390.

5                    (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4478

O6oWmen4

1          MR. RICHENTHAL:  Your Honor --

2          THE COURT:  Just a moment.  Just a moment.

3          MR. WEITZMAN:  The only record in the case about a

4    resolution is the Qatar resolution.

5          THE COURT:  Right.  390, I understand, in which,

6    Graham was the sponsor, and Menendez moved it out of committee.

7          MR. WEITZMAN:  Well, there's no evidence of that, and

8    the government --

9          THE COURT:  Wait.  No evidence of what?

10          MR. WEITZMAN:  That Senator Menendez moved it out of

11    committee.

12          THE COURT:  I see.

13          MR. WEITZMAN:  And the government has said they do not

14    plan to elicit that, because that would be speech or debate.

15          THE COURT:  Fine.

16          MR. WEITZMAN:  I believe what they're attempting to do

17    is set up a duties and responsibilities framework that leaves

18    that inevitable conclusion with the jury, which is the end run

19    around the speech and debate objection, if they intend to do

20    that.  Now, again, they haven't told -- we had a call

21    yesterday.  They didn't tell me that they were going to do

22    that, so I don't know where they're going with this, but I

23    don't know why they would elicit any testimony from her about

24    Senate resolutions.

25          MR. RICHENTHAL:  Your Honor, this has literally been

4479

O6oWmen4

1    approved for decades.  If Mr. Weitzman were right --

2              THE COURT:  Wait.  What has been approved for decades?

3              MR. RICHENTHAL:  That the government can elicit the

4    structure and power generally with respect to a United States

5    senator.

6              THE COURT:  I don't have any problem with that.

7              Go ahead.  Make your record.  Mr. Weitzman is off base

8    on that.  Go ahead.

9              MR. RICHENTHAL:  His objection's preserved multiple

10   times, but it's without merit.  The jury is entitled to

11   understand the power Mr. Menendez had for which he is alleged

12   to have received bribes.  I'm not going to ask her how he used

13   that power in a historical sense.  We know that's off limits.

14   I think the Court probably noticed how incredibly careful we're

15   being, even to tell the witness now I'm not asking you about

16   particular resolutions.  Mr. Weitzman's not allowed to deprive

17   the jury of the knowledge that the chairman has a role.

18             THE COURT:  All right.  You don't have to go on.  This

19   was basic setting of the framework, but now you're about to

20   move on to specifics.  Where are you going to go?

21             MR. RICHENTHAL:  I'd like to set the framework.

22             THE COURT:  You can continue to do that.

23             Go ahead.

24             MR. RICHENTHAL:  Having returned to the framework, I

25   was then going to move, as I said, on the record from the

O6oWmen4

1    general to the specific.

2              In moving from the general to the specific, I was

3    going to move from meetings generally with foreign officials,

4    which we have established through her, to meetings with

5    Egyptian officials.  Now, let's be clear, the defense has also

6    objected to that.  They jumped up, on my count, at least four

7    times.  That objection's also preserved.  The Court ruled on it

8    months ago.  We talked to Mr. Weitzman about it for hours.

9    It's covered in 3500 material.  The Court could not have been

10   more clear both in its ruling and orally we're allowed to

11   elicit he had meetings with foreign and we're allowed to elicit

12   what the officials asked for in the charged time period.

13   That's where we're going to go next; that she attended

14   meetings, she understood from those meetings what Egyptian

15   officials wants from the Senate.  We're not asking about

16   specific sales or goals at all.  It's crystal clear, in

17   general, what are their policy goals, what do they want.  And

18   then we're going to move forward in time.

19             This is something the defense has known we intended to

20   do -- I am not exaggerating -- for months.  They object every

21   time.  They only need to do it once to preserve.  We should

22   move forward with the trial.

23             MR. WEITZMAN:  Your Honor, I'm sorry.  I don't have an

24   understanding whether they intend in the general to elicit that

25   a Senate resolution cannot be advanced to the full Senate

O6oWmen4

1     through the SFRC committee without the chairman's approval.  If

2     they do plan to elicit that, I think that that is a violation.

3                MR. RICHENTHAL:  We were planning to elicit that in

4     general, just like a senator has to vote for a piece of

5     legislation to become the law.  But the resolution, we've

6     offered no evidence and don't intend to as to where it was,

7     that it advanced at all.  This was actually the subject of a

8     lot of back-and-forth with the Court.  We have never ever

9     sought to introduce evidence about where it was.  Our evidence,

10    as the Court no doubt recalls, is that Mr. Daibes referred to

11    it in the context of offering items of value to Mr. Menendez.

12    That's what we've always done.

13                The defense, on the contrary, keeps trying to

14    introduce evidence of what actually happened, that it was

15    actually a different senator.  We've never done that.  We don't

16    intend to do that.

17                MR. WEITZMAN:  Your Honor, if they don't intend to

18    elicit or leave the misimpression about what happens with 390,

19    the testimony can have no relevance.  Why even elicit that the

20    chairman has to approve something going from the committee to

21    the full Senate other than to leave an impression with the jury

22    that when Fred Daibes is sending the message about Senate

23    resolution 390 to the chairman of the SFRC he's asking him to

24    do something that's within his power.

25                THE COURT:  I understand.

4482

O6oWmen4

1           MR. WEITZMAN:  That's precisely what's prohibited.

2           THE COURT:  I understand.

3           MR. RICHENTHAL:  A good portion of what was just said

4     is right.  He is asking to do something within his power in

5     return for money.  That's a crime, and under *Brewster* and

6     decades of case law, we can introduce evidence that person A

7     offered an item of value to a public official for the public

8     official to take action on a matter before him.  Literally the

9     word "pending" is in *Brewster*.  It's in lots of other cases.

10    That's perfectly proper.

11          What we cannot do is introduce evidence that the

12    official actually took legislative activity, but that person A

13    paid him to do so with the "so" being legislative activity, of

14    course we can introduce that.  If we couldn't introduce that --

15          THE COURT:  Wait.  Wait just a moment.

16          Go ahead.

17          MR. RICHENTHAL:  If we couldn't introduce evidence

18    that a person offered a public official money to take action on

19    a matter pending before the public official --

20          THE COURT:  That you can introduce.

21          MR. RICHENTHAL:  Exactly.  And that's the point.  The

22    chairman has certain powers.  That's the context of this case.

23    This is relevant to the resolution.

24          At a time that matters, Mr. Daibes indicates to

25    Mr. Menendez there's a particular matter Mr. Daibes has an

O6oWmen4

1    interest in, and in and around the same time, Mr. Daibes

2    indicates he will pay for action on that matter.  Now,

3    Mr. Weitzman disagrees.  That's fine.  That's why we're having

4    a trial.  But nothing in what I just said -- nothing in what I

5    just said -- indicates that Mr. Menendez ever acted on what

6    Mr. Daibes wanted and that's the line the Supreme Court has

7    drawn, and that's the line we're being incredibly careful to

8    toe.

