UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,

             *Appellee,*

       *- v. -*

ROBERT MENENDEZ,

          *Defendant-Appellant,*

WAEL HANA, a/k/a "Will Hana," and
FRED DAIBES,

         *Defendants.*

**Docket No. 25-333**

**AFFIRMATION IN OPPOSITION TO THE DEFENDANT'S MOTION FOR BAIL PENDING APPEAL**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

STATE OF NEW YORK        )
COUNTY OF NEW YORK     ss.:
SOUTHERN DISTRICT OF NEW YORK  )

     PAUL M. MONTELEONI, pursuant to 28 U.S.C. § 1746, hereby affirms under penalty of perjury:

     1.    I am an Assistant United States Attorney in the Office of Jay Clayton, United States Attorney for the Southern District of New York. I represented the Government in the District Court, and I represent the Government in this appeal. I submit this affirmation in opposition to defendant-appellant Robert Menendez's motion for bail pending appeal. The District Court did not err—much less clearly err—in denying bail pending appeal. Menendez fails to meet his burden to present

a substantial question of law or fact, let alone one likely to result in a reversal or a new trial on all counts. Menendez's motion should therefore be denied.

## PRELIMINARY STATEMENT

2.      Superseding Indictment S4 23 Cr. 490 (SHS) (the "Indictment") was filed on March 5, 2024, charging Menendez in sixteen counts. Count One charged Menendez with conspiracy to commit bribery, in violation of 18 U.S.C. § 371. Count Two charged Menendez with conspiracy to commit honest services wire fraud, in violation of 18 U.S.C. § 1349. Count Three charged Menendez with conspiracy to commit extortion under color of official right, in violation of 18 U.S.C. § 1951. Counts Four and Seventeen charged Menendez with conspiracy to obstruct justice, in violation of 18 U.S.C. § 371. Counts Five and Eleven charged Menendez with bribery, in violation of 18 U.S.C. §§ 201(b)(2)(A) and (C), and 2. Counts Seven, Nine, and Thirteen charged Menendez with honest services wire fraud, in violation of 18 U.S.C. §§ 1343, 1346, and 2. Counts Eight, Ten, and Fourteen charged Menendez with extortion under color of official right, in violation of 18 U.S.C. §§ 1951 and 2. Count Fifteen charged Menendez with conspiracy for a public official to act as a foreign agent, in violation of 18 U.S.C. § 371. Count Sixteen charged Menendez with being a public official acting as a foreign agent, in violation of 18 U.S.C. §§ 219 and 2. Count Eighteen charged Menendez with obstruction of justice, in violation of 18 U.S.C. §§ 1503 and 2.

2

3.    Trial began on May 13, 2024, and ended on July 16, 2024, when the jury convicted Menendez on all counts.[1]

4.    On January 29, 2025, the District Court sentenced Menendez principally to 60 months' imprisonment on Counts One, Four, and Seventeen; 132 months' imprisonment on Counts Two, Three, Five, Seven, Eight, Nine, Ten, Eleven, Thirteen, and Fourteen; 24 months' imprisonment on Count Sixteen; and 120 months' imprisonment on Count Eighteen, all to run concurrently.[2]  The District Court entered judgment on January 31, 2025.  Menendez filed a timely notice of appeal.

5.    On January 27, 2025, Menendez moved before the District Court for bail pending appeal.  The District Court denied that motion in a written decision on April 25, 2025.

6.    Menendez is scheduled to begin serving his sentence on June 17, 2025.

## STATEMENT OF FACTS

### A.    The Offense Conduct

7.    The evidence at trial proved that then-Senator Menendez engaged in a corrupt scheme with his girlfriend and later wife Nadine Menendez and New Jersey

---

[1] Menendez's codefendants, Wael Hana and Fred Daibes, were each also convicted on all counts.

