# 25-333, 25-296

## United States Court of Appeals
## for the Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

— v. —

ROBERT MENENDEZ, WAEL HANA, FRED DAIBES

*Defendants-Appellants.*

On Appeal from the United States District Court for the
Southern District of New York
No. 1:23-cr-00490-SHS – Judge Sidney H. Stein

## OPENING BRIEF OF DEFENDANT-APPELLANT
## ROBERT MENENDEZ

Avi Weitzman
Paul C. Gross
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
(212) 318-6000

Adam Fee
PAUL HASTINGS LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
(310) 620-5719

Noel J. Francisco
*Counsel of Record*
John Henry Thompson
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
(202) 879-3939
njfrancisco@jonesday.com
jhthompson@jonesday.com

(continued on next page)

Meir Feder
JONES DAY
250 Vesey Street
New York, NY 10281
(212) 326.3939
mfeder@jonesday.com

David K. Suska
JONES DAY
150 West Jefferson
Suite 2100
Detroit, MI 48226
dsuska@jonesday.com

*Counsel for Defendant-Appellant
Robert Menendez*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................... 1

JURISDICTIONAL STATEMENT ................................................. 5

STATEMENT OF THE ISSUES .................................................... 5

STATEMENT OF THE CASE ....................................................... 5

    A.    The Main Characters ............................................. 6

    B.    The Egypt Scheme ................................................ 7

    C.    The New Jersey Scheme ...................................... 10

    D.    The Daibes Scheme ............................................ 13

    E.    The Indictments .................................................. 17

    F.    The Trial and Sentencing ................................... 18

SUMMARY OF ARGUMENT ...................................................... 19

STANDARD OF REVIEW ........................................................... 23

ARGUMENT ............................................................................... 24

I.    THE SPEECH OR DEBATE CLAUSE REQUIRES VACATUR ON ALL COUNTS ........ 24

    A.    The Speech or Debate Clause Prohibits Prosecutors From Using "Legislative Acts" in Any Manner ................................................ 25

    B.    The Daibes-Related Counts Directly Target Legislative Acts ................ 28

    C.    The Egypt-Related Counts Rested on Evidence of Legislative Acts ................................................................................. 36

    D.    The Speech or Debate Violations Taint All Counts ................................ 47

II.    THE MCDONNELL ERRORS ALSO REQUIRE VACATUR ON ALL COUNTS ......... 51

    A.    The New Jersey Scheme Involved No "Official Act." ........................... 54

B.    The McKinney Call Was Not an "Official Act."........................................57

C.    These Errors Entitle the Senator to Relief on All Counts ......................60

III.   THE FARA CONVICTION CANNOT STAND BECAUSE SECTION 219 VIOLATES THE SEPARATION OF POWERS AS APPLIED TO MEMBERS OF CONGRESS ........................................................................................................63

A.    Section 219 of FARA Unconstitutionally Interferes with How Members of Congress Discharge Their Official Responsibilities ..........63

B.    The District Court Erred in Sustaining the FARA Charge .....................67

IV.   THE EVIDENCE WAS INSUFFICIENT ON OBSTRUCTION .......................................68

V.   TRYING THIS CASE IN THE SOUTHERN DISTRICT OF NEW YORK VIOLATED CONSTITUTIONAL LIMITS ON VENUE .................................................70

A.    The Constitution Imposes Meaningful Limits on Venue ........................70

B.    No Essential Conduct for Bribery or Extortion Occurred in SDNY ............................................................................................................71

C.    No Essential Conduct for Wire Fraud Occurred in SDNY.....................75

D.    No Essential Conduct for FARA Occurred in SDNY .............................77

E.    No Acts in Furtherance of Alleged Conspiracies Occurred in SDNY ............................................................................................................78

CONCLUSION ..................................................................................................................80

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Att'y Gen. of U.S. v. Irish N. Aid Comm.*,
668 F.2d 159 (2d Cir. 1982)..........................................................64, 66

*Barenblatt v. United States*,
360 U.S. 109 (1959)........................................................................ 64

*Carter v. Comer*,
2024 WL 4533963 (D.C. Cir. Oct. 21, 2024)................................. 35

*Clinton v. City of New York*,
524 U.S. 417 (1998)........................................................................ 67

*Doe v. McMillan*,
412 U.S. 306 (1973)........................................................................ 25

*Eastland v. U. S. Servicemen's Fund*,
421 U.S. 491 (1975)..............................................................26, 32, 36

*Fletcher v. Peck*,
6 Cranch 87 (1810)......................................................................... 67

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010)........................................................................ 67

*Gravel v. United States*,
408 U.S. 606 (1972)..................................................................passim

*Griffin v. United States*,
502 U.S. 46 (1991)......................................................................... 34

*Hein v. Freedom From Religion Found., Inc.*,
551 U.S. 587 (2007)........................................................................ 65

*Hutchinson v. Proxmire,*
    443 U.S. 111 (1979) .................................................................. 25, 26, 33, 46

*In re Sealed Case,*
    80 F.4th 355 (D.C. Cir. 2023) .......................................................26, 29, 46

*Jud. Watch, Inc. v. Schiff,*
    998 F.3d 989 (D.C. Cir. 2021) ................................................................. 37

*Kilbourn v. Thompson,*
    103 U.S. 168 (1880) ...............................................................................25, 26

*McDonnell v. United States,*
    579 U.S. 550 (2016) ............................................................................passim

*McGrain v. Daugherty,*
    273 U.S. 135 (1927) ................................................................................. 32

*McSurely v. McClellan,*
    521 F.2d 1024 (D.C. Cir. 1975) .............................................................. 41

*Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.,*
    501 U.S. 252 (1991) ................................................................................. 65

*New York v. United States,*
    505 U.S. 144 (1992) ..............................................................................4, 67

*Nixon v. Fitzgerald,*
    457 U.S. 731 (1982) ................................................................................. 66

*NLRB v. Noel Canning,*
    573 U.S. 513 (2014) ................................................................................. 30

*NRP Holdings LLC v. City of Buffalo,*
    916 F.3d 177 (2d Cir. 2019) .................................................................... 27

*Percoco v. United States,*
    598 U.S. 319 (2023) ................................................................................. 61

*Printz v. United States,*
 521 U.S. 898 (1997) ........................................................... 54

*Pub. Citizen v. U.S. Dep't of Justice,*
 491 U.S. 440 (1989) ............................................................. 3

*Schick v. Reed,*
 419 U.S. 256 (1974) ........................................................... 65

*Skilling v. United States,*
 561 U.S. 358 (2010) ............................................. 9, 12, 53

*Tenney v. Brandhove,*
 341 U.S. 367 (1951) ..................................................... 64, 65

*Trump v. Mazars USA, LLP,*
 591 U.S. 848 (2020) ........................................................... 65

*Trump v. United States,*
 603 U.S. 593 (2024) ..................................................... 43, 65

*United States v. Abbas,*
 100 F.4th 267 (1st Cir. 2024) ........................................... 73

*United States v. Aguilar,*
 515 U.S. 593 (1995) ........................................................... 68

*United States v. Allocco,*
 305 F.2d 704 (2d Cir. 1962) ......................................... 31, 32

*United States v. Arthur,*
 544 F.2d 730 (4th Cir. 1976) ........................................... 51

*United States v. Beech-Nut Nutrition Corp.,*
 871 F.2d 1181 (2d Cir. 1989) ....................................... 72, 76

*United States v. Berkery,*
 889 F.2d 1281 (3d Cir. 1989) ........................................... 51

*United States v. Biaggi,*
   853 F.2d 89 (2d Cir. 1988)..................................................passim

*United States v. Birdsall,*
   233 U.S. 223 (1914)..................................................55, 58

*United States v. Bouchard,*
   828 F.3d 116 (2d Cir. 2016)..................................................73

*United States v. Brewster,*
   408 U.S. 501 (1972)..................................................passim

*United States v. Busic,*
   549 F.2d 252 (2d Cir. 1977)..................................................70

*United States v. Cabrales,*
   524 U.S. 1 (1998)..................................................70

*United States v. Davis,*
   689 F.3d 179 (2d Cir. 2012)..................................................71

*United States v. Dowdy,*
   479 F.2d 213 (4th Cir. 1973)..................................................27, 44, 45

*United States v. Galvez-Guerrero,*
   455 F. Appx. 749 (9th Cir. 2011)..................................................61

*United States v. Ganim,*
   510 F.3d 134 (2d Cir. 2007)..................................................9

*United States v. Garcia,*
   291 F.2d 127 (2d Cir. 2002)..................................................47

*United States v. Gilboe,*
   684 F.2d 235 (2d Cir. 1982)..................................................76, 77

*United States v. Grinage,*
   390 F.3d 746 (2d Cir. 2004)..................................................47

*United States v. Helstoski,*
  442 U.S. 477 (1979) .................................................................passim

*United States v. Jefferson,*
  289 F. Supp. 3d 717 (E.D. Va. 2017) .................................56, 59

*United States v. Johnson,*
  323 U.S. 273 (1944) ................................................................. 70

*United States v. Johnson,*
  383 U.S. 169 (1966) .................................................................passim

*United States v. Kim,*
  246 F.3d 186 (2d Cir. 2001) ....................................................passim

*United States v. Kirk Tang Yuk,*
  885 F.3d 57 (2d Cir. 2018) .................................................71, 78

*United States v. Klein,*
  80 U.S. 128 (1871) .................................................................. 65

*United States v. Lange,*
  834 F.3d 58 (2d Cir. 2016) .............................................71, 74, 78

*United States v. Lefebvre,*
  117 F.4th 471 (2d Cir. 2024) ................................................... 23

*United States v. Lindberg,*
  39 F.4th 151 (4th Cir. 2022) ................................................... 50

*United States v. Mangano,*
  128 F.4th 442 (2d Cir. 2025) .............................................23, 68

*United States v. McDermott,*
  245 F.3d 133 (2d Cir. 2001) ................................................... 51

*United States v. Meyers,*
  635 F.2d 932 (2d Cir. 1980) ...................................................passim

*United States v. Purcell,*
    967 F.3d 159 (2d Cir. 2020)................................................71, 72

*United States v. Ramirez,*
    420 F.3d 134 (2d Cir. 2005)....................................................71

*United States v. Rodriguez-Moreno,*
    526 U.S. 275 (1999)...............................................................70

*United States v. Rommy,*
    506 F.3d 108 (2d Cir. 2007)....................................................78

*United States v. Rostenkowski,*
    59 F.3d 1291 (D.C. Cir. 1995).................................................63

*United States v. Rutigliano,*
    790 F.3d 389 (2d Cir. 2015)....................................................79

*United States v. Saavedra,*
    223 F.3d 85 (2d Cir. 2000)......................................................79

*United States v. Salmonese,*
    352 F.3d 608 (2d Cir. 2003)....................................................79

*United States v. Sawyer,*
    85 F.3d 713 (1st Cir. 1996) .....................................................61

*United States v. Silver,*
    864 F.3d 102 (2d Cir. 2017)........................... 53, 56, 59, 62

*United States v. Stephenson,*
    895 F.2d 867 (2d Cir. 1990)....................................................71

*United States v. Swindall,*
    971 F.2d 1531 (11th Cir. 1992)...........................................42, 49

*United States v. Tillem,*
    906 F.2d 814 (2d Cir. 1990)....................................................71

*United States v. Tzolov,*
    642 F.3d 314 (2d Cir. 2011) .......................................................78, 79

*United States v. Urciuoli,*
    513 F.3d 290 (1st Cir. 2008) ............................ 53, 56, 57, 58

*United States v. Yates,*
    16 F.4th 256 (9th Cir. 2021) ......................................................47, 48

*USFL v. NFL,*
    842 F.2d 1335 (2d Cir. 1988) ....................................................... 36

*Weaver v. Massachusetts,*
    582 U.S. 286 (2017) ..................................................................... 49

*X-Men Sec., Inc. v. Pataki,*
    196 F.3d 56 (2d Cir. 1999) .......................................................... 26

*Yates v. United States,*
    354 U.S. 298 (1957) ..................................................................... 34

*Zivotofsky ex rel. Zivotofsky v. Kerry,*
    576 U.S. 1 (2015) ....................................................................46, 64

## STATUTES

18 U.S.C. § 201 ...................................................................17, 52, 71

18 U.S.C. § 219 ...................................................................passim

22 U.S.C. § 611 ...................................................................passim

22 U.S.C. § 612 ........................................................................... 63

28 U.S.C. § 1291 ........................................................................... 5

18 U.S.C. § 1343 ......................................................................... 75

18 U.S.C. § 1951 ......................................................................... 71

18 U.S.C. § 3231 ........................................................................... 5

xi

18 U.S.C. § 3237 ...................................................................................... 77

**OTHER AUTHORITIES**

Rafael Bernal, *Bipartisan Senate Bill Would End Cuban Embargo*, The Hill,
Mar. 6, 2023 ..................................................................................... 66

Eric Bradner et al., *Gaetz withdraws from attorney general consideration after
Trump told him he didn't have the votes in the Senate*, CNN (Nov. 21, 2024),
https://www.cnn.com/2024/11/21/politics/matt-gaetz-
withdrawing-attorney-general/index.html........................................ 31

Laura T. Gorjanc, *The Solution to the Filibuster Problem: Putting the Advice
Back in Advice and Consent*, 54 Case W. Res. L. Rev. 1435, 1460-61
(2004) ............................................................................................... 30

A. Hutzler et al., *Zelenskyy lobbies Congress for Ukraine aid at center of GOP
spending battle*, ABC News, Sept. 21, 2023.................................... 67

*Inquiry into the Matter of Billy Carter and Libya: Hearing Before the Subcomm. to
Investigate the Activities of Individuals Representing the Interests of Foreign
Gov'ts, of the S. Comm. on the Judiciary*, 96th Cong., 2d Sess., 700 (1980) ................... 67

Mychael Schnell, *Greene Moves to Force Vote on Censuring Omar for Somalia
Remarks*, The Hill, Feb. 1, 2024...................................................... 66

*Sen. Cruz Statement Standing With Israel After Prime Minister Netanyahu's
Address to Congress*, July 24, 2024,
https://www.cruz.senate.gov/newsroom/press-releases/sen-cruz-
statement-standing-with-israel-after-prime-minister-netanyahus-
address-to-congress.......................................................................... 66

David Strauss & Cass Sunstein, *The Senate, the Constitution, and the
Confirmation Process*, 101 Yale. L.J. 1491 (1992)........................... 30

U.S. Const. art. I, § 6, cl. 1 ..................................................................... 25

U.S. Const. art. II, § 2, cl. 2 ......................................................2, 20, 29, 30

U.S. Const. art. III, § 2, cl. 3 ............................................................... 70

Leonard Dupee White, *The Federalists: A Study In Administrative History*
(1948) ................................................................................................ 30

# INTRODUCTION

Prosecuting a Member of Congress for conduct relating to acts in office is not supposed to be easy. In our system of government, the principal check on abuse of power is political—voters can oust the official if they disapprove of how he does his job. But the Constitution is wary about allowing one branch (the Executive) to criminally investigate another (the Legislative) in front of a third (the Judicial).

Here, prosecutors built their case as a three-legged stool, alleging the Senator's involvement in three overlapping bribery "schemes" to support more than a dozen charges. As prosecutors assured the jury, if they had doubts about any one scheme they could lean on the others; what matters, they said, is the "big picture." The consequence of that trial strategy is clear for this appeal: If the convictions on any one scheme fall, so must the rest. And here, all three schemes are rife with reversible error.

The convictions on two of the schemes involve clear violations of the Speech or Debate Clause, which categorically forbids punishing Members of Congress for legislative acts—or even using those acts as evidence. *United States v. Brewster*, 408 U.S. 501 (1972). As this Court has recognized, the Speech or Debate Clause makes congressional bribery charges much harder to prove. *United States v. Meyers*, 635 F.2d 932 (2d Cir. 1980). Prosecutors must attempt to prove them solely through evidence that the legislator entered a corrupt *quid pro quo* agreement for official action. They must not put legislative activity itself on trial. That, however, is exactly what prosecutors here did for two of the schemes.