9              THE COURT:  I think we've heard it.

10             MR. WEITZMAN:  Yes, your Honor.  I understand your

11   Honor's ruling.

12             On our letter with respect to Egypt, your Honor, if I

13   may address that briefly?

14             THE COURT:  Yes.

15             MR. WEITZMAN:  So, we anticipate --

16             THE COURT:  Wait.  You're talking about a separate

17   letter from the Arkin letter?

18             MR. WEITZMAN:  No.  I'm talking about the Arkin

19   letter --

20             THE COURT:  Yes.

21             MR. WEITZMAN:  -- which was not related to Qatar but

22   related to Egypt.

23             THE COURT:  Got it.  Yes.  Let me just get it.

24             You're talking about 476?

25             MR. WEITZMAN:  Correct, your Honor.

O6oWmen4

1           THE COURT:  OK.

2           MR. WEITZMAN:  So, based on our conversation with the

3   government yesterday, we do expect that the government is going

4   to attempt to elicit from Ms. Arkin testimony that there was a

5   change --

6           THE COURT:  Yes.

7           MR. WEITZMAN:  -- to the senator's approach with

8   respect to Egypt.

9           THE COURT:  Yes.

10          MR. WEITZMAN:  As your Honor noted when discussing one

11  of the cases we cited, context is important.  The context of

12  that discussion, as we understand it, concerned a press release

13  that --

14          THE COURT:  Press releases are fair game and you, in

15  fact, say you want to introduce some.

16          MR. WEITZMAN:  Correct, your Honor.

17          THE COURT:  OK.

18          MR. WEITZMAN:  But let me explain the context.

19          THE COURT:  OK.

20          MR. WEITZMAN:  A press release that Sarah Arkin

21  proposed that Senator Menendez release, and his discussion goes

22  beyond that, though.  His discussion with Ms. Arkin --

23          THE COURT:  If I understand the reference, there's a

24  discussion where she's proposing a press release, and allegedly

25  he says my position on Egypt has changed and he disapproves the

4485

O6oWmen4

1    press release, which seems to me certainly is right.

2              MR. WEITZMAN:  What actually happens is he revises the

3    press release.

4              THE COURT:  OK.

5              MR. WEITZMAN:  And then they issue a revised press

6    release that's a bit toned down.

7              THE COURT:  Seems to me that's quite appropriate for

8    questioning.

9              MR. WEITZMAN:  But here's the issue, your Honor.

10             THE COURT:  Wait.  First me, then you.

11             It seems to me that the context, which, again, is my

12   focus on these things, is it's concerning a press release.

13   Fair game vis-à-vis speech and debate.

14             MR. WEITZMAN:  Your Honor, the issue is that these

15   discussions never just concern a press release.  When the

16   senator talks to her about this, he's discussing an entire

17   approach of how to deal with Egypt.

18             THE COURT:  OK.

19             MR. WEITZMAN:  He discusses not just the press release

20   but what to do with arms, and so I don't think those two can be

21   divorced in the context of this conversation between the

22   senator and his staffer.  Every -- I mean this discussion in

23   particular concerns an approach to dealing with Egypt with

24   carrots and sticks and approving arms or not approving arms.

25   And so I actually think context is very important, and I think

O6oWmen4

1   we should hear from Sarah Arkin for five minutes or ten minutes

2   in a voir dire outside the presence of the jury to understand

3   that context before the government should be permitted to

4   elicit that testimony.

5          MR. RICHENTHAL:  This is wildly improper and

6   incredibly belated.  This could have been brought to us months

7   ago.  I spent hours on the phone with Mr. Weitzman yesterday,

8   as did Mr. Mark.  We went through everything she was going to

9   say on this matter.  Everything.  We directed them to specific

10  3500, produced weeks ago, on this matter.  We told them, as we

11  put in writing to this Court, she will not talk about

12  legislation or arms in that conversation.  It is totally

13  improper and belated and disrupting this trial for them, time

14  and again, to say things that are not factually correct.

15  They're not entitled to two bites at the apple.

16         THE COURT:  Slow down.

17         MR. RICHENTHAL:  Ms. Arkin will say that the senator

18  declined to sign the press release and say he's going to change

19  his approach to Egypt to be more private and less public.

20  Ms. Arkin will not say -- I'll say it again, Ms. Arkin will not

21  say -- that the senator mentioned particular arms sales or

22  legislation or even came close to doing so.  It isn't going to

23  be what she'd say.  He's known this for months.

24         This is totally improper.  It is belated.  They don't

25  get to hear the testimony twice.  We're not asking what they

4487

O6oWmen4

1    think we can't ask.

2            THE COURT:  Well, just a moment.  The concept of a

3    voir dire is certainly an acceptable one.  In this context,

4    though, it does seem to me with the representation that she's

5    not going to be talking about arms and no question will elicit

6    anything about arms, I'm going to allow it to proceed.

7            But once again, putting that aside, Mr. Weitzman, I

8    do -- it's more than a sense that the defense has been

9    sandbagging the government consistently in waiting until beyond

10   the last minute to raise these issues.  I don't remember

11   exactly what it was, but I think the first time this was raised

12   was on June 1.  It's now late June.  This really should have

13   been worked out far in advance of this moment.

14           I think I've laid down the guidelines.  You have the

15   statement that there's not going to be any testimony about

16   arms.  Let's proceed on that basis.

17           2 o'clock.  Thank you.

18           (Luncheon recess)

19

20

21

22

23

24

25

O6oWmen4

```
 1                        AFTERNOON SESSION

 2                           2:00 p.m.

 3            (Jury not present)

 4            MR. MARK:  Your Honor, there was one thing we wanted

 5    to note for the record before we start.

 6            MR. RICHENTHAL:  Very quickly, your Honor.  I think I

 7    said this before we broke, but the conversation kind of took a

 8    turn.  There will be mention of arms.  I think the Court knows

 9    this.  In fact, when I move from the general to specific,

10    Ms. Arkin is going to testify about meetings she had and what

11    Egyptian officials said.  That's distinct from the

12    change-in-approach conversation we're talking about.  I believe

13    I made this comment before lunch.  The reason I'm saying it now

14    is I want the record to be clear.  Ms. Arkin is going to use

15    word "arms" at some point and military aid at some point, but

16    not with respect to that conversation.  Mr. Weitzman is aware

17    of this.  I think he objects and his objection's preserved, but

18    I just want to be as clear as possible about where I'm going.

19            THE COURT:  In what context is arms going to come up?

20            MR. RICHENTHAL:  I think that it will next come up

21    when I ask Ms. Arkin to shift, as I said, from the fact that

22    she had meetings with officials generally to saying she had

23    meetings with Egyptian officials in particular.  And my

24    intention was to ask her, consistent with the Court's ruling

25    and prior back-and-forth, what were the goals they expressed in
```

4489

O6oWmen4

1    those meetings; that is, what did they want from the United

2    States?

3            THE COURT:  The Egyptians.

4            MR. RICHENTHAL:  Correct, your Honor.

5            THE COURT:  That's fine.

6            MR. RICHENTHAL:  And that's why I wanted to flag that.

7            I also think that your Honor referenced the defense's

8    letter over the weekend, which was docket 476.  We did respond

9    to that.  It was docket 479; I don't think I put the document

10   number on the record.