[2] The District Court dismissed Count Fifteen, concluding that it was multiplicitous with Count One.

businessmen Wael Hana, Jose Uribe, and Fred Daibes to exchange things of value, including money, gold, and a Mercedes-Benz convertible, for promised and attempted official acts by Menendez to protect and enrich the bribe-payors and their associates.[3]  The Government presented testimony from thirty witnesses, including one of Menendez's Senate staffers and co-conspirator Uribe.  The Government also presented over 2,500 exhibits, including numerous text messages between Menendez and his co-conspirators; gold bars and envelopes of cash seized from Menendez's residence; and forensic evidence showing that these gold bars and envelopes of cash originated from Daibes and Hana.

8.     The first major component of the scheme concerned actions to benefit Hana and the Government of Egypt.  Menendez offered Hana—an Egyptian-American businessman with extensive Egyptian government contacts—corrupt promises to take official acts regarding U.S. policy and actions concerning Egypt, in exchange for promises of bribes, including payment on Nadine Menendez's mortgage, paychecks to Nadine Menendez as a supposed consultant to Hana's company, and gold bars.  (Dkt. 654 at 10-18).[4]

---

[3] Nadine Menendez was separately tried and convicted on April 21, 2025 on all counts, including five aiding and abetting counts on which the jury necessarily found that Menendez also committed the offenses.

[4] "Dkt." refers to an entry on the District Court's docket for this case; "Tr." refers to the trial transcript; "GX" refers to a Government exhibit; and "Mot." refers to Menendez's motion for bail pending appeal in this Court.  Unless otherwise noted,

9.     In exchange for these bribes, Menendez promised: (a) to use his leadership position in the Senate Foreign Relations Committee to approve military aid to Egypt, including a $99 million sale of tank ammunition (Dkt. 654 at 10-11; *see also id.* at 10 ("Tell Will I am going to sign off this sale to Egypt today")); and (b) to use his official position to attempt to pressure U.S. Department of Agriculture ("USDA") Under Secretary Ted McKinney to reverse the USDA's opposition to Egypt's grant of a monopoly to Hana's company (*id.* at 11-13).  Menendez also acted as Egypt's agent in other ways, including disclosing sensitive staffing numbers for the U.S. Embassy in Cairo, and briefing the head of Egyptian intelligence on human rights questions other Senators planned to ask him.  (Dkt. 654 at 34-39).

10.     The second major component was a corrupt *quid pro quo* in which, in exchange for a Mercedes-Benz convertible for Nadine Menendez from Hana and Uribe, Menendez promised and attempted to disrupt two New Jersey state criminal matters, including by trying to pressure then-New Jersey Attorney General Gurbir Grewal to change how his office was handling the cases.  (Dkt. 654 at 19-25).

11.     The third major component was a corrupt *quid pro quo* in which Menendez accepted cash and gold bars from Daibes in exchange for (a) Menendez's promises and attempts to disrupt a pending federal fraud prosecution of Daibes in

---

quotations omit internal quotation marks, citations, footnotes, and previous alterations.

the District of New Jersey, both by recommending that the President nominate Philip Sellinger for U.S. Attorney for New Jersey and then by seeking to influence the case following Sellinger's confirmation (Dkt. 654 at 25-27, 29-30); and (b) Menendez's promise to advance a Senate resolution supporting Qatar, to try to induce a firm with ties to Qatar's government to invest with Daibes (*id.* at 26-30).

12.     Menendez also obstructed the grand jury investigation of his conduct. After receiving subpoenas, he and Nadine Menendez created, and submitted to a Southern District of New York grand jury, checks and other documents falsely characterizing Hana's payment of Nadine Menendez's mortgage, and Uribe's payments toward the Mercedez-Benz, as loans.  (Dkt. 654 at 43-44).