1

One alleged that gold a co-defendant gave the Senator came in exchange for recommending a candidate as U.S. Attorney for New Jersey. But the Senator's recommendation (and the process for making it) was a core legislative act, representing the exercise of his power to provide "Advice" to the President about potential appointments. U.S. Const. art. II, § 2, cl. 2. The district court held otherwise—and allowed all of this evidence to be put to the jury—by concluding that a Senator's *pre-nomination* advice to the President is *never* a legislative act. But that is irreconcilable with the plain language of the Appointments Clause (which refers to "Advice" *and* "Consent"), unbroken historical practice, and prominent scholarship.

The other scheme, moreover, involved a *conceded* violation of the Speech or Debate Clause. It charged the Senator with accepting things of value in exchange for exercising his powers as Chairman or Ranking Member of the Senate Foreign Relations Committee ("SFRC") to sign off on aid to Egypt. The district court acknowledged that such sign-offs were legislative acts entitled to Speech or Debate protection. It thus barred *direct* evidence of those acts (though it erroneously allowed *indirect* evidence of them). After trial, however, prosecutors admitted they inadvertently gave the jury the very direct evidence the district court had excluded—evidence that was, in the prosecutors' own words, "compelling" and "highly probative." Remarkably the district court excused the error as waived and harmless. But the Senator had successfully *objected* to the evidence, and so plainly had not waived the protection. And as the Eleventh Circuit has squarely held, Speech or Debate error is structural and thus not subject to

2

harmless-error analysis. That rule reflects the truism that all separation-of-powers principles, including the Speech or Debate Clause, are not designed to protect the branches from each other, but the liberty of the People. After all, "[w]hen structure fails, liberty is always in peril." *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 468 (1989) (Kennedy, J., concurring).

The Speech or Debate Clause thus knocks out two legs of the stool. And the third suffers from an equally fatal flaw. Prosecutors contended that the Senator had accepted things of value in exchange for expressing concern to New Jersey state officials about two state criminal matters. That conduct does not involve *legislative* acts. But it does not involve *official* acts either. A Senator has no authority over state criminal matters, nor was there evidence that Senator Menendez in any way used (or agreed to use) his federal office to "pressure" or "advise" state officials. This third scheme thus fails under *McDonnell v. United States*, 579 U.S. 550 (2016).

Nor are these the only errors. This case marks the first time in history that prosecutors charged a Member of Congress under 18 U.S.C. § 219 of the Foreign Agents Registration Act, a notoriously slippery provision that criminalizes facially legitimate actions taken for improper motives, including at the "request" of a foreign official. Prosecuting a Senator—especially one who served as Chairman of the SFRC—for acting at the "request" of a foreign official is certain to chill others serving in the same and similar roles. And if the conviction here stands, who knows what legislator

is next in line for prosecution for supporting aid to, say, Israel, Palestine, Russia, or Ukraine.

Finally, stepping back, prosecutors here charged a Senator from New Jersey with engaging in unlawful acts in New Jersey and Washington D.C. There was simply no basis for pursuing this case in the Southern District of *New York*. The Government's only response is to point to the most attenuated of contacts with Manhattan—including, for example, that the Senator once drove through SDNY en route from JFK Airport to his home in New Jersey. If these arguments stand, the Constitution's venue guarantees are meaningless.

To return to the beginning, cases like this are not supposed to be easy to prosecute. When the Executive Branch seeks to imprison a Senator for his conduct in office, prosecutors must operate within guardrails erected by the Constitution and statutes. Here, prosecutors took shortcut after shortcut—including conceded errors. The convictions against Senator Menendez must be vacated.

## JURISDICTIONAL STATEMENT

The district court entered a final judgment on January 31, 2025. SA114. Senator Menendez timely appealed on February 13, 2025. A1222-23. The district court had jurisdiction under 18 U.S.C. § 3231, and this Court under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.     Are the convictions tainted by the admission of evidence barred under the Speech or Debate Clause?

2.     Are the convictions tainted by the Government's failure to establish that Senator Menendez agreed to take "official action" in exchange for bribes, and by the district court's flawed instructions to the jury on that point?

3.     Must the conviction for violating 18 U.S.C. § 219 be set aside because that statute's application offended the separation of powers?

4.     Must the convictions for obstruction of justice be vacated where the government failed to show that Senator Menendez intended to deceive the grand jury?

5.     Did the Government fail to establish venue in SDNY?

## STATEMENT OF THE CASE

Senator Menendez was convicted after a jury trial before Judge Sidney H. Stein, who imposed an eleven-year sentence and entered final judgment. The court's denial of the Senator's post-trial motions are reported at 759 F.Supp.3d 460 and 763 F.Supp.3d 538. The Senator maintains his innocence and disputes much of the below. But in the present posture, the evidence is taken in the light favorable to the Government.

## A.    The Main Characters.

Robert Menendez was a public servant for half a century.  A2528.  His story is distinctly American.  His parents fled Cuba with only the cash stored in a grandfather clock; their son worked his way to become a U.S. Senator for New Jersey.  A2525; A2528-30.  As Senator, he served on the SFRC—as its Chairman (2021-23), and Ranking Member (2018-21).  A2314-16.

Senator Menendez met Nadine Arslanian in late 2017.  A2534-35; A1225-351.  The Senator came into Nadine's life as she was trying to extricate herself from an abusive relationship and struggling financially.  A2533-36; A2539.  Lingering issues with her past boyfriend caused the Senator and Nadine to break up in November 2018.  A2535-36.  But they eventually reconciled, moved in together (at Nadine's home in New Jersey), and married in October 2020.  A2542-44.

The case involved three other central figures.  Wael Hana, Nadine's longtime friend, was a New Jersey businessman born in Egypt.  A1847-48; A1382-98.  Jose Uribe was also a New Jersey businessman.  A2185-97.  Uribe was close to Hana, who put him in touch with Nadine, who in turn connected Uribe with the Senator.  A2126-27; A2137; A2145; A2148-49.  Last was Fred Daibes, a New Jersey real-estate developer.  A1861.  Unlike the others, Daibes had known Senator Menendez for decades.  A1944.  More recently, Daibes became friends with Hana.  A2488-89; A1858.

6

### B.    The Egypt Scheme.

The Government split its case into three "schemes"—the first involving Egypt. On its telling, Senator Menendez agreed to sell out his country in April 2018 in exchange for Hana giving unspecified benefits to a woman with whom, at that time, the Senator had gone on a few dates.  A525-26.

Per the Government, before 2018, Senator Menendez was a thorn in Egypt's side, especially on human rights.  A2363-64.  But by that spring, his stances softened. A2364-65.  The Government made much of the Senator's meetings with Egyptian officials.  *E.g.*, SA32-33; A1806.  It also emphasized how certain nonpublic information was transmitted through Nadine to Hana (and in turn, to Egypt).  *E.g.*, A1498 (rows 102-03).   And at Nadine's behest, the Senator agreed to punch up a draft letter purportedly from an Egyptian official to the U.S. Government.  A1504 (rows 184-86).

Those favors aside, the Government contended that the Senator agreed to take two "official acts" in connection with this scheme—both well before any of the payments to Nadine that the Government sought to tie to these acts.  SA29.

First was military aid.  The Chairman and Ranking Member of the SFRC possesses power to "hold" much of the $1.3 billion allocated annually to Egypt.  A1870-76; A1880-85; A1890-1914.   The Senator's approach to foreign aid factored prominently at trial, particularly one text: In July 2018, the Senator messaged Nadine: "Tell Will I am going to sign off this sale to Egypt today" (then listing specifics).  A1518 (row 320); A1718.  This was a day after an official meeting between Egyptian officials

and Senator Menendez, where the parties discussed "[r]eleasing the suspended amounts of U.S. aid." A1518 (rows 310, 313-14).

Second was a brief call to an executive branch official. In April 2019, Egypt gave a company owned by Hana, "IS EG Halal Certifiers Inc.," exclusive rights to certify U.S. beef exports to Egypt as halal compliant. A2035; A1438. Concerned about competition and competence, the United States urged Egypt to change course. A1852-55. In May, an article was published in Egypt describing U.S. efforts to reverse IS EG's monopoly. A1542-43 (rows 721, 724). Hana forwarded that article to Nadine, who sent it to the Senator. *Id.* (rows 721-22). Senator Menendez then called Undersecretary of Agriculture Ted McKinney, who testified that the Senator told him to "[s]top interfering with my constituent" (*i.e.*, Hana's company). A2038-39; A2046. That was it: In protesting on behalf of his constituent, the Senator never threatened McKinney nor promised to use his office. A2042; A2054-56.

All this—the lion's share of the Government's evidence regarding Egypt—happened well before a *penny* went from Hana to Nadine, and without any evidence that any payment was promised. The first payment was in July 2019, to address a financial situation that arose in June 2019 (*i.e.*, about fifteen months *after* the supposed conspiracy began). That month, Nadine received a foreclosure complaint. She did not tell the Senator (then her boyfriend); instead, she turned to her friend Hana, who agreed to pay the debt (about $23,500). A1560 (row 956); A1421. It is unclear whether the Senator *ever* learned of this.

8

The other payments from Hana to Nadine were three $10,000 checks, in August and November 2019, representing compensation for work for IS EG. A1783-85; A2562-63. The Senator knew about these payments. A1813-15. The Government maintained this was all part of a "sham job" for Nadine to receive illicit payments from Hana. But the Government itself offered evidence of work Nadine did for IS EG. *E.g.*, A1560 (Nadine: "I need to be in the office eight hours a day"); A2554-59 (discussing Nadine's real work for IS EG).

The Government acknowledged that, to prove bribery, it needed to connect these 2019 payments to a preexisting agreement between the Senator and others. A525-26. After all, federal bribery law is not a code of "good government for state and local officials." *McDonnell*, 579 U.S. at 577 (citation omitted). It does not prohibit attempts "to buy favor or generalized goodwill from a public official," *United States v. Ganim*, 510 F.3d 134, 149 (2d Cir. 2007), or forbid officials' decisions that benefit citizens who contribute to their campaigns or provide them with gifts, *see Skilling v. United States*, 561 U.S. 358, 409-10 (2010). But the Government did not have anything showing an explicit *quid pro quo* involving Senator Menendez and anyone else; all it could point to were a few messages from April 2018 to April 2019 among the Senator, Nadine, and Hana about meetings with Egypt and Nadine's work for Hana. *E.g.*, A1767-70; A1765; A1720; A1777-81; A1744-45.

Putting the pieces together, the Government's theory was that, by April 2018, Senator Menendez had agreed to sell his office to Egypt for Nadine, whom he had just

started dating, in exchange for some unidentified future benefits from Hana. *See* A2593 (Closing: Government discussing "very early stages" of conspiracy starting late April 2018). Even after Hana had "broken promises" to Nadine for a year, the Senator— seemingly to throw more *quos* after no *quids*—called McKinney as part of the same illicit deal. *See* A2596-98. Only two months later did Nadine start to receive anything from Hana—in response to a foreclosure filed in June 2019—supposedly cinching his end of what had been an irrational one-sided bargain forged in early 2018.

The Government's case did not end entirely in Fall 2019. But it identified no concrete official act performed or promised by the Senator for Egypt from 2020 onward. Nor did it identify any meaningful *quid* running the other way. Instead, the Government pointed to how the Senator continued to meet with Egyptian officials— meetings that many other Senators also had with foreign officials. *E.g.*, A2438-43. And it emphasized that the Egyptians sought help from the Senator on diplomatic matters. A1581-82 (rows 1207-08, 1211-14); A1546 (rows 764-67, 777-78). At all times, the Senator was either Chairman or Ranking Member of the SFRC—a position where "relationship building" with foreign officials was a core function. A2463.

## C.     The New Jersey Scheme.

The next scheme had nothing to do with Egypt. The Government claimed that Senator Menendez agreed to intervene in two New Jersey state criminal matters involving people close to Uribe in exchange for Uribe buying Nadine a Mercedes.

10

Around 2018, the New Jersey Attorney General was looking into two of Uribe's associates. A2123; A2130. Early that year, Hana told Uribe he might have a way to help if Uribe was able to muster $200-250,000. A2133. Hana did not specify the "avenues" in mind, but did say he would get "in touch with Nadine and Senator Menendez," (A2133-34), who, by early 2018, had been on a few dates. However, no money changed hands, and there was no evidence that Hana talked to the Senator or Nadine about the case in 2018. Uribe's associate ultimately hired a high-powered New Jersey lawyer, Michael Critchley, for $250,000. A2133.

Come January 2019, Uribe was growing worried—often reaching out to Hana for advice. *E.g.*, A1596 (row 95). That month, Hana sent information about the pending prosecution to Nadine, who conveyed it to the Senator. *E.g.*, A1609-11 (rows 343, 345, 349, 352-69, 370, 373).

The next day, Senator Menendez placed a five-minute call to the New Jersey Attorney General. He raised an overall concern that Hispanic defendants in the trucking industry were treated unfairly before clarifying he had a case in mind—where Critchley represented the defendant. A2076-77. Attorney General Grewal said Critchley was a talented attorney. A2078. That was it. As Grewal himself testified, the Senator never asked him to do anything—let alone threaten him, or threaten to use his office. A2103-06.

A month later, Uribe connected directly with Nadine to discuss the prosecution for the first time. A2137. Uribe testified that Nadine was in need of a car; that she told

him Hana had promised to help but that fell through; and that Uribe said he would buy her one if she agreed to "help." A2138. Uribe acknowledged that the "help" she agreed to provide was to get Uribe "access" to the Senator. A2200. Once he got that access, Uribe asked for the Senator's assistance, but never disclosed the payments for Nadine's car. A2116-18; A2200-01. On the stand, the convicted fraudster fared poorly—so much so that, at closing, the Government cut bait. A2629-30 ("Nothing that I have said … relies on a single word of testimony from Uribe.").

Even at that, Uribe made no claim that Senator Menendez (or Nadine) ever promised any official action. Nadine never offered any "details" on how the Senator could help. A2142. She just promised to discuss the matter with her then-boyfriend. *E.g.*, A2152-54. And when Uribe eventually had the chance to speak with the Senator to raise these issues, he also—by Uribe's account—never committed to anything concrete. *E.g.*, A2157-58 (testifying that Menendez said he "would look into it").

A second call from Senator Menendez to Attorney General Grewal followed to set up a meeting. A2080-81. At that fifteen-minute meeting in September 2019, the Senator said he was still concerned about the matter where Critchley was the attorney, and Grewal reiterated that he could not discuss it. A2090-96. The Senator did not press and just made "small talk." A2091. Again, there was no "explicit ask," nor threats. *Id.* Grewal testified that he was unsure what case the Senator had in mind. A2100.

In April 2019, Uribe arranged for Nadine to get a Mercedes. *E.g.*, A1618-22 (rows 526, 561, 593, 611-13). Uribe acknowledged he never mentioned car payments

12

to the Senator.  A2200-04.  Nor was there evidence Nadine did.  But the Government argued that Senator Menendez was aware of the payments.  A1600 (row 149).

The two state criminal matters were eventually resolved independently—all agree—from anything Senator Menendez did.

### D.    The Daibes Scheme.

The Government's last scheme involved Senator Menendez's longtime friend Daibes, who was indicted in October 2018 by the U.S. Attorney in New Jersey.  A1674. For over two years, there is no indication the Senator did anything for Daibes, or that Daibes asked his friend to intervene.  Nevertheless, according to the Government, at some point near the end of 2020, the two agreed to a *quid pro quo*.  Once again, the Government offered no direct evidence of this deal.  Rather, it relied on proof of the Senator's legislative acts to argue for an inference of a corrupt agreement.

In December 2020, it fell to Senators Menendez and Booker to recommend the next U.S. Attorney for New Jersey.  A2260-61; A2270.  Senator Menendez turned to his friend Philip Sellinger, a well-respected New Jersey lawyer who had lobbied for the job.  A1649 (row 32); A2216; A2242.  In a December 2020 meeting, as Sellinger testified, the Senator asked about his "vision" for the office.  A2216.  At the "tail end," he raised Daibes's case: The Senator "believed that [Daibes] was being treated unfairly" and "hoped if [Sellinger] became U.S. Attorney that he would look at it carefully." A2217.  The discussion ended there.  Sellinger did not feel the Senator had pressured

him or asked for any specific action. A2246-48; *see also* A2241 (Sellinger: Senator never asked him "to do anything unethical or improper").