11           THE COURT:  I have it.

12           MR. RICHENTHAL:  Thank you, your Honor.

13           MR. WEITZMAN:  Your Honor, we understand that our

14   prior objection to discussion of what occurs in that meeting

15   with the Egyptians has been overruled and that our objection is

16   preserved.

17           THE COURT:  Correct.

18           MR. WEITZMAN:  Thank you, your Honor.

19           THE COURT:  Correct on both accounts.

20           Put the witness on the stand.

21           (Continued on next page)

22

23

24

25

O6oWmen4                          Arkin – Direct

 1              (Jury present)

 2              THE COURT:  You may be seated in the courtroom.

 3              You may continue with your direct examination of

 4    Ms. Arkin.

 5    BY MR. RICHENTHAL:

 6    Q.  Welcome back, Ms. Arkin.

 7       I think that before we broke, I had asked you about

 8    readouts you got from meetings or phone calls, and I believe

 9    you said I occasionally got a readout from Senator Menendez

10    himself.  Is that right?

11    A.  Yes.

12    Q.  I think you also said you may have gotten them from

13    Mr. Kelly.  Is that right?

14    A.  Yes.

15    Q.  Did you also get readouts from anyone else?

16    A.  Yes.  Sometimes the staff director was more likely to be

17    with the senator more frequently, so I would ask the staff

18    director.  The staff director would get a readout -- I would

19    get a readout from the staff director or ask the staff director

20    to get one from the senator and give one to me.

21              THE COURT:  Now, there's been discussion about

22    readouts.  As I understand it, a readout is simply somebody

23    telling you what happened at an event or a call.

24              THE WITNESS:  Yes.

25              THE COURT:  OK.

O715men2                    Tabourian - Direct

1   Q.   About what is the age gap between you two?

2   A.   We are 14 months apart.

3   Q.   Is Nadine your sister, currently today, married?

4   A.   Yes, she is.

5   Q.   To whom?

6   A.   Senator Menendez.

7   Q.   Prior to Senator Menendez, did Nadine have a first

8   marriage?

9   A.   Yes, she did.

10  Q.   Roughly how long was she married to her first husband

11  before Senator Menendez?

12  A.   Approximately 15 years.

13  Q.   Do you know approximately when that first marriage of

14  Nadine's came to an end?

15  A.   She was 22 when she got married, so 15 years after.

16  Q.   Was the divorce, say, within the last five years?  10 years

17  for the first marriage?  If you remember?

18  A.   Oh, no, it was -- it is probably a good 20 years.

19  Q.   So she was divorced from her first husband for quite some

20  time?

21  A.   Yes.

22  Q.   During the course of Nadine's first marriage, to your

23  knowledge, did Nadine work during that marriage?

24  A.   No, she did not.

25  Q.   Did, in that first marriage -- you don't have to say their

O715men2                              Tabourian - Direct

1    names or anything -- did Nadine have any children?

2    A.   Yes, she did.

3    Q.   How many?

4    A.   She had two kids.

5    Q.   Both with her first husband?

6    A.   Yes.

7    Q.   And are those two kids now grown-ups?

8    A.   Yes, they are.

9    Q.   After Nadine's divorce from her first husband, did you have

10   an understanding of how Nadine supported herself financially?

11   A.   Yes.

12   Q.   To your knowledge, how did Nadine support herself

13   financially after the end of her first marriage?

14   A.   So my mother passed away.  She left us money.  She was

15   getting alimony, child support.  Yeah.

16   Q.   And during that same period after the first marriage ended,

17   were you aware of Nadine having any regular employment?

18   A.   No.

19   Q.   Did there come a time in approximately 2018 when you

20   learned that Nadine was dating or otherwise involved with

21   Senator Menendez?

22   A.   Yes.

23   Q.   Can you tell us how you first learned that Nadine was

24   involved with Senator Menendez?

25   A.   She texted me.  She texted me and asked me to reach out to

O715men2                    Tabourian - Direct

1    Bob because they had broken up and she wanted me to try to

2    liaise with him and get them back together, help.  Yeah.

3    Q.  Before Nadine reaches out to you and asks for your help, do

4    you remember being aware that she was even dating the senator?

5    A.  No.

6    Q.  Do you remember roughly around what time or what was going

7    on when she reached out to you with this request?

8            THE COURT:  When was this?

9            MR. FEE:  Thank you.

10   A.  In 2018?

11           THE COURT:  Can you be more specific?  Maybe you can,

12   maybe you can't.

13   A.  Yes.  Yes, I can.  Actually it was that evening, it was

14   during the election, the senator's election, and it was the

15   night of the elections.

16   Q.  The vote?

17   A.  Sorry.

18   Q.  The vote?

19   A.  The vote.  The vote, yes.

20           THE COURT:  So, am I correct then that it would be

21   around November of 2018 that she asked you for help?

22           THE WITNESS:  Yes.  Exactly.  November '18.

23           THE COURT:  November 2018; right?  Is that what you

24   meant?

25           THE WITNESS:  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A260

5830

O715men2                          Tabourian - Direct

1          THE COURT:  OK.

2          THE WITNESS:  Sorry.

3     BY MR. FEE:

4     Q.  Did you have any understanding of the reason Nadine had

5     reached out to you to ask you to contact the senator?

6          MS. POMERANTZ:  Objection.  Hearsay.

7          THE COURT:  She may have an understanding.

8          Do you have an understanding as to why your sister

9     chose you to reach out?

10         THE WITNESS:  Yes, because -- well -- yes.  Because my

11    sister was in a previous relationship, in an unhealthy

12    relationship and that was creating a lot of chaos in her

13    relationship with the senator.  I think that he -- well, I know

14    that he, I think, was fed up with the previous relationship

15    constantly coming in between.

16         MS. POMERANTZ:  Objection.  Move to strike.

17         THE COURT:  I will allow it.

18    BY MR. FEE:

19    Q.  So did you end up sending, without telling me what you put

20    in the message, did you end up complying with your sister's

21    request to send a message?

22    A.  Yes, I did.

23         MS. POMERANTZ:  Your Honor, objection.  It is leading.

24         THE COURT:  It is leading.  I will allow it, though.

25    Q.  How did you send that message to Senator Menendez?

O783MEN5                        Summation - Mr. Monteleoni

1   amended form for 2020, a form trying to build a paper trail

2   that this was Nadine's old family gold from before the

3   marriage.

4           So when the time to came to file for 2021, he didn't

5   list the gold that Daibes gave him that year as income, and he

6   didn't list it as a gift.  He didn't list that he had received

7   it at all.