### B.     The Post-Trial Motions

13.     Menendez filed post-trial motions arguing, among other things, that the District Court's rulings violated the Speech or Debate Clause; the evidence of official acts and venue was insufficient; and Section 219 is unconstitutional.  (Dkt. 590).  The District Court denied those motions in a 78-page published opinion on December 13, 2024.  (Dkt. 654).[5]

14.     On November 14, 2024, the Government advised the defendants and the District Court that it had recently discovered that a small number of exhibits on

---

[5] The opinion is reported as *United States v. Menendez*, 759 F. Supp. 3d 460 (S.D.N.Y. 2024).

the jury's laptop (which had been inspected by all counsel without objection) inadvertently contained several sentences not admitted in evidence. (Dkt. 630). Menendez then filed a supplemental new trial motion (Dkt. 645), which the District Court denied, finding that the defendants had waived their objection to the laptop (Dkt. 710 at 8) and were, in any event, not prejudiced because (a) it was "extraordinarily unlikely that the jury even became aware of the presence of the extra-record material on the jury laptop" (*id.* at 9); (b) "[e]ven in the infinitesimal chance that the jury happened upon this evidence, there is similarly a miniscule likelihood that the jury would have understood it" or found it significant (*id.* at 10); and (c) any exposure would have been harmless because there was "abundant properly admitted evidence" on the same matters (*id.* at 11).[6]

### C.    Menendez's Bail Motion

15.    On January 27, 2025, Menendez moved in the District Court for bail pending appeal. (Dkt. 719). The District Court denied the motion on April 25, 2025. (Dkt. 839).

16.    On April 29 and May 2, 2025, respectively, Hana and Daibes moved before this Court for bail pending appeal, raising all but one ground that Menendez

---

[6] This opinion is reported as *United States v. Menendez*, 763 F. Supp. 3d 538 (S.D.N.Y. 2025).

does in his motion here.[7]  On May 16, 2025, after hearing argument, this Court denied Hana's and Daibes's motions.

## LEGAL STANDARD

17.    A court "shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment" be detained pending appeal unless the court finds "by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person or the community if released," and "that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in—(i) reversal [or] (ii) an order for a new trial."  18 U.S.C. § 3143(b).

18.    This provision gives effect to Congress's view that "[o]nce a person has been convicted and sentenced to jail, there is absolutely no reason for the law to favor release pending appeal or even to permit it in the absence of exceptional circumstances."  *United States v. Miller*, 753 F.2d 19, 22 (3d Cir. 1985).  Following a guilty verdict and sentencing, there is a "presumption in favor of detention." *United States v. Abuhamra*, 389 F.3d 309, 319 (2d Cir. 2004).  It is the defendant's burden to "rebut this presumption with clear and convincing evidence."  *Id.*

---

[7] The one exception is Menendez's challenge to Count Sixteen, with which Hana and Daibes were not charged.

19.    Under the second prong of the standard, a "substantial question" is "a close question or one that very well could be decided the other way." *United States v. Randell*, 761 F.2d 122, 125 (2d Cir. 1985).

> If a court does find that a question raised on appeal is "substantial," it must then consider whether that question is so integral to the merits of the conviction on which defendant is to be imprisoned that a contrary appellate holding is likely to require reversal of the conviction or a new trial.

*Id*.  With respect to all of these issues, "the burden of persuasion rests on the defendant." *Id.*

20.    This Court gives great deference to a district court's bail decisions and will reverse only where there is "clear error"—that is, only if "on the entire evidence," the Court is "left with the definite and firm conviction that a mistake has been committed." *United States v. Mattis*, 963 F.3d 285, 291 (2d Cir. 2020).  This Court reviews questions of law *de novo*.  *Abuhamra*, 389 F.3d at 317.

## ARGUMENT

### I.    MENENDEZ'S APPEAL PRESENTS NO SUBSTANTIAL QUESTION LIKELY TO RESULT IN REVERSAL OR A NEW TRIAL

21.    This Court should deny Menendez's motion, as it denied Hana's and Daibes's motions seeking the same relief on virtually identical grounds.

### A. Menendez Identifies No Substantial Question Regarding the Speech or Debate Clause

#### 1. There Is No Substantial Question Whether Menendez's Pre-Nomination Recommendation to the Executive Branch Was a Legislative Act

22. The District Court correctly ruled that Menendez's pre-nomination recommendation of a U.S. Attorney candidate to the Executive Branch was not a legislative act, because the Senate's "Advice and Consent" function, upon which Menendez relies (Mot. 12-13), applies *after*, not before, the President nominates a candidate. (Dkt. 252 at 4-5).