The next day, Sellinger called Senator Menendez to tell him he would look at "all cases carefully," but might recuse from the Daibes case because Sellinger's firm was adverse to Daibes in a civil lawsuit. A2220-21. The Senator then had an advisor (Michael Soliman) research another candidate, Esther Suarez. A2264-67. Around this time, the White House sent a memo urging Senators to prioritize diversity in their picks (which favored Suarez). A1353; A1753. In early 2021, the Senator put forward Suarez's name. A2251.

For unrelated reasons, Suarez's nomination stalled. Sellinger then reached out to the Senator. A2227. According to Soliman, Sellinger communicated to Soliman that he likely would *not* be recused on Daibes's case. A2273-75; A2278. Soliman relayed this to the Senator, and told him, "I think if you call Sellinger, you'll be comfortable with what he says," a comment that Soliman testified was about either Daibes or Sellinger's plans to boost office diversity—he could not recall. A2289-90.

Senator Menendez subsequently advised the President to nominate Sellinger for the U.S. Attorney position, which the President did. A2281-82. The Senate confirmed Sellinger. A1662 (row 199). Then, in March 2022, Senator Menendez asked Soliman— who was already planning to meet with Sellinger—to tell him to "give Mr. Daibes all due process," since the Senator felt the office had been "unresponsive to Mr. Daibes's counsel." A2285-86. Soliman understood this to be sincere: The Senator was

14

frustrated with how his friend's case was dragging but did not direct Soliman to ask for any outcome or otherwise pressure Sellinger in any way. A2293-95. In any event, at their meeting, Sellinger cut off any opening for Soliman to raise *any* case, and he did not do so. A2254-55.

Around this time, the Senator learned that Vikas Khanna would supervise the Daibes case as First Assistant. The Senator spoke with Khanna by phone. On that call, as Khanna testified, the Senator "congratulated" him on his new role and said he would work with "great lawyers"—naming two, one of whom was representing Daibes in his New Jersey case. A2482. The Senator never mentioned Daibes, however, or asked Khanna to do anything. A2485. And the Senator subsequently declined an invitation to Sellinger's investiture. A2255-56.

Throughout this period, Senator Menendez remained in close contact with Daibes, as did Nadine. *E.g.*, A1662-64 (rows 213-14, 243). And Daibes provided a number of things of value to the Senator and Nadine: around $82,500 in cash, and some gold. A549; A1817. The Government asserted that "friends do not give friends" such lavish gifts. A2652. But ahead of trial, the Government successfully excluded evidence showing that Daibes did just that—with friends in high and low places alike. A501-02.

While the actions involving Daibes's prosecution were the essence of the Government's last scheme, it also added the theory that Daibes bribed the Senator in exchange for favorable actions relating to Qatar—to help Daibes seal a business deal with a Qatari investment firm. As the Government told the jury, this charge was

15

secondary at best. A2691-92 (Closing: "There are no counts that rest alone on Qatar. None. Zero."). That said, in summer 2021, Daibes was looking for financing, and the Senator introduced him to a member of the Qatari royal family and a principal at Heritage Advisors (an investment firm). *See* A1652 (row 91). Daibes and Heritage started to discuss a $95 million real-estate deal. A1654 (rows 114-15).

During this time, Qatar contributed funds to help address the famine in Yemen, prompting U.S. officials to issue commendatory press releases. *E.g.*, A1355-59. The Senator sent copies of these releases to Daibes, who forwarded them to his would-be Qatari partners. *E.g.*, A1654 (row 118).

The Government did *not* claim that setting up a meeting or issuing a press release was official action. For that, the Government pointed to two texts that Daibes sent the Senator, each linking to a Senate resolution "express[ing] appreciation for the State of Qatar's efforts to assist the United States during Operation Allies Refuge." A1658 (row 164); A1661 (row 189). Although the messages did not indicate their purpose, the Government argued that the jury should infer that Daibes was soliciting Senator Menendez to support the resolution, so Daibes would look good to the Qataris. (The Senator did not in fact sponsor the resolution.) Around the time of these texts, Daibes provided the Senator some of the benefits noted above. A1659-1660 (rows 169, 176-78).

### E.    The Indictments.

On September 21, 2023, a grand jury indicted Senator Menendez, Nadine, Hana, Daibes, and Uribe in connection with these events.  The operative indictment charged 18 counts.  Counts 5-8 were bribery offenses (under 18 U.S.C. § 201, honest services fraud, and the Hobbs Act) covering the Egypt Scheme; Counts 9 and 10 were bribery offenses for the New Jersey scheme; and Counts 11-14 covered the Daibes scheme. The Government charged overarching conspiracy counts under each statute (1-3), on the theory that its three schemes were in fact all part of one interrelated enterprise. SA49; A2660-64.  And, based on the evidence that gave rise to the Egypt offenses, it charged substantive and conspiracy counts (15-16) under 18 U.S.C. § 219—which criminally bars Members of Congress from acting as "foreign agents" under the Foreign Agents Registration Act (FARA).  The Government boasted that this was "the first such charge … in U.S. history."  A1152.

The indictment also charged obstruction of justice.  Count 4 asserted the Senator sought to obstruct Daibes's prosecution in New Jersey.  Counts 17-18 asserted obstruction related to subsequent events.  Specifically, on June 16, 2022, the Senator and Nadine learned they were subjects of a grand jury investigation.  A1683; A1458-68. That December, Senator Menendez cut two checks to Nadine, one "for [the] car payment[s]" from Uribe; the other for the mortgage payments from Hana (memo line: "To liquidate loan").  A1402; A1407.  Nadine then wrote checks to Uribe and Hana, respectively, for those amounts—the former marked for "personal loan," the latter for

17

"Full payment of Wael Hana loan." *Id.*; *see* A2180-81. Senator Menendez's then-counsel also made a presentation to the U.S. Attorney's office, arguing the Senator only learned of these payments by Uribe and Hana once he learned of the investigation. A2303-05; A1415-19. The Government said all this was a cover-up.

### F. The Trial and Sentencing.

The Government's focus at trial was on the *quids*. It led with an account of the cash and gold found in the Senator's house—with the prosecution passing the jury gold bar after gold bar until the court intervened. A1843. The Government likewise structured its closing around items Senator Menendez received. A2578-90.

The Government lacked any proof of an explicit *quid pro quo*. Instead, the prosecution relied on an atmosphere of colloquial corruption, insisting that special treatment plus financial benefits was sufficient for bribery. *E.g.*, 2651. The Government also tried to paint a picture of "secrecy" among the defendants—stressing, for instance, that Senator Menendez did not disclose the above benefits on certain forms. *E.g.*, A1572 (row 1111); A2512; A1400.

The Government put all this to the jury via a "quite unusual" approach, to quote Judge Stein. A2208. The vast majority of its evidence came in through three summary charts (one for each scheme) read into the record by summary witnesses (over the course of many days) who had no familiarity with the underlying material—thereby allowing the prosecution to curate its proof while avoiding genuine cross-examination.

The jury returned a guilty verdict on all counts. The Government subsequently disclosed, however, that it had included, on the evidence laptop it gave the jury, material that Judge Stein had expressly excluded under the Speech or Debate Clause. The Government had previously described this material as "very critical" and "highly probative and compelling." A1953-54; A1047. Even so, the court excused the error as waived and harmless. SA99-112. The court then denied post-trial relief and sentenced the Senator to 11 years in prison.

## SUMMARY OF ARGUMENT

**I.** Rooted in historical experience establishing that the risk of prosecution might "intimidate[]" legislators in performing their roles, the Speech or Debate Clause shields all legislative activity from use in any prosecution. *E.g.*, *United States v. Johnson*, 383 U.S. 169, 179-81 (1966). The Supreme Court has defined the category of protected "legislative acts" broadly, covering anything that is "an integral part of the deliberative and communicative processes by which Members participate in … matters which the Constitution places within the jurisdiction of either House." *Gravel v. United States*, 408 U.S. 606, 625 (1972). Evidence of legislative acts cannot be introduced in a criminal trial. *United States v. Myers*, 635 F.2d 932, 937 (2d Cir. 1980). The Government broke that rule at the threshold by indicting Senator Menendez for legislative acts, then continued to ignore the Clause throughout trial.

**A.** To prove the Daibes-related scheme, the Government directly put on trial the Senator's decision to recommend to the President a particular candidate for U.S.

19

Attorney and his "deliberative and communicative process[]," *Gravel*, 408 U.S. at 625, for making it. The district court's holding that a Senator's *pre-nomination* advice to the President can *never* be a "legislative act"—or even integral to one—conflicts with the Constitution's direction to Senators to provide "Advice," not merely "Consent," U.S. Const. art. II, § 2, cl. 2, and with the long history of Senators doing just that.

**B.** The Government's case on the alleged Egypt scheme likewise depended on evidence immunized by the Speech or Debate Clause. In fact, prosecutors *admitted* to providing jurors with evidence that the district court *had excluded* under the Clause. Nevertheless, the district court indulged the Government's speculative harmless-error arguments, and even held that the Senator *waived* his Speech or Debate rights with respect to evidence he *successfully moved to exclude*.

Aside from these admitted violations, the Government also emphasized a text message in which the Senator announced his imminent decision to approve aid— functionally indistinguishable from admitting the Senator's vote on legislation. In addition, jurors heard extensive testimony about the Senator's meetings with Egyptian officials despite this Court's holding that such "information gathering" is immunized by the Speech or Debate Clause. *United States v. Biaggi*, 853 F.2d 89, 103 (2d Cir. 1988). At bottom, the Government's case on the Egypt scheme invited jurors to scrutinize the motives underlying Senator Menendez's exercise of core legislative functions—exactly what the Speech of Debate Clause prohibits.

**C.** The Speech or Debate Clause violations in this case were so pervasive—and so essential to the Government's case—that they taint every count. Most obviously, the substantive Daibes- and Egypt-related convictions cannot survive a proper application of the Clause's protections. And because the Government overtly framed each of its "schemes" as supporting (and relying on) the others, removing these counts brings down the prosecution's house of cards on bribery—and with it, the remaining derivative counts. Senator Menendez's convictions must be vacated across the board.

**II.** Where the Government managed to avoid the Speech or Debate Clause, it ran into another barrier: The "official act" requirement. *McDonnell*, 579 U.S. at 572.

**A.** The Government did not plead or prove a single "official act" in connection with the alleged New Jersey scheme involving Uribe, which involved a *state* investigation. The Senator had no power over state investigations or New Jersey's Attorney General. As the Attorney General testified, the Senator did not say or imply that he would "us[e] his official position"—*i.e.*, the power of his Senate office—to either "exert pressure on" or "advise" any New Jersey official. *Id.* at 574. In his brief communications with the Attorney General, Senator Menendez said nothing beyond "expressing support" for Latino defendants in general and Critchley's unidentified clients in particular—none of which is an official act. *Id.* at 573. The jury instructions erroneously left the jury to apply a colloquial, deeply unofficial understanding of "pressure" and "advice" that far exceeded the limits set by *McDonnell*.

**B.** The Egypt scheme suffers from the same defect: Calling a USDA official does not become an "official act" merely because the caller is a Senator. Instead, the Government needed to prove that Senator Menendez threatened to wield his legislative authority—that he "use[d] his office" to exert official "pressure" or deliver official "advice." *McDonnell*, 579 U.S. at 574. But there was no such testimony from the Government's witnesses. Beyond that, the call could not be an "official act" because USDA's stance on Egypt's monopoly decision was not *itself* an "official act."

**C.** These *McDonnell* errors entitle the Senator to relief on all counts. The New Jersey scheme fails because the Government did not even attempt to prove an official act. The Egypt scheme fails because the Government told the jury that the USDA call—not an official act—was "all you need to convict." A2599. Moreover, the district court's instructional error on the distinction between colloquial and official "pressure" and "advice" taints the bribery counts associated with both schemes. And in the absence of direct evidence of any *quid pro quo*, the government relied on what it depicted as a pattern of corruption to supply the necessary inferences for all three schemes, and to provide evidence of intent for the obstruction charges. All counts fall together.

**III.** This case involves yet another constitutional violation. Section 219 of FARA makes it a felony for Members of Congress to take otherwise lawful actions for certain proscribed reasons, such at the "request" of a foreign official. 22 U.S.C. § 611(c)(1), (o). The statute does not require, and the district court did not instruct the jury that it needed to find, any payment or bribe from a foreign official to convict. But

in dealing with foreign affairs, Members of Congress *routinely* act on legislative business involving requests from foreign governments, leaving prosecutors, judges, and juries with an intolerable degree of discretion in determining which such actions are actually criminal. Applied in that way, the statute tramples on the separation of powers.

**IV.** The obstruction-of-justice convictions also fail because the Government adduced insufficient evidence of the Senator's intent. Allegedly false statements to federal prosecutors or agents cannot support an obstruction conviction without a showing that the defendant "knew" that the statements "would be conveyed to the federal grand jury." *United States v. Mangano*, 128 F.4th 442, 482 (2d Cir. 2025). The Government presented *nothing* that would permit any inference that Senator Menendez knew any allegedly false statements would be conveyed to a grand jury. Nor did the Government prove that Senator Menendez had any involvement with Nadine's counsel's production of allegedly false documents in response to a grand jury subpoena.

**V.** Finally, the Government tried this case in the wrong venue. Senator Menendez lived in (and represented) New Jersey, and virtually all of the conduct involved in this case occurred there or in D.C. To try this case in SDNY required ignoring the Constitution's venue requirements.

## STANDARD OF REVIEW

The Court reviews *de novo* all relevant legal issues. *United States v. Lefebvre*, 117 F.4th 471, 474 (2d Cir. 2024).

23

# ARGUMENT

## I. THE SPEECH OR DEBATE CLAUSE REQUIRES VACATUR ON ALL COUNTS.

The Framers adopted the Speech or Debate Clause to ensure that legislators' work would be free from the shadow of prosecution. The Clause bars the use of any legislative activity in any criminal proceeding. Here, however, the Government did not merely *use* legislative acts in the course of its prosecution of Senator Menendez; it *built its case* on them.

The Government had no proof showing Senator Menendez agreeing to any *quid pro quo*—no witness testified to any such agreement, nor was there a single call, text, email, or meeting where the Senator even hinted at a deal. It therefore tried to prove deals indirectly: by cataloging how the Senator used his office, and then insisting this conduct flowed from bribes.

The Daibes-related counts rested almost entirely on Senator Menendez's recommendation of a candidate for U.S. Attorney for New Jersey. But that is the "Advice" in "Advice and Consent"—and therefore a legislative act, which cannot even be introduced at trial, let alone serve as the foundation for charges. Likewise, the Egypt-related counts were based on how the Senator—at all times serving as Chairman or Ranking Member of the SRFC—used his office in relation to a foreign power. But those are archetypal legislative acts, too, since they are part and parcel of the Senator's formal responsibilities. In short, at every turn, this prosecution was premised on how Senator Menendez *did his job*. The Speech or Debate Clause forbids that approach. To

comply with the Clause in proving a bribe, the Government must prove the corrupt agreement on its own. It cannot work backwards from legislative activity to infer a bribe—it must prove a Member agreed to sell his office *without* showing how he in fact used it. That is the *opposite* of what the Government did.

### A. The Speech or Debate Clause Prohibits Prosecutors From Using "Legislative Acts" in Any Manner.

**1.** "[F]or any Speech or Debate in either House," Members of Congress "shall not be questioned in any other Place." U.S. Const. art. I, § 6, cl. 1. This Clause was "borrowed" from England and the product of lessons learned. *Kilbourn v. Thompson*, 103 U.S. 168, 201-02 (1880). The Founders were committed to giving their Congress this protection "to prevent intimidation of legislators by the Executive and accountability before a possibly hostile Judiciary." *Gravel*, 408 U.S. at 617.

The Clause's "fundamental" objective is to free "the legislator from executive and judicial oversight that realistically threatens to control his conduct as a legislator." *Id.* at 618. To achieve this "prophylactic purpose," the Clause immunizes certain conduct—on the view that the costs of immunity are lower than the costs of leaving the conduct open for questioning by other branches. *Johnson*, 383 U.S. at 182.

**2.** The Supreme Court has emphasized that a "strictly literal reading" of the Clause would not serve its function. *Id.* Consistent with its history, the Clause must be read "practical[ly]," with an eye to the actual work of Congress. *Hutchinson v. Proxmire*, 443 U.S. 111, 124 (1979); *see Doe v. McMillan*, 412 U.S. 306, 311 (1973) (must be read

"broadly to effectuate its purposes"). The Court has thus defined a "legislative act" to include anything that is "an integral Part of the deliberative and communicative processes by which Members participate in … matters which the Constitution places within the jurisdiction of either House." *Gravel*, 408 U.S. at 624-25.