8           (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6422

O78Wmen6                    Summation - Mr. Monteleoni

1        MR. MONTELEONI:  And he said this form was complete

2   and accurate.  He lied.  He lied to hide the fact that he and

3   Nadine had gotten a kilo of gold from Fred Daibes.  That's

4   another reason you know that there was a corrupt *quid pro quo*.

5        Here's one more.

6        Everything that we've talked about is just one part of

7   the broader scheme, the broader pattern of corruption you've

8   seen from the start to the finish of this case.  McKinney isn't

9   the only government official that Menendez reached out to on

10  behalf of someone who was paying him.  I'll go over the others

11  in a minute, but when I get to the New Jersey attorney general

12  conduct, you can ask yourself.  If Menendez is reaching out to

13  the attorney general of New Jersey on behalf of someone who

14  just happens to be paying his girlfriend, how can it be a

15  coincidence that he's doing the exact same thing with Under

16  Secretary McKinney on behalf of someone who just happens to be

17  paying her too?

18       And when we get to the New Jersey U.S. Attorney

19  conduct, how can it be a coincidence that he's trying to help

20  the case of someone who just happens to be paying him when he's

21  also trying to help the business here of someone who also just

22  happens to be paying him?

23       When we get to Qatar, when Menendez is trying to

24  please people he thinks are connected to a foreign government

25  that might benefit the business of someone who just happens to

O78Wmen6                    Summation - Mr. Monteleoni

1   be paying him, how can that be a coincidence when he's trying

2   to do the exact same thing with the government of Egypt?

3           Common sense tells you when Menendez did the same

4   thing again and again, it wasn't a coincidence.  It was a

5   corrupt *quid pro quo* -- this for that, money, gold and

6   valuables from Hana and Fred Daibes for promises of official

7   acts to protect and enrich Hana and Daibes and their

8   associates, another reason that you know it was a corrupt *quid*

9   *pro quo.*

10          So that's six reasons, six reasons that you know it

11  was a corrupt *quid pro quo*, six reasons that you know the third

12  and fourth elements are proven.  Six reasons that you know of

13  Menendez is guilty of Count Five.  Six reasons that you know

14  that Hana and Daibes are guilty of Count Six.

15          Let me also talk about something called venue for a

16  minute.  It's not an element.  It's something that the judge

17  will instruct you has to be proven.  Venue, unlike the

18  elements, only has to be proven by a preponderance of the

19  evidence.  It doesn't have to be beyond a reasonable doubt,

20  just that it's more likely than not.  And venue just means that

21  for some essential part of the offense, something that's part

22  and parcel of the core offense conduct, whether that's an

23  element or something that's part and parcel of an element, it

24  has to have happened in the Southern District of New York.

25  Doesn't have to be known to all defendants, but it does have to

O78Wmen6                      Summation - Mr. Monteleoni

1    be foreseeable.  They have to foresee that an act that's part

2    and parcel of the offense is going to be done in the district.

3           So there's plenty of bases for venue on these counts,

4    but here's one obvious one.  When Menendez and Nadine are in

5    Mr. Chow in Manhattan at the dinner in June that we saw, Hana

6    pays for their dinner.  So that's actually a thing of value

7    right there.  That's enough, but also, when Hana from Mr. Chow

8    sends Shawky a WhatsApp message that's scheduling that July

9    meeting and dinner, that July meeting's right before Menendez

10   sends that promise about the tank ammunition, that's part and

11   parcel of Menendez's promises and of what leads to Menendez's

12   promises.  So that right there is also enough for venue without

13   even getting to the other bases like Khorozian selling gold in

14   New York for Nadine.

15          Then, finally, so for this count and for several of

16   the other counts that Fred Daibes is charged with, you're going

17   to be called upon to find that he was on bail at the time of

18   the offense.  So here, there's a stipulation that you can look

19   at, where the parties agree that he was released, since back in

20   November 2018.  That covers the time period of what we've been

21   talking about that Daibes did in these offenses, so this is

22   proven for Count Six.  I'm not going to keep mentioning it,

23   since it's the same for each count, but this is also proven for

24   the other counts that Daibes is charged with, where you're

25   going to be asked to find whether or not he was on bail at the

O793MEN1                    Summation - Mr. Monteleoni

1     having staff see Grewal walk in the door is the price he has to

2     pay.  But what he doesn't have to do is make a record of it by

3     putting it on his calendar.  So he doesn't.  Why?  Because

4     Menendez knows it is wrong.  Because he knows it is part of a

5     quid pro quo.  And that's another reason that you know this

6     element is proven.  Let's look at the next.

7             Just like with Egypt, they don't just act secretly at

8     the time.  They lie to cover it up later.  Let's look at

9     Menendez's financial disclosure forms again.  2020, this is the

10    pre-amendment one, but you won't see it on the amendment

11    either.  There are no car payments listed here in 2020 once

12    they are married and he has to report it.  He amends it to add

13    in the story about the family gold, but he never amends it to

14    report the car payments that Uribe is making in 2020.

15            Or here in 2021 where Uribe paid car payments for the

16    whole year or over $10,000.  Or here, in 2022, where Uribe paid

17    all the way up until the FBI showed up at the door.

18            That's the same thing that he has his lawyers say to

19    the U.S. Attorney's Office for the Southern District of New

20    York.  He doesn't, he didn't know anything about the car

21    payments.  But Menendez knew that Uribe was paying for the car.

22    We've just been through the timeline shows that.  You know he

23    knew Nadine couldn't afford the monthly car payments.

24            Why did he lie?  Why not just say, well, Uribe was

25    paying for the car, but that's fine, it wasn't part of a quid

O793MEN1          Summation - Mr. Monteleoni

1  pro quo.  Why not just say, Uribe was paying for the car, but

2  that's fine, it was a loan.  You know the answer.  Because it

3  was a bribe, and because he knew it.

4         Now that takes us to the next reason you know it is a

5  quid pro quo.  This scheme.  Every new piece of the puzzle you

6  see reinforces the clear pattern of corruption that you see

7  throughout the case.  One call standing in isolation, you can't

8  tell much from.  One piece of a jigsaw puzzle, you can't tell

9  much about the whole picture.  But as you add more pieces of

10  the puzzle and they fit together and as you add more pieces of

11  evidence and they fit together, the picture becomes clearer and

12  clearer and it becomes unmistakable.

13         And so you've seen how the pieces of the evidence in

14  this portion of the scheme, they all add up and they reinforce

15  each other.  But now look at it together with the Egypt

16  conduct, because it is all part of the same pattern of

17  corruption.