23. As Judge Stein recognized, the text of the Constitution makes plain that "Advice and Consent" refers to post-nomination action by the Senate. (Dkt. 252 at 5 ("The Constitution reads that the President 'shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . Officers of the United States'— not that the President 'with the advice of the Senate shall nominate, and with the Consent of the Senate shall appoint . . . Officers of the United States.'")).[8]

24. Supreme Court precedent, likewise, confirms that the Constitution commits nomination to the President alone. *See Edmond v. United States*, 520 U.S. 651, 659 (1997) ("By vesting the President with *the exclusive power to select* the principal (noninferior) officers of the United States, the Appointments Clause

---

[8] This opinion is reported as *United States v. Menendez*, 720 F. Supp. 3d 301 (S.D.N.Y. 2024).

*prevents congressional encroachment* upon the Executive and Judicial Branches." (emphasis added)); *see also id.* (quoting Alexander Hamilton's observation that "[t]he blame of a bad nomination would fall upon the president singly and absolutely.").

25.    The historical record confirms that a President's pre-nomination consultation with Senators, when it happens, is a "courtesy" that "was not envisioned by the framers."  Senate Historical Office, *Senate Stories: Origins of Senatorial Courtesy* (July 5, 2022), https://www.senate.gov/artandhistory/senate-stories/origins-of-senatorial-courtesy.htm ("Senatorial courtesy also has been interpreted to mean that a president should consult with senators of his or her party when nominating individuals to serve in positions in their home states.  *Such a practice was not envisioned by the framers*.  In fact, in *The Federalist*, No. 66, Alexander Hamilton wrote: 'There will, of course, be *no exertion of choice* [in executive appointments] on the part of Senators. They can only ratify or reject the choice of the President.'" (emphasis added)).[9]  Indeed, that this "courtesy" only

---

[9] Menendez's claim of a "consistent historical record" supporting his position (Mot. 12) is thus backward.  Indeed, Menendez's only cited historical source is a 1792 letter (*id.*), which actually undermines his claim.  *See* Letter from George Mason to James Monroe (Jan. 30, 1792), *available at* https://www.consource.org/document/george-mason-to-james-monroe-1792-1-30/. The letter states that the Constitution "gives to the President *alone* the Right of *Nomination*," that the nomination is what "brings the Subject fully under the Consideration of the Senate," and that officers "shall not be appointed, but with the Advice" of the Senate.  *Id.* (emphasis in original).

applies, if at all, to "senators of [the President's] party," *id.*, underscores that it is neither constitutionally mandated nor "integral" to the process (Mot. 13).

26.     The District Court's ruling is also consistent with uniform case law recognizing that an attempt to influence an *Executive Branch* decision is not *legislative* activity under the Speech or Debate Clause, at least—as here—outside formal Constitutional processes.  *See, e.g.*, *Gravel v. United States*, 408 U.S. 606, 625 (1972) ("That Senators generally perform certain acts in their official capacity as Senators does not necessarily make all such acts legislative in nature.  Members of Congress are constantly in touch with the Executive Branch of the Government and with administrative agencies—they may cajole, and exhort with respect to the administration of a federal statute—but such conduct, though generally done, is not protected legislative activity."); *United States v. Johnson*, 383 U.S. 169, 172 (1966) ("No argument is made, nor do we think that it could be successfully contended, that the Speech or Debate Clause reaches conduct, such as was involved in the attempt to influence the Department of Justice, that is in no wise related to the due functioning of the legislative process.").

27.     Against this authority, Menendez's sole case support (Mot. 12) rests on his obvious misreading of this Court's description of the typical "practice followed" in federal judicial nominations.  *See United States v. Allocco*, 305 F.2d 704, 711 (2d Cir. 1962) (describing President receiving "various sources of information" in

making selection, including that "since the appointment must have the advice and consent of the Senate[,] the recommendations of the candidate's Senators must be obtained and weighed by the President before a final decision is possible"). Contrary to Menendez's assertion (Mot. 12), this description just recognizes that because a *nominee* will ultimately need Senate approval, the President has a prudential reason to consult before nomination. Indeed, in describing an appointment needing "the advice *and consent* of the Senate," *Allocco*, 305 F.2d at 711 (emphasis added), this Court was necessarily referencing the steps that *follow* nomination.