The immunity is not boundless. *Brewster*, 408 U.S. at 513-14. Rather, it distinguishes "legislative" acts (covered) from "political" acts (not). *X-Men Sec., Inc. v. Pataki*, 196 F.3d 56, 69 (2d Cir. 1999); *see also In re Sealed Case*, 80 F.4th 355, 373-74 (D.C. Cir. 2023) (Katsas, J., concurring). The former are "things generally done in a session of the House by one of its members in relation to the business before it." *Kilbourn*, 103 U.S. at 204. To fall within the Clause, an act must be part of some "legislative function" or "legislative process," *Hutchinson*, 443 U.S. at 133—meaning actions that are "integral" to official duties, from heartland legislative acts like voting on a bill or speaking on the floor to preparatory acts like gathering information, *In re Sealed Case*, 80 F.4th at 362. Unprotected political acts, by contrast, are "casually or incidentally related to legislative affairs but not part of the legislative process itself." *Brewster*, 408 U.S. at 528. They include speeches outside of Congress, press releases, and lobbying the Executive on how to administer a statute or program. *See id.* at 512.

**3.** For legislative acts, the Clause's protections are "absolute"—a Member cannot be sued or prosecuted for legislative acts. *Eastland v. U. S. Servicemen's Fund*, 421 U.S. 491, 509 (1975). Equally critical, legislative acts cannot be used as evidence, even if the Government seeks to prosecute a Member for a non-legislative act. *Johnson*, 383

U.S. at 176-77; *see Biaggi*, 853 F.2d at 103. The "concern is whether there is a mention of a legislative act." *United States v. Helstoski*, 442 U.S. 477, 490 (1979). So, the Clause "precludes any showing of how [a Member] acted, voted, or decided." *Id.* at 489. Anything less would not ensure "wide freedom of speech, debate, and deliberation without intimidation or threats from the Executive Branch." *Gravel*, 408 U.S. at 616.

The Clause's protections are also objective, turning on the "nature of the act, rather than on the motive or intent of the official performing it." *NRP Holdings LLC v. City of Buffalo*, 916 F.3d 177, 191 (2d Cir. 2019). In fact, the Clause "forbids" any "inquiry" into motives—even to discern whether a given action was "legislative in fact." *Biaggi*, 853 F.2d at 103. Any case-by-case determination of whether a facially legislative action was done for a legitimate legislative purpose is the sort of impermissible "questioning" the Clause forbids. *Id.*; *see United States v. Dowdy*, 479 F.2d 213, 226 (4th Cir. 1973) (only proper question is whether a "legislative function … was *apparently* being performed," regardless of "motivation").

4. The Clause of course does not turn Members of Congress into "super-citizens, immune from criminal responsibility." *Brewster*, 408 U.S. at 516. It does not bar prosecutions that *relate* to legislative acts, provided they do not use or reveal the legislative acts themselves. That includes bribery: A Member can be prosecuted for *agreeing* to perform a legislative act for a bribe, so long as no evidence *revealing* the legislative act is used at trial. *Id.* at 526; *see Myers*, 635 F.2d at 937 (bribery prosecution is valid so long as no "evidence of a Member's legislative action" is "offered in evidence

against him"). Bribery prosecutions can thus comport with the Clause if they strictly target the corrupt *agreement*. *Helstoski*, 442 U.S. at 488-89.

The key is that prosecutors must prove the illicit bargain *directly*, not by working backwards from legislative acts. A prosecutor may offer, for example, a wiretap of a Senator offering to trade a vote for cash. What a prosecutor cannot do is try to infer the existence of a *quid pro quo* based on the Senator's legislative acts. This rule "make[s] [bribery] prosecutions more difficult." *Helstoski*, 442 U.S. at 488. But that was "the conscious choice of the Framers." *Brewster*, 408 U.S. at 516.

**B.     The Daibes-Related Counts Directly Target Legislative Acts.**

Counts 11, 13, and 14 charged Senator Menendez with taking bribes from Daibes in exchange for official acts, and Count 4 charged him with obstructing justice by trying to interfere with a federal prosecution due to those bribes. Yet the Government offered no direct proof of a *quid pro quo*—no testimony or evidence that the Senator agreed to a deal. Rather, the Government told the jury to infer one based on how the Senator exercised his constitutional authority to recommend a nominee for U.S. Attorney. But this conduct is immune under the Speech or Debate Clause. The jury should never have *seen* this evidence—let alone been able to *convict* on it.

**1.     The Federal Prosecution.** The thrust of the Daibes scheme was that Daibes bribed Senator Menendez to interfere with a pending federal prosecution. The Government's principal evidence was the Senator's recommendation of a nominee to become U.S. Attorney for New Jersey, and his associated vetting process. The

Government told the jury that by this selection, the Senator was trying to "install" a candidate he could "influence to help Daibes's case." A2644.

This violated the Speech or Debate Clause. When a Senator recommends a nominee to the President, he provides the "Advice" in "Advice and Consent." And a Senator's vetting of that candidate is quintessential information gathering essential to and inseparable from the recommendation and ensuing vote. The Speech or Debate Clause bars *any* of these acts from being used against a Member.

**a.** The Recommendation. Senator Menendez had the power to recommend the U.S. Attorney for New Jersey. A2260; A2270. The Government showed the jury how Senator Menendez recommended Sellinger to the President, who nominated him. A2281-82; A2230-31. That recommendation was a legislative act. The Speech or Debate Clause covers acts "integral" to "matters which the Constitution places within the jurisdiction" of a chamber. *Gravel*, 408 U.S. at 625. And the Constitution places within the Senate's jurisdiction the power of "Advice and Consent" on certain presidential nominees. U.S. Const. art. II, § 2, cl. 2. When Senator Menendez recommended a U.S. Attorney, he was "executing the duties of his office." *In re Sealed Case*, 80 F.4th at 362-63.

The district court nonetheless let this exercise of Senatorial responsibilities feature prominently at trial. The court recognized that "the giving of 'Advice and Consent' is squarely a legislative act." SA5; *see also* SA88-89. But it drew an artificial

and erroneous line, holding Advice and Consent "concerns only the *post-nomination* process." SA5 (emphasis added). That is incorrect.

*First*, pre-nomination recommendations are "Advice" under the Appointments Clause, which says that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint" officials in the Executive Branch. U.S. Const. art. II, § 2, cl. 2. Nothing in the text limits when a Senator may provide "Advice." To the contrary, limiting "Advice" to post-nomination input would give the word "no meaning at all," because the Senate's approval (or not) would be captured through its "Consent" (or lack thereof). Letter from George Mason to James Monroe (Jan. 30, 1792), *reprinted in* 3 *Papers of George Mason* 1255 (William Hutchinson & William Rachal eds, 1970). The two words thus "assign two distinct roles to the Senate—an advisory role before the nomination has occurred" (Advice) "and a reviewing function after the fact" (Consent). David Strauss & Cass Sunstein, *The Senate, the Constitution, and the Confirmation Process*, 101 Yale. L.J. 1491, 1495 (1992).

Were there ambiguity, the historical record resolves it. *E.g.*, *NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014). From the start, the political branches understood that "Advice" captures pre-nomination recommendations. Leonard Dupee White, *The Federalists: A Study In Administrative History* 83-85 (1948); Laura T. Gorjanc, *The Solution to the Filibuster Problem: Putting the Advice Back in Advice and Consent*, 54 Case W. Res. L. Rev. 1435, 1460-61 (2004).

30

The artificial temporal line drawn by the district court cannot be reconciled with the actual Senatorial role, including the unbroken practice, dating back to the first Adams Administration, of providing "Advice" regarding anticipated nominees. Indeed, the Senate often provides such "Advice" regarding anticipated nominees of a President-elect. By definition, such actions are *pre-nomination*. But no one could doubt that, when the Senate held January 2025 hearings for Pam Bondi, it offered "Advice"; or that Senators did the same when they rebelled against the anticipated nomination of Matt Gaetz. Eric Bradner et al., *Gaetz withdraws from attorney general consideration after Trump told him he didn't have the votes in the Senate*, CNN (Nov. 21, 2024), https://www.cnn.com/2024/11/21/politics/matt-gaetz-withdrawing-attorney-general/index.html.

This Court has recognized the centrality of pre-nomination Senatorial advice: "[S]ince the appointment must have the advice and consent of the Senate, the recommendations of the candidate's Senators must be obtained and weighed by the President before a final decision [on whether to nominate] is possible," *and then* "there is a nomination." *United States v. Allocco*, 305 F.2d 704, 711 (2d Cir. 1962). The district court dismissed that as dicta, but it was not. *Allocco* addressed whether the President's recess-appointment power extends to vacancies that arise before the recess. Its interpretation of that provision was premised on the length of the appointment process—specifically including "the advice and consent of the Senate" in the form of pre-nomination "recommendations of the candidate's Senators." *Id.* at 711.

31

*Second*, even if pre-nomination recommendations are not themselves "Advice," they are still legislative acts, as an "integral part" of the "communicative process" that flows into the Senate's advice-and-consent responsibilities. *Gravel*, 408 U.S. at 625. Pre-nomination input cannot be artificially sequestered from post-nomination advice and consent. That would leave Senators only an up-or-down vote on the President's choice, which is less likely to result in a successful appointment than a choice informed by Senatorial input. Such recommendations are thus at least an *implied* legislative power in furtherance of the Senate's advice-and-consent function, no different from subpoenas being an implied legislative power in furtherance of Congress's lawmaking function. *McGrain v. Daugherty*, 273 U.S. 135, 174-75 (1927). Like subpoenas, early recommendations allow the Senate to more "effectively" accomplish its objective (getting people confirmed). *Eastland*, 421 U.S. at 504. And like subpoenas, there is a longstanding historical record confirming that, as a real-world matter, pre-nomination recommendations are integral to Senators being "able to do the task assigned" to them by the Constitution. *Id.* at 505. Indeed, as the Government's witness explained, that is why the "blue slip" process developed. A2211-12. And that is what *Alloco* recognized, when it stated that Senators' views "must be obtained and weighed" up front. 305 F.2d at 711.

The district court maintained that pre-nomination advice fell outside the Clause because it was not a "constitutionally *mandated* function of a Senator." SA6 (emphasis added). But that is a non-sequitur; legislative subpoenas are not *mandated* either, but are

32

still protected legislative activity. So too here. Additionally, the district court's formalistic line between pre- and post-nomination advice fails to serve the Clause's evident purpose and defies the Supreme Court's instruction to give the Clause a "practical" construction. *Hutchinson*, 443 U.S. at 124. The district court here did the opposite. The Senator's recommendation of Sellinger to be U.S. Attorney was a legislative act, and using it as evidence against the Senator violated the Speech or Debate Clause.

  **b.**  <u>Vetting.</u> The Government also introduced evidence of what the Senator asked Sellinger prior to submitting his name to the White House—*i.e.*, how he vetted a prospective nominee. *See* A2639-42. Prosecutors focused on two discussions, where the Senator asked Sellinger about "priorities" and raised Daibes's case. A2216-17; A2221; A2224; A2246-48. The Senator said he thought Daibes was "being treated unfairly" and "hoped" Sellinger would "look at it carefully" should he become U.S. Attorney. A2217.

  These discussions are inextricable from the recommendation itself and fall in the heartland of the Speech or Debate Clause. It is settled that "information gathering" is protected legislative activity. *Biaggi*, 853 F.2d at 103. Here, Senator Menendez was inquiring into *how* a possible nominee would behave in office *before* deciding whether to recommend him to the President or vote for him if nominated. If the Senator's recommendation and vote are protected—as they are—the same is true of his information-gathering for making those decisions.

The district court agreed that these vetting activities would be covered *if* pre-nomination recommendations were legislative (which they are). SA6-7. But regardless, vetting is protected even if pre-nomination recommendations are *not*—the same vetting would, at minimum, inform the Senator's post-nomination vote. From any vantage, the Sellinger discussions were information-gathering in aid of legislative action (whether Advice or Consent). The Government's contention that this legislative conduct had a wrongful purpose is irrelevant under the Speech or Debate Clause.

**2.    Qatar.** The U.S. Attorney appointment was the heart of the Daibes-related counts. But the Government also raised the prospect that Daibes bribed the Senator in exchange for official acts relating to Qatar. That cannot rescue the Government's case given how it was presented to the jury. A2691-92 (Closing: "There are no counts that rest alone on Qatar. None."). When "jurors have been left the option of relying upon a legally inadequate theory," *Griffin v. United States*, 502 U.S. 46, 59 (1991), vacatur is required whenever "it is impossible to tell" whether the jury selected a proper or improper theory, *Yates v. United States*, 354 U.S. 298, 312 (1957). Besides, the Qatar theory *also* rested on Speech or Debate violations.

The Government's main evidence was that Daibes sent Senator Menendez two text messages: The first a link to a Senate resolution; the second an update, showing that other Senators had sponsored it. A1658 (row 164); A1661 (row 189). The Government claimed these were implied requests for the Senator to take official action

34

by supporting the resolution. A2572; A2647-48. This was unconstitutional for two reasons.

*First*, the Government cited Senator Menendez's failure to take legislative action by introducing the facts that the resolution was gaining sponsors, that Senator Menendez was not among them, and that the resolution was pending before the SFRC and thus required him to advance it to the floor. A2647-48. The Government implied that the Senator was holding out for more *quids*, asserting the Senator took gold from Daibes "knowing full well that Daibes want[ed] him to support that pending resolution," while stressing that he continued to withhold his support. A2648.

This violated the Clause. Choosing *not* to take a legislative act is on the same footing as *taking* one. *See Carter v. Comer*, 2024 WL 4533963, at *1 (D.C. Cir. Oct. 21, 2024) (finding no difference between legislative action and inaction). It is no more permissible for the Government to invite speculation about why Senator Menendez *declined* to sponsor a resolution than about his decision *to* sponsor a resolution. And the Government's suggestion that the Senator, who did not sponsor the resolution, nonetheless advanced it through the SFRC is equally impermissible. A2647. Simply put, the Government may not make "any showing" about "how a legislator acted." *Helstoski*, 442 U.S. at 489.

*Second*, using the resolution itself was unconstitutional because the Clause "precludes any showing of how [a legislator] acted, voted, or decided." *Id.* at 490. And that is so regardless of the actor. As this Court has held, one Member cannot introduce

35

another Member's legislative acts *even in his own defense*. *USFL v. NFL*, 842 F.2d 1335, 1374-75 (2d Cir. 1988). If a Member cannot use another's legislative acts in defense, it follows *a fortiori* that the Government cannot do so in prosecution.

The district court tried to get around the problem by having the Government redact the names of other Senators affiliated with the resolution. *E.g.*, A1949-50; SA89. This does not work. The Clause's protections extend to "actions"—not just actors. *Eastland*, 421 U.S. at 501. That is why the Supreme Court has said redactions are permissible only if they excise every "reference[] to legislative *acts*." *Helstoski*, 442 U.S. at 488 n.7 (emphasis added). Here they did not.

## C.    The Egypt-Related Counts Rested on Evidence of Legislative Acts.

Counts 5, 7, and 8 charged the Senator with accepting bribes in exchange for official acts on behalf of Egypt and Hana, and Count 16 charged him with unlawfully acting as an agent of Egypt. Here too, the Government offered no direct proof of a corrupt deal. Instead, the Government told the jury to infer one, based on Senator Menendez's acts in office, and in particular based on a before-and-after comparison: Look how the Senator acted toward Egypt before 2018, then look how he acted once Hana's payments began. *See* A2672-73. Indeed, one of the Government's key witnesses—a staffer on the SFRC—was put on to "summarize" the Senator's supposedly evolving positions on Egypt. A2363-64; *see also* SA54-55.

That should have set off alarm bells. The Government put on trial how a leading member of the SFRC interacted with a foreign power. Virtually all its evidence in

service of that showing involved how the Senator discharged the functions of his office—exactly what the Clause prohibits. *Helstoski*, 442 U.S. at 490 ("Revealing information" about a "legislative act … subject[s] a Member to being 'questioned,' … violating the explicit prohibition of the Speech or Debate Clause.").