18         The defense would have you believe that Menendez just

19  happened to make a very unusual call to try to pressure

20  Undersecretary McKinney to protect a monopoly, and that just

21  happened to be exactly the same thing that his website told the

22  world he wouldn't do.  But they would have you believe it's

23  that's not because his girlfriend had been promised some of the

24  profits from that monopoly.  That's just a coincidence.  And

25  now, they would have you believe that in the very same year,

O793MEN1                    Summation - Mr. Monteleoni

1    2019, Menendez just happened to make two very unusual calls to

2    try to pressure Attorney General Gurbir Grewal to disrupt two

3    criminal matters, and that just happens to be exactly the same

4    thing that his website told the world he wouldn't -- not just

5    wouldn't, but couldn't do.  But they would have you believe

6    that's not because his girlfriend was getting a Mercedes from

7    someone who knew both of the people involved in those criminal

8    matters.  That's just a coincidence too.  It is a coincidence

9    that those two coincidences about Egypt and the New Jersey

10   Attorney General both happened to Menendez and Hana who had

11   nothing to do with each other.

12       Are those just coincidences?  Of course not.  And I

13   haven't even started with the New Jersey U.S. Attorney conduct

14   where Menendez reaches out to yet another law enforcement

15   official about another pending criminal matter, that just so

16   happens to implicate another person who is paying Menendez.

17   But we'll come back to that one.

18       So I want to talk about an extra additional reason

19   that you know that there was a corrupt quid pro quo involving

20   the scheme to disrupt the New Jersey Attorney General criminal

21   matters.

22       And you might have noticed that there is one thing I

23   haven't talked about yet.  And that is a single word of

24   testimony from Jose Uribe.  Nothing that I have said until this

25   point yesterday, nothing that I have said until this point

O793MEN1                    Summation - Mr. Monteleoni

1    today, relies on a single word of testimony from Uribe.  Before

2    you even consider anything Uribe has to say, there is already

3    enough evidence to prove Count Nine.  I've talked for over two

4    hours between these two days.  I haven't even touched on

5    Uribe's testimony.

6            Even if you ignore Jose Uribe's testimony completely,

7    there would be more than enough evidence to convict every

8    defendant on every count.  But you shouldn't ignore it, because

9    it is devastating proof of the defendants' guilt.

10           First of all, you saw Uribe's demeanor.  He was

11   straightforward about what he did and about what he didn't do,

12   and he was the same person on cross-examination as he was on

13   direct examination.

14           And even more importantly, what Uribe told you was

15   overwhelmingly corroborated.  It matched up with all the

16   evidence in the case, text messages, phone records, financial

17   records.  He told you about the bribes.  Most of them are right

18   there on the documents.

19           And he also told you about things which match up with

20   other evidence he didn't even know about.  For example, when he

21   told you that Fernando Barruos was in the Bronx when Uribe

22   called him to ask him to make the payment on the car, that's

23   exactly what Special Agent Wheeler told you that the phone

24   records, the cell site records showed.  Remember that chart of

25   the deposits that Nadine made after the cash handoff?  Those

O793MEN3                    Summation - Mr. Monteleoni

1          You heard that Mr. Khorozian didn't write down the

2     serial numbers of every piece of gold that passes through his

3     hands.  Why would he?  The only evidence you saw tracing that

4     gold was the picture that Nadine Menendez happened to take the

5     hour before she went to sell those first two gold bars.

6          Imagine trying to figure out whose gold bars they

7     were, if she hadn't done that.  In fact, you don't have to

8     imagine it.  You've actually seen that scenario in trial.

9          Let's look at how many kilo bars Menendez and Nadine

10     had.  There is the two that the FBI found in the house in the

11     closet in the Menendezes' bedroom.  These obviously were not

12     sold to Mr. Khorozian, since they were still in the house.  The

13     FBI compared the serial numbers on these two to Daibes'

14     inventories.  That's 2 kilos from Daibes, kilos 1 and 2.

15          Next.  On March 31, 2022, Nadine went to Mr. Khorozian

16     to sell 2 kilos claiming they were her family gold.  We know,

17     because she happened to take a picture of them first, they were

18     also from Daibes' gold inventory.  These are two different

19     kilo, kilos 3 and 4.

20          But remember, she goes back to Khorozian to sell two

21     more kilos of gold in the middle of May, right around when

22     Daibes gets a letter of intent from Heritage solidifying the

23     deal he had been hoping to get with Menendez's help.  These

24     checks are all the documentary evidence we have of kilos 5 and

25     6.  Menendez and Nadine had two more kilos of gold and sold

O793MEN3                   Summation - Mr. Monteleoni

1   them.  But because nobody took a picture of the serial numbers,

2   and wrote it down, those two haven't been on those charts.

3   Those two aren't part of the quarter million dollar

4   calculations we've been talking about.

5           This almost $120,000 from the sale of those last

6   2 kilos, 5 and 6, it's not even in that total.  You can draw

7   your own conclusions about where they come from.  The evidence

8   suggests they came from Daibes.  You don't need to find these

9   2 kilos from Daibes to convict.  That's what happens when

10  Nadine sells kilo bars, but doesn't happen to take a photo of

11  their serial numbers.  That's secrecy.

12          Fifth reason that you know there was a corrupt quid

13  pro quo for this count.  The lies.  We've seen how the

14  financial disclosure forms don't show the kilos of gold.  Look

15  what else they don't show.  Envelopes of cash.  This one, the

16  one in Menendez's jacket pocket, had to have been provided in

17  late 2020, 2021 or 2022.  Where is it on the forms for those

18  years?  Nowhere.  Where are any of the envelopes of cash on

19  these forms?  Nowhere.  More lies.  More reasons you know it

20  was a quid pro quo.

21          That brings us to the last reason you know this was a

22  quid pro quo.  The big picture.  We've shown you the pattern of

23  corruption throughout all of the parts of this scheme, and it

24  all makes sense that the same people are doing things the same

25  way, again and again, because it is of course all part of the

O793MEN3            Summation - Mr. Monteleoni

1   same overall scheme.

2           But think of the flip side of that.  Think of what
3   needs to be true for none of these to be corrupt quid pro quos.
4   Menendez takes a number of acts to benefit the government of
5   Egypt, but that has nothing to do with the fact that Wael Hana,
6   who is asking him to do these things, has just promised his
7   girlfriend a job.  That's a coincidence.

8           And Menendez takes a number of acts to benefit the
9   government of Qatar and is asked by Daibes to advance a Senate
10  Resolution praising Qatar.  But that has nothing doing with the
11  fact that Menendez's house is filled with cash and gold from
12  Daibes.  Just a coincidence.

13          Menendez calls McKinney to protect the business
14  monopoly that Egypt gives Hana, just like his website says he
15  doesn't do, but that has nothing to do with the fact his
16  girlfriend was promised a job by Hana from that monopoly.
17  Another coincidence.

18          Menendez then calls Grewal to interfere in a criminal
19  case, just like his website says he can't do, but that has
20  nothing to do with the fact his girlfriend was promised a
21  Mercedes by Hana.  Coincidence.

22          Menendez then calls Grewal again, summons him to a
23  meeting to intervene in a criminal investigation, just like his
24  website says he cant' do, but that has nothing do with the fact
25  his girlfriend was given a Mercedes by Hana's friend Uribe.