28.    Lacking any cogent textual or case support, Menendez instead cites a handful of law review articles that generally seek to *change* settled constitutional interpretation (Mot. 12-13 & n.4), and he fails to rebut the District Court's citation of other articles reaching the opposite conclusion and grounding it in Constitutional text and history (Dkt. 252 at 5). A litigant's ability to find a few secondary sources containing language apparently consistent with his position does not discharge his burden to show a close question, especially where the Constitution's text, Supreme Court precedent, and the historical record supply a clear answer.

### 2.    There Is No Substantial Question Whether Menendez's Corrupt Meetings Are Protected Legislative "Information Gathering"

29.    As part of the bribery scheme, Menendez had a series of meetings with Egyptian officials, some of which were over food and wine, at which he "learned

what the Egyptians wanted" so he could "take actions to give them just that." (Mot. 4). Incredibly, he now seeks to characterize these corrupt meetings as protected "information gathering." (Mot. 13-14). That argument, not all aspects of which are preserved (*see* Dkt. 611 at 98-99), is contrary to the holdings of the Supreme Court, this Court, and the record.

30. Menendez's claim is that the information he "gathered" was *which acts Egyptian officials sought* in exchange for the bribes he was demanding and receiving. (Mot. 4, 13). That is exactly what this Court has held is not a legislative act but an unprotected discussion of "the possible future performance of legislative functions." *United States v. Williams*, 644 F.2d 950, 951-52 (2d Cir. 1981) (approving evidence that agent "sought help from the Senator for a private immigration bill").

31. This Court's holding is consistent with the rule that "[w]hile the Speech or Debate Clause recognizes speech, voting, and other legislative acts as exempt from liability that might otherwise attach, it does not privilege either Senator or aide to violate an otherwise valid criminal law in preparing for or implementing legislative acts." *Gravel*, 408 U.S. at 626. Unsurprisingly, meeting with persons with an interest in potential legislative acts to solicit bribes, or hear which acts they desire in exchange, has never been held to be protected. *See United States v. Brewster*, 408 U.S. 501, 526 (1972); *United States v. Renzi*, 651 F.3d 1012, 1023

(9th Cir. 2011) (noting that *Brewster* approved prosecution of Congressman "for negotiating with and ultimately promising private individuals that he would perform future legislative acts in exchange for private gain"). The District Court correctly applied this rule (Dkt. 252 at 8-9), and Menendez's argument that a Congressman engages in protected "information-gathering" when he learns what favors a bribe-payer is seeking is contrary to precedent and would eviscerate the laws against bribery. *See Brewster*, 408 U.S. at 516 ("Given such a sweeping reading, we have no doubt that there are few activities in which a legislator engages that he would be unable somehow to 'relate' to the legislative process."); *see also Renzi*, 651 F.3d at 1023 (*Brewster* rejected argument "that the prosecution was simply a veiled attempt to inquire as to the motivation for those later 'legislative acts' actually performed").

32.     Menendez attempts to manufacture a substantial question by claiming that *United States v. Dowdy*, 479 F.2d 213 (4th Cir. 1973), supports his position. (Mot. 14). That is simply wrong. In *Dowdy*, the Fourth Circuit recognized that evidence regarding a Congressman's secret "conversations and arrangements with" co-conspirators who were bribing him was "not barred by the speech or debate clause," 479 F.2d at 224, even when the co-conspirators requested particular Congressional actions during those conversations, *id.* at 218.[10]  That is the same