1. **Foreign Aid.** As the Government detailed, the Senator had power to "hold" foreign military sales or financing. *E.g.*, A1870-76; A1880-85; A1890-914. In fact, the Chairman and Ranking Member of the SFRC must "sign off" on most aid for the State Department to distribute it. A1903. This is why Egypt targeted the Senator, the Government said, and why the Senator's approach to aid was a pillar of the prosecution. *E.g.*, A1835; A2571-72. But none of that evidence should have been admitted.

a. <u>Specific Holds/Sign-Offs.</u> Begin with the evidence that even the district court agreed was barred—yet the Government put before the jury anyway.

Before trial, the district court held that "[a] Senator's decision whether to place a hold on foreign aid as part of the performance of that Senator's duties … meets the definition of a legislative act." SA8. Rightly so: When the Executive Branch sends an item of foreign aid to Congress for review, it is part of a formalized interbranch process, where a Senator is exercising a duty of office. *See Jud. Watch, Inc. v. Schiff*, 998 F.3d 989, 991-92 (D.C. Cir. 2021). The court therefore agreed that any evidence revealing these actions could not go to the jury. SA8.

The Government persisted in urging the court to allow evidence of third-parties *talking about* legislative acts. It was candid as to why: Its case was that Egypt bribed Senator Menendez to approve aid, so it was "very critical" to show that Egypt thought it was getting a return on investment. A1953-54. The district court rejected this attempt to circumvent its decision, A426, even after the Government sought reconsideration, offering some redactions and stressing how "difficult" it would be to prove its case without this material, A429; *see* A69-70 (order of May 29, 2024).

But after trial, the Government disclosed that it had included those marginally redacted exhibits on the laptop it gave the jury—then later admitted it had also included *fully unredacted* versions. A721-31; A1112-27. Those materials were the most important piece of evidence Judge Stein had excluded: A text from Nadine to Hana stating "Bob had to sign off on this," with a link regarding an arms sale. A1811; A1740, A1758. Likewise, the Government uploaded onto the laptop an unredacted message from an Egyptian official to Hana, stating that someone in Egypt's government had told him that "senator Menendize [sic] put a hold on a billion $ of usaid to Egypt before the recess!!!"—to which Hana responded: "Not true, and he knows nothing about it." A1787; A1789-96, A1798-804.

The Government acknowledged that putting this on the jury's laptop violated Judge Stein's order. A1126.[1] Making matters worse—and contrary to the district

---

[1] The Government wiped all relevant information from the laptop, which made the laptop unavailable for analysis to test the Government's harmlessness argument. The

court's apparent desire to downplay these errors—these exhibits were not buried within thousands of others and thus unlikely to matter: Prosecutors specifically drew attention to the exhibits containing the Helmy message in their summation. A2603. The exhibit containing Nadine's message factored prominently at the end of the Government's key summary chart. A1587 (rows 1266-68). This "very critical" evidence of the Senator *actually* signing off on aid to Egypt—something found nowhere else in the record, and which the Government deemed "highly probative and compelling," to the point of seeking reconsideration—should never have gone to the jury. A1953-54; A1047. That alone is enough to compel vacatur.

The district court avoided that conclusion by adopting the Government's blame-shifting argument that Senator Menendez waived his Speech or Debate objection—*with respect to evidence that he had successfully moved to exclude*—by failing to catch the errors when the Government shared the laptop just a few hours before giving it to the jury. SA105-06. That is untenable. A waiver of Speech or Debate rights "can be found only after explicit and unequivocal renunciation of the protection." *Helstoski*, 442 U.S. at 491. The district court never acknowledged this standard, let alone explained how it was met. Nor could it. Senator Menendez continually and successfully objected to this material throughout trial. *E.g.*, A426. And it was the *Government's* responsibility to ensure that

---

Government has not submitted a sworn declaration explaining this course of action. *See* A1107-08.

the *Government's* exhibits, which the *Government* had uploaded onto a laptop for the jury, were redacted correctly. There is no serious argument the Senator waived anything here, especially under the distinct waiver "rules" that govern "in this setting." *Helstoski*, 442 U.S. at 491.

      **b.**   <u>The "Sign Off" Text.</u> There was much more. The court admitted a text message that Senator Menendez sent to Nadine: "Tell Will I am going to sign off on this sale to Egypt today" (listing $99 million of tank ammunition). A1718. Other than the excluded evidence the Government wrongly gave the jury, this was the only evidence of Senator Menendez making an actual representation to the Egyptians as to foreign aid. And it was a major part of the Government's case. *E.g.*, A1836 (emphasizing this "sign off" text as perhaps the clearest evidence of an official act in opening); A2596 (same in closing); A521 (leading example in Rule 29 opposition); A1051 (same for Rule 33). Indeed, the Government structured much of its case with an eye toward this text. For instance, it put on a State Department official to discuss how long it typically took for the Senate to clear arms sales—only to cast the "sign off" message as suspect, given that it was "unusually fast." *See, e.g.*, A1913-14; A2606.

      The district court admitted this message on the ground that it was a mere "promise" to take future action, as opposed to evidence of a past legislative act. SA9; SA87. But while standalone promises are not legislative acts, the court misapplied that principle. There is a difference between promises of future acts that directly evidence a corrupt agreement and factual statements about imminent future acts that are facially

legitimate but used to *infer* a corrupt agreement. The former does not offend the Clause; the latter does. This distinction is critical if the Clause is to offer genuine protection.

The Supreme Court has held that promises made as part of sealing an illicit deal are not legislative acts. Where a Member says he will vote for a nominee in exchange for $1 million, that "promise to act in a certain way" is not covered by the Clause. *Brewster*, 408 U.S. at 501. But the Government cannot evade the Clause by introducing evidence of a news article or interview or tweet where a Member—right before going to the floor—says how he plans to vote. Imagine a CNN article: "Senator Menendez says he will drop hold on Egyptian aid." That evidence would be an obvious end-run around Speech or Debate protections. But the Clause is not so wooden; its protections are "intrinsically functional." *McSurely v. McClellan*, 521 F.2d 1024, 1041 (D.C. Cir. 1975).

Indeed, precedent marks a different line: between promises as part of a corrupt "compact," and "showing[s] of [what] a legislator [actually] decided." *Helstoski*, 442 U.S. at 489. Here, the text falls on the wrong side of that line. It is not a conditional statement made to forge an illicit agreement. It is, rather, a unilateral declaration of a facially legitimate decision already made. The Government used this decision to create the impression that the Senator *did* in fact take a certain act, and used that as indirect evidence of a pre-existing *quid pro quo*. That is not allowed. The Government cannot use evidence revealing what a Member "decided" any more than it can submit evidence of the decision itself. *Id.* It must prove a corrupt agreement through evidence of the

41

*bargain*, not by inferences from the *quo*; the Government's attempt to skirt that line was too clever by half.

To be sure, *Helstoski* said that the Clause "extends only to an act that has already been performed." 442 U.S. at 490. But in context, the Court's point was that a standalone "promise" is "not" itself "a legislative act." *Id.* The Court did not allow the Government to use a declaration of a decision made (like the text here) to create the inference that such an action was in fact taken—thus putting a Member to the impermissible choice of admitting the act (and waiving his immunity) or letting that impression lie (allowing the Government to accomplish indirectly what it cannot do directly). *See United States v. Swindall*, 971 F.2d 1531, 1546 (11th Cir. 1992) (explaining that Government cannot manufacture "inference" that certain "legislative acts" were actually taken).

**c.** <u>General Aid.</u> The Government also manufactured the impression that Senator Menendez was affirmatively approving billions of dollars of aid to Egypt during this period. That was impermissible too.

The Government did so through a two-step argument. First, it offered evidence that foreign military sales and financing could not proceed until the Chairman and Ranking Member signed off. *E.g.*, A1890; A1903; A1908; A1936. Then, it added evidence that billions of dollars of aid in fact went through while the Senator was Chairman or Ranking Member. *E.g.*, A1881; A1884-87; A1964. That is indistinguishable from proof the Senator approved the foreign aid—on the

42

Government narrative, as part of his "change in approach with respect to Egypt." A2364-66; *see* A2671 (Closing: "Before [the bribes] started, he was tough on Egypt."). This was another clear violation of the Clause. A "prosecutor [cannot] do indirectly what he cannot do directly." *Trump v. United States*, 603 U.S. 593, 631 (2024).

Over objection, the district court let all this in as background for *why* someone would want to bribe the Senator. *E.g.*, A2331-32. But that overlooked how the Government's evidence, and especially its revelation of how much aid Egypt received during the relevant time, intentionally and inevitably revealed *how* Senator Menendez exercised his legislative authority. *That* crossed the constitutional line.

**2. Information Gathering.** To frame its evidence about how the Senator approached Egyptian aid, the Government put forward extensive evidence of the Senator's many meetings with the Egyptians, and used that evidence to craft the image of a cozy—and thus corrupt—relationship.

Through testimony and documentary evidence, the Government told the jury about years of meetings between the Senator and members of the Egyptian government. *E.g.*, A1496 (rows 71-72); A1511-18; A1731-38; A1772-75, A1742; A2430-32; A2396. As important, the Government's evidence revealed that these meetings involved Egyptians telling Senator Menendez what they wanted from the United States. *E.g.*, A2348; A2350; A2358; A2466-68; A2475; A1825-29.

All of this should have been excluded, since it constitutes legislative information-gathering, which this Court has held is protected activity. *Biaggi*, 853 F.2d at 103.

Indeed, this was legislative information-gathering *on the Government's own account*: Its theory was that the Senator was learning from Egyptian officials what legislative acts they wanted from him on their behalf. *E.g.*, A2671 (Closing: "This was years, years of meeting[s]. … Years of learning what they wanted and taking actions to give them what they wanted."); *see* A559-61. That theory is self-refuting: If the meetings involved discussions of legislative acts, then they were legislative information-gathering, and thus were immune.

The district court agreed that these meetings would generally be covered under the Speech or Debate Clause because they were information-gathering activities directly related to legislative acts. SA9; SA88. But the court nonetheless held the Clause does not extend to "violat[ing] an otherwise valid criminal law in preparing for or implementing legislative acts"—*i.e.*, this information-gathering was not protected because the Senator was gathering information for legislative acts with the corrupt motive of fulfilling his end of a bribe. SA9.

As should be clear, that circular argument fails. Prosecutors cannot evade the Speech or Debate Clause by arguing that legislative acts were taken for corrupt purposes—the point of the Clause is to put legislative acts off-limits regardless of motive. *Johnson*, 383 U.S. at 181. Per the district court, when the Government wants to admit a legislative act, it can simply say the act's purpose was criminal. If that sufficed, the Clause would never apply. Instead, if something is *objectively* a legislative act, the actor's *subjective motive* is irrelevant. *Dowdy*, 479 F.2d at 224. It does not matter

if the "defendant's actual motives … could have been … for improper non-legislative purposes." *Id.* at 226.  So here, when the information-gathering was related to legislative activity—as all agree it was—"the propriety and the motivation for the action taken, as well as the detail of the acts performed, are immune from judicial inquiry."  *Id.*; *see Biaggi*, 853 F.2d at 103.

Of course, *non-legislative acts* that are otherwise criminal are not immune from prosecution, even if they relate to a legislative act.  *E.g.*, *Myers*, 635 F.2d at 937-38.  If a Senator broke into someone's house to get a document, he could not claim Speech or Debate protections against a breaking-and-entering charge.  But here, the challenged action is the *information-gathering* itself, which *is* a legislative act, and is *not* otherwise criminal.  The protections for that act do not fall away based on the allegation they were done with an illicit motive—just as a Senator's floor speech is never admissible, even if the Government claimed he gave it to fulfill a corrupt deal.  *Johnson*, 383 U.S. at 184-85.  Again, preventing courts from probing legislators' minds is one of the Clause's purposes.  *Brewster*, 408 U.S. at 528.

**3.    Diplomacy.**  Finally, the Government also put on trial how the Senator interacted with Egyptian officials.

As the Government's witnesses laid bare, engaging in diplomacy was one of the Senator's official responsibilities.  *E.g.*, A2452-53 (Senators "meet and form relationships with foreign officials … on behalf of themselves as senators or on behalf of the committees which they're representing"); A2461 (a "huge part of Senator

Menendez's job … was to meet with foreign leaders"); *see Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 16 (2015) ("[M]any decisions affecting foreign relations … require congressional action."). Yet a key part of the prosecution was branding this "relationship building" as criminal. Outside of the meetings discussed above, the Government stressed how the Senator communicated with Egyptian officials, favors he did, and non-classified information he shared. *E.g.*, A2610-11 (discussing "ghostwritten letter" on behalf of Egypt); A2611 (discussing non-classified information about embassy staff). As a result, the Senator was forced to *justify to the jury* how this all fit within his foreign policy. *E.g.*, A2457-58 (discussing his "carrot and stick" approach).

That cannot square with the Speech or Debate Clause. If a Senator's office requires engaging in diplomacy—as the Government itself stressed—then acts of diplomacy must be covered. Otherwise, those functions will halt overnight; Members cannot engage in the subtle art of diplomacy if their every interaction may be used to prosecute them.

The district court disagreed, reasoning that communications among Members and those outside Congress typically fall beyond the Clause. SA10. But here, too, the court misread precedent. Sharing information beyond the halls of Congress via *political* actions—like press releases—is not legislative. *See Hutchinson*, 443 U.S. at 130-31. But diplomacy by the Chairman of the SFRC is different in kind; that information-sharing is *legislative business*. The give-and-take of diplomacy is not done to win votes; it is done to discharge a "duty of [the] office." *In re Sealed Case*, 80 F.4th at 362.

46

### D.   The Speech or Debate Violations Taint All Counts.

The evidence recounted above was central to the Daibes- and Egypt-related counts, and its unconstitutional admission directly requires vacatur on those counts. *See, e.g.*, *United States v. Garcia*, 291 F.2d 127, 145 (2d Cir. 2002); *United States v. Grinage*, 390 F.3d 746, 751 (2d Cir. 2004). But the problem runs deeper. Given how the Government structured its case, these violations tainted every count of conviction.

### 1.   The Daibes Counts.

The heart of the Government's bribery case as to Daibes (Counts 11, 13, and 14) was the supposed federal-prosecution scheme. The key evidence was *whom* the Senator recommended for U.S. Attorney and *how* he vetted him. All of that was impermissible. And the Qatar scheme cannot save these counts. That scheme *also* relied on constitutionally proscribed evidence, as explained. Moreover, when the primary theory of guilt is defective, that is decisive—even where a secondary theory is untainted. *E.g.*, *United States v. Yates*, 16 F.4th 256, 269 (9th Cir. 2021). Here, by the Government's admission, its Qatar scheme was secondary at best. *See* A2691-91 (Closing: "There are no counts that rest alone on Qatar. None.").

The related obstruction count (Count 4) falls too. None of the Senator's acts here were inherently obstructive—there was no witness intimidation or document destruction. Rather, the Government's case was that the Senator's facially legitimate actions—*e.g.*, recommending someone to be U.S. Attorney—were part of a "corrupt endeavor to obstruct justice," given the payments. A2684. In other words, by the Government's lights, there was obstruction because the Senator "attempted to use his

power to recommend the U.S. Attorney who he thought he could influence over Daibes's case." *Id.* But it is no more obstructing justice for a Senator to recommend a U.S. Attorney who is favorably disposed toward certain defendants than it is for the President to nominate a Chairman of the SEC, for example, who is favorably disposed toward certain companies. Senator Menendez had the constitutional authority to recommend a U.S. Attorney, including one he believed would provide "all due process" to his friend Daibes. That was the fair administration of justice, not its obstruction.

**2.    The Egypt-Related Counts.** The counts involving Egypt were similarly tainted. The substantive bribery counts (Counts 5, 7, and 8) were based on the idea that Egypt targeted the Senator because of the "power" he wielded. A1839. And the Senator's most important power was control over foreign aid. That is why the Government spent days on the topic of U.S.-Egypt military aid. *E.g.*, A1868-919; A1934-36; A2309-446. And it is what the Government emphasized to the jury as the essence of its theory. *E.g.*, A2591 (Closing: "So for these [bribery] counts, if Menendez promised to approve military aid to Egypt, like a foreign military sale or a grant of foreign military financing money, that's a promise of official action."). So, as above, the violative evidence was inescapably prejudicial as to these counts.