O793MEN3                    Summation - Mr. Monteleoni

1    Another coincidence.

2            Menendez then raises another criminal case, Daibes'

3    case, when he's interviewing his friend Sellinger for the

4    position of chief federal law enforcement officer for New

5    Jersey, but that has nothing to do with the fact that his house

6    is full of cash and gold from Daibes.  Another coincidence.

7            The coincidences don't stop.  Just a coincidence that

8    hours after he hears Sellinger may have been to be recused,

9    that's when he looks for Esther Suarez to be U.S. attorney.

10   And it's just a coincidence than Suarez just happens to be

11   someone that Daibes thinks will be favorable to him.  And it is

12   a coincidence he goes right back to Sellinger after his advisor

13   thinks Sellinger can be have control of the Daibes case after

14   all.

15           Just a coincidence that all of this cash was withdrawn

16   during the time period that this was happening.  And it is just

17   a coincidence Menendez was searching for the price of kilos of

18   gold during the time period when this is happening, starting

19   minutes after an in-person visit from Fred Daibes, who actually

20   provided the kilos of gold.

21           Just a series of coincidences?  That is nonsense.  Not

22   a coincidence.  It is a corrupt quid pro quo.  Menendez agreed

23   to and did take all of those actions in exchange for all of

24   those things of value.  These elements are proven.

25           For venue, again, you have plenty.  From the big

O793MEN3                    Summation - Mr. Monteleoni

1    to let Nadine get Daibes' gold out of her safe and into the

2    financial system, where she can use it to pay her mortgage or

3    to buy a house with Daibes' assistance.

4           There are more wires in evidence, of course.  Daibes

5    while he's in Manhattan to meet with the Emir of Qatar tries to

6    make a WhatsApp call to Sheikh Sultan.  Every WhatsApp

7    communication gets processed outside of New York.

8           Heritage's deal professionals located in Manhattan,

9    send e-mails to Heritage in London.

10          Plenty of wires.  All you need is one.  This element

11   is done.  Those wires also give you all the venue that you need

12   for this count.  Menendez and Daibes are guilty of Count 13.

13          Count 14.  Extortion.  Menendez, again, the New Jersey

14   U.S. Attorney and Qatar part of the scheme.  Public official,

15   undisputed.

16          Obtained property, we've been through this.  The gold

17   and the cash given in exchange for official action.  The same

18   quid pro quo we've just been talking about.

19          Interstate commerce.  There are plenty of effects

20   here.  Each gold sale in New York is one.  That's all you need.

21   But there is much more.  Even a potential effect on interstate

22   commerce is one.  So just the potential that Menendez's acts

23   would have affected Heritage's decision about whether to make a

24   $95 million investment from abroad into New Jersey would count,

25   too.  This element is also done.

O793MEN3                    Summation - Mr. Monteleoni

1          For venue, again, the gold sale into Manhattan, the

2     free ride from J.F.K. through Manhattan and the Bronx.  These

3     are enough for venue.

4          Menendez is guilty of Count 14.  He used his official

5     position to obtain cash and gold in exchange for promises that

6     he would tamper with the process for selecting the chief

7     federal law enforcement officer for New Jersey, in the hopes

8     and in the hope he would advance a formal resolution of the

9     U.S. Senate.

10          So now that we've gone through the charges that apply

11     to each of the three parts of the scheme separately, let's go

12     back to the top of the indictment for the corruption conspiracy

13     group of counts.

14          Count One is bribery conspiracy.  That's against all

15     three defendants.  Covers the Egypt part of the scheme, and the

16     New Jersey U.S. Attorney and Qatar part of the scheme together.

17          I expect that for the first element, existence of an

18     agreement, Judge Stein will instruct you that a conspiracy is

19     just an agreement or understanding among at least two people to

20     violate the law.  Doesn't mean defendants had to sit around a

21     table and say out loud I agree to exchange a bribe payment for

22     an official act.  Doesn't mean the defendants had to enter into

23     a written contract.  Just means that through their words and

24     their actions, the defendants reached an agreement, even an

25     unspoken agreement, to violate the law.

O793MEN3                    Summation - Mr. Monteleoni

1           In this case, the objects of the conspiracy are the

2    bribery counts.  So an agreement to commit the bribery offenses

3    in Counts Five or Six relating to Egypt, or in Counts 11 or 12

4    relating to the New Jersey U.S. Attorney and Qatar, is enough.

5           I expect the judge will instruct you that you have to

6    be unanimous about at least one object of the conspiracy, can

7    be more, can be all, but it doesn't have to be.  All you need

8    is one.  So if you find that two or more people agreed that at

9    least one of these offenses in Counts Five, Six, 11 or 12 be

10   committed, this element is satisfied.

11          And here the proof is overwhelming.  We've just gone

12   through the fact that each of these counts is proven.  Now, did

13   two or more people agree to commit each of these counts?  Of

14   course.  Hana and Daibes were bribing Menendez.  They agreed to

15   pay the bribes, Menendez agreed to take them.  They didn't need

16   to say it out loud or put it in writing.  Their actions show

17   you that they agreed to commit bribery together.

18          And you know from the evidence we've gone through that

19   Nadine was also in on it too, so that's another person who

20   agreed to the commission of each of these offenses.  Either

21   way, two or more people, that's all you need.  This element is

22   proven as to each defendant.

23          Second element, that each defendant knowingly and

24   willfully joined the conspiracy.  I expect the judge will

25   instruct that you each defendant must have known what they were

O793MEN3                    Summation - Mr. Monteleoni

1    doing and taken the actions in question deliberately and

2    voluntarily.  Here that's obvious.  Did Menendez take an IS EG

3    Halal check from Fred Daibes by accident?  Did he call McKinney

4    by accident?  Did Hana write that check by accident?  Did he

5    ask Menendez to call McKinney by accident?  And does Daibes

6    hand those checks to Menendez by accident?  Did he fill

7    Menendez's house with gold and cash by accident?  Of course

8    not.  The defendants took these actions intentionally.  This

9    element is proven against each defendant.

10        And an overt act.  This just means at least one person

11   did something -- anything -- to make the conspiracy happen.

12   The act itself doesn't have to be a crime, it just has to

13   further the conspiracy.  Are there overt acts here?  Of course

14   there are.  There are plenty.  Acts like Menendez sending out

15   the tank ammunition promise.  Menendez calling McKinney.  Hana

16   writing the IS EG Halal checks.  Daibes delivering those

17   checks.  Menendez receiving the checks.  Daibes handing over a

18   bar of gold.  So many more.  This element is proven many times

19   over.

20        The acts that give venue for the substantive counts

21   are enough for venue on the conspiracy counts, too.  So that's

22   all you need.

23        Menendez, Hana, and Daibes are guilty of conspiracy to

24   commit bribery.