---

[10] Rather than deal with the holding of *Dowdy* that is on point and contrary to his arguments, Menendez quotes from a separate holding from *Dowdy*, that the Clause prevented the Government from introducing evidence of documents that a

reasoning applied by Judge Stein here. It is also consistent with this Court's precedent, which in no way suggests that the Speech or Debate Clause extends to the type of meetings at issue here. *See United States v. Biaggi*, 853 F.2d 89, 103 (2d Cir. 1988) (deeming committee-funded factfinding for hearing protected, but allowing evidence of "nonlegislative reasons" for factfinding trips); *Williams*, 644 F.2d at 952 (allowing evidence of discussion of proposed bill). And as explained above, even information gathering directly in advance of a formal hearing is protected only if it is "in itself not criminal," *Gravel*, 408 U.S. at 629.

### 3. There Is No Substantial Question Whether Menendez's Promise to Approve an Arms Sale in the Future Is a Legislative Act

33. Menendez's third argument—that his text message, "Tell Will I am going to sign off this sale to Egypt today," was protected by the Speech or Debate Clause—does not come close to presenting a substantial question. (Mot. 14-15). As Judge Stein recognized, this statement is plainly in the future tense and covered by the Supreme Court's clear holding that "[p]romises by a Member [of Congress] to perform an act in the future are not legislative acts." *United States v. Helstoski*, 442 U.S. 477, 489 (1979); (*see* Dkt. 839 at 7 ("That this text message constituted such a promise is not a close question; it manifestly is a promise to perform an act in the

---

Congressman collected to be used in a congressionally authorized subcommittee investigation. (Mot. 14). Nothing like that is at issue in this case.

future.")). Menendez acknowledges that "promises to act are not immune" (Mot. 15), but then implausibly attempts to suggest that his statement did not promise a future act.[11]   In a thinly-disguised sufficiency challenge, Menendez claims the message does not show a "compact" (Mot. 15), but even though unnecessary to Speech or Debate analysis, the evidence is overwhelming that the message shows just that.  (*See* Dkt. 654 at 10-14).

### 4. There Is No Substantial Question Whether a New Trial Was Required by the Erroneous Inclusion of Unredacted Matter on the Jury Laptop

34.   Menendez is wrong to claim that the erroneous inclusion of a handful of improperly redacted exhibits on the jury's laptop presents any substantial question.  (Mot. 15-16).  The District Court, which presided over the nearly 10-week trial, correctly found an "essentially infinitesimal chance" (Dkt. 839 at 13) that the jury even saw the extra-record matter, which consisted of "a few phrases buried in thousands of exhibits and many thousands of pages of evidence" (Dkt. 710 at 9), and a "miniscule" likelihood the jury would have understood it (*id.* at 10).[12]  These fact-

---

[11] Menendez's recharacterization of his promise about what he was "going to" do as an allegedly protected statement of what he had previously "decided" (Mot. 15) would eviscerate the rule that "promises" to "perform an act in the future" are unprotected, *Helstoski*, 442 U.S. at 489, since every statement of intent to perform a future act is necessarily made after the speaker "decided" to form that intent.

[12] The Government's reuse of the jury's laptop, pursuant to standard practice, does not, contrary to Menendez's passing suggestion (Mot. 2), remotely undermine the District Court's findings.  (*See* Dkt. 648 at 27-32).

bound findings deserve "substantial weight," *United States v. Nkansah*, 699 F.3d 743, 751 (2d Cir. 2012), *abrogated on other grounds by Loughrin v. United States*, 573 U.S. 351, 366 & n.9 (2014). The District Court also concluded that Menendez would not have been prejudiced even if the jury had seen and understood the material, rendering any error harmless. (Dkt. 710 at 11). Menendez makes only the most cursory challenge to that fact-bound conclusion. (Mot. 16).[13]