The Government did argue below—and the district court appeared to accept— that the excluded evidence it inadvertently provided the jury likely did not influence the verdict, based on speculation that the jury never bothered to look at it. That cynical argument fails. As explained above, it *is* likely that the jury considered this material,

given where it was placed on the summary chart. *Supra* p. 39. Indeed, the jury *told* the court in a note that it was reviewing the laptop containing the illicit evidence in its deliberations. A2699. Plus, while this was the only evidence the court barred under the Clause, it was far from the only evidence the court *should have* barred. Without all these constitutional violations, the Government's case as to Egypt collapses.

More fundamentally, and as the Eleventh Circuit has held, Speech or Debate errors are structural and thus defy harmless-error analysis. *See Swindall*, 971 F.2d at 1548 n.21 ("[The] Speech or Debate privilege is not merely an evidentiary or a testimonial privilege … [and] [t]herefore a harmless-error analysis will not excuse a violation."). Structural error applies when "harm [at trial] is irrelevant to the basis underlying the right," because the right "protects some other interest." *Weaver v. Massachusetts*, 582 U.S. 286, 295 (2017). That is true of the Speech or Debate Clause: Its purpose is not to ensure "fair trials," but to safeguard the separation of powers. *Helstoski*, 442 U.S. at 491. It prescribes a "prophylactic rule" to serve that end. *Johnson*, 383 U.S. at 182. And that rule is irreconcilable with harmless-error review, which by definition would sometimes allow legislative acts to play at trial. *See Swindall*, 971 F.2d at 1548 n.21

For all these reasons, the Egypt-related bribery counts must be vacated. And the FARA count (16) falls with them. On the Government's telling, what was enough for bribery was also sufficient for FARA. *See* A2667-74 (Closing: "Common sense tells you, that's exactly why they wanted to bribe Menendez. They wanted him to go easier on Egypt" and act as their agent.). If the bribery counts are tainted, so is the FARA

49

count. *See United States v. Lindberg*, 39 F.4th 151, 164 (4th Cir. 2022) (requiring vacatur where error may have "effortlessly bled" from one count to another).

**3.** **The New Jersey-Related Counts.** Although the New Jersey scheme (Counts 9-10) did not rest on distinct Speech or Debate evidence, these counts were not immunized from the Speech or Debate errors. Rather, given how the Government chose to structure its bribery case, a flaw in any of the three schemes was a flaw in all of them. Quite deliberately, the Government framed its bribery theory as a three-legged stool, with each scheme supporting (and relying upon) the others. It made this express at closing, telling the jury that to convict on one scheme, it should lean on the others. *See, e.g.*, A2614-15 (urging jury to convict on Egypt based on how that scheme fit into "broader pattern"); A2628-29 (on New Jersey: "Every new piece of the puzzle you see reinforces the clear pattern of corruption that you see throughout the case. … But now look at it together with the Egypt conduct, because it is all part of the same pattern of corruption."); A2655-56 (on Fred Daibes: "That brings us to the last reason you know this was a quid pro quo. The big picture.").

The consequence of that framing is that if any of these legs fall out, the whole enterprise topples. If the jury found the Senator guilty of one scheme, it was far more likely to find him guilty on the rest—again, that was the Government's pitch. And where errors on some counts "effortlessly ble[e]d into the jury's consideration" of others, the latter are infected too. *Lindberg*, 39 F.4th at 164-65. So if this Court agrees with the Senator on *any* of the Speech or Debate Clause errors (*i.e.*, those affecting either

the Daibes or the Egypt schemes), vacatur is required for *all* of the substantive bribery counts. *See United States v. McDermott*, 245 F.3d 133, 138-39 (2d Cir. 2001) (sufficient evidence for one count, but still reversing due to prejudice from evidence for other count); *United States v. Berkery*, 889 F.2d 1281, 1285 (3d Cir. 1989) ("closely intertwined" counts require complete reversal).

4.    **The Other Counts.**  All that remains are the all-encompassing conspiracy counts (1-3), and the derivative obstruction charges (17-18).  They fall, too, because— as the Government put it—the substantive bribery charges were "building block[s]" for its case.  A2576.  The conspiracy counts posited a "single" intertwined conspiracy, covering all schemes.  A551.  So vacatur on the counts relating to any of those schemes taints the conspiracy counts.  On the obstruction counts, the Government theorized that the Senator obstructed justice by *concealing bribes* as loans.  It is therefore highly likely that the jury's "determination" that the Senator took bribes was "a crucial step in ascertaining whether he" obstructed justice.  *United States v. Arthur*, 544 F.2d 730, 736 (4th Cir. 1976).  The errors tainting the bribery counts thus taint Counts 17-18.[2]

## II.    THE *MCDONNELL* ERRORS ALSO REQUIRE VACATUR ON ALL COUNTS.

Only the New Jersey scheme did not rest heavily on legislative acts protected by the Speech or Debate Clause.  But it suffered from the opposite problem—it involved

---

[2] Even if the convictions on Counts 17-18 were somehow hermetically sealed from the improper convictions on all other counts, those convictions still must be vacated because the Government failed to adduce evidence of Senator Menendez's intent. *Infra* p. 68-70.

no "official acts" at all under *McDonnell*. Even as framed by the Government, the New Jersey scheme never contemplated use of Senator Menendez's federal power or authority—only, at most, his stature as a prominent figure. An agreement to use the latter is not official action under *McDonnell*. This requires vacatur of the convictions on the New Jersey-related counts—which, for reasons explained above, topples the Government's three-legged stool and requires across-the-board vacatur.

After *McDonnell*, the applicable principles are clear: The Government needed to prove beyond a reasonable doubt that Senator Menendez agreed to a *quid pro quo* involving performance of an "official act." An "official act" is "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit." 18 U.S.C. § 201(a)(3). As *McDonnell* explained, that definition has two components, each subject to important limits. *First*, the defendant's action must concern a "question, matter, cause, suit, proceeding or controversy"—*i.e.*, a "formal exercise of governmental power," of a "focused and concrete" nature, that is "pending" before either the defendant or another "public official." 579 U.S. at 569-70. *Second*, the defendant "must make a decision or take an action *on* that question or matter." *Id.* at 572. He can do so by formally exercising his own substantive authority on the matter; or he can do so by "using his official position" either "to exert pressure on another official to perform an 'official

act'" or "to advise another official, knowing or intending that such advice will form the basis for an 'official act' by another official." *Id.* at 574.

Just as important, *McDonnell* clarified what does *not* count as an "official act." Merely acting to facilitate a decision on a matter—*e.g.*, by "[s]etting up a meeting," "calling an official," or "gather[ing] additional information"—does not suffice. *Id.* at 573. Neither does "expressing support" for an action. *Id.* Without these limits, bribery statutes would "cast a pall of potential prosecution" over "commonplace" constituent service. *Id.* at 575.

Fundamentally, *McDonnell* limits criminal liability to the wrong Congress targeted: the corruption of *power.* Without a link to official authority, there can be no bribe—or honest services fraud, or Hobbs Act extortion. *See Skilling*, 561 U.S. at 407 n.41; *United States v. Silver*, 864 F.3d 102, 111 (2d Cir. 2017). Across these corruption statutes, bribery requires an agreement to actually "use" one's "official position" for private gain. *McDonnell*, 579 U.S. at 574. That means leveraging *the power of the office*—not merely the network, access, or generic influence associated with being a high-profile person.

The New Jersey counts went far beyond *McDonnell*'s guardrails. They invited the jury to convict Senator Menendez based on conversations in which, at most, he "traded … on the reputation, network and influence that comes with political office." *United States v. Urciuoli*, 513 F.3d 290, 296 (1st Cir. 2008). It offered no evidence that the Senator used, threatened to use, or agreed to use *his office* to secure a corrupt objective. And yet, while trading on one's prominence is not an official act, the court

declined to give proposed instructions that would have informed the jury of the crucial boundaries of official "pressure" or "advice." These errors entitle the Senator to relief.

### A. The New Jersey Scheme Involved No "Official Act."

For the New Jersey scheme (Counts 9-10), the supposed *quo* consisted of two brief discussions where Senator Menendez, without naming any case, relayed concerns to New Jersey's Attorney General Grewal about selective prosecution by state officials. A2625; A2103. Grewal testified that the Senator requested no action. A2103-05. Nor did he threaten to use his authority—against Grewal or anyone else. A2105-06; A2110-12. And Grewal feared no retribution from Senator Menendez, who lacked any authority over the Attorney General. A2106-07.

Unless being a Senator automatically turns any inquiry to a state officeholder into official action—which would be flatly contrary to *McDonnell*—simply "meeting" with or "calling" Grewal, even to "express[] support" for a course of action, is insufficient. 579 U.S. at 573. And the Government offered no evidence that Senator Menendez exercised (or agreed to exercise) any federal authority on Uribe's behalf.

Nor was there any basis for the jury to find that the Senator "us[ed]" (or agreed to use) "his official position" either to "exert pressure" on Grewal, or to "advise" him "knowing or intending that such advice [would] form the basis for an 'official act'" by New Jersey officials. *Id.* at 574. Indeed, as a matter of law, the evidence *could not* support such a finding. No federal official enjoys power to direct prosecutions by New Jersey— a separate sovereign in our constitutional structure. *See Printz v. United States*, 521 U.S.

898, 919 (1997). And there was no evidence the Senator ever used (or agreed to use) his federal authority to bend New Jersey officials to his will. As such, the Senator's (at most) implied request for state action was not official "advice" or "pressure" under *McDonnell*, as it involved no "us[e]" of an "official position." 579 U.S. at 575.

Start with "advice." To illustrate this species of official action, *McDonnell* invoked *United States v. Birdsall*, which involved the bribery of federal officials "charged with the duty of … advising the Commissioner of Indian Affairs" on whether to grant clemency to federal offenders. 233 U.S. 223, 228 (1914). As *McDonnell* explained, these officials were responsible for providing advice on which superiors "'would necessarily rely.'" *McDonnell*, 579 U.S. at 572 (quoting *Birdsall*, 233 U.S. at 234). Discharging that official duty "reflected a decision or action to advise another official on the pending question"—satisfying the official-act requirement. *Id.* at 574.

Here Senator Menendez had no *authority* (much less *duty*) to advise Grewal on state matters. The jury could find that the Senator provided "advice" only in the most colloquial sense of making a suggestion or recommendation. But that cannot be what *McDonnell* meant. The Court referred to advice that one "uses his official position" to deliver—like the advice in *Birdsall*. The broader, colloquial interpretation reads those crucial words out of the opinion. It would also swallow the warning that merely "expressing support" for an action does not "qualify," *id.* at 573—any expression of support (whether in a private meeting or press release) could be framed as colloquial

"advice." Treating that as sufficient would "cast a pall of potential prosecution," *id.* at 575, over routine political conduct.

Senator Menendez did not "us[e] his official position to exert pressure," either. *Id.* at 572. Proving an official act based on a defendant's position on a matter requires evidence that he "formally used his power" to *act on* that preference. *Silver*, 864 F.3d at 122. Because the Senator had no authority to direct Attorney General Grewal's actions, communicating his views on a pending matter is not official "pressure." *See United States v. Jefferson*, 289 F. Supp. 3d 717, 737-38 (E.D. Va. 2017) (Congressman did not take official action when he colloquially pressured African officials on matters outside his purview). Nor was there evidence that the Senator "exploit[ed]" his federal power by "invok[ing] any purported oversight authority or threaten[ing] to use official powers in support of his advocacy" for Uribe. *Urciuoli*, 513 F.3d at 296. Grewal himself testified that Senator Menendez never threatened to use his Senate office in any way. A2103-06; A2110-12. So there was no basis to conclude that the Senator did, intended to, or agreed to "us[e] his official position to exert pressure" on Grewal. *McDonnell*, 579 U.S. at 572.

The district court believed Senator Menendez's prominence as a New Jersey politician was enough—that the jury could find "pressure" based *solely* on Grewal's testimony that the Senator carried "a lot of influence," and that state officials did not "want to upset" him. SA39-40. But merely *holding* office is not the same as "*using*" that office. *McDonnell* requires the latter. 579 U.S. at 572. Otherwise, every opinion held

by a powerful politician would be a nascent "official act," and *McDonnell*'s line between "pressure" and "expressing support" for action "at a meeting, event, or call" evaporates. *Id.* at 573. It is simply "not a crime" to "trade[]" on "the reputation, network and influence that comes with political office." *Urciuoli*, 513 F.3d at 296.[3]

## B. The McKinney Call Was Not an "Official Act."

For the Egypt scheme, the Government again urged the jury to convict Senator Menendez based on a call where he offered no official "advice" and did not leverage his office to apply "pressure." The Government told jurors that the Senator's call to USDA official Ted McKinney "is all you need to convict on the Egypt bribery counts," because the call represented his "following through on" a "promise" to Hana. A2598-99. McKinney testified that Senator Menendez told him to "stop interfering with my constituent," A2047, but acknowledged that the Senator never pressured him to take any action, or threatened to use his office should USDA refuse. A2054-55. Despite this, the district court reasoned that "the jury was entitled to determine" from the call alone "that Menendez was seeking to pressure McKinney concerning the position [of]

---

[3] The Government cannot solve this problem by arguing the jury permissibly found that the Senator *agreed* to take official action on Uribe's behalf, even if he never *actually* did so. *Contra* SA40 (adopting this view). That is pure speculation: The Government offered no evidence the Senator agreed to undertake any action distinct from the actions he actually took (raising Uribe's concerns with Grewal). Only speculation would permit the jury to conclude, for instance, that Senator Menendez agreed to threaten New Jersey's federal funding unless Grewal intervened. Uribe himself testified only that he believed the Senator agreed to "help" him—with no further details. *E.g.*, A2120; A2138; A2142.

the USDA" on the monopoly issue—which was "more than enough to establish the official act requirement." SA31. That is wrong twice over.

*First*, the Government and district court again improperly relied on an informal and colloquial understanding of "advice" and "pressure." Senator Menendez had no official advisory relationship with USDA or McKinney, nor any responsibility to provide input on topics like this. *Cf. Birdsall*, 233 U.S. at 228, 234.

As for "pressure," the Government again relied on the Senator's influence, rather than evidence that he sought to "us[e] his official position" to sway McKinney. *McDonnell*, 579 U.S. at 572. On McKinney's telling, the Senator never even hinted he would use his authority to push USDA to change course or to retaliate if not. The Government "did not show by context or threat that [Senator Menendez] sought deliberately to exploit" any "leverage" associated with his legislative authority. *Urciuoli*, 513 F.3d at 296. Without that, merely opposing a policy—just like "expressing support" for one—is not official action. *McDonnell*, 579 U.S. at 573; *see supra* p. 55-57.

*Second*, the Government's reliance on the call suffers from another, equally fundamental flaw: USDA's position on Egypt's monopoly decision was not an official act either—and thus any "advice or pressure" relating to that decision cannot qualify. The agency's stance on this topic was not "a formal exercise of governmental power," *McDonnell*, 579 U.S. at 574, for the simple reason that USDA has no role in Egypt's decisionmaking. In this context, the Executive Branch enjoys only the "power of persuasion"—to make its views known in hopes Egypt will listen. A2050; A1852. But

expressing views on a matter of public concern is not official action: If public opposition to a methadone clinic does not qualify (*Silver*, 864 F.3d at 122), USDA's opposition to Egypt's monopoly falls short too.

The only exercise of governmental power was when *Egypt* granted the monopoly. That does not qualify as an "official act" for federal bribery because it was not a matter pending before any U.S. official. *See Jefferson*, 289 F. Supp. 3d at 738 (decisions pending before foreign officials cannot form basis for official act). Thus, USDA's position on that decision—to say nothing of the Senator's position on that position—bore no nexus to any "formal exercise" of *U.S.* sovereign authority. *McDonnell*, 579 U.S. at 574. Without that, there could be no abuse of federal power.

The district court failed to appreciate any of this. On "pressure," it again adopted a colloquial reading of *McDonnell*, ignoring that criminal pressure must involve *use* of an official position. SA30-31. And on USDA's stance on Egypt's monopoly, it ignored this Court's ruling in *Silver* that a legislator's public opposition to a methadone clinic is not official action. 864 F.3d at 118. The court below instead adopted a simplistic "official capacity" test, satisfied by McKinney's use of "official letterhead" to communicate with Egypt. SA32. But *Silver* was clear that use of "government letterhead" is insufficient absent, for example, a "threat[] to withhold funding." 864 F.3d at 118-21. The call was not an official act.