25        The next count, Count Two, is conspiracy to commit

O793MEN3                    Summation - Mr. Monteleoni

1   honest services wire fraud.  That's against all defendants.

2   This relates to the entire corruption scheme.  Egypt, the New

3   Jersey Attorney General, the New Jersey U.S. Attorney, and

4   Qatar.

5           The first element is just that there was an agreement

6   to commit the underlying honest services fraud offenses.  Here,

7   this is any of the honest services fraud offenses, that's Count

8   Seven regarding Egypt, Count Nine regarding the New Jersey

9   Attorney General, or Count 13, regarding the New Jersey U.S.

10  Attorney and Qatar.  Just like with the bribery conspiracy, you

11  have to be unanimous that two or more persons agreed on at

12  least one object.  Could be more, but all that's needed is at

13  least one.

14          As we've discussed, each of the honest services fraud

15  schemes are proven.  And each of them involved the agreement of

16  two or more people.  Menendez, Hana, Daibes, Nadine, Uribe.

17  This element is proven against all of the defendants.

18          The next element is that the defendant knowingly and

19  willfully joined the conspiracy.  Just like with Count One,

20  none of this happened by accident.  Hana didn't promise the

21  Mercedes by accident, Menendez didn't call Grewal by accident.

22  This element is proven as well.  That's all you need for Count

23  Two.  There isn't even an overt act element for honest services

24  fraud conspiracy.

25          Again, venue is shown by any act in furtherance of the

O793MEN3                    Summation - Mr. Monteleoni

1    scheme, like the wires that we already talked about or other

2    things, like driving to Long Island to make a cash deposit.

3    Count Two is proven.  Menendez, Hana, and Daibes are guilty of

4    honest services fraud.

5            Next is Count Three.  Conspiracy to commit extortion

6    under color of official right.  That's against Menendez, again

7    relating to the entire scheme.  Egypt, New Jersey Attorney

8    General, New Jersey U.S. Attorney, and Qatar.

9            Again, there has to have been an agreement between two

10   or more persons to commit extortion under color of official

11   right.

12           Here the objects are any of the extortion offenses

13   we've been through.  That's Count Eight regarding Egypt, Count

14   10 regarding the New Jersey Attorney General's Office, and

15   Count 14 regarding the New Jersey U.S. Attorney and Qatar.

16   Again, you only have to be unanimous on at least one of those

17   objects.  There could be more.

18           Was there an agreement between two or more persons to

19   commit extortion?  Of course there was.  Menendez agreed with

20   Nadine to use his official position to obtain property that he

21   wasn't entitled to, to obtain bribes.  The two of them worked

22   together, Menendez calling the shots and taking and promising

23   the official actions, Nadine acting as the go-between,

24   connecting Menendez with the bribe payers.  You saw that

25   through all the evidence.  He used her as a go-between to pass

O793MEN3                    Summation - Mr. Monteleoni

1    messages through her and collected funds through her and he

2    knew what she was doing.  He knew what she was getting paid

3    for.

4            Her communications with Hana, Daibes, and Uribe as

5    well as with all those other people she was complaining to,

6    like Howard Dorian, make clear she knew exactly what her role

7    was in the scheme.  So yes, this element is proven.  Menendez

8    agreed with Nadine to commit extortion under color of official

9    right.

10           Element two.  Did Menendez join this conspiracy with

11   Nadine knowingly and willfully?  Of course he did.  The

12   evidence has proven just like for Counts One and Two.  Menendez

13   didn't do any of this by accident.

14           And just like with Count Two, there is no requirement

15   of an overt act, so Count Three is proven as well.

16           Venue, again, is proven by the same effects on

17   interstate commerce we talked about for the substantive counts,

18   plus any of the other acts in the Southern District of New York

19   like the phone calls, the text messages, the other meetings in

20   Manhattan.  Menendez is guilty of conspiracy to commit

21   extortion under color of official right.  We are done with the

22   corruption offenses.

23           All that's left now are the foreign influence offenses

24   and finally the obstruction offenses.

25           The next one is Count 16 which is a charge that

6536

O793MEN3                          Summation - Mr. Monteleoni

1    political activities, acted as a political consultant, and

2    represented the interests of Egypt before the United States.

3    But what about the other part.  The agency relationship.

4            So, listen carefully to Judge Stein's instructions on

5    this.  I expect he'll tell you what this does and doesn't mean.

6    Doesn't mean Menendez's every move has to be controlled by

7    Egypt.  Doesn't mean he has to be Egypt's servant, and doesn't

8    mean Menendez has to be operating under the direction or

9    control of a foreign principal.

10           It is enough that if Menendez acted at the request of

11   a foreign principal, so long as that request meets some special

12   requirements.  Request in this context, it isn't an ordinary

13   ask.  Doesn't count if the foreign principal just asks or

14   persuades another person for his own reasons to do something.

15   What you have to decide, the ultimate question is whether

16   Menendez was not acting fully independently.  Was not simply

17   stating or following his own views, but was instead acting as

18   an agent of the foreign principal.  How do you know Menendez

19   did that here?

20           Listen to the judge's instructions.  I expect that

21   he's going to tell you to look at common sense factors like

22   were the instructions or requests accompanied by an offer or

23   the provision of compensation?  Did the foreign principal's

24   goals align with the defendant's own views?  How frequently did

25   the defendant interact with the foreign principal or its

O793MEN3                    Summation - Mr. Monteleoni

1    intermediaries, could be officials, could be others acting as

2    go-betweens like Nadine and Hana.  And was there an ongoing

3    relationship or coordination between the principal and the

4    defendant, and did the defendant seek or receive feedback on

5    his work from the foreign principal?

6           How do those apply here?  Was Menendez just acting

7    independently on his own?  Doing things that just happened to

8    benefit Egypt?  Was he taking these actions for Egypt between

9    2018 and 2022 based on his own independent judgment of what

10   would benefit the United States?  Or was he doing it for

11   another reason, like because he was getting paid.

12          You know the answer to this one.  He was doing it

13   because he was getting paid.  First, through promises to

14   Nadine, then eventually, through checks, gold, and the other

15   things that Hana was giving him in connection with the Egypt

16   counts.

17          Let's look at the frequency.  This wasn't a one-off.

18   This was years, years of meeting with Hana, years of meeting

19   with Ahmed Helmy, years of meeting with Mai Abdelmaguid.  Years

20   of learning what they wanted and taking actions to give them

21   what they wanted.

22          Were Menendez's goals aligned with Egypt?  You've

23   heard about his human rights record.  Before this started, he

24   was tough on Egypt.  That's why, right after they met, Hana dug

25   up and sent to Nadine an article from months prior about

O793MEN3                    Summation - Mr. Monteleoni

1    Menendez's tough stance on Egypt.  They thought he was going to

2    be a tough nut to crack.  Common sense tells you, that's

3    exactly why they wanted to bribe Menendez.  They wanted him to

4    go easier on Egypt.  Turns out, it only took a few months of

5    promises of payment to get him to start doing just that.