35. Menendez's argument also fails for the independent reason that he waived his objections. (Dkt. 710 at 7-8 ("'Defense counsel is as responsible as the prosecutor for seeing to it that only proper exhibits are sent to the jury room.'" (quoting *United States v. Camporeale*, 515 F.2d 184, 188 (2d Cir. 1975))). Contrary to Menendez's claim (Mot. 16), the District Court never found that he waived the Clause, such that the Government could rely on legislative acts in prosecuting him (*i.e.*, the type of waiver rejected in *Helstoski*). Instead, the District Court simply applied Rule 51's requirement to preserve exhibit objections, which the Clause does not suspend. (*See* Dkt. 839 at 7-8). Nor, contrary to Menendez's suggestion (Mot. 16), does the Clause suspend the normal rules on harmlessness or prejudice. *See,*

---

[13] Rather than show how this evidence could possibly have prejudiced the jury, Menendez simply cites the Government's argument that the evidence would have been powerful *if explained in context*. (Mot. 2). But since no such explanation happened, the terse extra-record phrases would have been highly confusing if stumbled on amidst voluminous dense documents. (*See* Dkt. 648 at 32-36; Dkt. 655 at 14).

*e.g.*, *Dowdy*, 479 F.2d at 227-28 (declining to reverse conviction on certain counts despite introduction of legislative act evidence at trial); (Dkt. 648 at 47-55). More fundamentally, the Clause obviously does not require a new trial because of material that—as the District Court found—the jurors almost certainly never even saw. No defendant is entitled to a new trial because jurors were *near* documents without seeing them.

### B. There Is No Substantial Question Whether the Evidence Was Sufficient to Prove an Official Act

36. The District Court correctly found ample evidence of official acts. (Dkt. 839 at 3-5). Menendez's suggestion that he cannot have "use[d] his official position" to cause an act outside of the Senate (Mot. 18) has already been rejected by this Court, *see United States v. Mangano*, 128 F.4th 442, 476 (2d Cir. 2025) (rejecting argument that "if one public official has no formal or official relationship with another, he essentially acts as a private party in advising or seeking to 'pressure' the other official"), and the record overwhelmingly shows Menendez did just that (Dkt. 654 at 11-13, 19-21).

### C. There Is No Substantial Question Whether the Evidence Was Sufficient to Prove Venue

37. Menendez's challenge to venue (Mot. 19) does nothing to rebut the District Court's thorough findings of sufficient evidence, including face-to-face meetings in, and provision of things of value in, the district. (*See* Dkt. 839 at 5-6;

Dkt. 654 at 46-57). This is plainly sufficient for the substantive counts, let alone the conspiracy counts, which require only "any act, innocent or illegal" in furtherance of the conspiracy in the district. *United States v. Tzolov*, 642 F.3d 314, 320 (2d Cir. 2011).

### D. There Is No Substantial Question Whether Section 219 Is Constitutional

38. Menendez's claim that Section 219 is unconstitutional (Mot. 18-19) presents no substantial question. His separation of powers arguments sound in the same meritless claims of chilling effect that have been raised, and uniformly rejected, in First Amendment and Equal Protection Clause challenges to the Foreign Agents Registration Act, which Section 219 expressly incorporates. *See Attorney General v. Irish People, Inc.*, 684 F.2d 928, 935 & n.23 (D.C. Cir. 1982). The District Court correctly rejected this claim. (*See* Dkt. 252 at 10-16).

### E. Even if All of Menendez's Claims Were Substantial or Meritorious, He Would Not Be Entitled to Bail Pending Appeal

39. Even if *all* of Menendez's above-discussed challenges prevailed, he still would not be entitled to bail, because none implicates his obstruction convictions. (*See* Dkt. 839 at 10). Indeed, obstruction convictions are often affirmed even when underlying convictions are reversed. *See, e.g.*, *United States v. Triumph Cap. Grp.*, 544 F.3d 149, 152 (2d Cir. 2008) (affirming obstruction conviction, reversing all underlying convictions); *Mangano*, 128 F.4th at 452 (affirming

obstruction convictions, reversing certain underlying convictions); *United States v. Aiello*, 118 F.4th 291, 306-07 (2d Cir. 2024) (affirming false statements conviction following vacatur of underlying conviction).