## C.     These Errors Entitle the Senator to Relief on All Counts.

On the New Jersey scheme, the evidence was legally insufficient to support the bribery verdicts.  The Government offered no direct evidence of a *quid pro quo* for official action, and the only "official acts" it suggested fall short as a matter of law.  *Supra* p. 54-57.  Again, it is not enough to recharacterize *unofficial* acts as evidence of an *agreement* to perform unidentified *official* acts.  The district court treated the Grewal discussions as a "close enough" substitute, but the Government did not identify any other official acts that were part of the alleged bargain with Uribe.  *Supra* n. 3.  Thus, because the Grewal discussions were not official acts, the convictions on Counts 9-10 cannot survive.  And, as explained, removing one leg from the Government's stool brings down the entire case.  *Supra* p. 50-51.

On the Egypt scheme, the McKinney call was only one of the alleged *quos* (albeit the only one that did not implicate the Speech or Debate Clause).  But at closing, the Government said the call was "all you need to convict."  A2599; A2602.  Prosecutors characterized the call as a "shocking" and "alarm[ing]" application of "pressure," but never specified how Senator Menendez *used his authority*.  A2600-01.

To resist that argument, Senator Menendez sought a jury instruction "that the pressure and advice have to be an exercise of official action itself"—*i.e.*, that the Senator "use[d] the public office of … senator to" apply pressure or deliver advice.  A2567-68; *see also* A325 (Senator Menendez's proposed instruction).  The Government—worried that these "guardrails" would jeopardize its case—opposed any elucidation on

"pressure" or "advice." A2568. Instead, it argued that the jury should apply "a layperson's" understanding of "pressure" (and presumably "advice," too). A2569. The district court agreed, refused to provide any specific instruction on "pressure" or "advice," *id.*, and instead charged the jury to "decide what an official act is in the context of these charges," A2696.

Those instructions failed to provide adequate guidance on the crucial distinction between official "advice" or "pressure" and merely expressing one's preference as an influential politician. Where "the line between the merely unattractive and actually criminal conduct is blurred, the court must take pains to explain the difference to the jury." *United States v. Sawyer*, 85 F.3d 713, 741 (1st Cir. 1996). As this Court has recognized, jury instructions in bribery cases "must carefully focus the jury's attention on the difference between lawful" and illicit conduct. *Biaggi*, 909 F.2d at 695; *see also, e.g.*, *Sawyer*, 85 F.3d at 741 (jury must be "told specifically" about distinction between bribery and mere "cultivation of business or political friendship"); *Percoco v. United States*, 598 U.S. 319 (2023) (reversing bribery conviction where instructions did not define crime with "sufficient definiteness"). The need for clarity is especially acute where—as with the distinction between *official* and *colloquial* "pressure" or "advice"—there is no reason to think that "jurors, based only on their lay experiences," would know where the Supreme Court has drawn the all-important line. *United States v. Galvez-Guerrero*, 455 F. Appx. 749, 751 (9th Cir. 2011).

"Because the jury was not correctly instructed on the meaning of 'official act,' it may have convicted [Senator Menendez] for conduct that is not unlawful." *McDonnell*, 579 U.S. at 579. The Government's presentation obscured the distinction between official "pressure" and "advice" and merely "expressing support" for, or opposition to, a policy. *McDonnell*, 579 U.S. at 572-73. A "proper charge" is one that "give[s] the jury guideposts as to what would qualify as criminal wrongdoing under the law." *Silver*, 864 F.3d at 118. Senator Menendez proposed guideposts that would have clarified the key line between *wielding one's office* and *trading on one's influence*. It was legal error for the court to refuse those instructions. Nor is there any way to cast that error as harmless "beyond a reasonable doubt." *Id.* at 119. Again, the Government told the jury that it could convict on the Egypt counts based on the McKinney call *alone* (A2598-99), on the theory that status as an "influential person" was enough to make it an official act (A2044). Given McKinney's testimony that Senator Menendez in no way leveraged his authority, "it is possible that a rational jury" instructed on the meaning of pressure and advice under *McDonnell* "would not find that [he] engaged in a *quid pro quo* to exchange official acts." *Silver*, 864 F.3d at 119.

The Senator is therefore entitled to vacatur on the Egypt-related counts (5, 7, 8, 16)—and, with them, the rest as well. *See supra* p. 50-51.

62

III.  **THE FARA CONVICTION CANNOT STAND BECAUSE SECTION 219 VIOLATES THE SEPARATION OF POWERS AS APPLIED TO MEMBERS OF CONGRESS.**

There is another defect with the FARA conviction.  As applied to a Member of Congress, the statute violates the separation of powers.

A.  **Section 219 of FARA Unconstitutionally Interferes with How Members of Congress Discharge Their Official Responsibilities.**

The Speech or Debate Clause is not the only protection for Members of Congress.  "[T]he separation of powers" is an independent structural "protection." *United States v. Rostenkowski*, 59 F.3d 1291, 1307 (D.C. Cir. 1995).  And as applied to Members of Congress, Section 219 of FARA violates the separation of powers.

Start with how the law works.  For private citizens, FARA is a disclosure obligation—an "agent of a foreign principal" must register as such.  22 U.S.C. § 612(a).  But for Members of Congress, Section 219 makes it a felony *to be* or *to act as* an agent of a foreign principal.  18 U.S.C. § 219(a), (c).  And the definition of "agent" is particularly problematic.  It encompasses anyone who (i) engages in "political activities," "publicity" services, or certain other acts (ii) "at the order, request, or under the direction or control, of a foreign principal."  22 U.S.C. § 611(c)(1).  The first of these elements sweeps in *everything* legislators do; "political activities" includes "in any way influenc[ing]" the government or the public regarding "domestic or foreign policies" or "the political or public interests, policies, or relations of a government of a foreign country."  § 611(o).  And the second bans such conduct if undertaken for the wrong reasons—*e.g.*, to satisfy a foreign official's "request."  § 611(c)(1).  The upshot is

63

that, for Members of Congress, Section 219 criminalizes not inherently wrongful acts, but doing the job they were elected to do—just with what the statute deems an impermissible motive. *See* A2702 (jury instruction that "the ultimate question … is whether it is fair to draw the conclusion that an individual is not acting independently, such as by simply stating or believing his own views"); *see also Att'y Gen. of U.S. v. Irish N. Aid Comm.¸* 668 F.2d 159, 161 (2d Cir. 1982) (recognizing that FARA defines "agent" in a way that does not require proof of "control").

Applying FARA in this way runs roughshod over the separation of powers.  For starters, the Supreme Court has held that the Judiciary cannot probe legislators' motives.  "So long as Congress acts in pursuance of its constitutional power, the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power." *Barenblatt v. United States*, 360 U.S. 109, 132 (1959); *see also Tenney v. Brandhove*, 341 U.S. 367, 377 (1951) ("[I]t [is] not consonant with our scheme of government for a court to inquire into the motives of legislators.").  But applying Section 219 to Members thrusts the Judiciary into doing just that.  Under the Constitution, "many decisions affecting foreign relations … require congressional action." *Zivotofsky*, 576 U.S. at 16.  Hardly a week goes by that a Senator or Representative does not interact with foreign officials or individuals that "in any way influence[s] … foreign policies." 22 U.S.C. § 611(o).  Applying Section 219 to Members asks judges and juries to assess the propriety of all of that—*e.g.*, did the Senator approve foreign aid "believing his own

views" (to quote the jury instruction) or because a foreign official requested it? "Courts are not the place for such controversies." *Tenney*, 341 U.S. at 378.

This application of FARA also violates the principle that one branch cannot "superintend" another. *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 611-12 (2007). Just as each branch cannot abdicate its responsibilities, nor can it micromanage another's work—no matter how "innocuous" that may seem. *Metro. Washington Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 276-77 (1991). Anti-superintendence is why the political branches cannot give courts a "rule of decision," *United States v. Klein*, 80 U.S. 128, 146 (1871); why Congress cannot set the basis for pardons, *Schick v. Reed*, 419 U.S. 256, 266 (1974); and why neither the Executive nor the Judiciary may interfere with "the right of the people to be fully and fearlessly represented by their elected Senators and Congressmen," *Myers*, 635 F.2d at 936 (2d Cir. 1980). Enforcing Section 219 against a Senator flouts this principle. "Congress and the President have an ongoing institutional relationship as the 'opposite and rival' political branches established by the Constitution." *Trump v. Mazars USA, LLP*, 591 U.S. 848, 866 (2020). Allowing the Executive Branch to criminally target Members for how they do their jobs would enable the President to "'exert an imperious controul' over the [Legislature]." *Id.* at 867 (citation omitted).

Relatedly, any law that punishes facially legitimate conduct based on motives naturally produces a chilling effect—which is why the Supreme Court has recognized immunities for governmental actors. *E.g.*, *Trump*, 603 U.S. at 614-15. Applying Section

219 to Members marks an even greater "intrusion on the authority and functions" of one of the three branches than the laws at issue in those cases. *Nixon v. Fitzgerald*, 457 U.S. 731, 754 (1982). If the conviction here is upheld, the prospect of prison time will "cast a pall" over essentially every decision every legislator takes on every matter that could redound to the benefit of a foreign government. *McDonnell*, 579 U.S. at 575. And this chilling effect is exacerbated by Section 219's vagueness. This Court has acknowledged that the law's boundaries are "difficult to locate." *Irish N. Aid*, 668 F.2d at 161.

Finally, given all this, the consequences of upholding the Section 219 conviction here are astonishing. Take just a few examples. For years, groups of Senators have advocated to end the Cuban trade embargo after visiting Cuban officials.[4] Last year, Members pledged to increase American support for Israel after Prime Minister Netanyahu addressed a joint session.[5] Also last year, Representative Ilhan Omar promised to represent the interests of Somalia in Congress.[6] And many Senators and Representatives have supported aid for Ukraine based on outreach by President

---

[4] Rafael Bernal, *Bipartisan Senate Bill Would End Cuban Embargo*, The Hill, Mar. 6, 2023.

[5] *Sen. Cruz Statement Standing With Israel After Prime Minister Netanyahu's Address to Congress*, July 24, 2024, https://www.cruz.senate.gov/newsroom/press-releases/sen-cruz-statement-standing-with-israel-after-prime-minister-netanyahus-address-to-congress.

[6] Mychael Schnell, *Greene Moves to Force Vote on Censuring Omar for Somalia Remarks*, The Hill, Feb. 1, 2024.

Zelenskyy.[7]  Are these all indictable offenses?  Does guilt really turn on an assessment of motive?  Does our separation of powers tolerate such inquiries?  These questions should answer themselves.  Indeed, the Executive Branch once disavowed weaponizing Section 219 in this way as "totally out of line."  *Inquiry into the Matter of Billy Carter and Libya: Hearing Before the Subcomm. to Investigate the Activities of Individuals Representing the Interests of Foreign Gov'ts, of the S. Comm. on the Judiciary*, 96th Cong., 2d Sess., 700, 701 (1980).  Unfortunately, the prosecutors here had no such concerns.

### B.    The District Court Erred in Sustaining the FARA Charge.

The district court also dismissed these concerns.  It emphasized that "Congress itself" enacted FARA and "provided … that it applies to its Members," making it an "expression of congressional autonomy" rather than an "affront."  SA12.  But a statute may violate the separation of powers "whether or not the encroached-upon branch approves the encroachment."  *New York v. United States*, 505 U.S. 144, 182 (1992); *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 497 (2010).  And it is constitutionally improper for one Congress to intrude on the prerogatives of its successors.  *E.g.*, *Clinton v. City of New York*, 524 U.S. 417, 452 (1998) (Kennedy, J., concurring) ("[O]ne Congress cannot yield up its own powers, much less those of other Congresses to follow."); *Fletcher v. Peck*, 6 Cranch 87, 135 (1810) (same).

---

[7] A. Hutzler et al., *Zelenskyy lobbies Congress for Ukraine aid at center of GOP spending battle*, ABC News, Sept. 21, 2023.

The district court also erred in analogizing Section 219 to criminal statutes applying to Members of Congress that have withstood separation-of-powers challenges. SA13-15. It pointed to cases rejecting challenges to the Ethics in Government Act and bribery statutes. *Id.* But the Ethics in Government Act merely imposes financial-disclosure requirements, and while those obligations are triggered by holding office, they concern the legislators' personal finances, not how they perform their jobs. SA13. Thus, unlike Section 219, the Ethics in Government Act neither purports to regulate, nor risks chilling, how legislators do their jobs. And as for bribery statutes, "[t]aking a bribe … is not … an act performed as a part of … the role of a legislator." *Brewster*, 408 U.S. at 526. Section 219, by contrast, reaches essentially everything a legislator does in his capacity as a legislator—as long as he does so at the "request" of a foreign official. Those are public and in many instances legislative acts; they do not become private ones because of a supposedly bad motive.

## IV. THE EVIDENCE WAS INSUFFICIENT ON OBSTRUCTION.

Senator Menendez's convictions on Counts 17 and 18 for obstruction of justice fail for the additional reason that the government adduced insufficient evidence of the Senator's intent. This Court has held—consistent with Supreme Court precedent—that making allegedly false statements to federal prosecutors or agents cannot form the basis of an obstruction conviction without showing the defendant "knew that the allegedly false statements he made to the federal investigators … would be conveyed to the federal grand jury." *Mangano*, 128 F.4th at 482 (citation omitted). Mere proof that

a defendant "utter[ed] false statements to an investigating agent … who might or might not testify before a grand jury" cannot "make out [an obstruction] violation," even where the defendant has actual knowledge of a pending grand jury investigation. *United States v. Aguilar*, 515 U.S. 593, 600 (1995).

At trial, the Government presented nothing that would permit an inference that Senator Menendez *knew* that any allegedly false statements would be conveyed to a grand jury (and none apparently were). Rather, the evidence submitted on obstruction was: (1) grand jury subpoenas proffered to show the existence of a grand jury investigation; (2) a heavily redacted excerpt from a lengthy PowerPoint prepared and presented to prosecutors by former counsel to Senator Menendez, which stated that certain payments to Uribe and Hana were made to repay loans (A1415-19); and (3) two checks signed by Senator Menendez—one that states "To liquidate loan" in the memo line and a second that states "for car payment"—that were produced to the government by *Nadine's* former counsel. *See* A2677-83 (Government summation of evidence on obstruction charges).

None of this suffices to prove Senator Menendez's intent to present a false statement to the grand jury. The Government did not prove beyond a reasonable doubt that Senator Menendez had any involvement with *Nadine's* counsel's production of allegedly false documents in response to a grand jury subpoena. And there was no evidence that Senator Menendez had authorized (or even reviewed) the PowerPoint that his counsel presented to prosecutors—or that, even had he reviewed and

69

authorized the PowerPoint, he understood that statements therein might be presented to a grand jury (which they apparently were not). Unsurprisingly, then, the district court did not rely on the PowerPoint in sustaining the convictions, instead relying on the checks that Nadine's counsel produced. *See* SA60-63.

As to those checks, the district court's efforts to fill in evidentiary gaps wither under scrutiny. Even if there were "voluminous evidence … that Menendez was significantly involved in all aspects of Nadine's daily life," SA63, that does not mean the Senator was involved in private, *privileged* discussions between Nadine *and her attorneys* about what to submit in response to a grand jury subpoena. There is no evidence that he was. Senator Menendez's convictions on these counts must be vacated.

## V. TRYING THIS CASE IN THE SOUTHERN DISTRICT OF NEW YORK VIOLATED CONSTITUTIONAL LIMITS ON VENUE.

### A. The Constitution Imposes Meaningful Limits on Venue.

"Questions of venue in criminal cases … are not merely matters of formal legal procedure." *United States v. Johnson*, 323 U.S. 273, 276 (1944). Rather, they "raise deep issues of public policy" "that touch closely the fair administration of criminal justice." *Id.* The Constitution "twice safeguards the defendant's venue right," *United States v. Cabrales*, 524 U.S. 1, 6 (1998), and these protections "stand as bulwarks against prosecutorial overreach[]," *United States v. Busic*, 549 F.2d 252, 253 (2d Cir. 1977).