6           By May of 2018, he's ghostwriting that letter for

7    Egypt, articulating Egypt's views in response to a fellow

8    senator's human rights concerns.  By July of 2018, he's

9    promising to approve a military sale at a record pace.

10          By the spring of 2019, he more fundamentally shifted.

11   He told Sarah Arkin he wanted to try a different approach with

12   Egypt, and he refused to sign a letter that harshly criticized

13   Egypt, choosing instead to soften his public tone.

14          And a few more years of checks, gold, and other things

15   of value later, he's working with Mai Abdelmaguid, someone that

16   his staff thinks is an Egyptian intelligence officer, to set up

17   a trip to Egypt outside of the supervision of the State

18   Department.  And Menendez knows that when the State Department

19   finds out about it, Abdelmaguid panics.  This is supposed to be

20   our trip, not the State Department's trip.

21          How does Menendez react when he learns that

22   Abdelmaguid is panicking?  Does he say, well, I'm just an

23   independent diplomat doing what I think is best for the United

24   States, so there is no problem if the State Department knows

25   about the trip.  No.  He says "taken care of."  How does he

O7bWmen5                    Rebuttal - Mr. Richenthal

1    says taken care of.  So what did that mean?  I've got Mai's

2    back.  Sarah Arkin, my staffer for years, don't worry about it.

3    You know what he did.  He lied to her.  He kept her away from

4    the CODEL, because it was more important to him to keep Mai

5    happy than his own professional staffer happy.

6         It's been a two-month trial, but if you remember

7    nothing else about Menendez's relationship with Egypt, remember

8    what's in the middle of your screen.  He chose someone who he

9    understood was an Egyptian intelligence officer over a

10   professional staffer of the United States Senate Foreign

11   Relations Committee, who had devoted years to him in service to

12   the United States.  You could use many words to describe that.

13   What the law describes it as is serving as a foreign agent.

14        Now, I'm going to make a few other, small arguments

15   and then I'm going to wrap up, because I've been talking for a

16   long time.

17        On this same point -- by same point I mean Wael Hana

18   paying Robert Menendez -- Mr. Lustberg made the following

19   argument.  He argued whatever else you think, this can't have

20   been corrupt because it wasn't enough money.  Remember he said,

21   like, Nadine only gets tens of thousands and it's a big deal to

22   Egypt so it can't be true.

23        Well, first of all, I don't expect you're going to

24   hear that the law excludes bribes if the briber should have

25   asked for more.  I don't expect you're going to hear anything

O7bWmen5                      Rebuttal - Mr. Richenthal

1    like that.  Your common sense would tell you the contrary.  But

2    it also doesn't make any sense factually because, yes, Nadine

3    Menendez only got some money in 2019, but it was a lot of

4    money.  In fact, it's the mortgage payments.  It's the fake

5    job.  It's the Mercedes.  It's cash I showed you that

6    Mr. Lustberg didn't talk about.  It's gold.  Hana gave gold

7    too, you know that.  So it's actually a lot.  But there's a

8    more fundamental problem with this argument.  None of the

9    scheme gets disrupted.  There's a search of Menendez's home.

10   You can damn well infer that if it kept going, Robert Menendez

11   expected to get more.  Why would he not?  Hana is raking in

12   money.  So if you stop it and only a certain amount was paid,

13   does that somehow demonstrate it wasn't bribery?  No.  Of

14   course it doesn't.

15          And again, I don't expect you're going to have to

16   decide whether the bribe was big enough, because it literally

17   makes no sense why Robert Menendez does this unless he's

18   getting paid.  There is no other explanation.  This is a man

19   who was known for years -- for years -- for his human rights

20   record.  Why does he do it?  There's literally only one answer

21   to that question.  It's money.

22          Now, from Egypt to Qatar.  I'm not going to talk too

23   long about Qatar.  And one reason I'm not is I just want to

24   note you can find every defendant guilty of every count even if

25   you literally never talk about Qatar.  Period.  There are no

O7bWmen5                    Rebuttal - Mr. Richenthal

1    counts that rest alone on Qatar.  None.  Zero.  It's part of
2    the counts, but there's no count that rests solely on it.  It's
3    important you remember that.  But you shouldn't forget about
4    Qatar, because it just reinforces everything you've learned for
5    two months.

6         Now, Mr. Fee showed you a bunch of stuff about Qatar.
7    I think there was a tweet in there, a whole bunch of press
8    releases.  The idea was, well, everyone just loves Qatar.
9    Everyone said nice things about Qatar, so if Menendez said nice
10   things about Qatar, he's just one of lots of people.  How many
11   of them had gold in their home from someone trying to do
12   business with Qatar, Fred Daibes's company.  How many of them
13   had bundles of cash in their home from someone trying to do
14   business with a Qatari-tied company?

15        Now, let's be clear.  There's nothing wrong with
16   thanking Qatar.  This case is not about Qatar.  But the
17   question is are you acting because you actually think they
18   deserve thanks, or are you acting because you like the
19   envelopes of cash in your home and your friend is trying to do
20   business with a company called Heritage which has people
21   connected to Qatar?  Don't take your eye off the ball here.
22   They also tried to suggest, well, there's, like, investment
23   people and lawyers, and they're all involved in the deal.  OK.
24   Ladies and gentlemen, the allegation is not, like, the deal was
25   corrupt.  The allegation is that Menendez took things from Fred

O7bWmen5                    Rebuttal - Mr. Richenthal

1   Daibes, knowing Fred Daibes wanted Menendez to do things for

2   Qatar, because that would get Fred Daibes closer to the Qatari

3   officials and closer to the deal.  The deal is fine.  What led

4   to the deal?  Why did Bob Menendez take things from Fred Daibes

5   and do very strange things for Qatar?  Because he was on the

6   take.

7          Now, you may be thinking, well, what strange things?

8   Remember the press release he put out?  Sarah Arkin testified

9   about this.  They were planning to put a press release out

10  thanking a whole bunch of countries.  Qatar is one of them, and

11  then, like a switch, within ten minutes of a communication from

12  Daibes, Menendez says let's thank Qatar.  The problem, as you

13  know, is not that thanking Qatar is wrong.  It's why did he do

14  it?  Why, within ten minutes?  Do you have any doubt as to why?

15  Of course you don't.

16         Now, what else did Daibes suggest Menendez should do?

17  Pass a bill.  Remember the resolution.  He kept updating him on

18  the resolution.  Now, Fred Daibes is a real estate developer.

19  He's not a lawyer.  He doesn't work for Menendez.  There's no

20  evidence that his job was to, like, update Menendez on

21  resolutions in the Senate.  So why is he, like, constantly

22  updating him on a particular resolution?  And why -- that's

23  weird enough, by the way, but why is he doing it after offering

24  a Patek Phillipe watch?  It's because those things are linked.

25  Fred Daibes didn't fall in love with Qatar or decide he wanted