40.    Menendez "pose[s] no challenge," *Randell*, 761 F.2d at 125, to his obstruction convictions besides unconvincing claims of spillover prejudice.  That alone defeats his motion.  *See id.* at 125-26 ("[W]e are not required to decide whether these questions are substantial, since they pose no challenge to petitioner's conviction on the five tax evasion counts.  Petitioner's only claim with respect to the tax counts is that the jury could have been affected by the 'spillover' from the court's other alleged errors.").

41.    Menendez's claim of spillover prejudice (Mot. 17) ignores the legal standard, which imposes an "extremely heavy burden" on him.  *Aiello*, 118 F.4th at 306.  This Court looks to (1) whether the evidence on the challenged counts is more inflammatory than on the remaining counts; (2) whether the challenged counts and remaining counts arise from similar facts and whether the evidence on the challenged counts would have been admissible on the remaining counts; and (3) "the strength of the government's case on the remaining counts."  *United States v. Sullivan*, 118 F.4th 170, 211 (2d Cir. 2024).  Here, where the evidence on the other counts was "no more inflammatory" than the obstruction evidence, *id.* at 212; where at least "much of" the evidence on each count "would have been, at minimum, admissible

as other acts evidence under Fed. R. Evid. 404(b)," *id.* at 213-14; and where the evidence on each count "was strong," *id.* at 214, Menendez utterly fails to discharge his burden of demonstrating that invalidating any count would affect *any* other, let alone *all* others. (*See* Dkt. 839 at 5-6, 8-10).

42.     Tellingly, Menendez centers his claim not on the evidence, but the Government's summation. (Mot. 17). But far from arguing that any count "rel[ied] upon" (*id.*) any other, the Government stressed how even *subsets* of the evidence on each count alone sufficed for conviction. (*See, e.g.*, Tr. 6401 ("[E]ven if there were nothing more than what we've just been through, we would be done with these elements."); Tr. 6441 (similar); Tr. 6503 (similar)). The Government's argument that the conduct charged in certain counts provided additional evidence of the defendants' intent on others weighs *against*, not towards, prejudicial spillover, as it shows that the evidence would have been admissible as to each count. *See Sullivan*, 118 F.4th at 213-14; *Aiello*, 118 F.4th at 306. Indeed, summations routinely reference evidence supporting multiple counts together without establishing spillover prejudice. *See, e.g.*, *United States v. Rankin*, No. 18 Cr. 272 (JAM) (D. Conn.) (ECF No. 518 at 4155-67) (summation reviewed in *Sullivan*, 118 F.4th at 211-15); *United States v. Ciminelli*, No. 16 Cr. 776 (VEC) (S.D.N.Y.) (ECF No. 819 at 2460-61) (summation reviewed in *Aiello*, 118 F.4th at 306-07).

43.     Finally, contrary to Menendez's conclusory suggestion (Mot. 18), the obstruction counts did not depend on the payments being bribes.  Rather, Menendez obstructed justice by submitting false evidence to the grand jury that the payments were loans, when in fact they were not loans.  As Judge Stein recognized, it is legally irrelevant whether the payments were also proven to be bribes.  (Dkt. 839 at 10 ("It is not true that these checks were not obstruction unless they were designed to obscure or conceal bribe payments.")).

## CONCLUSION

Menendez's motion should be denied.

Dated:      May 23, 2025
            New York, New York

                        Respectfully submitted,

                        JAY CLAYTON
                        United States Attorney

            By:     s/ Paul M. Monteleoni_____
                    Eli J. Mark
                    Daniel C. Richenthal
                    Paul M. Monteleoni
                    Lara Pomerantz
                    Catherine Ghosh
                    Assistant United States Attorneys
                    (212) 637-2431/2109/2219/2343/1114
                    Christina A. Clark
                    Special Assistant United States Attorney
                    (202) 307-5191

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this motion complies with the type-volume limitation of Rule 27(d)(2). As measured by the word processing system used to prepare this response to a motion, there are 5,192 words in this response.

JAY CLAYTON
United States Attorney

By:  s/ Paul M. Monteleoni
Paul M. Monteleoni
Assistant United States Attorney
(212) 637-2219