Venue is proper only where a crime is "committed." U.S. Const. art. III, § 2, cl. 3. Unless Congress has specified the crime's location, a court must identify the

70

"essential conduct" that constitutes each offense—often laid out in the statute's "key verbs"—and determine whether the defendant committed or caused at least some of that essential conduct in the district where he was tried. *United States v. Rodriguez-Moreno*, 526 U.S. 275, 279-80 (1999); *United States v. Kim*, 246 F.3d 186, 191 (2d Cir. 2001).

Statutes implicating venue must be "narrowly construed." *United States v. Ramirez*, 420 F.3d 134, 146 (2d Cir. 2005). Not only must the Government show that essential conduct occurred in the venue, but also that it was "reasonably foreseeable" to the defendant that the conduct would occur there. *United States v. Kirk Tang Yuk*, 885 F.3d 57, 69 (2d Cir. 2018). And it must prove venue for *each* crime. *United States v. Davis*, 689 F.3d 179, 185 (2d Cir. 2012). Like standing, venue is not dispensed in gross— separate analysis is required for each count *and* each defendant. *United States v. Lange*, 834 F.3d 58, 71 (2d Cir. 2016). The Government must establish venue by a preponderance of the evidence and cannot rest on "speculati[on]." *United States v. Purcell*, 967 F.3d 159, 188-89 (2d Cir. 2020).

### B. No Essential Conduct for Bribery or Extortion Occurred in SDNY.

Venue for bribery is proper only where bribery's "essential conduct" occurs— where a defendant "corruptly demands, seeks, receives, accepts, or agrees to" a bribe. *United States v. Stephenson*, 895 F.2d 867, 874 (2d Cir. 1990) (quoting 18 U.S.C. § 201). Because extortion is "the obtaining of property from another, with his consent, … under color of official right," 18 U.S.C. § 1951(b)(2), venue for extortion is

appropriate only where a defendant "use[d] the authority of his office to obtain unearned money." *United States v. Tillem*, 906 F.2d 814, 821 (2d Cir. 1990).

Accordingly, for the bribery and extortion counts, the Government needed to prove that Senator Menendez took steps *in SDNY* to seek or demand money in exchange for official acts. It failed. According to its summation, Senator Menendez's meetings with Egyptian officials and alleged promises to act on their behalf took place in New Jersey or D.C. A520-24; A1964; A1988-89; A1995; A2037-38. So too his interactions with Daibes, Qatar, and those involved in Daibes's prosecution. *See* A544-46; A2418-22; A2481-82; A2516-18. His actions on behalf of Uribe were in New Jersey. *See* A534-38; A2076-77; A2080-81; A2084-85; A2100. And the benefits allegedly provided to the Senator and Nadine were all given in New Jersey. *E.g.*, A2014-15, A2017-18; A2068-69.

Nonetheless, the Government attempted to pin venue on a few fleeting contacts with SDNY. None suffices.

1.     **Mr. Chow Dinner:** Solely as a hook for venue, the Government introduced evidence that, in June 2018, Senator Menendez ate dinner in Manhattan at a restaurant called Mr. Chow. *See* A1984. It showed only that Hana, Senator Menendez, and Nadine had dinner, and that Hana sent a text message sometime around the dinner to an Egyptian official, confirming the time for an already-scheduled meeting in D.C. *See* A1977-80. The Government presented no evidence about what was discussed. There was certainly no evidence that Senator Menendez sought or agreed to accept a

bribe. Any argument that he did would be "entirely speculative." *Purcell*, 967 F.3d at 188-89.

At most, a jury could have concluded that this dinner was a mere preparatory act (as opposed to essential offense conduct) that cannot support venue. *See United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1190-91 (2d Cir. 1989). The Government's theory was that this dinner was just "to *plan* [a] meeting" with an Egyptian official. A2675 (emphasis added). Venue requires more.

**2.     Ride from JFK:** The Government also pointed to Daibes's driver picking up the Senator at JFK Airport in October 2021 and driving him to home to New Jersey, passing through SDNY for a few minutes en route. A2515-16. There was no evidence that Senator Menendez had any conversation with Daibes's driver, much less sought or agreed to any bribe during that car ride (let alone while the car was in SDNY).

**3.     Qatar Event:**  In post-trial briefing, the Government claimed that a Manhattan event involving the Emir of Qatar could support venue. *But see United States v. Bouchard*, 828 F.3d 116, 127 (2d Cir. 2016) ("We are disinclined to affirm a conviction based on a theory that was not advanced regarding a critical element."); *United States v. Abbas*, 100 F.4th 267, 287-88 (1st Cir. 2024) (this rule applies equally to venue). This was baseless. Senators Menendez and Booker attended the event. A2298-300. The only evidence about the meeting's content was a text from Senator Booker describing the speakers' "insights … about Afghanistan" as "really fascinating and illuminating."

A1760-61.  That in no way permits an inference that Senator Menendez sought or obtained a *quid pro quo* at the meeting.

**4.    Hotel Meeting:**  The Government also floated, in post-trial briefing, another SDNY event it never suggested to the jury for venue—a September 2019 hotel meeting with Daibes, Senator Menendez, and an Egyptian official.  But the only evidence about this meeting was that it took place—nothing more, and certainly nothing about bribes or official acts.  *See* A2003-10.

**5.    Resale of Gold:**  Next, a New Jersey jeweler testified that Nadine met him at his store to sell two gold bars.  A2492-93.  He then took them to a wholesaler in Manhattan.  A2495-97; A2500-02.

There are two problems here: This was not conduct by *Senator Menendez*, and it was not *bribery or extortion*.  Even if Senator Menendez had personally gone to Manhattan to sell the gold bars, that would not suffice for venue.  The Senator allegedly received these bars *in New Jersey*.  *See* A2587-88.  Selling purported proceeds is not an essential conduct element (or a "key verb") for either crime.  *Kim*, 246 F.3d at 191.

More, what Nadine or the jeweler did in SDNY is insufficient.  Other people's actions cannot serve as a stand-in for the Senator's conduct.  *See Lange*, 834 F.3d at 71 ("venue must be proper with respect to … each defendant").  The Government presented no evidence that Senator Menendez even knew the gold bars were being sold, much less in SDNY.  A2505.  And it never once argued to the jury that the sale was foreseeable to the Senator.  A2616; A2621; A2658-85.

74

**6.      Cash Deposit in Long Island:** Nadine once made a cash deposit in Long Island shortly after she may have received money from Uribe in New Jersey.  A2072; A1672; A1429-30.  The Government argued this was sufficient for venue because she may have crossed a bridge over waters belonging to SDNY on her way there.  A2636.  But again, venue for extortion and bribery does not depend on what one does with bribes after receiving them.  Venue is based on seeking or accepting things of value in exchange for official acts.  And as with the gold bars, what *Nadine* may have done says nothing about *Senator Menendez's* conduct in SDNY, or even about foreseeability.

## C.      No Essential Conduct for Wire Fraud Occurred in SDNY.

Counts 7, 9, and 13 charged wire fraud.  Venue for wire fraud lies where a defendant "transmits or causes to be transmitted" an interstate wire "in furtherance of a fraud"; such a wire is "'transmitted' both where it was sent and where it was received."  18 U.S.C. § 1343; *Kim*, 246 F.3d at 190-91.  It is not enough that *someone* transmitted a wire; *the defendant himself* must have transmitted it or caused its transmission.  *See Kim*, 246 F.3d at 191-92; *see also id.* at 190 (wires caused when defendant knows "'the use of the wires would follow'" his actions "'or if such use could reasonably have been foreseen'").

The Government failed to prove that Senator Menendez ever transmitted, or caused to be transmitted, in SDNY, any interstate wire communications in furtherance of a bribery scheme.  It focused on communications by his *co-defendants*.  None was sufficient.

75

1.     **Hana's Text at Mr. Chow (Count 7):**  During the dinner at Mr. Chow, Hana texted an Egyptian official to confirm the time for a D.C. meeting that was already on the books.  A1977.  This is insufficient.  All the text did was confirm a meeting—it did not discuss the alleged scheme, seek to obtain anything by fraud, or engage in any fraudulent behavior.  This is not like a case where a defendant directs fraudulent invoices to a bank in Manhattan, *Kim*, 246 F.3d at 188, 191-93, or uses calls to New York to negotiate fraudulent shipping contracts, *United States v. Gilboe*, 684 F.2d 235, 237-39 (2d Cir. 1982).  It was, at most, an insufficient preparatory act. *Beech-Nut*, 871 F.2d at 1190-91.

2.     **Jeweler's Call to Manhattan (Counts 7 & 11):**  The New Jersey jeweler who sold Nadine's gold bars made a call to Manhattan during the transaction.  A2496-97.  That cannot support venue for the wire-fraud counts.  This call was not in furtherance of any alleged wire-fraud schemes.  Again, once a participant in a scheme receives an illicit payment, how he disposes of that payment does not further the object of the scheme. *Supra* p. 74-75. Plus, Senator Menendez did not make this call, nor did he in any sense "cause" the jeweler to make it—he was not involved in the transaction, and the Government never once argued that the call was foreseeable. *See supra* p. 74.

3.     **Daibes's Text and Calls to Senator Menendez (Counts 7 & 11):**  On the day Senator Menendez and Daibes met with an Egyptian official at a Manhattan hotel, Daibes texted the Senator where to meet.  A2004-05.  But there was no evidence this meeting had anything to do with any alleged schemes. *See supra* p. 73-74.  Plus, the

Government failed to present any evidence that this text was sent from or received in SDNY. *Compare* A1570 (rows 1092-94), *with* A1470-89. The Government also cited calls Daibes made to the Qatari investment managers during the September 2021 event with the Emir in Manhattan. *See* A584. But again, there was no evidence the meeting was related to the alleged schemes. *See supra* p. 73. And the calls *went unanswered*; it would be unprecedented to find that a failed call was an interstate communication. *See* A1657 (row 156-58); A1484.

**5.** **Nadine's Texts and Calls (Count 9):** As to Count 9, the Government urged that texts and calls Nadine sent *from New Jersey* to individuals *in New Jersey* somehow sufficed for venue. Even though these wires were neither sent nor received in SDNY, the Government argued that it was enough if they "bounc[ed]" off cell towers in SDNY. A2521; A582-84.

If a *wire transfer* passes through a district, that may qualify, because a wire transfer involves a movement of "commerce," and Congress explicitly authorized venue in a district "through … which … commerce … moves." 18 U.S.C. § 3237(a) (second paragraph); *see also, e.g.*, *Gilboe*, 684 F.2d at 239. But for messages or communications sent via interstate wire, the *first* paragraph of § 3237(a) applies, *see Kim*, 246 F.3d at 191-92, and mere passage through a district is not listed as a basis for venue.

**D. No Essential Conduct for FARA Occurred in SDNY.**

No federal case appears to have analyzed venue for FARA, so the Court must determine the statute's "essential conduct." Under 18 U.S.C. § 219(a), it is illegal for a

"public official" to "act[] as an agent of a foreign principal." And under 22 U.S.C. § 611(c), acting as an agent means committing one of four acts "at the order, request, or under the direction or control, of a foreign principal": (1) "engag[ing] … in political activities," (2) "act[ing] … as a public relations counsel … or political consultant," (3) "solicit[ing], collect[ing], disburs[ing], or dispens[ing] … things of value," or (4) "represent[ing] the interests of [the] foreign principal." Senator Menendez could therefore be prosecuted in SDNY only if he performed the above conduct for Egypt in SDNY. But he did not. All of the actions occurred in New Jersey or D.C.

### E. No Acts in Furtherance of Alleged Conspiracies Occurred in SDNY.

Venue for conspiracy lies where essential conduct occurred—where a conspiracy was formed, *United States v. Rommy*, 506 F.3d 108, 118-119 (2d Cir. 2007), or where a defendant or co-conspirator acted (or caused a third party to act) "for the purpose of accomplishing the objectives of the conspiracy," *United States v. Tzolov*, 642 F.3d 314, 320 (2d Cir. 2011). But if the Government attempts to ground venue on the acts of a co-conspirator or third party, "it must have been 'reasonably foreseeable' to each defendant … that a qualifying overt act would occur in the district." *Kirk Tang Yuk*, 885 F.3d at 69. And foreseeability must be proved using "evidence," not conjecture. *Lange*, 834 F.3d at 71. The Government failed these requirements for all counts.

1. **Count 4:** Count 4 alleged a conspiracy to obstruct Daibes's prosecution in New Jersey, which the Senator supposedly did through meetings and calls. *See, e.g.,* A2234; A2238-39. None of those meetings or calls took place in New York. The

Government's only hooks for venue were the ride home from JFK Airport and the jeweler's sale of gold bars in Manhattan. A222-23; A2685; SA76. Both fail as a matter of law—no one drove the Senator home from the airport or disposed of the gold to *influence Daibes's prosecution*.

2. **Counts 1-3:** These were the conspiracy counterparts to the substantive bribery, fraud, and extortion counts. Once again, the Government failed to show any SDNY-based overt acts in furtherance of any of these purported conspiracies.

*Disposal of cash and gold:* Much of the Government's focus was on the jeweler's sale of gold in Manhattan and Nadine's travel over SDNY waters to deposit cash. But "[t]his court has consistently ruled that where a conspiracy's purpose is economic enrichment," that purpose is completed when the conspirators receive "their anticipated economic benefits." *United States v. Salmonese*, 352 F.3d 608, 615 (2d Cir. 2003). Since the venue question focuses on where the defendant or co-conspirator acted to "accomplish[] the objectives of the conspiracy," *Tzolov*, 642 F.3d at 320, the analysis ends once "the proceeds have been received," *United States v. Rutigliano*, 790 F.3d 389, 397-98 (2d Cir. 2015). Indeed, if the rule were otherwise, the Government would be able to lay venue anywhere a conspirator spends bribe money at any point in the future, with no limiting principle. That is not the required "cautious interpretative approach" to venue. *United States v. Saavedra*, 223 F.3d 85, 92 (2d Cir. 2000).

*Dinner and car ride:* Nor can the dinner at Mr. Chow or Senator Menendez's ride from JFK to New Jersey suffice for venue for these counts. As discussed, the

Government introduced no evidence that any discussion relevant to the conspiracies occurred during the dinner or ride. Nor were these the *quids* of the alleged bribery conspiracies. To the contrary, there was ample evidence that Hana and Daibes had generously picked up Nadine's and Senator Menendez's meal tabs (and provided other gifts) *for years before* any alleged conspiracy. *See* A1865; A1941; A1958; A1961; A2508; A2548-51; A1382-98.

*Other unrelated acts:* The Government's grab-bag of remaining items were not in furtherance of the conspiracies. As explained, the Government offered nothing to show that the Manhattan hotel meeting or event with Senator Booker furthered any conspiracy. And for the reasons above, a text or phone call bouncing off a cell tower is insufficient.

## CONCLUSION

The Court should vacate all counts of conviction.

Dated: June 6, 2025

Avi Weitzman
Paul C. Gross
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
(212) 318-6000

Adam Fee
PAUL HASTINGS LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
(310) 620-5719

/s/ *Noel J. Francisco*
Noel J. Francisco
  *Counsel of Record*
John Henry Thompson
JONES DAY
51 Louisiana Avenue NW
Washington, D.C. 20001
(202) 879-3939
njfrancisco@jonesday.com
jhthompson@jonesday.com

Meir Feder
JONES DAY
250 Vesey Street
New York, NY 10281
(212) 326.3939
mfeder@jonesday.com

David K. Suska
JONES DAY
150 West Jefferson
Suite 2100
Detroit, MI 48226
dsuska@jonesday.com

*Counsel for Defendant-Appellant*
*Robert Menendez*

81

## CERTIFICATE OF COMPLIANCE

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Garamond font.

This brief complies with the Court's order of May 23, 2025, granting permission to file an oversized brief because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), it contains 20,707 words, as determined by the word-count function of Microsoft Word 365.

Dated: June 6, 2025

/s/ Noel J. Francisco
Noel J. Francisco

*Counsel for Defendant-Appellant*
*Robert Menendez*

## CERTIFICATE OF SERVICE

I hereby certify that on June 6, 2025, I electronically filed Defendant-Appellant Robert Menendez's Opening Brief and Appendices with the Clerk of the Court of the United States Court of Appeals for the Second Circuit by using the appellate ACMS system. I certify that all participants in the case are registered ACMS users and that service will be accomplished by the appellate ACMS system.

Dated: June 6, 2025

/s/ *Noel J. Francisco*
Noel J. Francisco

*Counsel for Defendant-Appellant*
*Robert Menendez*